**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| EXTRACTION OIL & GAS, INC. *et al.*,[1] | ) | Case No. 20-11548 (__) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

## Relief Requested

1. The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order"), substantially in the forms attached hereto: (a) authorizing the Debtors to (i) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits (as defined below) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits, including payment of prepetition obligations related thereto; and (b) granting related relief.

2. In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Extraction Oil & Gas, Inc. (3923); 7N, LLC (4912); 8 North, LLC (0904); Axis Exploration, LLC (8170); Extraction Finance Corp. (7117); Mountaintop Minerals, LLC (7256); Northwest Corridor Holdings, LLC (9353); Table Mountain Resources, LLC (5070); XOG Services, LLC (6915); and XTR Midstream, LLC (5624). The location of the Debtors' principal place of business is 370 17th Street, Suite 5300, Denver, Colorado 80202.

## Jurisdiction and Venue

3. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rule 9013-1(m).

6. On June 14, 2020 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Matthew R. Owens, Co-Founder, President and Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

7. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation

and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**The Debtors' Workforce**

8. The Debtors' employees, temporary workers, and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' employees, temporary workers, and independent contractors include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their employees, temporary workers, and independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

9. Moreover, the vast majority of the Debtors' employees exclusively rely on their compensation and benefits to pay their living expenses and support their families. Thus, the Debtors' employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits. Consequently, the relief requested herein is necessary and appropriate.

10. The Debtors employ approximately 181 individuals (each, an "Employee" and collectively, the "Employees") on a part- or full-time basis. Approximately 125 of the Employees are salaried, exempt, and approximately 56 of the Employees are salaried, non-exempt. No Employee is represented by a union or collective bargaining unit.

11. In addition to the Employees, the Debtors also retain specialized contractors in the ordinary course of business to provide a variety of services critical to the Debtors' operations, including, among other things, drilling, engineering, and other operational services

(the "Independent Contractors"), sourced periodically from various staffing agencies (the "Staffing Agencies") to fulfill certain duties and complete certain projects on a short-term basis. As of the Petition Date, the Debtors retain approximately 25 Independent Contractors. The Independent Contractors are an important supplement to the efforts of the Debtors' Employees.

12. The Debtors' Employees and Independent Contractors perform a wide variety of functions critical to the Debtors' operations. In many instances, these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. Without the continued, uninterrupted services of their Employees and Independent Contractors, the Debtors' efforts during these chapter 11 cases will be threatened.

## Employee Compensation and Benefits

13. To minimize the personal financial burden Employees and Independent Contractors would suffer if prepetition obligations are not paid or remitted to such parties when due or as expected, the Debtors seek authority to pay and honor certain prepetition claims and continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, salaries, health and welfare benefits, and certain supplemental benefits the Debtors historically have provided (collectively, the "Employee Compensation and Benefits") on an interim and final basis, as detailed herein.

14. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

15. By this Motion, the Debtors seek authority to pay the following prepetition amounts owed on account of the Employee Compensation and Benefits:

| Relief Sought | Interim | Final Amount |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Employee Compensation | $80,000 | $80,000 |
| Unpaid Independent Contractor Compensation | $190,000 | $190,000 |
| Payroll Processing Fees | $2,000 | $2,000 |
| Withholding Obligations | $0 | $0 |
| Non-Insider Severance Program (Final Order Only) | N/A | $0 |
| Employee Expense and Reimbursement Program (Final Order Only) | N/A | $140,000 |
| Commercial Card Program | $0 | $0 |
| Non-Employee Director Compensation (Final Order Only) | N/A | $100,000 |
| Non-Insider Quarterly Retention Plan (Final Order Only) | N/A | $0 |
| **Employee Benefits Program** | | |
| Health Insurance Programs | $260,000 | $260,000 |
| Disability Benefits | $10,000 | $10,000 |
| Workers' Compensation Program | $0 | $0 |
| Basic Life and AD&D Insurance | $10,000 | $10,000 |
| 401(K) Retirement Savings Plan | $210,000 | $210,000 |
| Paid Leave | $0 | $0 |
| Supplemental Benefits (Final Order Only) | N/A | $40,000 |
| **TOTAL** | **$762,000** | **$1,042,000** |

16. As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Employee Compensation and Benefits is approximately $1,042,000.

## I. Compensation and Withholding Obligations.

### A. Unpaid Wages.

17. The Debtors pay Employees' wages, salaries, and other compensation (excluding bonuses, reimbursable expenses, severance, and paid leave) on a semi-monthly basis (collectively, the "Employee Compensation"). Employees are paid current. However, because certain portions of the Employee Compensation are paid two weeks in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, overtime work in the days preceding the commencement of these chapter 11 cases and potential discrepancies between the amounts paid and the amounts that Employees believe

should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. In the last twelve (12) months, the Debtors spent an average of approximately $2,600,000 per month on Employee Compensation.

18. As of the Petition Date, the Debtors estimate that there is $80,000 outstanding with respect to Employee Compensation. The Debtors believe that no Employees are owed Employee Compensation in excess of the $13,650 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Cap"). Accordingly, the Debtors request authority to honor any prepetition obligations on account of Employee Compensation, and to continue the Employee Compensation practices on a postpetition basis in the ordinary course of the Debtors' business consistent with past practice.

19. Moreover, the Debtors' employ Paycor, Inc. ("Paycor") as their payroll provider. Payroll is processed approximately two days before the pay date, and Paycor pulls the funds from the Debtors' account the day before the pay date. In the last twelve (12) months, the Debtors paid an average of approximately $7,600 per month to Paycor on account of such payroll services (the "Payroll Processing Fees"). As of the Petition Date, the Debtors estimate that there is approximately $2,000 outstanding with respect to prepetition Payroll Processing Fees. The Debtors request authority to honor any prepetition Payroll Processing Fees and to continue to pay such Payroll Processing Fees on a postpetition basis in the ordinary course of business consistent with past practice.

**B. Unpaid Independent Contractor Compensation.**

20. The Debtors make payments to the Independent Contractors (the "Independent Contractor Compensation") individually or through the Staffing Agencies, as applicable, for the provision of certain services critical to the Debtors' operations, including, among other things, drilling, engineering, and other operational services. The Debtors' Employees rely on the

support of Independent Contractors to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors believe the authority to continue paying their Independent Contractors is critical to minimize disruption of the Debtors' continued business operations.

21. In the last twelve (12) months, the Debtors' Independent Contractor Compensation totaled approximately $2,280,000. As of the Petition Date, the Debtors estimate that Independent Contractors are owed an aggregate of approximately $190,000 on account of accrued but unpaid services rendered prior to the Petition Date. Accordingly, the Debtors request authority to honor any prepetition obligations on account of the Independent Contractor Compensation and to continue paying such Independent Contractor Compensation on a postpetition basis in the ordinary course of business consistent with past practice. The Debtors do not believe they owe any Individual Contractor amounts in excess of the Priority Cap, but for the avoidance of doubt, the Debtors only seek to pay the Independent Contractors in excess of the $13,650 Priority Cap pursuant to a Final Order.

**C. Withholding Obligations.**

22. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, alimony, child support, and other similar deductions, as well as certain pre- and post-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Some of the Deductions are forwarded to various third-party recipients. In the last twelve (12) months, monthly Deductions totaled approximately $17,390,000. As of the Petition Date, the Debtors estimate that there are no amounts outstanding with respect to the Deductions. However, out of an abundance of caution, the Debtors request authority to honor any prepetition Deductions to the appropriate third parties, and to continue to pay such

Deductions on a postpetition basis in the ordinary course of business consistent with past practice.

23. The Debtors are also required by law to withhold from Employee Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Payroll Taxes," and together with the Deductions, the "Withholding Obligations") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance. The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed. In the last twelve (12) months, monthly Payroll Taxes totaled approximately $3,390,000. As of the Petition Date, the Debtors estimate that there are no amounts outstanding with respect to the Payroll Taxes. However, out of an abundance of caution, the Debtors request authority to honor any prepetition Payroll Taxes to the appropriate third parties, and to continue to pay such Payroll Taxes on a postpetition basis in the ordinary course of business consistent with past practice.

**D. Non-Insider Severance Program (Final Order Only).**

24. In the ordinary course of business, the Debtors provide severance benefits to certain eligible non-Insider Employees in the event of a termination by the Debtors that is not for "cause," by reason of death or disability, or if the Employee voluntarily resigns (the "Non-Insider Severance Program"). Under the Non-Insider Severance Program, Employees receive, following termination and upon signing a separation agreement subject to a general release, a payment determined by a combination of the Employee's salary and length of time employed by the Debtors calculated at three weeks for each year of service increasing from a four-week

minimum up and until a fifteen-week maximum. The Debtors also subsidize or continue to provide COBRA benefits to certain eligible former Employees after their termination.

25. The Debtors believe that the Non-Insider Severance Program is critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success. As of the Petition Date, the Debtors estimate that there are no amounts outstanding with respect to the Non-Insider Severance Program.

**E. Employee Expense and Reimbursement Program (Final Order Only).**

26. In the ordinary course of business, the Debtors reimburse Employees on the 10th and 25th day of each month for out-of-pocket costs relating to ordinary and necessary business expenses that such Employees incur in the scope of their employment and that are approved by their manager (the "Employee Expense and Reimbursement Program"). The Debtors will reimburse Employees for expenses associated with, but not limited to, entertainment expenses, air travel, lodging, training, conferences, industry organization meetings, catering for internal meetings or trainings, and other business-related expenses related to the discharge of the Employee's duties. As the expenses are incurred by Employees through the use of their personal funds, the applicable Employee may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, the Debtors' inability to reimburse the Employee pursuant to the Employee Expense and Reimbursement Program likely would impose significant hardship on Employees.

27. In certain cases, however, Employee Expense and Reimbursement Program is processed through a system based on use of the Debtors' purchasing cards (the "P-Cards"). The Debtors maintain 12 P-Cards with Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to the

commercial card program governed by the WellsOne Commercial Card Agreement, dated on or around December 16, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Commercial Card Program"), between Debtor Extraction Oil & Gas, Inc. and Wells Fargo. Pursuant to the Commercial Card Program, the P-Cards are prefunded to serve as collateral to secure any purchases made by an Employee on a company credit card. As an essential part of the operation of the Debtors' business, authorized Employees use the P-Cards to charge expenses to procure goods and services used by the Debtors, pay for business-related travel for Employees, and otherwise cover expenses for general corporate purposes as part of the Employee Expense and Reimbursement Program.[2]

28. In using a P-Card, the applicable Employee must ensure that the intended purchase complies with the Debtors' policies and procedures. The Debtors' prepetition monthly credit limit under the P-Cards was originally $6,000,000. However, that limit was reduced to $200,000 and later reduced to $100,000, the current monthly limit. In the last two months since the reductions, the Debtors averaged approximately $35,000 to $40,000 of monthly charges on the P-Cards. As of the Petition Date, the Debtors estimate that they do not owe any amount on account of the P-Cards.[3]

29. Further, the Debtors' inability to reimburse pursuant to the Employee Expense and Reimbursement Program could impose a hardship on the Employees where such individuals

---

[2] For more information regarding the payment of the P-Cards, please reference the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief* filed contemporaneously herewith and incorporated here by reference.

[3] The Debtors do not seek any relief with respect to the Commercial Card Program or P-Cards in this Motion, but rather seek such relief in the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* filed contemporaneously herewith.

incurred obligations for the Debtors' benefit. Employees incurred the reimbursable expenses under the Employee Expense and Reimbursement Program as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.

30. Due to the timing of when Employees submit expenses for reimbursement, it is difficult for the Debtors to precisely estimate the amount of prepetition obligations outstanding as of the Petition Date on account of their Employee Expense and Reimbursement Program. Based on historical practice in the last twelve (12) months, the Debtors pay approximately $230,000 per month in the aggregate on account of their Employee Expense and Reimbursement Program. As of the Petition Date, the Debtors estimate that there is $140,000 outstanding with respect to the Employee Expense and Reimbursement Program. Accordingly, the Debtors seek authority to pay any unpaid prepetition obligations under their Employee Expense and Reimbursement Program, solely pursuant to the Final Order, and to continue such program on a postpetition basis in the ordinary course consistent with past practice.

**F. Non-Employee Director Compensation (Final Order Only).**

31. Extraction Oil & Gas, Inc. maintains a board of directors comprised of six non-Employees and two Employees (each, a "Director"). Each of the non-Employee Directors are prepaid approximately $100,000 per year, and are entitled to expense reimbursement for all reasonable and documented out-of-pocket travel expenses incurred in connection with their Director duties (the "Director Compensation"). The executive chairman of the board of directors is compensated through the Debtors' semi-monthly payroll system as a salaried employee and is paid approximately $405,000 per year. As of the Petition Date, the Debtors estimate that there are no amounts outstanding with respect to the Director Compensation. The Debtors request the authority to honor any prepetition obligations on account of Director Compensation, solely

pursuant to the Final Order, and to continue paying such Director Compensation on a postpetition basis in the ordinary course of business consistent with historical practice.

**G. Non-Insider Quarterly Retention Plan (Final Order Only).**

32. In the ordinary course of business, the Debtors maintained a short-term incentive plan and a long-term incentive plan to drive performance among eligible non-Insider Employees.[4] However, in light of the historic decline in commodity prices and the unprecedented level of market volatility affecting the oil and gas industry, the Debtors determined that their historic compensation structure and performance metrics are ineffective in motivating and incentivizing the Debtors' workforce in the current environment.

33. In an effort to maintain the stability and cohesion of the Debtors' workforce and minimize distractions arising from the uncertainty associated with their compensation program, the Debtors, consistent with their historic practices and with the advice of their independent compensation consultant and advisors, implemented a cash retention plan pursuant to which all eligible non-Insider Employees may earn a quarterly retention bonus if such Employee remains employed through and including the last day of the applicable quarter (the "Non-Insider Quarterly Retention Plan"). The Non-Insider Quarterly Retention Plan provides that if a non-insider Employee is terminated for any reason prior to the last day of the applicable quarter, such non-Insider Employee shall forfeit all payment rights with respect to any quarterly retention bonus in respect of such quarter and all subsequent quarters. The Debtors' ability to retain non-Insider Employees is essential to ensure that the non-Insider Employees remain engaged and focused on the performance of their duties.

[4] The relief sought under this Motion with respect to the Non-Insider Quarterly Retention Plan does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority for payment respect to such parties and reserve all rights with respect to the "insider" status of such parties.

34. Under the Non-Insider Quarterly Retention Plan, the Debtors converted their previous 2020 non-insider variable compensation structure into a cash retention plan for 136 non-Insider Employees, which is payable quarterly subject to their continued employment. The 136 non- Insider Employees are entitled to a total cash quarterly amount of $991,913.00, representing $7,293.00 per Employee per quarter.

35. Additionally, for 11 non-Insider Employees, the Debtors converted the 2020 target short-term incentive plan and target performance equity grants under the long-term incentive plan into a prepaid cash retention plan. The 11 non-Insider Employees were prepaid a total of $2,117,606. This prepayment award is subject to clawback and acceleration if they leave the Debtors' employment without "good reason" or their employment is terminated for "cause" before certain dates and events. For the avoidance of doubt, in exchange for receiving the prepayment, the 11 non-Insider Employees did not and will not receive any annual bonus pursuant to the short-term incentive plan on account of their performance during fiscal year 2020 and their performance equity grants under the long-term incentive plan were cancelled.

36. As of the Petition Date, the Debtors estimate that there are no amounts outstanding with respect to the Non-Insider Quarterly Retention Plan. The Debtors seek authority to continue the Non-Insider Quarterly Retention Plan, solely pursuant to the Final Order, on a postpetition basis. For the avoidance of doubt, the Debtors are only seeking relief for non-Insiders with respect to the Non-Insider Quarterly Retention Plan.

**II. Employee Benefit Programs.**

37. In the ordinary course of business, the Debtors offer a comprehensive employee benefits package to all of their Employees who work 30 hours or more (the "Employee Benefits Programs"). All benefits pursuant to the Employee Benefits Programs are effective on the first day of the month following or coinciding with the applicable Employee's date of hire.

**A. Health and Welfare Programs.**

38. The Debtors offer a number of health and welfare benefits programs to eligible current full-time Employees including the Health Insurance Programs, the Basic Life and AD&D Insurance, the Disability Benefits, the Workers' Compensation Program, the 401(K) Retirement Savings Plan, and Paid and Unpaid Leave (each as defined herein, and collectively, the "Health and Welfare Programs").

**1. Health Insurance Programs.**

39. The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plan, the Dental Plan, the Vision Plan, and the FSA (each as defined herein, and collectively, the "Health Insurance Programs"). The Debtors are not self-insured under any of the Health Insurance Programs. The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

40. The Debtors offer a medical plan to current Employees administered by Cigna Corporation ("Cigna") that utilizes the Cigna Open Access Plus Network of doctors and hospitals pursuant to the Cigna Medical PPO plan (the "Medical Plan"). Under this Medical Plan, certain doctors and hospitals have agreed to provide services at contracted rates. Thus, if an Employee stays within the network covered by the Medical Plan, they will receive the highest level of benefits offered at the lowest costs. Nevertheless, Employees have the freedom to select any provider out of network at the expense of higher out-of-pocket costs. The coverage in the Medical Plan and associated premium differ depending on (a) the level of coverage Employees elect to receive, (b) whether the Employee has dependents covered by the Medical Plan, and (c) whether such coverage is provided by an in- or out-of-network provider. Under the Medical

Plan, the Debtors pay 95% of the premium and the Employees pay 5%. The premiums range between approximately $1,300 to $4,000 per Employee per month.

41. The Debtors also offer current Employees a Cigna dental PPO benefit plan (the "Dental Plan") and a Cigna vision plan (the "Vision Plan"), both administered by Cigna. The coverage in the Dental Plan and the Vision Plan differs depending on (a) the level of coverage Employees elect to receive and (b) whether such coverage is provided by an in- or out-of-network provider. Monthly healthcare premiums differ depending on the Dental Plan or Vision Plan in which the Employee is enrolled and whether the Employee has dependents covered by the applicable plan. For the Dental Plan, the Debtors pay 95% of the premium and the Employees pay 5%. The premium ranges between approximately $72 to $220 per Employee per month. For the Vision Plan, the Debtors pay 95% of the premium and the Employees pay 5%. The premium ranges between approximately $20 to $50 per Employee per month. As such, the total cost of the Dental Plan and the Vision Plan is approximately $51,000 per month. The Debtors request authority to honor any prepetition obligations on account of the Dental Plan and the Vision Plan and to continue the Dental Plan and the Vision Plan on a postpetition basis in the ordinary course of business consistent with past practice.

42. The Debtors provide Employees who participate in the Medical Plan, Dental, Plan, and/or Vision Plan with access to either a healthcare or dependent care flexible spending account (the "FSA"), administered by Retirement Planning Services, Inc. d/b/a 24HourFlex ("24HourFlex"), which can be used to cover incidental medical costs and dependent childcare. Each year, Employees can contribute up to $2,750 and immediately draw on contributions to pay for eligible health care expenses. The FSA also affords Employees a "grace period" of an additional two and a half months after the end of the plan year to incur healthcare expenses. The

Debtors do not contribute to any Employee's FSA. The Debtors pay a monthly administration fee of approximately $650 to 24HourFlex on account of the FSA.

43. The Debtors pay approximately $830,000 per month in the aggregate for their contributions to and the administrative and premium payments for the Health Insurance Programs. As of the Petition Date, the Debtors estimate that there is $260,000 outstanding with respect to the Health Insurance Programs. Accordingly, by this Motion, the Debtors request authority to honor any prepetition obligations on account of Health Insurance Programs and to continue administering such Health Programs on a postpetition basis in the ordinary course of business and in a manner consistent with past practice.

**2. Life Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

44. The Debtors provide basic life (the "Basic Life Insurance") and accidental death and dismemberment insurance coverage (the "Basic AD&D Insurance," and together with the Basic Life Insurance, the "Basic Life and AD&D Insurance") to current Employees through Lincoln Financial Group ("Lincoln Financial"). The Basic Life and AD&D Insurance provides coverage equal to one times the Employee's annual salary up to a maximum amount of $300,000. Current Employees may also purchase additional life insurance (the "Voluntary Life Insurance") and supplemental accidental death and dismemberment insurance (the "Voluntary AD&D Insurance" and, together with the Voluntary Life Insurance, the "Voluntary Life and AD&D Insurance"), covering themselves and their dependents, through Lincoln Financial. The Voluntary Life and AD&D Insurance offers (a) the Employee an overall maximum benefit five times the Employee's annual salary up to a maximum of $500,000, (b) the spouse an overall benefit maximum of 50% of the employee's amount, up to a maximum of $250,000, and (c) the child an overall benefit maximum of $10,000.

45. In the last twelve (12) months, the Debtors paid approximately $150,000 on account of premiums for the Basic Life and AD&D Insurance. As of the Petition Date, the Debtors estimate that there is $10,000 outstanding with respect to the Basic Life and AD&D Insurance. Accordingly, the Debtors request authority to honor any prepetition obligations on account of Basic Life and AD&D Insurance, and to continue providing such Basic Life and AD&D Insurance on a postpetition basis in the ordinary course of business consistent with past practice.

**b. Disability Benefits.**

46. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"), which are administered by Lincoln Financial. Employees are eligible for Disability Benefits upon the Employee's date of hire. Under the short-term disability benefits program, Employees are entitled to, among other things and after the applicable waiting period, 60% of their income for a maximum benefit of $2,500 in the event the Employee is unable to perform his/her job due to illness or injury unrelated to the Employee's work (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things after the applicable waiting period, 60% of their income for a maximum benefit ranging between $6,000 to $12,500 depending on their class[5] in the event the Employee meets the plan's definition of disability (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits").

47. Employees' Short-Term Disability Benefits begin after an Employee's eighth day of absence due to sickness or injury and continue for up to a maximum of 26 weeks. The

[5] Pursuant to the Long-Term Disability Benefits plan, Employees in Class 1 are entitled to a maximum benefit of $12,500, Employees in Class 2 are entitled to a maximum benefit of $10,000, and Employees in Class 3 are entitled to a maximum benefit of $6,000.

Long-Term Disability Benefits begin after an Employee is continuously absent for 180 days and continue until the later of the Employee reaching 65 years of age or reaching the social security normal retirement age.

48. The Debtors pay Lincoln Financial approximately $14,000 per month in premiums on account of the Short-Term Disability Benefits. Currently, approximately 177 Employees are receiving Short-Term Disability Benefits. The Debtors pay Lincoln Financial approximately $10,000 per month in premiums on account of the Long-Term Disability Benefits. Currently, approximately 175 Employees are receiving Long-Term Disability Benefits.

49. In the last twelve (12) months, the Debtors paid Lincoln Financial approximately $180,000 in administrative fees and premiums on account of the Disability Benefits. As of the Petition Date, the Debtors estimate that there is $10,000 outstanding with respect to the Disability Benefits. Accordingly, the Debtors request the authority to honor any prepetition obligations on account of Disability Benefits, and to continue providing such Disability Benefits on a postpetition basis in the ordinary course of business consistent with past practice.

**c. Workers' Compensation Program.**

50. The Debtors maintain workers' compensation insurance for Employees at the levels required by applicable laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program in Colorado through Pinnacol Assurance ("Pinnacol"). All Employees participate in the Debtors' Workers' Compensation Program and each Employee is insured up to approximately $1,000,000 per occurrence pursuant to the workers' compensation policy with Pinnacol. The Debtors pay approximately $160,000 annually to Pinnacol for maintaining the Workers' Compensation Program.

51. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[6]

52. In addition, to the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

53. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the chapter 11 process. Thus, the Debtors request the authority to (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, and (b) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

54. There are currently no open claims under the Workers' Compensation Program. As of the Petition Date, the Debtors have no current outstanding obligations on account of the Workers' Compensation Program. Nevertheless, out of abundance of caution, the Debtors seek authority to honor any prepetition obligations on account of the Workers Compensation Program, and to continue paying for such Workers' Compensation Program on a postpetition basis in the ordinary course of business consistent with past practice.

[6] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

**3. 401(K) Retirement Savings Plan.**

55. The Debtors offer their Employees the opportunity to participate in a 401(K) Retirement Savings Plan. Specifically, the Debtors provide eligible Employees with the opportunity to participate in the Extraction Oil & Gas 401K Plan (the "401(K) Retirement Savings Plan"), which is administered by Principal Financial Services, Inc. ("Principal"). The 401(K) Retirement Savings Plan allows for Employees to set aside money for retirement by making pre-tax contributions to the 401(K) and/or after-tax contributions to a Roth 401(K) up to limits set by the Internal Revenue Code. Each Employee's 401(K) contributions are deducted automatically from each paycheck. The Debtors match the Employees' 401(K) Retirement Savings Plan contributions dollar-for-dollar in an amount up to the first 6% of the Employees' eligible compensation (the "401(K) Retirement Savings Plan Contributions"). The Employee's contributions and the Company's match are fully vested on the Employee's date of hire. In the last twelve (12) months, the Debtors' monthly payments and disbursements on account of the 401(K) Retirement Savings Plan Contributions averaged approximately $410,000. As of the Petition Date, the Debtors estimate that there is $210,000 outstanding with respect to the 401(K) Retirement Savings Plan. Out of an abundance of caution, the Debtors request authority to honor any prepetition obligations on account of the 401(K) Retirement Savings Plan and to continue the 401(K) Retirement Savings Plan on a postpetition basis in the ordinary course of business consistent with past practice.

**4. Paid and Unpaid Leave.**

56. The Debtors maintain several paid and unpaid leave benefit programs for Employees, providing paid leave for their Unlimited PTO Policy, Holidays, Other Paid Leave policies, and providing unpaid leave for Family and Medical Leave and other Unpaid Leave policies (each as defined below, and collectively, the "Paid and Unpaid Leave").

57. The Debtors offer an unlimited paid time off policy ("Unlimited PTO Policy") to the Employees as a Paid Leave benefit. Under the Unlimited PTO Policy, employees are afforded the flexibility to take planned time off for vacation, sick, or personal reason to the extent the Employee's supervisors or managers have approved such leave. As the Debtors employ an Unlimited PTO Policy, there is no accrual of unused PTO and thus Employees will not receive compensation for "unused" vacation time should they leave the Company.

58. In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including:

- 10 paid holidays throughout the year, during which Employees are not required to work and are paid their base rate of pay (the "Holidays");
- unpaid leave under the Family and Medical Leave Act for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs (the "Family and Medical Leave");
- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for bereavement leave, jury or court attendance, time spent voting, military leave, or salary continuation medical leave (the "Other Paid Leave") and unpaid leaves of absence for medical leaves, domestic abuse leaves, and personal leaves (the "Unpaid Leave").

These other forms of Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations.

59. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any Paid Leave in the ordinary course of business pursuant to the Debtors' Unlimited PTO Policy, which will not create any material cash flow requirements beyond the Debtors' normal payroll

obligations. As a result, the Debtors seek authority to allow eligible Employees to use their Paid Leave postpetition in the ordinary course of business consistent with past practice.

**5. Supplemental Benefits (Final Order Only).**

60. The Debtors also offer a number of supplemental benefits to eligible Employees including the Employee Assistance Program, Identity Theft Protection Program, Monthly Parking Stipend, and Cell Phone Credit (each as defined herein, and collectively the "Supplemental Benefits").

**a. The Employee Assistance Program.**

61. The Debtors offer an employee assistance program (the "Employee Assistance Program") to current Employees, which is administered by Lincoln Financial. The Employee Assistance Program provides Employees and their family members with confidential guidance and various resources including, without limitation, services for (a) in-person help with short-term issues, (b) unlimited phone access to legal, financial, and work-life services, (c) a 25% discount on in-person consultations with network lawyers, (d) financial consultations and referrals, and (e) work/life services for assistance with child care, finding movers, kennels and pet care, and vacation planning. The Debtors do not make any payments on account of the Employee Assistance Program. As of the Petition Date, the Debtors estimate that there are no amounts outstanding with respect to the Employee Assistance Program. The Debtors request authority to honor any prepetition obligations on account of the Employee Assistance Program and to continue the Employee Assistance Program on a postpetition basis in the ordinary course of business consistent with past practice.

**b. Identity Theft Protection Program.**

62. The Debtors partner with ID Watchdog, Inc. ("ID Watchdog") to provide Employees direct insight into their critical data associated with their identity to help them

determine whether they have been a victim of identity theft (the "Identity Theft Protection Program"). Under the Identity Theft Protection Program, ID Watchdog continually monitors billions of data points and rapidly alerts the Employee as soon as information associated with the Employee's identity is detected. The Debtors fund the entire Identity Theft Protection Program at no cost to the Employees. As of the Petition Date, the Debtors estimate that there is $10,000 outstanding with respect to the Identity Theft Protection Program. Out of abundance of caution, the Debtors request authority to honor any prepetition obligations on account of the Identity Theft Protection Program and to continue administering such Identity Theft Program Plan on a postpetition basis in the ordinary course of business consistent with past practice.

**6. Monthly Parking Stipend.**

63. In the ordinary course of business, the Debtors cover the cost of parking for their Employees in Denver. Specifically, the Debtors provide a $500 per month vehicle allowance, paid $250 per pay period, to field Employees who use their personal vehicles for company business (the "Monthly Parking Stipend"). As of the Petition Date, the Debtors estimate that there is $10,000 outstanding with respect to the Monthly Parking Stipend. Out of abundance of caution, the Debtors request authority to honor any prepetition obligations on account of the Monthly Parking Stipend and to continue administering such benefits on a postpetition basis in the ordinary course of business consistent with past practice.

**c. Cell Phone Credit.**

64. In the ordinary course of business, the Debtors also offer a majority of their Employees a $75 non-taxable reimbursement toward their cell phones (the "Cell Phone Credit"). As of the Petition Date, the Debtors estimate that there is $20,000 outstanding with respect to the Cell Phone Credit. Out of abundance of caution, the Debtors request authority to honor any

prepetition obligations on account of the Cell Phone Credit and to continue administering such benefits on a postpetition basis in the ordinary course of business consistent with past practice.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

65. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. Section 507(a)(4) of the Bankruptcy Code requires the Debtors to pay wages, salaries, commissions, vacation, severance, and sick leave as administrative priority claims up to a limit of $13,650 per individual. *See* 11 U.S.C. § 507(a)(4). As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than $13,650 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Although an Independent Contractor may receive more than $13,650 on account of certain Employee Compensation and Benefits, the Debtors submit that satisfaction of their full obligations is warranted under section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity. For the avoidance of doubt, the Debtors seek authority to pay such amounts solely pursuant to the Final Order.

66. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties and reduces the risk of

Employee attrition that would inevitably result if payment were to cede. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

67. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475-81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

68. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

69. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Third Circuit and other circuits have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also Matter of Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

70. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.

71. The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New England Railway, Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

72. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105,

where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

73. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

74. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood

of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

75. Indeed, courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested here. *See, e.g.*, *In re Bluestem Brands, Inc.*, No. 20-10566 (KBO) (Bankr. D. Del. Dec. 17, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 21, 2020); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (same); *In re Forever 21, Inc,*, No. 19-12122 (KG) (Bankr. D. Del. Nov. 13, 2019) (same); *In re PES Holdings, LLC*, No. 19012122 (KG) (Bankr. D. Del. Aug. 20, 2019) (same); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 9, 2019) (same).[7] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business consistent with past practice.

**III. The Non-Insider Quarterly Retention Plan Is a Reasonable and a Sound Exercise of Business Judgment.**

76. Furthermore, the Debtors request that they be allowed to continue to honor the Non-Insider Quarterly Retention Plan in the ordinary course of business. The Debtors submit that the Non-Insider Quarterly Retention Plan should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because the Debtors only seek to continue on a postpetition basis their prepetition Non-Insider Quarterly Retention Plan and no insiders will be paid on account of the Non-Insider Quarterly Retention Plan pursuant to this Motion. *See In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

77. The Debtors submit that continuing to maintain the Non-Insider Quarterly Retention Plan for non-Insiders is a sound exercise of their business judgment and in the best interests of the estates. Importantly, the Non-Insider Quarterly Retention Plan is a component of the Debtors' overall Employee Compensation and Benefits package and is intended to retain Employees in the ordinary course. Pursuant to the Non-Insider Quarterly Retention Plan, 11 non-Insider Employees received prepayment awards in lieu of their annual bonus under the short-term incentive plan for their performance during fiscal year 2020. Importantly, these prepayment awards are subject to clawback if the Employees quit without "good reason" or their employment is terminated for "cause" before certain dates and events. Moreover, for the remaining 136 non-Insiders, the payments under the Non-Insider Quarterly Retention Plan is only attained if an Employee remains with the Debtors for the applicable quarterly period. The Debtors therefore believe that it is necessary to continue this program for non-Insiders on a postpetition basis to continue to retain employees and keep them engaged and focused on the performance of their duties. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the Non-Insider Quarterly Retention Plan on a postpetition basis.

## IV. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

78. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

79. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Employee's workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a significant disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

80. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing operations and anticipated access to cash collateral and debtor in possession financing. Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

81. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to pay the Employee Compensation and Benefits that accrued prior to the Petition Date and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

82. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

83. Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion

or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

**Notice**

84. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition senior credit facility or, in lieu thereof, counsel thereto; (d) the lenders under the Debtors' prepetition senior credit facility or, in lieu thereof, counsel thereto; (e) lenders under the Debtors' debtor-in-possession financing facilities or, in lieu thereof, counsel thereto; (f) the administrative agent under the Debtors' debtor-in-possession financing facilities or, in lieu thereof, counsel thereto; (g) the indenture trustee for the Debtors' prepetition senior notes or, in lieu thereof, counsel thereto; (h) the holders of the Debtors' prepetition senior notes or, in lieu thereof, counsel

thereto; (i) the ad hoc group of holders of the Debtors' preferred equity or, in lieu thereof, counsel thereto; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the United States Securities and Exchange Commission; (m) the state attorneys general for states in which the Debtors conduct business; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

85. No prior motion for the relief requested herein has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, substantially in the forms attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: June 15, 2020
Wilmington, Delaware

*/s/ Richard W. Riley*

**WHITEFORD, TAYLOR & PRESTON LLC**[1]
Marc R. Abrams (DE No. 955)
Richard W. Riley (DE No. 4052)
Stephen B. Gerald (DE No. 5857)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone: (302) 353-4144
Facsimile: (302) 661-7950
Email: mabrams@wtplaw.com
rriley@wtplaw.com
sgerald@wtplaw.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (*pro hac vice* pending)
Allyson Smith Weinhouse (*pro hac vice* pending)
Ciara Foster (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: christopher.marcus@kirkland.com
allyson.smith@kirkland.com
ciara.foster@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

[1] Whiteford, Taylor & Preston LLC operates as Whiteford Taylor & Preston L.L.P. in jurisdictions outside of Delaware.