**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| EXTRACTION OIL & GAS, INC., *et al.*,[1] | Case No. 20-11548 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 14** |

**OBJECTION OF GRAND MESA PIPELINE, LLC
TO DEBTORS' OMNIBUS MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
REJECTION OF UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY
AND EXECUTORY CONTRACTS EFFECTIVE AS
OF THE DATES SPECIFIED HEREIN AND (II) GRANTING RELATED RELIEF**

Grand Mesa Pipeline, LLC ("**Grand Mesa**") submits this objection (the "**Objection**") to the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Effective as of the Dates Specified Herein and (II) Granting Related Relief* (D.I. 14) (the "**Rejection Motion**").

**PRELIMINARY STATEMENT**

1.      Lumping together a broad array of twenty agreements in their bare bones first-day Rejection Motion, including two oil transportation service agreements with Grand Mesa, which are referred to collectively herein as the "TSAs",[2] the Debtors seek to reject these agreements *en masse* even though the TSAs are subject to different law, rules and procedures than the majority of the other agreements.  The TSAs relate to an interstate crude oil pipeline—the Grand Mesa Pipeline—that is regulated by the Federal Energy Regulatory Commission ("**FERC**" or the "**Commission**") under the Interstate Commerce Act ("**ICA**"), 49 U.S.C. App. § 1 *et seq.*  The

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Extraction Oil & Gas, Inc. (3923); 7N, LLC (4912); 8 North, LLC (0904); Axis Exploration, LLC (8170); Extraction Finance Corp. (7117); Mountaintop Minerals, LLC (7256); Northwest Corridor Holdings, LLC (9353); Table Mountain Resources, LLC (5070); XOG Services, LLC (6915); and XTR Midstream, LLC (5624). The location of the Debtors' principal place of business is 370 17th Street, Suite 5300, Denver, Colorado 80202.

[2] As defined below, the two TSAs are the Extraction TSA and the Bayswater TSA.

TSAs are more than merely private contracts. Rather, the TSAs involve "filed rates", terms and conditions of pipeline transportation service subject to the exclusive jurisdiction of FERC that have the force and effect of law.

2.      While the Rejection Motion suffers from infirmities that require its denial insofar as it seeks rejection of the TSAs, this Court should defer ruling on the Rejection Motion until resolution of Grand Mesa's pending Lift-Stay Motion (defined below) in furtherance of invoking FERC's processes.[3] Even if considered at this stage, however, the Rejection Motion fails for multiple reasons.

3.      **First,** the Rejection Motion fails to apply both the correct standard and process for review of the proposed rejection of FERC-regulated TSAs. Referencing only the inapplicable and materially irrelevant "business judgment" standard, the Debtors do not attempt to satisfy—or even acknowledge—the governing "public interest"[4] analysis necessary for filed rates. Under its grant from Congress pursuant to the ICA, FERC exercises exclusive jurisdiction to ensure that interstate oil pipeline rates, terms, and conditions of transportation services are "just and reasonable" and non-discriminatory. Each TSA is subject to FERC's jurisdiction, which section 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") does not, and was not intended to, override. FERC's review under the ICA is a separate and distinct inquiry, and one outside the scope of the traditional assumption or rejection analysis performed regularly by this Court.

---

[3] Because the Debtors have failed to petition FERC themselves, contemporaneously with the filing of this Objection Grand Mesa has filed its *Motion of Grand Mesa Pipeline, LLC for Order Confirming that the Automatic Stay Does Not Apply or, in the Alternative, for Relief from the Automatic Stay* (the "**Lift-Stay Motion**") to confirm Grand Mesa's right to petition FERC for a declaration regarding its jurisdiction over oil transportation agreements as conferred pursuant to the ICA and for an ICA review of the Debtors' attempts to reject their regulatory obligations under the TSAs.

[4] As explained herein, the "public interest" standard has a specialized meaning under FERC precedent and the ICA, establishing an extremely high bar to any attempt to modify or abrogate a freely negotiated FERC-jurisdictional agreement such as the TSAs.

4.     As explained herein, FERC also has exclusive jurisdiction under the ICA to determine whether any modification or abrogation of the TSAs that would be effectuated by rejection of the TSAs is in the public interest.  Once agreements such as the TSAs have been approved by FERC, the duty to comply with a TSA's contractual terms "springs from [FERC's] authority, not from the law of private contracts." *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 422 (1952) ("***Pa. Water***").  As such, the Debtors may not ignore and, as a result, collaterally attack FERC-approved transportation service agreement terms—including the filed rates in such agreements—under the guise of a routine rejection motion.  Yet that is precisely what the Debtors seek to do.

5.     This Court also cannot and should not proceed under a traditional rejection analysis without FERC having had the opportunity to formally determine through a FERC order whether any modification or abrogation in connection with rejection of the TSAs is consistent with the public interest under the ICA.  *See United Gas Pipe Line Co. v. Mobile Gas Ser. Corp.*, 350 U.S. 332 (1956) (holding that under the Natural Gas Act, natural gas companies cannot unilaterally change contract rates) ("***Mobile***"); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956) (holding that under the Federal Power Act, the Commission had no power to change a contract rate without first finding the existing rate unjust, unreasonable, or unduly discriminatory or preferential) ("***Sierra***" and together with *Mobile*, and subsequent decisions applying the holdings of these two cases, forming the basis of the "***Mobile-Sierra* doctrine**").[5]

6.     Even if the Court were to find that FERC does not have exclusive jurisdiction under the ICA to determine whether a debtor's abrogation or modification of filed rates and other terms

---

[5] *Flint Hills Resources Alaska, LLC v. FERC*, 627 F.3d 881, 887 (D.C. Cir. 2010) (holding that "reliance, in an ICA proceeding, on a Natural Gas Act case … is orthodox and presumptively permissible.") ("***Flint Hills***"); *see also Sierra*, 350 U.S. at 353.

of the TSAs through rejection is consistent with the public interest, its statutory authority at least must be harmonized with the Bankruptcy Code. *Morton v. Mancari*, 417 U.S. 535, 557 (1974) ("when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). Rejection of a FERC-jurisdictional contract in bankruptcy "alters the essential terms and conditions of a contract that is also a related rate; therefore, [FERC's] approval is required to modify or abrogate the filed rate." *ETC Tiger Pipeline, LLC*, 171 FERC ¶ 61,248, at P 23 (2020) ("***ETC Tiger Pipeline***"). Accordingly, the effect of rejection of the TSAs, and therefore the determination of whether rejection is appropriate or warranted, goes well beyond that of a simple contract rejection and any determination of the propriety of rejecting the TSAs must, therefore, at least include a review and determination by FERC that abrogation or modification of the TSAs is consistent with the public interest under the ICA. To that end, the U.S. Court of Appeals for the Sixth Circuit recently instructed the bankruptcy court in the *FirstEnergy* case to allow FERC to undergo its normal process to evaluate the public interest implicated by the proposed rejection of several FERC-jurisdictional agreements. *FERC v. FirstEnergy Sols., Corp. (In re FirstEnergy Sols. Corp.)*, 945 F.3d 431 (6th Cir. 2019) ("***First Energy***").

7.      Virtually every court to recently address the issue has allowed FERC to undergo the same public interest evaluation, in accordance with FERC's standard process, and to speak through its orders[6] on the issue of the public interest as part of the bankruptcy rejection procedure.

---

[6] *ETC Tiger Pipeline,* at P 25 ("Such an agreement from the Commission can only occur via a Commission order."); *Indianapolis Power & Light Co.*, 48 FERC ¶ 61,040 at 61,203, n. 29 ("The Commission speaks through its orders."), *order on reh'g*, 49 FERC ¶ 61,328 (1989); (*see also Seminole Energy Services, LLC, et al.*, 126 FERC ¶ 61,041 at Appx. p. 6, n. 41 (2009) (Enforcement Staff Report and Recommendation, Docket No. IN09-9-000) (FERC Staff report stating that "it is a well-settled principle that the Commission speaks through its orders, and not the absence thereof") (citing *Mid-American Energy Holdings Co.*, 118 FERC ¶ 61,003 at P 19, n. 45 (2007) ("The Commission, a five-member agency, acts through its written orders, which are 'issued' following a favorable vote of the majority. Phrased differently, in the absence of such orders . . . the Commission cannot be said to have acted." (citations omitted)).

As explained more fully below, Grand Mesa submits that rejection of the TSAs by this Court cannot occur without obtaining approval from FERC. At a minimum, the Court must consider FERC's informed determination on the impact that rejection of the TSAs would have on the public interest under the ICA.

8.    **Second**, even if a business judgment standard relevant to ordinary commercial contracts is deemed to apply to the TSAs (which it decidedly does **not**), the Debtors still fail to meet that test. In their conclusory omnibus Rejection Motion that combines, in broad-brush fashion, a host of disparate contracts, the Debtors fail to explain how rejection of the TSAs advances the Debtors' interests. The Debtors are continuing to use the Grand Mesa Pipeline on a postpetition basis and a significant component of their commercial operations, as well as other major contracts and business relationships, are dependent on the TSAs. In fact, the Restructuring Support Agreement, ("**RSA**") entered into by the Debtors and certain other creditor constituencies appears to provide those creditors with input into the Debtors' decision-making on rejections, which, in turn, raises questions as to who is driving decisions about rejection. *See* RSA, D.I. 18, Ex. B (Restructuring Term Sheet), p. 11. Surely the Debtors cannot claim to be exercising their business judgment if third parties with self-serving interests are exerting influence over the Debtors' business decisions. Nothing in the Rejection Motion answers these glaring concerns. At a minimum, discovery is required to develop the record as to the decision-making process and the substantive basis for the Debtors' decisions on rejection.

9.    **Third**, and separate from the FERC considerations, the Debtors improperly seek to reject a TSA containing valid and enforceable covenants running with the land. In particular, one of the TSAs contains dedication rights (including covenants running with the land) granted to Grand Mesa that are valid and enforceable under applicable state law and cannot be rejected. If

the Debtors had intended to contest the validity of such rights and interests, it could not be through a boilerplate omnibus rejection motion; they would need to have commenced an adversary proceeding.  As described more fully below, however, any such attempt by the Debtors to challenge the extent or validity of the dedication rights and covenants running with the land would be futile.  Grand Mesa's dedication rights and covenants running with the land are valid under applicable law and, as a result, preclude the Debtors' rejection of the Bayswater TSA (defined below).  The Rejection Motion's silence as to the controlling dedication rights further underscores the misguided nature of the Debtors' approach.

10.    **Finally**, even if this Court saw fit to grant the Rejection Motion in respect of the TSAs (which Grand Mesa respectfully submits would be in error), as explained herein, the equities clearly do not support the Debtors' request for an order to be effective *nunc pro tunc* to the Petition Date.  Grand Mesa submits that any such order could only be entered, if at all, prospectively.

## BACKGROUND

A.    **The Chapter 11 Cases.**

11.    On June 14, 2020 (the "**Petition Date**"), the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

12.    On June 15, 2020, the Debtors filed the Rejection Motion.  Pursuant to the Rejection Motion, the Debtors seek entry of an order authorizing rejection of certain transportation service agreements to which Grand Mesa is a counterparty.

13.    By agreement with the Debtors, Grand Mesa's deadline to object to the Rejection Motion was extended through and including August 4, 2020.

14.    Contemporaneously herewith, Grand Mesa has filed the Lift-Stay Motion with this Court for an order confirming that the automatic stay does not apply or, in the alternative, for relief from the automatic stay to permit Grand Mesa to file a petition with FERC seeking an expedited determination with respect to the TSAs.[7]

**B.    The Grand Mesa Pipeline.**

15.    Grand Mesa operates the Grand Mesa Pipeline, an interstate oil pipeline that originates in Weld County, Colorado and extends approximately 550 miles southeast.  Given its capacity to transport up to 150,000 barrels per day, the pipeline provides critical takeaway capacity for crude oil producers in the Denver-Julesburg Basin.  Additionally, the pipeline's convenient position affords shippers access to the U.S. Midcontinent markets and the Texas Gulf Coast refinery complex.  The Grand Mesa Pipeline not only supports the continued growth and production in the area but does so in a cost-effective and environmentally responsible way by reducing the current utilization of rail and truck transportation.

**C.    The TSAs.**

16.    On February 19, 2016, Grand Mesa and a shipper—Extraction Oil & Gas, LLC, the predecessor to one of the above-captioned Debtors, Extraction Oil & Gas, Inc. ("**Extraction**")— entered into an Amended and Restated Transportation Services Agreement (the "**Extraction TSA**").[8]  A generic TSA containing the same terms as the Extraction TSA, and which Grand Mesa

---

[7] If Grand Mesa's request in the Lift-Stay Motion is granted by the Court, Grand Mesa would request in its petition to FERC that FERC issue an order regarding whether the public interest requires abrogation or modification of the TSAs within the standard timeline of 180 days.

[8] Amended and Restated Transportation Services Agreement (by and between Grand Mesa Pipeline, LLC and Extraction Oil & Gas, LLC), February 19, 2016 (filed with and approved by FERC on September 8, 2016 in Docket No. OR16-12) ("**Extraction TSA**").  The Extraction TSA supersedes two prior agreements between the parties— namely: (1) the Five-Year Transportation Agreement; and (2) the Ten-Year Transportation Agreement.  Rather than terminating the Five-Year Transportation Agreement and separately amending the Ten-Year Transportation Agreement, the parties chose to enter into the TSA with the intent of forming a single contract governing the rights and responsibilities running between Grand Mesa and Extraction.

offered to all potential shippers, was filed with FERC on August 9, 2016.  As explained below, FERC approved the key terms of the TSA on September 8, 2016, in Docket No. OR16-12.  The Extraction TSA accounts for a substantial amount of the total capacity of Grand Mesa's pipeline.[9]

17.     Under the Extraction TSA, Grand Mesa undertook the obligation to construct, own, operate and maintain the Grand Mesa Pipeline—an interstate crude oil pipeline and certain associated appurtenant facilities.[10]  In exchange for Grand Mesa's commitment to construct the Grand Mesa Pipeline, and to secure a share of the capacity on the pipeline for its volumes of crude oil, Extraction committed to ship specified volumes of Crude Petroleum through the pipeline once it became operational and agreed to pay a minimum, fixed payment each month in addition to a fee applicable to any incremental volumes shipped through the Grand Mesa Pipeline.[11]

18.     The Extraction TSA expressly contemplates the involvement of FERC in connection with pipeline rates and various related matters.  The thirty-five-page Extraction TSA mentions FERC at least thirty times, leaving no doubt regarding the central role FERC plays in regulating interstate oil pipelines and related agreements such as the Extraction TSA.

19.     Grand Mesa is also a party to that certain Amended and Restated Transportation Services Agreement with Extraction Oil & Gas, Inc., dated June 21, 2016 (assigned by Bayswater Exploration & Production, LLC to Extraction Oil & Gas, Inc. (successor by conversion to Extraction) pursuant to an Assignment, Bill of Sale and Conveyance dated October 3, 2016 effective July 1, 2016, a copy of which is attached hereto as Exhibit B) (the "**Bayswater TSA**"[12] and together with the Extraction TSA, the "**TSAs**").[13]  Like the Extraction TSA, the terms of the

---

[9] Extraction TSA at p. 1; *Grand Mesa Pipeline, LLC*, Petition for Declaratory Order by Grand Mesa Pipeline, LLC, Docket No. OR16-12, at p. 1 (Mar. 11, 2016) ("**Grand Mesa PDO**").
[10] Extraction TSA at pp. 1-5.
[11] *Id.* at pp. 5-6.
[12] Grand Mesa PDO at p. 1.
[13] Upon information and belief, the Debtors are in possession of copies of the TSAs.  The TSAs contain commercially sensitive information and are subject to confidentiality restrictions.  Accordingly, Grand Mesa is not attaching copies

Bayswater TSA are the same as the generic TSA approved by FERC.  Pursuant to a letter dated August 12, 2016, Grand Mesa consented to such assignment.  Extraction is, therefore, the current contract counterparty to Grand Mesa under the Bayswater TSA.[14]  As assurance for Extraction's performance thereunder, the Bayswater TSA also contains a dedication of interests to Grand Mesa which constitutes a covenant running with the land, deemed to touch and concern all of Extraction's oil and gas leasehold interests in the lands within the dedication area.  Ex. A at ¶¶ 1-2; *see also* Ex. B, ¶ 10 (Bayswater Acreage Dedication – acknowledgment of the binding and enforceable nature of the dedicated interests against Extraction).

### D.    An Overview of FERC, and its Approval of the TSAs.

20.    FERC is the federal agency charged with specific regulatory oversight over the interstate transportation of energy (i.e., natural gas, oil, and electricity), wholesale power transactions, and the authorization of certain energy infrastructure, including liquefied natural gas (LNG) terminals, interstate natural gas pipelines, and hydropower projects.

21.    For well over 100 years, oil pipelines providing interstate transportation service have been subject to regulation of their services and rates under the ICA.  *See* Hepburn Act, Pub. L. No. 59-337, 34 Stat. 584 (1906).  In 1977, Congress transferred authority over interstate oil pipelines to the then newly created FERC, the newly-reconstituted successor agency to the Federal Power Commission.  *See* 49 U.S.C. § 60502.  One year later, Congress clarified that FERC would regulate oil pipelines in accordance with the 1977 version of the ICA.[15]

---

of the TSAs to its Objection and does not believe that the substance of the TSAs is necessary for this Court's consideration of the FERC-related issues raised in the Objection.  Grand Mesa will gladly make copies of the TSAs available to the Court upon request on an in camera, confidential basis, subject to entry of an appropriate Protective Order.

[14] Amended and Restated Transportation Services Agreement (by and between Grand Mesa Pipeline, LLC and Bayswater Exploration & Production, LLC), June 21, 2016 (filed with and approved by FERC on September 8, 2016 in Docket No. OR16-12) ("**Bayswater TSA**"); Grand Mesa PDO at p. 1.

[15] Public Law No. 95-473, § 4(c), 92 Stat. 1466-1470 (1978).

22.     The ICA has historically been considered a common carriage statute, with an emphasis in its administration on rate uniformity and service on non-discriminatory terms.[16]   In recent years, FERC has interpreted the ICA to permit the approval of non-discriminatory oil pipeline transportation contracts, such as the TSAs, to support the construction of needed oil pipeline infrastructure that FERC has determined to be in the public interest.   *See, e.g.*, *TransCanada Keystone Pipeline, LP*, 125 FERC ¶ 61,025, at P 21 (2008); *Colonial Pipeline Co.*, 116 FERC ¶ 61,078, at P 44 (2006) ("The Commission has recognized the need for investment in energy transportation infrastructure, whether for electric power, natural gas or oil, to meet the nation's growing demand for energy.") (citing *Shell Oil Co. v. FPC*, 520 F.2d 1061, 1081 (5th Cir. 1975) (encourage increased exploration and production).   Thus, the Commission has stated that it has approved a number of oil pipeline transportation contracts "to support pipelines' efforts to attract shippers that will make long-term volume commitments to support the construction of new facilities", 125 FERC ¶ 61,025, at P 21 (2008), and that absent approval of such contracts in a particular case, "the [pipeline] project might not be built at all." *Id.* (quoting *Express Pipeline Partnership*, 77 FERC ¶ 61,188, at 61,756 (1996)).

23.     Pursuant to FERC's policy of approving non-discriminatory transportation agreements to support the construction of new oil pipeline infrastructure, Grand Mesa filed a Petition for Declaratory Order with FERC on March 11, 2016 for approval of the TSA that it offered to all potential shippers on a non-discriminatory basis, and associated rules and regulations governing transportation service set forth in its tariff, which is incorporated as part of the TSA.

---

[16] *Keogh v. Chicago and Northwestern R. Co.*, 260 U.S. 156, 163 (1922) ("The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier . . . . This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated.") ("*Keogh*"); *Maislin Industries, U.S., Inc. et al. v. Primary Steel, Inc., et al.*, 497 U.S. 116, 126 (1990) ("The duty to file rates with the Commission, and the obligation to charge only those rates, have always been considered essential to preventing price discrimination and stabilizing rates.") (internal citations omitted) ("*Maislin*").

Like other oil pipelines contemplating major investments in new pipeline capacity, Grand Mesa

filed a Petition for Declaratory Order with FERC to obtain FERC's "advance approval . . .

regarding the application, reasonableness and lawfulness of the structure" of the proposed rates

and terms of the TSA. *Grand Mesa Pipeline, LLC*, 156 FERC ¶ 61,163, at P 10 (2016) ("***Order***

***on Grand Mesa PDO***").  Grand Mesa explained in its Petition that due to the major investment

involved in constructing its pipeline, both Grand Mesa and its shippers (including Extraction,

which filed comments in support of Grand Mesa's Petition) needed confirmation, prior to the

commencement of service of the project, that the rates and key terms agreed to in its TSA would

be acceptable to the Commission and that those shippers would have access to pipeline capacity

as provided in the TSA.  Grand Mesa PDO at pp. 3-4.  In short, the regulatory certainty provided

by advance FERC approval of the TSA was critically important to Grand Mesa's decision to

construct the Grand Mesa Pipeline.  Such pre-approval by FERC provides both shippers and

pipelines confidence that their negotiated agreements will be honored without modification,

provides the rate and contract certainty needed to obtain financing to construct the pipeline, and

protects shippers from unilateral rate increases by the pipeline.

24.    On September 8, 2016, based on "the requirements of the provisions of the ICA

and Commission precedent applying those provisions," FERC granted Grand Mesa's Petition.

Order on Grand Mesa PDO at P 14.  FERC found that Grand Mesa's proposal was "consistent

with precedent, just and reasonable and not unduly discriminatory or preferential" under the ICA.

*Id.*  FERC stated that its order "confirms that *the key provisions of the TSA and amended TSA will*

*be upheld during the term of the agreement.*"  *Id.* at P 15 (emphasis added).  Accordingly, FERC

approved the specific provisions of the TSA, including, *inter alia*: (1) Grand Mesa's requested

tiered discounts for longer-term shipper commitments,[17] (2) Grand Mesa's request that shippers signing the TSA may have priority access to up to ninety percent of the pipeline's capacity,[18] (3) Grand Mesa's request that initial TSA rates and adjustments to such rates be treated as settlement rates under the Commission's regulations during the term of the TSA,[19] and (4) contract extension rights in Grand Mesa's proposed TSA allowing shippers signing the TSA to make a one-time election to extend the term by an additional five years.[20]

25.     All rates for interstate oil transportation service must be filed with and approved by FERC.  *Enbridge Energy, Ltd. P'ship*, 152 FERC ¶ 61,047 (2015).  All terms and conditions of such service must be included in tariffs that are also filed with and approved by FERC. Accordingly, any challenge to a rate for, or term and condition of providing, interstate oil transportation service must be made before FERC.  49 U.S.C. § 3(1).  Because FERC is granted exclusive jurisdiction to regulate interstate oil pipeline rates as well as the terms and conditions of interstate oil pipeline transportation service, a court's role in reviewing FERC's actions is limited. *Ass'n of Oil Pipe Lines v. FERC*, 876 F.3d 336, 339 (D.C. Cir. 2017).

26.     For the reasons set forth herein, rejection of the TSAs does not satisfy applicable law and the Rejection Motion should be denied as to the TSAs.  At a minimum, the Court should defer any ruling on the Rejection Motion in respect of the TSAs until such time as Grand Mesa and the Debtors have completed discovery concerning the issues raised in the Rejection Motion. Grand Mesa intends to promptly serve discovery requests on the Debtors now that a contested matter has been created.  Moreover, the Court should also defer any ruling on the Rejection Motion

---

[17] *Id.* at P 16 ("The Commission has also recognized that shippers making longer-term commitments incur greater costs and undertake more significant risks than shippers that do not make longer-term commitments and are therefore not similarly situated.")
[18] *Id.* at P 17.
[19] *Id.* at P 19.
[20] *Id.* at P 20.

in respect of the TSAs until such time as the Court has had an opportunity to hear arguments and rule on the related Lift-Stay Motion.

## ARGUMENT

I.    **The Court Should Defer Consideration of the Rejection Motion Pending Its Ruling on the Lift-Stay Motion.**

27.    While the Rejection Motion suffers from numerous procedural and substantive infirmities that require its denial as related to the TSAs, this Court should defer ruling on the Rejection Motion pending resolution of the Lift-Stay Motion. As described in greater detail below, any ultimate determination on the proposed rejection of the TSAs must at least in some manner take into account the Congressionally-mandated review and determination by FERC that rejection of the TSAs is consistent with the public interest under the ICA. FERC must continue to protect the public interest under the ICA through enforcement of the filed rate and *Mobile-Sierra* doctrines, described in greater detail below. Concurrently, this Court must consider the impact of a proposed contract rejection on the Debtors' estates. The respective roles of FERC and this Court under their enabling statutes demonstrate that each must approve a debtor-shipper's request to unilaterally reject, abrogate, or modify its obligations under a FERC-jurisdictional contract before rejection can take effect. *In re Boston Generating LLC*, No. 10-6528, 2010 U.S. Dist. LEXIS 120347, at *7 (S.D.N.Y. Nov. 12, 2010) ("If either the bankruptcy court or FERC does not approve the Debtors' rejection of the HSA, the Debtors may not reject the contract."). Accordingly, this Court should defer any ruling on the Rejection Motion pending FERC's review and determination of issues impacting the public interest.

II.     **Even if the Court Considers the Rejection Motion Now, the Motion Must be Denied Because it Fails on Procedural and Substantive Grounds.**

28.     Even if the Court decides to consider the Rejection Motion now (which Grand Mesa respectfully submits would be premature), the Rejection Motion suffers from numerous procedural and substantive infirmities that warrant its denial.  As a threshold matter, the Rejection Motion fails to apply the correct standard.  Even if the Court were to apply the more deferential business judgment standard applicable to ordinary commercial contracts (and not the FERC-regulated TSAs), the Debtors' conclusory assertions, set forth in an omnibus motion covering a broad array of agreements set forth in a simple list, that rejection of the TSAs is a proper exercise of their business judgment still do not provide this Court with a sufficient evidentiary basis to grant the Rejection Motion as related to the TSAs.

A.     **Because the Business Judgment Standard is Inappropriate, the Rejection Motion Should Not Be Considered Until FERC Is Permitted to Consider Whether Rejection of the TSAs Will Harm the Public Interest.**

29.     For most ordinary commercial contracts (but **not** filed rates), the business judgment standard applies to rejection determinations.  Under that standard, the impact of rejection on a non-debtor counterparty or other third parties or consumers would have little to no bearing on the analysis.  Paying lip-service to the wrong standard, in their omnibus Rejection Motion, the Debtors do no more than make the conclusory contentions that rejection of the various disparate agreements set forth therein will remove an unnecessary burden on their estates and represents a sound exercise of their business judgment.  Rej. Mtn. ¶¶ 8-10.  In doing so, the Rejection Motion completely ignores that certain of the agreements the Debtors seek to reject (including the TSAs) are filed rate contracts governed and approved by FERC, for which merely asserting that the Debtors are appropriately exercising their business judgment is legally insufficient to obtain Court approval.

30.     The proper standard for rejecting FERC-regulated agreements, which the Debtors ignore, has been adjudicated in numerous Circuits, with virtually all courts having found that the public interest should be considered when evaluating the rejection of a FERC-regulated agreement. *See, e.g.*, *In re FirstEnergy Sols. Corp.*, 945 F.3d at 454-455 ("[W]hen a Chapter 11 debtor moves the bankruptcy court for permission to reject a filed energy contract that is otherwise governed by FERC . . . the bankruptcy court must consider the public interest"); *In re Mirant Corp.*, 378 F.3d 511, 524 (5th Cir. 2004) ("***Mirant***") ("Supreme Court precedent supports applying a more rigorous standard" than the business judgment standard when evaluating a request to reject an agreement regulated by FERC); *Calif. Dep't of Water Res. v. Calpine Corp. (In re Calpine Corp.)*, 337 B.R. 27, 39 (S.D.N.Y. 2006) (holding that because "the fate of wholesale power contracts cannot be determined without consideration of the public interest, the executive agency FERC should determine that interest [rather than the bankruptcy court]").

31.     The Debtors' ability to reject certain other types of contracts in bankruptcy does not give them license to avoid FERC review of their public-law obligations arising under the ICA when filed rates are involved.  Given the threat to the filed rate system that such conduct would pose, FERC must be given a full opportunity to investigate the facts in this case and determine whether the public interest is implicated by such conduct.  As explained, *infra,* FERC conducts its public interest analysis by hearing from the affected parties and all other parties-in-interest to compile a record upon which FERC can render its analysis of implications to the public interest resulting from modification or abrogation of the filed rate and FERC-approved agreement.  *Energy Harbor LLC,* 170 FERC ¶ 61,278 (Mar. 30, 2020) ("***Energy Harbor***"); *ETC Tiger Pipeline, supra*. Upon completion of that analysis, FERC will issue an order detailing its findings and its conclusion with respect to the public interest.

32.    Consistent with existing precedent in other Circuits, and as explained below, this Court can then take account of FERC's findings either as a bar under the ICA to rejection of the TSAs (which Grand Mesa respectfully submits is the proper approach in these circumstances) or, alternatively, as highly instructive guidance on whether rejection of the TSAs is so essential to the success of the Debtors' restructuring that it outweighs the public interest implications, if any, articulated by FERC in its order.  Here, the Rejection Motion does not even address the required procedures or governing law and standards in respect of rejection of FERC-regulated agreements.

**B.    FERC Has Exclusive Authority Under the Interstate Commerce Act to Determine Whether Modification or Abrogation of the TSAs in Connection with any Rejection is in the "Public Interest".**

33.    FERC approval is needed to reject a contract subject to FERC's exclusive jurisdiction.  The TSAs, which contain filed rates, fall squarely within FERC jurisdiction under the ICA.  The Debtors, therefore, may not reject the TSAs without FERC approval.  The intersection between the Bankruptcy Code and the jurisdiction of FERC over the provision of energy services has recently been the subject of considerable litigation.  To date, such litigation has focused on the potential rejection in bankruptcy of contracts for the sale and transportation of electricity and natural gas regulated by and approved by FERC under the Federal Power Act ("**FPA**") and Natural Gas Act ("**NGA**"), respectively, and governed by the filed rate and "*Mobile-Sierra*" doctrines equally applicable to the ICA.  Indeed, the ICA is a seminal ratemaking and regulatory statute that served, in relevant part, as a model for subsequent ratemaking statutes such as the FPA and NGA.[21]

---

[21] As recently as last week, in *SFPP, L.P. v. FERC*, No. 19-1067, 2020 U.S. App. LEXIS 24222, at *28 (D.C. Cir. Jul. 31, 2020), the D.C. Circuit stated: "The filed rate doctrine is rooted in Section 6(7) of the ICA, 49 U.S.C. app. § 6(7) (1988). *Frontier Pipeline Co.*, 452 F.3d at 776 ("[Section] 6(7) . . . . establishes the familiar filed rate doctrine."); *see Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) ("The filed rate doctrine has its origins in [the Supreme] Court's cases interpreting the Interstate Commerce Act." ("**SFPP v. FERC**").

34.     Federal courts that have addressed the concurrent jurisdiction of FERC and bankruptcy courts have recognized FERC's statutory obligation to review the effect of proposed contract rejections on the public interest under the FPA and the NGA.  In several instances, courts have held that FERC has exclusive jurisdiction to determine whether a rejection of a FERC-jurisdictional contract harms the public interest, and that such contracts may be rejected only if FERC approves the rejection.  For example, in *Calpine* the District Court concluded that the Bankruptcy Court may not unilaterally authorize rejection of FERC-jurisdictional power purchase agreements because to do so would directly interfere with the Commission's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts. 337 B.R. 27.  The court found "little evidence [in the Bankruptcy Code] of congressional intent to limit FERC's regulatory authority," absent which "the Bankruptcy Code should not be read to interfere with FERC jurisdiction" over wholesale power agreements.  *Id.* at 33; *see also NRG Energy, Inc.,* No. 03-3754, 2003 U.S. Dist. LEXIS 11111 at 9-10. (S.D.N.Y. Jun. 30, 2003).  Similarly, in *Boston Generating, LLC,* the District Court found that the debtor must obtain a ruling from FERC that abrogation of a FERC-jurisdictional contract does not contravene the public interest and without such approval the debtor may not reject the contract.  2010 U.S. Dist. LEXIS 120347.

35.     While certain cases discussed above involved the FPA and NGA, the instant case involves materially identical issues under an even more foundational statute that FERC is also responsible for administering: the ICA.[22]  As explained below, (1) FERC has exclusive authority over the rates, terms and conditions of interstate transportation service provided by oil pipelines,

---

[22] 49 U.S.C. App. § 1 *et seq.* (1988); *Flint Hills*, 627 F.3d at 887 (holding that "reliance, in an ICA proceeding, on a Natural Gas Act case such as Sea Robin is orthodox and presumptively permissible."); *see also Sierra*, 350 U.S. at 353.

and (2) pursuant to that authority, FERC has specifically approved the two TSAs that the Debtors

seek to reject, including the rates set forth in the TSAs.[23]

      **C.**      **FERC-Filed Oil Transportation Contracts, and the Rates Included in Such Contracts, Have the Force of Law Under the ICA and Cannot Be Changed Under the Filed Rate and *Mobile-Sierra* Doctrines Unless Approved by FERC and Required by the Public Interest.**

      36.     Oil transportation contracts, such as the TSAs, the "approved rates" in such

contracts, and the tariff governing service provided under such contracts, bind the shipper and

pipeline with the force of law.[24]  Like natural gas transportation contracts under the NGA and

wholesale power contracts under the FPA, interstate oil transportation contracts cannot be changed

or abrogated without FERC approval under the ICA.  *See, e.g.*, *Ark. La. Gas Co v. Hall*, 453 U.S.

571, 577 (1981) ("*Arkla*") ("'The considerations underlying the [filed rate] doctrine…are

preservation of the agency's primary jurisdiction over reasonableness of rates and the need to

insure that regulated companies charge only those rates of which the agency has been made

cognizant.'" (citing *City of Cleveland v. FPC*, 525 F.2d 845, 854 (1976)); *Louisville & Nashville*

*R.R. v. Maxwell*, 237 U.S. 94, 97 (1915) ("***Louisville & Nashville R.R. Co.***") ("Under the Interstate

Commerce Act, the rate of the carrier duly filed is the only lawful charge."); *Frontier Pipeline Co.*

---

[23] Amended and Restated Transportation Services Agreement (by and between Grand Mesa Pipeline, LLC and Extraction Oil & Gas, LLC), February 19, 2016 (filed with and approved by FERC on September 8, 2016 in Docket No. OR16-12).

[24] *See, e.g.*, *FirstEnergy*, at 443-44, which states as follows:

    The "filed-rate doctrine," as applied in the FPA, holds that FERC has plenary and exclusive jurisdiction over wholesale power rates, terms, and conditions of service for any such rate filed with FERC. *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371-72, 108 S. Ct. 2428, 101 L. Ed. 2d 322 (1988). This is not limited to only "rates," but includes all contractual provisions, methodologies, restrictions, or any quantity or price terms. *Id.*

While the case quoted above arose under the FPA, it addressed ratemaking provisions of the FPA that are materially identical to the ratemaking provisions of the ICA, and thus applies with equal force here. *See Arkla*, 453 U.S. at 577 ("The filed rate doctrine has its origins in this Court's cases interpreting the Interstate Commerce Act…and has been extended across the spectrum of regulated utilities."); *Concord v. FERC*, 955 F.2d 67, 71 (citing *Maislin*, 497 U.S. 116) ("*Concord*"); *Pa. Water*, 193 F.2d at 235.  Thus, subsequent decisions under the FPA and NGA applying the filed rate doctrine are based upon the foundational jurisprudence interpreting the ICA and are applicable to cases involving the ICA.

*v. FERC*, 452 F.3d 774, 788 (D.C. Cir. 2006) (citing 49 U.S.C. App. § 6(7) as establishing the filed

rate doctrine in the ICA); *OXY USA v. FERC*, 64 F.3d 679, 699 (D.C. Cir. 1995) (applying filed

rate doctrine to request to change rates of Trans Alaska Pipeline System oil pipeline) (citing *Moss

v. CAB*, 430 F.2d 891, 897 (D.C. Cir. 1970). In 1906, Congress amended the ICA to include the

regulation of oil pipelines, based upon the public interest in ensuring that transporting oil in

interstate commerce was conducted in a "just and reasonable" manner and without

discrimination.[25] The ICA provides for "comprehensive and detailed regulation" of the industries

subject to its authority. *Pa. Water & Power Co. v. FPC*, 193 F.2d 230, 235 (D.C. Cir. 1951).

Under the comprehensive regulatory framework established by the ICA, FERC has exclusive

jurisdiction over the transportation of oil in interstate commerce. *Id.*

37.    Pursuant to the ICA, an oil pipeline must file its oil transportation contracts with

FERC, including the rates, terms and conditions contained in such contracts, for such contracts to

have the force of law. Under Section 6 of the ICA,[26] a pipeline may not change its rates or terms

of service without prior notice to the public and FERC. Section 15(7)[27] of the ICA gives FERC

the authority to suspend a pipeline's rate filing for up to seven months and set a hearing to

determine its lawfulness. Section 13(1)[28] of the ICA also authorizes FERC to investigate the

lawfulness of any existing rate, set a new "just and reasonable" rate, and award reparations for

overcharges.

38.    The prohibition on an oil pipeline charging rates that differ from those filed with

FERC is known as the "filed rate doctrine," which is codified by the aforementioned sections of

---

[25] The Hepburn Act of 1906, 34 Stat. 584 (1906). Prior to its amendment, the ICA had focused largely on railroads.
[26] 49 U.S.C. App. § 6 (1988).
[27] *Id.* § 15(7).
[28] *Id.* at § 13(1).

the ICA and implemented by FERC's regulations.[29]   Although the filed rate doctrine is often associated with the FPA and NGA, *Arkla*, 453 U.S. at 573,[30] courts have traced the filed rate doctrine's *origin* to the ICA itself and numerous cases arising under the ICA.   *See id.* ("The filed rate doctrine has its origins in this Court's cases interpreting the Interstate Commerce Act . . . and has been extended across the spectrum of regulated utilities."); *see also SFPP v. FERC* at *28 ("The filed rate doctrine is rooted in Section 6(7) of the ICA" citing *Frontier Pipeline Co.*, 452 F.3d at 776 ("[Section] 6(7) . . . . establishes the familiar filed rate doctrine.") and *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) ("The filed rate doctrine has its origins in [the Supreme] Court's cases interpreting the Interstate Commerce Act.")).

39.    The Supreme Court unequivocally confirmed the applicability of the filed rate doctrine under the ICA in *Maislin*.   497 U.S. 116.   The case arose out of a trucking company's bankruptcy filing, and the estate's claims against a shipper for the difference between the filed rate and the rate actually charged.   According to the *Maislin* Court, "the filed rate governs the legal relationship between shipper and carrier":

> The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.... This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated.

*Maislin*, 497 U.S. at 126 (quoting *Keogh*, 260 U.S. at 163).

---

[29] 18 C.F.R. § 341.0 *et seq.* (2020).
[30] Although *Arkla* was decided under the NGA, cases under the NGA or ICA are applicable to cases under the other statute where their provisions are similar.   *Flint Hills* 627 F.3d. at 887 ("First, we note that the carriers' *reliance, in an ICA proceeding*, on a Natural Gas Act case such as *Sea Robin is orthodox and presumptively permissible*.") (emphasis added).

40.    The Supreme Court also emphasized the "classic statement of the 'filed rate doctrine'", *id.*, as set forth in a prior ICA case, which held as follows:

> "Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers [] are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable.… This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."

497 U.S. at 126 (quoting *Louisville & Nashville R.R. Co.*, 237 U.S. at 97).  Accordingly, the Supreme Court stated that it "has long understood that the filed rate governs the legal relationship between shipper and carrier." *Id.*

41.    Thus, for oil pipeline transportation rates and contracts to be lawful under the ICA, including rates under a pipeline transportation contract, they must be filed with FERC.  Pipelines are prohibited from charging a different rate than that which is on file, and any change to a rate or contract approved by FERC can only be accomplished by obtaining the approval of FERC under the applicable provisions of the ICA.  *Frontier Pipeline*, 452 F.3d at 788 (citing 49 U.S.C. App. § 6(7)).  Courts have "justified the doctrine as necessary to enforcement of the underlying statute, [including] the Interstate Commerce Act." *Concord*, 955 F.2d at 71 (citing *Maislin*, 497 U.S. 116).  As noted above, the ICA contains the sole and exclusive procedures for modifying or abrogating a filed rate or transportation contract, which contract is already under FERC's oversight and regulation, including pursuant to a Commission investigation or a complaint, and after a hearing. *Id.*; 49 U.S.C. App. §§ 8, 15(1), 15(3), 15(6)-(7).

42.    Importantly, the TSAs "are not typical commercial contracts but rather establish public obligations that carry the force of law." *ETC Tiger Pipeline,* at P 22 (citing *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004) (filed rates "are considered to be 'the

law'")).  The breach that will be caused by the proposed rejection here does not create "a typical dispute over the terms of a contract, but the unilateral termination of a regulatory obligation."  *See In re Calpine Corp.*, 337 B.R. at 36.  FERC itself recently noted: "As the Supreme Court has explained with specific regard to [FERC]-jurisdictional contracts, filed rate obligations exist independently of private contractual duties and continue to bind the counterparties, regardless of one party's breach of contract, or even a determination that a contract may not be enforced at all." *ETC Tiger Pipeline,* at P 22 (citing *Pa. Water*, 343 U.S. at 422).  Accordingly, there are threshold issues outside the scope of the traditional assumption or rejection analysis routinely performed by this Court, and which are beyond the scope of its jurisdiction.

43.    Consistent with the long history of the filed rate doctrine under the ICA, this Court should recognize FERC's authority over the administration of filed rates and contracts under its jurisdiction by deferring its ruling on the Rejection Motion and granting the Lift-Stay Motion, thereby permitting Grand Mesa to petition FERC for a hearing regarding the TSAs.  *Mirant*, 378 F.3d at 523 ("The Bankruptcy Code clearly anticipates ongoing governmental regulatory jurisdiction while a bankruptcy proceeding is pending.") (citing *Louisiana PSC v. Mabey (In re Cajun Elec. Power Coop., Inc.*), 185 F.3d 446, 453 (5th Cir. 1999).

44.    In addition to the filed rate doctrine, changes to contracts subject to FERC jurisdiction are subject to the *Mobile-Sierra* doctrine.  Under *Mobile-Sierra*, the Supreme Court has held that parties "may not unilaterally abrogate or modify their voluntarily negotiated, arms'-length contracts subject to the Commission's jurisdiction unless the Commission first 'concludes that the contract seriously harms the public interest.'"  *NextEra Energy, Inc. and NextEra Energy Partners, L.P. v. Pacific Gas and Electric Co.*; *Exelon Corp. v. Pacific Gas and Electric Co.*, 167 FERC ¶ 61,096 at P. 23 (quoting *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1*, 554

U.S. 527, 530, 534 (2008) ("***Morgan Stanley***").  Parties seeking to avoid their contractual

obligations under the *Mobile-Sierra* "public interest" standard may do so only after FERC makes

a "finding of 'unequivocal public necessity' or 'extraordinary circumstances'" where "the public

interest will be severely harmed" by allowing the existing filed rate to continue.  *Morgan Stanley*,

554 U.S. at 550-51.

45.    As noted above in Section B, in recent years, FERC has approved bilateral oil

transportation agreements under the ICA.  The existence of these bilateral, FERC-jurisdictional

agreements triggers the application of *Mobile-Sierra* to efforts to modify or abrogate such

agreements.  Indeed, FERC has recently applied the *Mobile-Sierra* public interest standard to

agreements submitted for approval under the ICA to resolve disputes over rate and tariff issues

between oil pipelines and their shippers.[31]  Under the *Mobile-Sierra* public interest standard, there

is a presumption that freely negotiated contracts such as the TSAs will not be modified or

abrogated absent a showing that the contracts seriously harm the public interest.  *Energy Harbor*,

170 FERC ¶ 61,278 at P 14 (quoting *Morgan Stanley*, 554 U.S. at 530; *accord NRG Power Mktg.,*

*LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 167 (2010)).

---

[31] *See B.P. Prods. N.A. v. Sunoco Pipeline L.P.*, 166 FERC ¶ 61,197, at PP 14-15 (2019); *Buckeye Pipe Line Co., L.P.*, 167 FERC ¶ 61,042, at P 13 (2019).  Although it arose in cases decided under the NGA and FPA, the *Mobile-Sierra* doctrine is not limited in application to NGA and FPA cases.  In addition to FERC's reliance on *Mobile-Sierra* in ICA cases as noted above, federal courts of appeals have applied *Mobile-Sierra* in Federal Communications Commission cases as well. *See, e.g.*, *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 969 (11th Cir. 2005) ("Under [the *Mobile-Sierra*] doctrine, an agency can abrogate or modify a utility contract 'only if the public interest so requires.' *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 709 (D.C. Cir. 2000) (per curiam); *see also Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 353-55 (1956); *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 344-45 (1956) [parallel citations omitted].  The CLECs and the Commission argue that the FCC could not have invoked the *Mobile-Sierra* doctrine, because the FCC did not make an explicit finding regarding the public interest, but this argument fails.  The FCC plainly based its decisions on the public interest."); *cf. Bellsouth Telecoms. v. Cinergy Communs. Co.*, 2005 U.S. Dist. LEXIS 61239 (E.D. Ky. 2005) (finding that because interconnection agreements were *not* "privately negotiated contracts" *Mobile-Sierra* does not apply).

46.     Through the Rejection Motion, the Debtors effectively seek to abrogate or modify their FERC-approved TSAs with Grand Mesa, including the filed rates in these TSAs.  Rejection of a FERC-jurisdictional contract in bankruptcy "alters the essential terms and conditions of a contract that is also a filed rate; therefore, the Commission's approval is required as rejection would modify or abrogate the filed rate."  *ETC Tiger Pipeline*, at P. 23.  Accordingly, to comply with the filed rate doctrine, the *Mobile-Sierra* doctrine, and the requirements of the ICA, the Court should delay ruling on the Rejection Motion and permit Grand Mesa to seek FERC's determination, after a proceeding pursuant to FERC's normal procedures, regarding whether a change to or abrogation of filed rates and other terms and conditions of FERC-approved agreements caused by a rejection in bankruptcy is consistent with and required by the public interest.

47.     Both FERC and this Court have independent and concurrent jurisdiction under their respective enabling statutes to enforce the laws delegated to them by Congress.  It is not necessary to decide whether the jurisdiction of FERC or a bankruptcy court is superior, nor is it appropriate or lawful to relegate either to providing an advisory opinion to the other for the purpose of upholding their statutory obligations and addressing whether a contract may be abrogated, modified or rejected.  Rather, FERC must continue to protect the public interest under the ICA through enforcement of the filed rate doctrine and the principles of *Mobile-Sierra* based on the sanctity of contracts.  Concurrently, the bankruptcy court must consider the impact of a proposed contract rejection on the debtor's estate.  FERC's and this Court's respective roles under their enabling statutes demonstrate that each must approve a debtor-shipper's request to unilaterally reject (in the case of the Court), or abrogate or modify (in the case of FERC), its obligations under a FERC-jurisdictional contract, before a contract rejection can take effect.

48.     Congress could not have intended, for example, that FERC should determine whether rejection of a contract promotes or impedes the goal of achieving a successful reorganization in bankruptcy.   By the same token, Congress could not have intended that bankruptcy courts be the final arbiter of whether the rejection, abrogation or modification of an interstate oil transportation contract would pose a threat to the public interest in providing consumers access to available oil supply at just and reasonable rates under the ICA.   Given its familiarity and expertise in respect of matters affecting interstate oil, natural gas and wholesale electric markets, and the regulatory scheme applicable to these industries, FERC is best qualified to determine the impact that abrogation or modification of transportation contracts would have on the public interest in ensuring the availability of energy at affordable rates.   Precluding a federal regulatory body from discharging its Congressionally-mandated duty to consider implications of rejection on a FERC-approved filed rate and transportation agreement cannot be what the law requires.

49.     In fact, given the possibility, if not likelihood, of multiple companies seeking to utilize the bankruptcy process to reject FERC-jurisdictional contracts in this economic downturn, FERC is the appropriate and best suited forum in which the cumulative impact of multiple proposed contract rejections on the public interest can be evaluated.[32]   Accordingly, this Court should, and indeed must, defer to FERC's consideration and determination of the unique public interest that FERC alone is statutorily mandated to protect.

50.     The Rejection Motion is also an impermissible collateral attack on the filed rate and FERC's order granting Grand Mesa's PDO.  *See Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861, 868 (9th Cir. 2006) (courts "may not entertain a petition for review that collaterally attacks a prior

---

[32] As set forth above, "[t]he Bankruptcy Code clearly anticipates ongoing governmental regulatory jurisdiction while a bankruptcy proceeding is pending."  *Mirant*, 378 F.3d at 523 (citation omitted).

FERC order"). *Cf. NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 55 (2d Cir. 1999) (explaining that the debtor "may not collaterally attack or impair in the bankruptcy courts the license allocation scheme developed by the FCC"). FERC has exclusive authority over the rates, terms and conditions set forth in the TSAs such that the Debtors cannot in this Court seek to abrogate or modify those rates—an objective that the Debtors are attempting to accomplish through rejection. *See Calpine*, 337 B.R. at 36 (stating that the debtor could not through rejection cease performance under the rates, terms, and conditions of a filed rate in the hopes of getting a better deal). For this reason as well, the Court must defer to FERC's consideration and determination of whether the attempt to reject the TSAs amounts to a collateral attack on both FERC's orders and the filed rate.

    **D.**    **Even if the Court Determines that FERC Approval Under the ICA is not *Required* for the TSAs to be Rejected, FERC Should be Permitted to Provide its Opinion as to Whether Rejection of the TSAs is Consistent with the Public Interest Under the ICA.**

    51.    While courts that have addressed the issue have acknowledged FERC's jurisdiction over wholesale power and interstate natural gas transportation contracts that a debtor seeks to reject in bankruptcy, Grand Mesa acknowledges that both the Fifth and Sixth Circuits harmonize the various statutory interests by requiring the bankruptcy court to consider but not necessarily follow FERC's determinations.[33] These courts have ruled that FERC's approval of a contract rejection need not be obtained as a prerequisite to bankruptcy courts' authority to reject the executory contracts in proceedings before them. However, the Sixth Circuit has required bankruptcy courts to obtain FERC's determination, through its own procedures and process, as to whether rejection

---

[33] Grand Mesa also acknowledges the recent ruling in the *Ultra Petroleum Corp., et al.* chapter 11 cases denying a request to modify the automatic stay filed by a counterparty to a firm transportation service agreement with one of the debtors and which was seeking to file a petition before FERC for a determination whether the debtor's proposed rejection of the firm transportation service agreement was in the public interest. *Ultra Petroleum Corp.*, Case No. 20-32631, D.I. 454 (Bankr. S.D. Tex. July 22, 2020). The court in *Ultra Petroleum*, however, is confined to the errant ruling of the Fifth Circuit in *Mirant*, a limitation that this Court does not have. In addition, the court in *Ultra Petroleum* failed to appropriately consider FERC's exclusive jurisdiction over a filed rate and the importance of securing a formal determination from FERC in respect of the public interest before making any determination on rejection.

of FERC-jurisdictional agreements would adversely affect the public interest that FERC is mandated to protect under its governing statutes. *See FirstEnergy,* 945 F.3d at 454-55; *cf. Mirant,* 378 F.3d at 522-26; *see also In re Ultra Petroleum Corp., et al.,* Case No. 20-32631, D.I. 274 (Bankr. S.D. Tex. Jun. 15. 2020) (entering *Order Requesting FERC Participation* requesting that FERC "participate as a party-in-interest in the bankruptcy proceedings to argue and comment on whether the rejection of [debtor's] contract with [gas transportation agreement counterparty] would harm the public interest"); *PG&E Corp. v. FERC*, No. AP 19-03003, 2019 WL 2477433, at *16 (Bankr. N.D. Cal. June 12, 2019) (applying the business judgment test, but noting that "the court will not ignore what others [i.e., FERC] have said about public interest and the need to take it into account while at the same time paying careful attention on the reorganization goals").

52.    In *Mirant*, the U.S. Court of Appeals for the Fifth Circuit determined that there were no exceptions in the Bankruptcy Code prohibiting rejection of contracts subject to FERC regulation. 378 F.3d 511. The court found that the bankruptcy court's rejection of a contract did not invade FERC's exclusive jurisdiction because such rejection only indirectly affected the filed rate. *Id.* at 519-520.[34] Notwithstanding this conclusion, the court required the bankruptcy court to impose a higher standard than the typical business judgement standard applied to contract rejections, and contemplated FERC's input in making such determinations. Specifically, the court required the bankruptcy court to balance the equities, carefully scrutinize the impact of rejection upon the public interest, and allow FERC's participation to assist it in balancing the equities. *Id.* at 525.

---

[34] In reaching this conclusion, the court relied on a Fifth Circuit decision in *Gulf States Utils. Co. v. Ala. Power Co.*, 824 F.2d 1465, 1471-73 (5th Cir. 2004), which, according to the court, held that a court may alter a FERC-jurisdictional contract when the breach of contract claim is based on "another rationale" other than a challenge to the rate and the claim only indirectly affects the rate. *Id.* The court in *Calpine* did not construe the filed rate doctrine as narrowly as the Fifth Circuit and found that there was no corollary in the Second Circuit. 337 B.R. 27. at 38. Thus, this rationale appears to be unique to the Fifth Circuit.

53.    More recently, in *FirstEnergy*, 945 F.3d 431, the Sixth Circuit reversed the bankruptcy court's finding that it had exclusive and unlimited jurisdiction over the FERC-jurisdictional contracts.[35]  The court found that FERC and the bankruptcy court had concurrent jurisdiction, and that the best way to harmonize the two statutes was to require the bankruptcy court to apply a higher standard that requires the court to consider the impact of rejection on the public interest, including the consequential impact on consumers.  To this end, the court held that the bankruptcy court must consider the public interest and ensure that the equities balance in favor of rejecting the contract.  Moreover, the Sixth Circuit held the bankruptcy court must permit FERC to provide an opinion on the public interest in accordance with its ordinary approach and processes under the FPA.  *Id.* at 454.

54.    FERC recently provided a roadmap for making such determinations on an expedited basis.  As a result of the Sixth Circuit's decision in *FirstEnergy*, 945 F.3d at 454-55, FERC issued an order establishing expedited paper hearing procedures to consider the positions of each counterparty to the FERC-jurisdictional contracts at issue there regarding how to apply *Mobile-Sierra* to such contracts (which were wholesale power contracts subject to the jurisdiction of the FPA).  *See Energy Harbor,* 170 FERC ¶ 61,278.  Under the expedited procedures adopted by FERC, the debtor in *Energy Harbor* was required to submit a filing within 30 days explaining why rejection was in the public interest, with counterparties opposed to rejection required to provide a response within 30 days thereafter.  The Commission stated that it anticipated issuing its ruling within 180 days of the initiation of the proceeding.  *Id.* at P 23.

---

[35] As recently as June 22, 2020, and consistent with similar FERC rulings under the FPA, FERC held that "[w]here a party to a Commission-jurisdictional agreement under the NGA seeks to reject the agreement in bankruptcy, that party must obtain approval from both the Commission and the bankruptcy court to modify the filed rate and reject the contract, respectively."  *ETC Tiger Pipeline*, at P 20.

55.     Whether this Court determines that (1) FERC approval of any modification or abrogation resulting from rejection is required for this Court to reject the TSAs, or (2) FERC's determination of the impact that such rejection would have on the public interest considerations under the ICA must be considered by the Court in ruling on requests for contract rejection, it is clear that any ruling by this Court on the Rejection Motion in respect of the TSAs must be reserved until such time as the Court has ruled on the Lift-Stay Motion.

56.     For the reasons discussed above, Grand Mesa requests the Court to follow the rationale of the courts in the Second Circuit and find that a determination from FERC with respect to rejection and the attendant public interest implications is required before rejection under the Bankruptcy Code can be effective.  *See Boston Generating*, 2010 U.S. Dist. LEXIS 120347, at \*7 ("If either the bankruptcy court or FERC does not approve the Debtors' rejection of the HAS, the Debtors may not reject the contract.").  If the Court, however, is inclined instead to follow the procedures outlined by the Fifth and Sixth Circuits (and consistent with the deference to FERC's authority set forth in Third Circuit precedent), under *FirstEnergy* it should allow FERC to determine under its own procedures and processes whether the public interest under the ICA requires rejection of the TSAs, on a similar timeline as FERC required in the *Energy Harbor* proceeding.  Specifically, Grand Mesa would request FERC to issue its ruling no later than within 180 days of the initiation of the proceeding.  This would provide sufficient time for the Court to factor FERC's ruling into its disposition of the issues in these cases.

**E.      Even if it Was Applicable to the Rejection of the TSAs, the Debtors Have Failed to Satisfy the Business Judgment Rule.**

57.     The business judgment rule governs a debtor's decision of whether to reject a non-FERC-regulated executory contract under section 365 of the Bankruptcy Code.  *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (citing *Grp. of Institutional*

*Inv'rs v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523 (1943)); *Computer Sales Int'l, Inc. v. Fed.*

*Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003).  "Under the business

judgment standard, the sole issue is whether the rejection benefits the estate."  *In re HQ Global*

*Holdings, Inc.*, 290 B.R. at 511; *see also N.L.R.B. v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d

72, 79 (3d Cir. 1982) aff'd sub nom., 465 U.S. 513 (1984) (stating that the "usual test for rejection

of an executory contract is simply whether rejection would benefit the estate.").

58.    There is nothing in the Rejection Motion—other than conclusory statements by the

Debtors—that would provide this Court with a basis upon which rejection of the TSAs could

benefit the Debtors' estates.  Rej. Mtn. ¶¶ 8-10.  Indeed, there are a multitude of issues impacting

any business judgment assessment that the Rejection Motion fails to address.  For example, the

Debtors have gathering agreements in place with third parties that are necessary to their operations

and connected to Grand Mesa's Pipeline.  There is no commercially or legally cognizable argument

that the TSAs are a burden on the Debtors' estates when the TSAs represent a necessary vehicle

for the Debtors to bring their product to market.  The Debtors have presented no evidence—other

than a conclusory statement—that rejecting the TSAs will benefit their estates and represents a

proper or reasonable exercise of their business judgment.  Rej. Mtn ¶ 10.

59.    Furthermore, even if the Court were to conclude that the business judgment

standard applies to the rejection of the TSAs (which it does not), at a minimum Grand Mesa first

requires discovery from the Debtors to determine whether the Required Consenting Senior

Noteholders (or any other party) under the Debtors' RSA improperly influenced the Debtors'

"business judgment" under the circumstances.  The RSA appears to provide other creditor

constituencies with input into the Debtors' decision-making on rejections, which, in turn, raises

questions as to who is actually making decisions about rejection.  *See* RSA, D.I. 18, Ex. B

(Restructuring Term Sheet), p. 11.  The Debtors' claim that they are exercising sound business judgment would be significantly undermined if third parties are exerting influence over the Debtors' business decisions.    Nothing in the Rejection Motion addresses these issues. Accordingly, discovery is required to develop the record as to the decision-making process and the substantive basis for the Debtors' decisions on rejection.  Grand Mesa will be serving the Debtors with discovery requests forthwith.

III.    **FERC's Exclusive Authority to Ascertain the "Public Interest" Under the ICA Notwithstanding, the Court Must Deny the Rejection Motion In Respect of the Bayswater TSA Because it is Procedurally Defective and Substantively Without Merit.**

A.    **The Rejection Motion Is Not the Proper Procedural Mechanism for the Debtors to Obtain Relief if They Are Seeking to Challenge Grand Mesa's Dedication Rights and Covenants Running With the Land.**

60.    Assuming, *arguendo*, that the Debtors are not ignoring the Dedications (defined below) creating covenants running with the land granted to Grand Mesa under the Bayswater TSA, then it appears the Debtors are seeking a rejection order from this Court to effectively quiet title on the property under the Bayswater TSA by stripping Grand Mesa of the commitment, dedication, and conveyance of real property interests explicitly provided for in the Bayswater TSA.  The Debtors do so in contravention of Fed. R. Bankr. P. ("**Bankruptcy Rules**") 7001, which requires the filing of an adversary proceeding before any such relief in respect of dedication rights may be obtained.

61.    Bankruptcy Rule 7001 requires the Debtors to file an adversary proceeding to determine the validity and extent of Grand Mesa's interests represented by the Bayswater TSA, or obtain a declaratory judgment that Grand Mesa's interests do not run with the land.  Fed. R. Bankr. P. 7001(2), (9).  Bankruptcy Rule 7001(2) is clear that an adversary proceeding must be commenced "to determine the validity, priority, or extent of a lien or other interest in property."

Fed. R. Bankr. P. 7001(2).  Similarly, Bankruptcy Rule 7001(9) provides that an adversary proceeding be commenced "to obtain a declaratory judgment relating to" proceedings described in subsections of Bankruptcy Rule 7001.  Fed R. Bankr. P. 7001(9).

62.    Bankruptcy Rule 7001 "is grounded in principles of due process" guaranteed by the Fifth Amendment to the United States Constitution.  *In re Mansarary-Ruffin*, 530 F.3d 230, 236-37 (3d Cir. 2008) (quotations omitted).  An adversary proceeding provides "greater procedural protection" than a contested matter, "requiring a complaint and a summons, providing for an answer and discovery, and generally concluding only after trial or a dispositive motion."  *Id.* at 237.  Bankruptcy Rule 7001 is "mandatory and establishes a right to specific process that must be afforded."  *Id.* at 238 (debtor could invalidate lien only through an adversary proceeding commenced pursuant to Bankruptcy Rule 7001, and not by motion).

63.    The Debtors' proposed rejection of the Bayswater TSA would effectively operate as an action for a declaratory judgment to determine an interest in property by rejecting the claim of interests of Grand Mesa founded in contract and state law.  Bankruptcy Rule 7001 requires that any such action must be brought as an adversary proceeding.  This should be of no surprise to the Debtors, as courts have consistently held that property interests cannot be rejected under section 365 of the Bankruptcy Code.  *See, e.g.*, *Gouveia v. Tazbir*, 37 F.3d 295, 299 (7th Cir. 1994) (finding section 365 inapplicable to covenants running with the land because they are property interests); *In re Hayes*, No. 07-00045-RBK, 2008 WL 8444812, at *11 (B.A.P. 9th Cir. Mar. 31, 2008) (affirming bankruptcy court's conclusion that restrictive covenants on real property were not executory contracts that could be rejected).

64.    Courts in this Circuit and others routinely resolve disputes involving covenants running with the land of the type set forth in the Bayswater TSA under the procedural safeguards

afforded by an adversary proceeding, *not* a rejection motion.  *See, e.g. Alta Mesa Holdings, LP v. Kingfisher Midstream, LLC (In re Alta Mesa Res., Inc.)*, Adv. Proc. No. 19-03609) (Bankr. S.D. Tex. Sept. 12, 2019) (debtors commenced adversary proceeding seeking declarations that certain agreements did not contain covenants running with the land; *Southland Royalty Co., LLC v. Wamsutter LLC*, Adv. Proc. No. 20-50551 (Bankr. D. Del. Mar. 27, 2020) (debtor commenced adversary proceeding to resolve contract interpretation and covenant running with the land issues); *Whiting Oil and Gas Corp. v. BNN Western, LLC*, Adv. Proc. No. 20-03196 (Bankr. S.D. Tex. Jun. 22, 2020) (debtors commenced adversary proceeding seeking declaration that certain covenants contained in gathering and disposal agreements do not run with the land); *Kinder Morgan Altamont LLC v. EP Energy E&P Company, L.P.*, Adv. Proc. No. 19-03681 (Bankr. S.D. Tex. Nov. 22, 2019) (midstream contract counterparty commenced adversary proceeding seeking declaration that gas purchase contract and related agreement contained covenants running with the land); *Monarch Midstream, LLC v. Badlands Production Co.* (*In re Badlands Energy, Inc.*), Adv Proc. No. 17-01429 (Bankr. D. Colo. Oct. 23, 2017) (midstream counterparty to gas gathering agreements commenced adversary proceeding seeking declaratory judgment that agreements contained covenants running with the land and that assets could not be sold free of clear of such obligations).

65.    Thus, the Rejection Motion is an improper mechanism to adjudicate substantive issues of state law and contract interpretation that underly a determination of Grand Mesa's property interests under the Bayswater TSA.  Accordingly, the Court should only determine and adjudicate such issues in the context of an adversary proceeding.

66.    Notwithstanding the foregoing, even if the Debtors were to commence an adversary proceeding, Grand Mesa's property interests conveyed through the Dedications under the

Bayswater TSA create valid, enforceable covenants running with the land that cannot be rejected under section 365 of the Bankruptcy Code.

### B.    Covenants that Run With the Land Cannot Be Rejected.

67.    As a key component of the Bayswater TSA and as assurance for Extraction's performance thereunder, Extraction dedicated and committed to the performance of the agreement, "all of its right, title and interest in and to: (i) the Subject Leases; (ii) the Wells; (iii) the Dedicated Reserves; and (iv) Shipper's Crude Petroleum" (the "**Dedications**"), in respect of the "Dedication Area" described in the Bayswater TSA.  Bayswater TSA at 1.1.   The Bayswater TSA provides further that the Dedications "shall be a covenant running with the land" and "shall be deemed to touch and concern all of Shipper's oil and gas leasehold interests in the lands within the Dedication Area, and shall be binding upon all of Shipper's permitted successors and assigns."  Bayswater TSA at 1.2.

68.    "Property interests are created and defined by state law" and the relevant property is located in Colorado; therefore, Colorado law applies.  *See In re Badlands Energy, Inc.*, 608 B.R. 854, 867 (citing *Butner v. United States*, 440 U.S. 48, 55 (1979) and *Clarke v. Clarke*, 178 U.S. 186, 191 (1900) ("[i]t is a principle firmly established that to the law of the state in which the land is situated we must look for the rules which govern its descent, alienation, and transfer")).   Under Colorado law,[36] "real covenants 'run with the land' and burden or benefit successors in interest." *Cloud v. Ass'n of Owners, Satellite Apartment Bldg., Inc.*, 857 P.2d 435, 440 (Colo. App. 1992). The Bankruptcy Code, including sections 363 and 365, does not trump this well-settled principle

---

[36] Though the Bayswater TSA is governed by Texas law, since "[p]roperty interests are created and defined by state law," and the Dedications thereunder are located in Colorado, application of Colorado law concerning real covenants is mandated. *Butner v. U.S.*, 440 U.S. 48, 55 (1979); *see also*, *Clarke v. Clarke*, 178 U.S. 186, 191 (1900) ("It is a principle firmly established that to the law of the state in which the land is situated we must look for the rules which govern its descent, alienation, and transfer").

of property law.    For example, in *In re Lonesome Pine Holdings, LLC*, the United States

Bankruptcy Court for the District of Colorado held that a debtor may not sell property free and

clear of covenants running with the land under §363(f).  2011 Bankr. LEXIS 5775, *9 (Bankr. D.

Colo. Sept. 1, 2011) (restrictive covenants "are not 'interests' that fall within § 363").  The Court

held that covenants running with the land "create equitable interests that do not compel a person

to accept a monetary interest; thus, when restrictive covenants are involved, there is nothing that

can force those who benefit from restrictive covenants to 'forego equitable relief in favor of a cash

award.'"  *Id.* at *8-9.

71.    Courts consistently hold that agreements containing covenants running with the

land cannot be rejected under section 365 of the Bankruptcy Code.  *See, e.g.*, *Gouveia*, 37 F.3d at

299 (section 365 was inapplicable to covenants running with the land); *Alta Mesa Res.*, 613 B.R.

at 95 (gathering agreement containing covenants running with the land was not subject to rejection

under section 365); *Badlands Energy*, 608 B.R. at 875 (same); *In re Banning Lewis Ranch Co.*,

532 B.R. 335, 345 (Bankr. D. Colo. 2015) (because gathering agreements were of the type that run

with the land debtor's rejection of agreements would serve no purpose).

70.    Grand Mesa's interests under the Bayswater TSA are classified as "property rights"

under the Bankruptcy Code and, as such, are not subject to rejection under section 365.  Therefore,

because the Bayswater TSA contains covenants running with the land, as discussed below, they

are contracts binding on the Debtors.

C.    **The Dedications in the Bayswater TSA Run With the Land.**

71.    Under Colorado law, "[i]n order for a covenant to run with the land, not only must

the parties to the covenant intend that it do so, but the covenant must 'touch and concern the land."

*Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74

(Colo. App. 1993). Here, the Dedications in the Bayswater TSA easily satisfy both required elements.

### 1.    The Parties Intended the Dedications to Run With the Land

72.    Section 1.2 of the Bayswater TSA is a clear manifestation of the parties' intent that the Dedications run with the land:

> The dedication by Shipper described in the preceding paragraph for the performance of this Agreement shall be a covenant running with the land (and for clarity, shall also apply to any Dedicated Interests acquired by Shipper subsequent to the Effective Date), shall be deemed to touch and concern all of Shipper's oil and gas leasehold interests in the lands within the Dedication Area, and shall be binding upon all of Shipper's permitted successors and assigns. To that end, counterparts of a recording memorandum for this Agreement, in the form attached hereto as Exhibit E, shall be filed of record in all counties in which any of the Dedicated Interests are located.

Bayswater TSA at 1.2.

73.    In turn, the Memorandum of Amended Restated Transportation Services Agreement (the "**Recording Memorandum**"), a copy of which is annexed hereto as <u>Exhibit A</u>, referenced in the above excerpt (that was duly recorded with Weld County, Colorado Clerk and Recorder on January 18, 2017 at 3:11 PM) further states that "the Parties further provide notice they intend that Grand Mesa's interests in the Dedicated Interests shall be subject to and burdened by the Agreement, the terms thereof shall be deemed incorporated by reference in its entirety herein and be appurtenant to and run with the land comprising the Dedicated Interests and the Dedication Area, and further, that the Agreement shall be binding and enforceable upon the successors and assigns of the Parties or of any interest in the Property." *See* Ex. A, ¶ 4; Ex. B, ¶ 10.

74.    The language in the Bayswater TSA and its accompanying Recording Memorandum is sufficient to satisfy the intent element. *See Reishus v. Bullmasters, LLC*, 2016 409 P.3d 435, 441 (Col. Ct. App. 2016) (finding that the "parties clearly intended the 2007

Amended Agreement to run with the land" where contract "explicitly states that 'the provisions of this Agreement shall run with the Ranch, shall be binding upon and inure to the benefit of all Owners, their legal representatives, heirs, successors and assigns, and shall be in effect in perpetuity unless amended or terminated as provided in this Agreement.'" (citation omitted; alteration deleted); *see also Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 628 (Utah 1989) ("An express statement in the document creating the covenant running with the land is usually dispositive of the intent issue").

## 2.    The Dedications Touch and Concern the Land

75.    Under Colorado law, to satisfy the "touch and concern" element, a covenant must "closely relate to the land, its use, or its enjoyment." *Cloud v. Ass'n of Owners, Satellite Apartment Bldg., Inc.*, 857 P.2d 435, 440-41 (Colo. App. 1992). "Whether a covenant runs with the land turns on the construction of relevant documents." *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. Ct. App. 1993).

76.    Here, it is clear that the Dedications "closely relate" to "the use" and "enjoyment" of the land. As an example, in the Bayswater TSA, the "Dedicated Reserves" are burdened by the Dedications. Dedicated Reserves are defined as "all of the right, title and interest of Shipper in and to all Crude Petroleum reserves *in and under* the Subject Leases and the Wells Owned or Controlled by Shipper, whether now owned or hereafter acquired by Shipper." Bayswater TSA at § 2. Moreover, the Bayswater TSA further defines "Subject Leases" as "the oil, gas, and mineral … deeds, conveyances, and other instruments" described elsewhere in the Bayswater TSA. *Id.*

77.    Generally, "reserves" are commonly understood in the energy industry to be the "unproduced but recoverable oil and/or gas in place in a formation which has been proven by production." Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law,

Manual of Oil & Gas Terms, Vol. 8, at p. 894 (LexisNexis Matthew Bender 2015).   Additionally, under Colorado law, "an oil and gas lessee has a legally protected property interest in the mineral estate covered by the leases."  *Maralex Res., Inc., v. Chamberlain*, 320 P.3d 399, 403 (Col. Ct. App. 2014); *see also Gaddis v. McDonald*, 633 P.2d 1102, 1104 (Col. Ct. App. 1981) ("An overriding royalty interest in respect to oil and gas leases is a real property interest").

78.     Thus, it is clear that the Dedications "touch and concern" the relevant land. Colorado courts find that the touch and concern requirement is satisfied where there is a sufficient connection with the covenant to the possession, use or enjoyment of the land.  In *In re Banning Lewis Ranch Co.*, LLC, a Colorado bankruptcy court determined a municipality's annexation agreement with a landowner that had a covenant to "not create additional costs or impose additional burdens on the City's existing residents" touched and concerned the land.  532 B.R. 335 at 340 (Bankr. D. Col. 2015).  Similarly, in *Reishus v. Bullmasters, LLC*, the court found that a hunting restriction adopted by a simple majority of tenants in common to real property touched and concerned the land as "[t]hese provisions are closely tied with the use, possession, and enjoyment of the ranch.  409 P.3d 435, 441 (Col. Ct. App. 2016).

79.     Accordingly, under Colorado law[37] the Dedications are covenants that run with the land that cannot simply be rejected under section 365 of the Bankruptcy Code.  The Debtors have not suggested otherwise in the Rejection Motion, nor can they.

---

[37] As noted in herein, though the Bayswater TSA is governed by Texas law, the question of whether the Dedications are real property interests must be analyzed pursuant to Colorado law, the location of the real property.  However, even if Texas law applied, the result would be no different.  Under Texas law, "a covenant runs with the land when it [1] touches and concerns the land; [2] relates to a thing in existence or specifically binds the parties and their assigns; [3] is intended by the original parties to run with the land; [4] and when the successor to the burden has notice." *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987) (alterations added). Here, elements [1] and [3] are satisfied for the reasons outlined above.  Element [2] is satisfied because the language of the Dedications clearly binds the parties and their assigns and relates to real property in existence.  Element [4] is satisfied because record notice was provided through the Recording Memorandum and the Debtors had actual notice of the Designation expressly set forth in the Bayswater TSA.  *See* Ex. A.

IV.       **The Debtors are Not Entitled to Relief *Nunc Pro Tunc*.**

80.       Even if the Court is inclined to grant the Rejection Motion notwithstanding the arguments set forth above (which Grand Mesa submits would be in error), the TSAs should not be rejected *nunc pro tunc* to the Petition Date, as the Debtors have requested.

81.       Pursuant to the TSAs, the Debtors have reserved committed capacity[38] for the transportation of their oil on the Grand Mesa Pipeline (the "**TSA Capacity**").  In return for providing the Debtors with known, uninterruptible, committed pipeline capacity to transport the Debtors' oil (which Grand Mesa cannot sell on a committed basis to any other shipper), the Debtors pay Grand Mesa a dollar amount based on the "obligation to ship or pay [Extraction's] Committed Volume" in the amount "of two hundred three million (203,000,000) Barrels" of oil over the term of the Extraction TSA (the "Fixed Monthly Payment"),[39] regardless of whether the Debtors utilize the TSA Capacity on the Grand Mesa Pipeline.

82.       Because the Debtors bargained for, received, and continue to receive the benefit of access to the TSA Capacity on a daily basis, Grand Mesa has reserved, and continues to reserve, the TSA Capacity on its pipeline for the benefit of the Debtors.  Thus, under the TSA approved by FERC, Grand Mesa is required to provide the TSA Capacity to the Debtors and cannot re-sell the TSA Capacity on a committed basis while the TSAs are in effect.  As a result, until the TSAs are rejected (and to the extent the Debtors do not use their capacity), Grand Mesa is left with unused capacity on its pipeline that it cannot sell to other shippers on a committed basis.

---

[38] Extraction TSA at 3.1 (stating that "Grand Mesa shall provide Services for all volumes up to the Fixed Monthly Payment Volume"), and at 10.1 (stating that Extraction's capacity "shall not be reduced due to prorationing resulting from Pipeline System oversubscription due to shipper nominations exceeding Pipeline System capacity in any given Month.").  The Bayswater TSA contains similar terms.

[39] *Id.* at 4.1 and 8.1.  The Bayswater TSA contains similar terms, with a lower quantity.

83.     The facts of these chapter 11 cases reflect that the retroactive rejection of the TSAs to the Petition Date is not appropriate or equitable.  Permitting the Debtors to reject the TSAs, effective *nunc pro tunc* to the Petition Date, would result in an undue burden on Grand Mesa, which remains bound by FERC rules to dutifully reserve significant amounts of pipeline capacity for the benefit of the Debtors, with no ability to sell such capacity on a committed basis to other shippers.

84.     Courts, including this Court, generally hold that "section 365(a) is most faithfully read as making court approval a condition precedent to the effectiveness of a trustee's rejection of [an executory contract].  Therefore, the date of court approval … controls."  *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. #1 (In re Thinking Machines Corp.)*, 67 F.3d 1021, 1025 (1st Cir. 1995); *see also In re DBSI, Inc.*, 409 B.R. 720, 733 (Bankr. D. Del. 2009) (stating that "[t]he majority of courts, including the Bankruptcy Court for the District of Delaware, hold that court approval is a 'condition precedent' to an effective [executory contract] rejection.")

85.     Courts, however, permit the retroactive application of an order rejecting an executory contract "only after balancing the equities in a particular case."  *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (citing *In re Thinking Machines Corp.*, 67 F.3d at 1028 (observing that "bankruptcy courts may enter retroactive orders of approval, and should do so when the balance of equities preponderates in favor of such remediation.").  The power to grant retroactive relief is derived from the Bankruptcy Court's equitable powers to ensure a fair outcome. *In re TW, Inc.*, 2004 WL 115521, at *2 (D. Del. Jan. 14, 2004) (denying *nunc pro tunc* rejection of a lease where the leased premises were not properly surrendered).  An order granting relief *nunc pro tunc* is not a remedy that should be given as a matter of course, but only after a balancing of

the equities in a particular case. *Id.* It is the burden of the moving party to show that *nunc pro tunc* relief, is appropriate. *Id.*

86.    In this case, retroactive rejection to the Petition Date is not equitable and the Debtors have failed to show it is appropriate. Pursuant to the plain wording of the TSAs, Grand Mesa is required to reserve for the Debtors the TSA Capacity on the Grand Mesa Pipeline and Grand Mesa cannot sell that capacity on a committed basis to any other shippers, regardless of whether the Debtors utilize the TSA Capacity, as long as the TSAs remain in effect. Rejection would have inequitable results for Grand Mesa, including the loss of its bargained for revenue streams and expansion capital cost recovery for the period between the filing of the Rejection Motion and the date when the Rejection Motion might be approved by the Court. In the meantime, Grand Mesa cannot resell the TSA Capacity to any other shippers on a committed basis.

87.    To further underscore the illogicality of the *nunc pro tunc* relief requested by the Debtors, within two weeks after filing the Rejection Motion, in accordance with the terms of the TSAs, **the Debtors scheduled shipments for the entire month of July 2020** *and*, **more recently, on July 24, 2020, the Debtors scheduled shipments for the entire month of August 2020.** *Both of these monthly nominations were made under the very TSAs the Debtors are seeking to have deemed rejected as of June 14, 2020.* *Nunc pro tunc* relief under these circumstances is not only unwarranted, it is inexplicable. Permitting the Debtors to reject the TSAs *nunc pro tunc* to the Petition Date would be inequitable and result in an undue burden on Grand Mesa.

## CONCLUSION

For the reasons set forth herein, Grand Mesa respectfully requests that this Court (i) sustain Grand Mesa's Objection and deny the Rejection Motion in respect of the TSAs, or, in the alternative, (ii) sustain Grand Mesa's Objection and deny the Rejection Motion specifically in

respect of the Bayswater TSA and defer any ruling in respect of the Extraction TSA until the Court has heard arguments and issued a ruling with respect to Grand Mesa's Lift-Stay Motion filed contemporaneously herewith.

[Signature on next page]

Dated: August 4, 2020
     Wilmington, Delaware

Respectfully submitted,

GREENBERG TRAURIG, LLP

/s/ *Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801
Telephone: 302-661-7000
Facsimile: 302-661-7360
Email: melorod@gtlaw.com

and

Iskender H. Catto
Hal S. Shaftel
Ryan A. Wagner
Greenberg Traurig, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
Email: cattoi@gtlaw.com
     shaftelh@gtlaw.com
     wagnerr@gtlaw.com

and

Kenneth M. Minesinger
Howard L. Nelson
Jack T. LeBris Erffmeyer
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
Telephone:  (202) 331-3100
Facsimile:  (202) 331-3101
Email:  minesingerk@gtlaw.com
     nelsonh@gtlaw.com
     lebriserffmeyerj@gtlaw.com

Counsel for Grand Mesa Pipeline, LLC