# EXHIBIT C

FERC ICA Oil Tariff                                                         FERC No. 1.0.0

# DJ SOUTH GATHERING, LLC
# LOCAL TARIFF

## CONTAINING

## RULES AND REGULATIONS

Governing the Interstate Transportation of

## CRUDE PETROLEUM BY PIPELINE

**FROM ORIGINS IN ADAMS AND WELD COUNTIES, COLORADO
TO DESTINATIONS IN WELD COUNTY, COLORADO**

Issued under authority of 18 CFR § 342.2(b) for establishing initial rates.

Issued on less than one (1) day's notice under authority of 18 C.F.R. § 341.14. This tariff publication is conditionally accepted subject to refund pending a 30 day review period.

The provisions published herein will, if effective, not result in an effect on the quality of the human environment.

**ISSUED: October 4, 2019**                **EFFECTIVE: October 5, 2019**

**ISSUED BY:**                              COMPILED BY:

Adam Bedard                                 Patrick McMurry
Chief Executive Officer                     SVP Gathering and Transportation
DJ South Gathering, LLC                     DJ South Gathering, LLC
1600 Broadway, Suite 2400                   510 So. Coltrane, Suite A
Denver, CO 80202                            Edmond, OK 73034
                                            405-697-0863

# TABLE OF CONTENTS

| SUBJECT | ITEM NO. | PAGE NO. |
|---|---|---|
| DEFINITIONS | 5 | 3 |
| NOMINATIONS; MINIMUM QUANTITY | 10 | 4 |
| TITLE | 15 | 5 |
| REQUIRED SHIPPER INFORMATION | 20 | 5 |
| LINE FILL AND TANK BOTTOM REQUIREMENTS | 25 | 5 |
| QUALITY SPECIFICATIONS | 30 | 6 |
| GAUGING, TESTING AND DEDUCTIONS | 35 | 6 |
| DESTINATION FACILITIES REQUIRED | 40 | 8 |
| NOTICE OF ARRIVAL, DELIVERIES AND DEMURRAGE | 45 | 8 |
| MIXING IN TRANSIT | 50 | 8 |
| APPLICATION OF RATES AND CHARGES | 55 | 9 |
| PAYMENT OF TRANSPORTATION AND OTHER CHARGES | 65 | 9 |
| LIABILITY OF CARRIER | 70 | 9 |
| WARRANTIES | 75 | 11 |
| DUTY OF CARRIER | 80 | 12 |
| CLAIMS AND TIME FOR FILING | 85 | 12 |
| ADDITIVES | 90 | 12 |
| PIPEAGE OR OTHER CONTRACTS | 95 | 12 |
| PRORATION OF PIPELINE CAPACITY | 100 | 12 |
| STORAGE IN TRANSIT | 105 | 15 |
| COMMODITY | 110 | 15 |
| CONNECTION REQUIREMENTS | 115 | 15 |
| ORIGINATION FACILITIES | 120 | 15 |

# RULES AND REGULATIONS

## ITEM 5.    DEFINITIONS

**"Affiliate"** as herein used means, with respect to any Person, any Person directly or indirectly Controlling, Controlled by or under common Control with such Person.

**"API"** as herein used means American Petroleum Institute.

**"Applicable Laws"** means all federal, state or local laws, rules, orders or regulations applicable to these rules and laws, the parties, the System and the operation thereof.

**"Barrel"** as herein used means forty-two (42) United States gallons at sixty degrees (60°) Fahrenheit and zero (0) gauge pressure if the vapor pressure of the Crude Petroleum is at or below atmospheric pressure, or at equilibrium pressure if the vapor pressure of the Crude Petroleum is above atmospheric pressure.

**"Carrier"** as herein used means DJ South Gathering, LLC.

**"Control," "Controlling" or "Controlled"** means the possession, directly or indirectly, of the right or power to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, partnership interests, management authority, by contract or otherwise; and without limiting the foregoing, it shall be deemed that the ownership of more than 50% of the voting securities, partnership interests, member interests or percentage interest of another Person shall be deemed to meet such control test.

**"Crude Petroleum"** as herein used means the direct liquid product of oil wells, or the indirect liquid petroleum products of oil or gas wells, or a mixture of such products.

**"FERC"** as herein used means the Federal Energy Regulatory Commission or any commission, agency or other governmental body succeeding to the powers of such commission.

**"Force Majeure"** as herein used means an event that is beyond the reasonable control of a party and could not have been prevented through the exercise of reasonable diligence, including, without limitation, strikes; lockouts; work stoppages, or other labor disputes or shortages; riots; civil disturbances or disorders; war; acts of the public enemy; terrorism; espionage; nuclear disaster; act of God; fire; explosion; breakage or accident to machinery, equipment, or pipelines; severe weather; earthquakes; floods; epidemics; embargoes; material shortage or unavailability not resulting from Carrier's failure to timely place orders or take other necessary actions therefor; inability to obtain necessary rights-of-way; inability or delay in obtaining governmental permits; government codes, ordinances, laws, rules, regulations, or restrictions; or actions that block or prohibit performance. For the avoidance of doubt, a shutdown of the System or any part thereof due to planned maintenance, Shipper's decision to cease or materially reduce or change its operations in the market area served by the System, or Shipper's financial condition or the obligation to pay amounts that have become due under a transportation services agreement, shall not constitute a Force Majeure event.

**"Nomination"** as herein used means a written (physical or electronic) designation by a Shipper to Carrier of a stated quantity of Crude Petroleum for transportation from a specified origin point or points of Carrier to a specified destination point or points of Carrier over a period of one Operating Month in accordance with these rules and regulation.

**"Operating Month"** as herein used means a month that shall be deemed to begin the first day of such month at 0700 hours until the first day of the succeeding month at 0659 hours (Central Standard or Central Daylight Savings Time, as applicable).

**"Person"** means any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such) or other entity.

**"Royalties"** has the meaning assigned to such term in Item No. 70.

**"Shipper"** as herein used means a party who contracts with Carrier for transportation of Crude Petroleum, as defined under the terms of these rules and regulations.

**"System"** as herein used means the pipeline that Carrier owns an interest in and to which these rules and regulations are applicable.

**"Tender"** as herein used means an offer by a Shipper to Carrier in accordance with this tariff for the transportation of a stated quantity of Crude Petroleum from a specified origin of Carrier to specified destination point.

## ITEM 10.    NOMINATIONS; MINIMUM QUANTITY

Unless otherwise stated on a tariff making reference to these rules and regulations, Nominations for the transportation of Crude Petroleum for which Carrier has facilities will be accepted into Carrier's System under these rules and regulations in quantities of not less than ten thousand (10,000) Barrels aggregate from one or more Shippers as operations permit and provided such Crude Petroleum is of similar quality and characteristics as is being transported from receipt point to destination point; except that Carrier reserves the right to accept any quantity of Crude Petroleum from other facilities to which Carrier's facilities are connected if such quantity can be consolidated with other Crude Petroleum such that Carrier can make a single delivery of not less than twenty thousand (20,000) Barrels, and Carrier will not be obligated to make any single delivery of less than twenty thousand (20,000) Barrels, unless Carrier's operations dictate otherwise. The term "single delivery" as used herein means a delivery of Crude Petroleum in one continuous operation into a single facility to which Carrier is connected.

Crude Petroleum will be transported only under a Nomination accepted by the Carrier from origins (or facilities connected to Carrier's gathering System if and when gathering service is to be performed by the Carrier) to destinations when a tariff covering the movement is lawfully in effect and on file with the FERC as to interstate traffic and with the appropriate state commission covering intrastate traffic.

Any Shipper desiring to Tender Crude Petroleum for transportation shall make a Nomination to the Carrier in writing before 5:00 p.m. Central Standard Time/Central Daylight Saving Time, whichever is applicable, on the twenty-fifth (25th) of the month preceding the movement. Within forty-eight (48) hours after its receipt of such Nomination (or by the end of the next business day if received on a non- business day), Carrier shall, by written notice to Shipper, confirm the Nomination as proposed or notify Shipper of any necessary revisions to such Nomination. Carrier shall furnish Shipper with a final Nomination at least two days prior to the first day of such following Month. In the event Shipper's Nomination for its initial shipment of Crude Petroleum on the System falls on a day after the 25th day of a Month, the above deadline shall be extended and the Parties shall coordinate with each other to allow shipments to commence the next Month. Unless such notification is made, the Carrier will be under no obligation to accept Crude Petroleum for transportation.

When Nominations submitted by Shippers to Carrier on or before the twenty-fifth (25th) day of the month preceding the Operating Month do not exceed the capacity of the System or any line segment thereof, additional Nominations may be accepted by the Carrier to fill capacity. Carrier is under no obligation to accept such incremental Nominations, and such additional Nominations will be accepted only if they do not impair the movement of Crude Petroleum nominated before the twenty-fifth (25th) day of the preceding month.

### ITEM 15.    TITLE

The Carrier shall have the right to reject any Crude Petroleum, when nominated for transportation, which may be involved in litigation, or the title of which may be in dispute, or which may be encumbered by a lien or charge of any kind, and it may, in a non-discriminatory manner, require the Shipper to provide satisfactory evidence of unencumbered title prior to accepting deliveries of Crude Petroleum from Shipper. By Tendering Crude Petroleum, the Shipper warrants and guarantees that the Shipper has good title thereto and agrees to hold Carrier harmless for any and all loss, cost, liability, damage and/or expense resulting from failure of title thereto; provided, that acceptance for transportation shall not be deemed a representation by the Carrier as to title.

### ITEM 20.    REQUIRED SHIPPER INFORMATION

At any time, upon written request of the Carrier, on a non-discriminatory basis, any prospective or existing Shipper shall provide to the Carrier information that will enable the Carrier to enforce the terms of this tariff. Such information may include, but is not limited to, the names of any Affiliates of the Shipper or prospective Shipper, the legal business name of the Shipper or prospective Shipper and the registered business address of the Shipper or prospective Shipper.

The Carrier shall not be obliged to accept Crude Petroleum for transportation from an existing or prospective Shipper if the Shipper or prospective Shipper fails to provide to the Carrier any information requested in accordance with this Item No. 20 within three (3) days of the Carrier's written request, or if the Carrier reasonably determines that any of the information provided pursuant to this Item No. 20 is false.

### ITEM 25.    LINE FILL AND TANK BOTTOM REQUIREMENTS

Prior to delivering Barrels out of Carrier's System, each Shipper will be required to supply a pro rata share of Crude Petroleum necessary for pipeline and tankage fill to ensure efficient operation of Carrier's System. Crude Petroleum provided by Shippers for this purpose may be withdrawn only after: (1) shipments have ceased and the Shipper has notified Carrier in writing of its intention to discontinue shipments in Carrier's System, and (2) Shipper balances have been reconciled between Shipper and Carrier. Carrier may, in a non-discriminatory manner, require advanced payment of transportation charges on the volumes to be cleared from Carrier's System, and any unpaid accounts receivable, before final delivery will be made. Carrier shall have a reasonable period of time from the receipt of said notice, not to exceed six months, to complete administrative and operational

requirements incidental to Shipper withdrawal.

## ITEM 30.   QUALITY SPECIFICATIONS

No Crude Petroleum will be accepted for transportation except merchantable Crude Petroleum which is properly settled, whose gravity, viscosity, and other properties are such that it will be readily susceptible to transportation through the Carrier's existing facilities, and which will not adversely affect the quality of Crude Petroleum from other Shippers or cause disadvantage to other Shippers and/or Carrier.

These specifications shall apply to each barrel of the Nomination and not be limited to the composite sample of the Nomination.

Carrier reserves the right to reject all Nominations or any part thereof when, in Carrier's discretion, reasonably exercised:

(1) The Reid Vapor Pressure of the Crude Petroleum greater than twelve pounds (12.0 lbs.) per square inch absolute;

(2) The Crude Petroleum contains more than five-tenths of one percent (0.5%) water;

(3) The Crude Petroleum contains basic or foreign sediment and water and other impurities exceeding one percent (1%) by volume;

(4) The gravity of the Crude Petroleum is less than twenty degrees (20°) API gravity or greater than fifty-five degrees (55°) API gravity at sixty degrees Fahrenheit (60°F);

In addition to those quality requirements listed above, the Carrier shall further restrict acceptance of Crude Petroleum if the Crude Petroleum does not meet the relevant quality specifications of the connecting carrier to which production is Nominated.

Carrier may, from time to time, undertake to transport other or additional grades of Crude Petroleum and if, in the opinion of Carrier, sufficient quantities are not nominated or facilities are not available to justify continued transportation of other or additional grades, Carrier may, after giving reasonable notice to Shippers who may be affected, cease transporting particular grades of Crude Petroleum.

## ITEM 35.   GAUGING, TESTING AND DEDUCTIONS

Crude Petroleum shipped hereunder shall be measured and tested by a representative of the Carrier or by Automatic Custody Transfer (ACT) equipment provided by the Carrier. In the case of oil measurement by ACT Unit meters, the Gross Observed Volume (GOV) shall be calculated from the

Indicated Volume and the application of the Meter Factor (MF) as given in API MPMS Chapter 12.2 in its latest revision. Where the measurement is determined by tank gauge, such measurement shall be based upon tanks strapped and tables compiled in accordance with Chapter 2, "Tank Calibration", API Manual of Petroleum Measurement Standards, Latest Edition, indicating on hundred percent (100%) full capacity. Volume measurements by temperature compensated meters shall be corrected for meter factor and pressure in accordance with the API Manual of Petroleum Liquid Hydrocarbon by Pipeline Displacement Meters.

Where the tank or meter of the Shipper is used for volume determination for deliveries into or from Carrier's facilities, Carrier reserves the right to require re-strapping or check-strapping of any such tank. The recalculation of Carrier shall deduct from the volume of Crude Petroleum received into Carrier's facilities the actual amount of suspended basic or foreign sediments, water and other impurities as ascertained by centrifuge or other tests agreed upon.

The net standard volume (NSV) of oil at sixty degrees Fahrenheit (60° F) and one atmosphere, calculated from the GOV, less sediment and water and other impurities volume percentage shall be the quantity received or delivered by Carrier.

All receipts of Crude Petroleum shall be subject to a deduction of two-tenths of one percent (0.2%) to cover line loss due to shrinkage and evaporation incident to transportation on Carrier's facilities, and the volumes delivered to Shipper from Carrier's facilities shall be net of such deduction. ("Pipeline Loss Allowance")

Carrier will not accept any material for shipment above fifty-five degrees (55°) API gravity at sixty degrees Fahrenheit (60° F) unless requested by the Shipper and accepted by the Carrier.

In addition to the Pipeline Loss Allowance set forth above, all Crude Petroleum nominated for shipment shall be subject to a further deduction as determined in the Table below for gravity shrinkage ("Gravity Shrinkage Deduction")

| **API Gravity, Degrees** | **Deduction For Incremental Evaporation & Shrinkage** |
| --- | --- |
| 55.1 through 59.9 | 1.5% |
| 60.0 through 64.9 | 2.0% |
| 65.0 through 69.9 | 2.5% |
| 70.0 through 74.9 | 3.0% |
| 75.0 and above | 5.0% |

Meters on ACT Units shall be proved or cause to be proved by Carrier no less than monthly. Shipper or its representative shall have the privilege of being present or represented during the gauging, proving, or metering and testing performed by Carrier. Shipper shall grant access to Shipper's facility to Carrier's representative and to any connecting carrier's representative for witnessing meter or gauge readings or meter proving and for any other required inspection incidental to measurement and transportation of Crude Petroleum. Except for arithmetic errors, all measurements and testing by Carrier shall be conclusive if a representative of the Shipper or its Consignee was not present during such measuring and testing.

After consideration of all the factors set forth in this Item No. 35, a net balance will be determined as the quantity deliverable by Carrier, and transportation charges will be assessed on this net balance.

## ITEM 40.     DESTINATION FACILITIES REQUIRED

Carrier will accept Crude Petroleum for transportation only when the Shipper has made the necessary arrangements for shipment beyond, or has provided the necessary facilities for receiving said Crude Petroleum as it arrives at, the destination and has advised Carrier of such arrangements on or before the Nomination date.

## ITEM 45.     NOTICE OF ARRIVAL, DELIVERIES AND DEMURRAGE

The obligation of the Carrier is to deliver the quantity of Crude Petroleum to be transported, less deductions noted in Item No. 35 (GAUGING, TESTING AND DEDUCTIONS), at the specified destination. Such delivery may be made upon twenty-four (24) hours' notice to Shipper who shall accept and receive said Crude Petroleum from the Carrier with all possible dispatch into tanks or receptacles arranged for or provided by the Shipper.

Commencing after the first seven o'clock a.m. notice after expiration of said 24-hour notice, Carrier shall assess a demurrage charge on any part of said Crude Petroleum offered for delivery and not taken by Shipper. The demurrage charge will be 50.0 cents per Barrel per day for each day of 24 hours or fractional part thereof.

After expiration of said 24-hour notice, Carrier's liability for loss, damage or delay with respect to Crude Petroleum offered for delivery but not taken by Shipper shall be that of a warehouseman only. If the Shipper is unable or refuses to receive said Crude Petroleum as it arrives at the specified destination, the Carrier reserves the right to make whatever arrangements for disposition of the Crude Petroleum it deems appropriate in order to clear its pipeline. Any additional expenses incurred by the Carrier in making such arrangements shall be borne by the Shipper.

## ITEM 50.     MIXING IN TRANSIT

Crude Petroleum will be accepted for transportation only on condition that it shall be subject to normal changes in general characteristics while in transit as may result from the mixture of such Crude Petroleum with other similar Crude Petroleum in the pipeline and/or tanks of Carrier or connecting carrier. Carrier will not be liable for variations of gravity or quality of Crude Petroleum occurring while in its custody and is under no obligation to deliver the identical Crude Petroleum as received. There shall be no adjustment for downgrading or upgrading of Crude Petroleum Tendered for transportation as a result of mixing in transit.

## ITEM 55.    APPLICATION OF RATES AND CHARGES

Crude Petroleum accepted for transportation shall be subject to the rates and charges in effect on the date of receipt of such Crude Petroleum by Carrier. Transportation and all other lawful charges will be collected on the basis of net quantities of Crude Petroleum delivered as determined in the manner provided in Item No. 35 (GAUGING, TESTING AND DEDUCTIONS).

## ITEM 65.    PAYMENT OF TRANSPORTATION AND OTHER CHARGES

Shipper shall be responsible for payment of transportation and all other charges applicable to the shipment, and may be required, in a nondiscriminatory manner, to prepay such charges or furnish a guaranty of payment satisfactory to Carrier. Payments not received by Carrier in accordance with invoice terms shall be subject to a late charge equivalent to 125% of the prime rate as quoted by The Wall Street Journal, or the maximum rate allowed by Applicable Laws, whichever is less. Carrier shall have a lien on all Crude Petroleum accepted for transportation to cover payment of all charges, including demurrage and late charges and may refuse to make delivery of the Crude Petroleum until all charges have been paid. If said charges, or any part thereof, shall remain unpaid for thirty days after notice of readiness to deliver, the Carrier may sell the Crude Petroleum at public auction. Carrier shall have a lien on Crude Petroleum when there shall be failure to take the Crude Petroleum at the point of destination as provided in Item No. 45 (NOTICE OF ARRIVAL, DELIVERIES AND DEMURRAGE). Carrier shall have the right to sell said Crude Petroleum at public auction, for cash. The auction will be held between the hours often o'clock a.m. and four o'clock p.m. on any day not a weekend or legal holiday, and not less than twenty-four hours after the Shipper has been officially notified of the time and place of such sale and the quantity, general description, and location of the Crude Petroleum to be sold. Carrier may be a bidder and purchaser at such sale. Out of the proceeds of said sale, Carrier shall pay itself for all transportation, demurrage, and other lawful charges, expenses of notice, advertisement, sale and other necessary expenses, and expenses of caring for and maintaining the Crude Petroleum, and the balance shall be held for whomsoever may be lawfully entitled thereto after the auction. If the proceeds of said sale do not cover all expenses incurred by Carrier, the Shipper is liable to Carrier for any deficiency.

When reasonable grounds for insecurity of payment or performance arise, or as otherwise required by a transportation services agreement, Carrier may demand from Shipper adequate assurance of performance. Adequate assurance means sufficient security in the form and for the term specified by Carrier, including, but not limited to, a standby, irrevocable letter of credit, a prepayment, or a guaranty by a creditworthy entity.

## ITEM 70.    LIABILITY OF CARRIER

As a condition to Carrier's acceptance of Crude Petroleum under this tariff, each Shipper agrees to defend, indemnify and hold harmless Carrier against claims or actions for injury and/or death of

any and all persons whomever and for damage to property of or any other loss sustained by Carrier, Shipper, and/or any third party resulting from or arising out of (1) any breach of or failure to adhere to any provision of this tariff by Shipper, its agents, employees, or representatives or (2) the negligent act(s) or failure(s) to act of Shipper, its agents, employees or representatives in connection with delivery or receipt of Crude Petroleum.

No waiver by either Party of any default by the other in the performance of any provision, condition, or requirement in this tariff will be deemed to be a waiver of, or in any manner release the other Party from, performance of any other provision, condition, or requirement in this tariff, nor be deemed to be a waiver of, or in any manner release the other Party from, future performance of the same provision, condition, or requirement; nor will any delay or omission of either Party to exercise any right under this tariff in any manner impair the exercise of any such right or like right accruing to it thereafter.

Shipper will pay or cause to be paid, and agrees to indemnify and hold harmless Carrier from and against the payment of, all excise, gross production, severance, sales, occupation, and all other taxes, charges, or impositions of any and every kind and character required by statute or by any governmental authority with respect to the Crude Petroleum and the handling thereof prior to and at receipt and then at and after delivery. Neither Party will be responsible or liable for any taxes or other statutory charges levied or assessed against the facilities or the other Party used for the purpose of carrying out the provisions of this tariff. Any Party entitled to an exemption from any such taxes or charges will furnish the other Party any necessary documentation thereof.

Shipper will be solely responsible for the payment of all royalties, overriding royalties, bonus payments, production payments, payments for interests in production, or other similar payments due on production (collectively, "Royalties") relating to the Crude Petroleum in accordance with the terms of the applicable oil and Gas leases, Applicable Laws and other instruments affecting production of the Crude Petroleum. Shipper assumes full responsibility and liability for said payments, and hereby agrees to indemnify, defend, and hold Carrier and its Affiliates harmless from any and all liability or loss of any kind or character incident to the payment of Royalties.

The Shipper shall be liable for the payment of gathering and transportation charges, fees, and other lawful charges accruing to or due Carrier by Shipper, including but not limited to, penalties, interest and late payment charges on Crude Petroleum delivered by Carrier. All accrued charges are due on delivery of Crude Petroleum by Carrier. Carrier may, at its option, require Shipper to pay all such charges and fees in advance or to provide an irrevocable letter of credit satisfactory to Carrier.

The Carrier while in possession of any of the Crude Petroleum herein described shall not be liable for any loss thereof, damage thereto, or delay, caused by: fire, storm, flood, epidemics, Act of God, terrorism, vandalism, criminal acts, landslides, land collapses, riots, civil disorder, strikes, insurrection, rebellion, war, act of the public enemy, quarantine, the authority of law, requisition or necessity of the Government of the United States in time of war, default of Shipper or Owner, earthquakes, sinkholes, or from any other cause not due to the negligence of Carrier and in no event shall Carrier be liable to Shipper for consequential, incidental or exemplary damages to Shipper. In case of loss of Crude Petroleum in a segregated shipment, the Shipper thereof shall bear the entire loss, damage, or delay that occurs. In case of loss of Crude Petroleum that is not in a segregated shipment, each Shipper of the grade of Crude Petroleum so lost shall share such loss

in the proportion that the amount of such grade of Crude Petroleum then in the custody of Carrier for the account of such Shipper bears to the total amount of such grade of Crude Petroleum then in the custody of Carrier in such System.

Carrier will be obligated to deliver only that portion of a Crude Petroleum shipment remaining after deducting such loss. Transportation charges will be made only on quantities of Crude Petroleum delivered.

If Crude Petroleum is lost in transit, while in the custody of Carrier, due to causes other than those described in the first paragraph of this Item No. 70, Carrier may obtain and deliver to Shipper other Crude Petroleum of the same quantity and grade as that which was lost, but Carrier shall not be obligated to do so. In the alternative, Carrier may compensate Shipper for such loss in money. If Carrier compensates Shipper for such loss in money, the price per Barrel shall be determined as of the date of the loss based on the value of the lost Crude Petroleum.

**EXCEPT AS MAY BE PROVIDED IN A TRANSPORTATION SERVICES AGREEMENT, REGARDLESS OF CAUSE, IRRESPECTIVE OF WHETHER FORESEEABLE, CARRIER WILL NOT BE LIABLE TO A SHIPPER FOR LOSS OF PRODUCTION, LOSS OF USE, LOSS FROM BUSINESS INTERRUPTION, LOSS OF PROFIT OR ANTICIPATED PROFIT, LOSS OF REVENUE, LOSS OF BUSINESS, LOSS OF GOODWILL OR REPUTATION, OR WASTED EXPENDITURE, OR FOR FINES OR PENALTIES, OR FOR ANY INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE COST, EXPENSE, LOSS, OR DAMAGE OF ANY KIND ARISING OUT OF OR RELATING TO THIS TARIFF, ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS TARIFF, OR ANY CONTRACT ENTERED INTO COVERING THE TRANSACTIONS CONTEMPLATED BY THIS TARIFF.**

**ITEM 75.    WARRANTIES**

Shipper warrants that the Crude Petroleum Tendered to Carrier will conform to the specifications stated in Item No. 30 (QUALITY SPECIFICATIONS), will be merchantable, and will not be contaminated. Shipper will be liable to Carrier and/or other Shippers for any damage, including special, incidental, and consequential, arising from a breach of this warranty. The transportation of the Crude Petroleum will be refused or canceled if Carrier determines or is advised that the Crude Petroleum does not meet the requirements of these Rules and Regulations.

## ITEM 80.     DUTY OF CARRIER

Carrier shall not be required to transport Crude Petroleum except with reasonable diligence, considering the quality of the Crude Petroleum, the distance of transportation and other material elements. Carrier cannot commit to delivering Crude Petroleum to a particular destination, at a particular time.

## ITEM 85.     CLAIMS AND TIME FOR FILING

As a condition precedent to recovery for loss, damage, or delay of shipments, claims must be filed in writing with the Carrier within nine (9) months after the delivery of the Crude Petroleum, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits arising out of such claims must be instituted against Carrier within two (2) years from the time when the Carrier delivers, or Tenders delivery of the Crude Petroleum or, in case of failure to make or Tender delivery, within two (2) years after a reasonable time for delivery has elapsed. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, Carrier will not be liable and such claims will not be paid.

## ITEM 90.     ADDITIVES

Carrier reserves the right to approve, or reject the injection of corrosion inhibitors, viscosity or pour point depressants, drag reducing agents, or other such additives commonly used in crude pipeline operations in Crude Petroleum to be transported unless previously approved for use by Shipper.

## ITEM 95.     PIPEAGE OR OTHER CONTRACTS

Separate pipeage and other contracts between Shipper and Carrier, in accordance with the applicable tariff and theses rules and regulations, may, in a non-discriminatory manner, be required before any duty of transportation by the Carrier shall arise.

## ITEM 100.    PRORATION OF PIPELINE CAPACITY

Definitions utilized for this Item No.100 are as follows:

**Average Monthly Volume**: means (a) with respect to a Historical Shipper, the average of such Historical Shipper's monthly volumes of Crude Petroleum transported during the Base Period, which

shall be calculated over the entire Base Period including any months for which no movements occurred; and (b) with respect to a Committed Non-Priority Joint Tariff Shipper, the greater of the average of monthly volumes actually shipped or the monthly average of such shipper's Committed Volume for each month during the applicable Base Period; and (c) with respect to an Excess Shipper, the average of the Excess Volumes actually shipped for each month during the applicable Base Period.

**Base Period**: a period of 12 consecutive months, excluding the month prior to System proration.

**Committed Non-Priority Joint Tariff Shipper**: a Shipper that has signed a TSA in connection with the joint open season conducted by Carrier and Saddlehorn Pipeline Company, LLC ("Saddlehorn Pipeline") and that commenced in November 2018 for non-firm Joint Tariff Rate service from Carrier's Badger or Matador CDP Origin Points, located in Weld and Adams Counties, Colorado, to the Saddlehorn Pipeline terminal facility near Platteville, Colorado, and then to Saddlehorn Pipeline's Destination Point in Cushing, Oklahoma.

**Committed Priority Shipper**: a Shipper that has signed a TSA with Carrier in connection with Carrier's open season held in December 2018 and September 2019, where such TSA contains an acreage dedication either with or without a minimum volume commitment for Priority Capacity.

**Committed Shipper**: a Committed Priority Shipper or a Committed Non-Priority Joint Tariff Shipper.

**Committed Volume**: The volume committed by a Shipper for transportation on Carrier's System as follows: (a) for a Committed Priority Shipper with a minimum volume commitment, the Committed Volume shall be the applicable Minimum Volume Commitment as specified in its TSA; (b) for a Committed Priority Shipper without a minimum volume commitment, the Committed Volume shall be the Firm Capacity identified in its TSA; and (c) for a Committed Non-Priority Joint Tariff Shipper, the Committed Volume shall be as specified in its TSA.

**New Shipper**: a shipper that is not a Regular Shipper or a Committed Shipper.

**Excess Shipper**: a Committed Priority Shipper, solely with respect to its Excess Volumes.

**Excess Volumes**: volumes nominated in a month by a Committed Priority Shipper in excess of its Committed Volume.

**Historical Shipper**: a Shipper, other than a Committed Non-Priority Joint Tariff Shipper and a Committed Priority Shipper, that has shipments in at least 6 months in the Base Period.

**Priority Capacity**: Capacity that is only subject to proration in the event of Force Majeure or an operational disruption and, for any month in which prorationing applies, shall equal 90% of System Capacity.

**Regular Shipper**: (a) a Historical Shipper; and (b) a Committed Non-Priority Joint Tariff Shipper; and (c) an Excess Shipper.

**System Capacity**: the total volume of Crude Petroleum that the System is capable of transporting under current conditions.

**TSA:** A transportation service agreement executed by Shipper and Carrier (a) in connection with Carrier's open seasons held in December 2018 and September 2019, where such TSA contains an acreage dedication either with or without a minimum volume commitment for Priority Capacity; or (b) in connection with the joint open season conducted by Carrier and Saddlehorn Pipeline that commenced in November 2018 for non-firm Joint Tariff Rate service from Carrier's Badger or Matador CDP Origin Points, located in Adams and Weld Counties, Colorado, to the Saddlehorn Pipeline terminal facility near Platteville, Colorado, and then to Saddlehorn Pipeline's Destination Point in Cushing, Oklahoma.

If the total volume of Crude Petroleum nominated is in excess of the System Capacity, Crude Petroleum will be apportioned for acceptance and transportation per the following manner:

1. Up to 10% of System Capacity will be allocated among all New Shippers. When the Nominations made by New Shippers exceed ten percent (10%) of the available System Capacity, each New Shipper will receive a pro rata portion of the ten percent (10%) allocated to New Shippers (based upon nominated volumes).

2. The Priority Capacity will be allocated first to Committed Priority Shippers so that each Committed Priority Shipper is allocated capacity in an amount equal to its Committed Volume. A Committed Priority Shipper that nominates Crude Petroleum in excess of its Committed Volume will be a Regular Shipper with respect to such excess volumes.

3. The Committed Priority Shippers' nominations shall be prorated only if the System Capacity is less than the aggregate Committed Volumes of all Committed Priority Shippers, in which case proration shall be based on each Committed Priority Shipper's Committed Volume.

4. Regular Shipper Capacity shall be calculated as the net of the System Capacity less the allocated capacity to New Shippers and Committed Priority Shippers. All capacity not allocated to Committed Priority Shippers and New Shippers shall be allocated to Regular Shippers based on each Regular Shipper's Average Monthly Volume.

5. The **"Proration Factor"** for each Regular Shipper shall be equal to the quotient of (a) the Regular Shipper's Average Monthly Volume at the time of allocation; <u>divided by</u> (b) the aggregate total of all Regular Shippers' Average Monthly Volumes at the time of allocation.

6. The capacity allocated to each Regular Shipper shall be equal to the lesser of the Regular Shipper's: (a) monthly nomination; or (b) Proration Factor share of all Regular Shipper Capacity for such month.

7. Any remaining System Capacity not allocated through the application of sections 1 through 6 above, will be allocated on a pro rata basis among all Shippers having remaining unmet nominations.

No Nominations shall be accepted beyond the amount that the nominating party has readily accessible for shipment. To penalize inflation of Shippers' Nominations, a Shipper's space allocation for the next proration month will be reduced by the amount of allocated throughput not Tendered in the calendar month under proration, unless due to Force Majeure.

### ITEM 105.   STORAGE IN TRANSIT

Storage services may, in a non-discriminatory manner, be provided by Carrier to Shippers as specifically stated in a tariff making reference to these rules and regulations.

### ITEM 110.   COMMODITY

Carrier is engaged primarily in the transportation of Crude Petroleum and will not accept any other commodity for transportation under tariffs making reference hereto.

### ITEM 115.   CONNECTION REQUIREMENTS

Connections to Carrier's System will only be considered if made by formal written notification to Carrier. All connections will be subject to design requirements necessary to protect the current and future safety, security, integrity and efficient operation of Carrier's pipeline(s) in accordance with generally accepted industry standards. Acceptance of any request for connection will be subject to compliance with governmental regulations. All connection costs shall be paid by the connecting party.

### ITEM 120.   ORIGINATION FACILITIES

Crude Petroleum will be received at an Origin Point only from pipelines, tanks, or facilities that are provided by Shipper or Shipper's designee, or a connecting carrier or connecting non-jurisdictional field gathering system.