## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| EXTRACTION OIL & GAS, INC., *et al.*, [1] | Case No. 20-11548 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 337, 338 & 440** |

### OBJECTION OF GRAND MESA PIPELINE, LLC
### TO DISCLOSURE STATEMENT FOR THE JOINT PLAN OF
### REORGANIZATION OF EXTRACTION OIL & GAS, INC. AND ITS DEBTOR
### AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Grand Mesa Pipeline, LLC ("**Grand Mesa**") objects (the "**Objection**") to the *Disclosure Statement for the Joint Plan of Reorganization of Extraction Oil & Gas, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 338] (the "**Disclosure Statement**")[2] submitted by the above-captioned debtors and debtors-in-possession (the "**Debtors**") in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Extraction Oil & Gas, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 337] (the "**Plan**"). In support of this Objection, Grand Mesa respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Disclosure Statement fails to include critical information necessary for creditors—and this Court—to evaluate key terms of the Plan and reflects a Plan that is non-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Extraction Oil & Gas, Inc. (3923); 7N, LLC (4912); 8 North, LLC (0904); Axis Exploration, LLC (8170); Extraction Finance Corp. (7117); Mountaintop Minerals, LLC (7256); Northwest Corridor Holdings, LLC (9353); Table Mountain Resources, LLC (5070); XOG Services, LLC (6915); and XTR Midstream, LLC (5624).  The location of the Debtors' principal place of business is 370 17th Street, Suite 5300, Denver, Colorado 80202.

[2] Capitalized terms used but not otherwise defined herein have the meanings given in the Disclosure Statement.

confirmable.   As such, the Disclosure Statement fails to satisfy the "adequate information" requirements of section 1125 of the Bankruptcy Code and cannot be approved.

2.     Without limitation, the Disclosure Statement fails to contain inadequate information (or simply contains *no* information) with respect to the following:

> **Rejection of the TSAs with Grand Mesa**.  The Disclosure Statement does not contain any information regarding the Debtors' pending attempt to reject the TSAs with Grand Mesa, the related litigation with Grand Mesa or the consequences to the Debtors' estates of rejection of the TSAs, including the significant financial ramifications of such rejection—potential rejection damages claims totaling hundreds of millions of dollars;

> **Rejection of Other Midstream Agreements**.  The Disclosure Statement contains *no* information regarding the potential rejection of other transportation services agreements (or other similar agreements) nor does it explore the financial impact to the Debtors' estates associated with rejection of those agreements;

> **Senior Noteholder Control**.  The Disclosure Statement fails to provide—in plain terms for creditors to understand—how beholden the Debtors are to the Consenting Senior Noteholders and the significant control and influence afforded that constituency under the Restructuring Support Agreement;

> **Equity Dilution**.  With respect to a Stand-Alone Restructuring, the Disclosure Statement fails to adequately describe the risk of substantial equity dilution and the benefits being conferred on the Rights Offering Participants, at the expense of general unsecured creditors;

> **FERC Approval**.  The Disclosure Statement fails to address the need for FERC approval in connection with any rate changes through rejection of the TSAs or otherwise under the Plan where FERC has exclusive jurisdiction over the Grand Mesa Pipeline tariff and the TSA's; and

> **Releases and Exculpations**.  The Disclosure Statement does not provide adequate information regarding the scope of the third-party releases, the consideration provided in exchange for these broad releases, the scope of the exculpations (which improperly includes non-estate parties) or the nature and value of third party or non-debtor claims being released pursuant to the Plan.

In light of these and other material omissions, a hypothetical reasonable investor cannot possibly make an informed judgment about the Plan and the Disclosure Statement should not be approved.

3.      Approval of the Disclosure Statement should also be denied because the Plan is patently non-confirmable.  Among other legal deficiencies, the Plan:

> ➢ seeks to drive outsized returns to the Debtors' unsecured senior noteholders, who are being given the right to invest new money at substantial discounts to plan value and other benefits to the exclusion of general unsecured creditors;

> ➢ in violation of the absolute priority rule, proposes a recovery and valuable subscription rights to out-of-the-money parent-level equity holders, even while billions of dollars of unsecured claims remain unpaid;

> ➢ does not satisfy the requirements of 11 U.S.C. § 1129(a)(6), as it fails to provide that (i) FERC—the governmental regulatory commission with jurisdiction over the rates of the Debtors—has approved any rate changes to be effectuated through the Plan, or (ii) approval of the rate changes to be effectuated through the Plan is conditioned on FERC approval;

> ➢ insulates insiders and various other lender-parties and their "Related Parties" from liability by way of sweeping blanket releases with unproven or inadequate consideration being provided to the Debtors; and

> ➢ provides exculpations for non-estate fiduciaries.

4.      Given the non-confirmable nature of the Plan, permitting solicitation of the current iteration of the Plan would be a waste of estate and judicial resources and should not be sanctioned.  For these reasons, and those described in greater detail below, the Court should deny approval of the Disclosure Statement.

## RELEVANT FACTUAL BACKGROUND

**A.      The Grand Mesa Pipeline.**

5.      Grand Mesa operates the Grand Mesa Pipeline, an interstate oil pipeline that originates in Weld County, Colorado and extends approximately 550 miles southeast.  Given its capacity to transport up to 150,000 barrels per day, the pipeline provides critical takeaway capacity for crude oil producers in the Denver-Julesburg Basin.  The pipeline's convenient position also affords shippers access to the U.S. Midcontinent markets and the Texas Gulf Coast refinery

complex.  The Grand Mesa Pipeline not only supports the continued growth and production in the area, but does so in a cost-effective and environmentally responsible way by reducing the current utilization of rail and truck transportation.

**B.**     **The Transportation Services Agreements.**

6.     On February 19, 2016, Grand Mesa and a shipper—Extraction Oil & Gas, LLC, the predecessor to one of the above-captioned Debtors, Extraction Oil & Gas, Inc. ("**Extraction**")— entered into an Amended and Restated Transportation Services Agreement (the "**Extraction TSA**").  Under the Extraction TSA, Grand Mesa undertook the obligation to construct, own, operate and maintain the Grand Mesa Pipeline—an interstate crude oil pipeline and certain associated appurtenant facilities.

7.     Grand Mesa is also party to that certain Amended and Restated Transportation Services Agreement with Bayswater Exploration & Production, LLC, dated June 21, 2016 (assigned by Bayswater Exploration & Production, LLC to Extraction, pursuant to an Assignment, Bill of Sale and Conveyance, dated October 3, 2016 and effective July 1, 2016) (the "**Bayswater TSA**" and together with the Extraction TSA, the "**TSAs**").  Pursuant to the Bayswater TSA, Grand Mesa provides Extraction with known, uninterruptible, committed pipeline capacity in exchange for certain fees.  The Bayswater TSA also contains dedication rights (including covenants running with the land) granted to Grand Mesa that are valid and enforceable under applicable state law.

8.     The terms and conditions of the TSAs are subject to the exclusive jurisdiction of the Federal Energy Regulatory Commission ("**FERC**"), which regulates the Grand Mesa Pipeline under the Interstate Commerce Act, 49 U.S.C. §§ 1 *et seq.* (the "**ICA**").

## PROCEDURAL BACKGROUND

9.      On June 14, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

10.      Substantially concurrent with the Petition Date, the Debtors entered into the Restructuring Support Agreement (the "**RSA**") with certain members of the Ad Hoc Noteholder Group that in the aggregate held approximately 80 percent of the claims under the Debtors' Senior Notes, and negotiated a $125 million postpetition financing facility (comprised of $50 million in new money), provided by holders of approximately 88 percent of the Debtors' Revolving Credit Facility.  The Debtors assert that, among other things, the Plan (as contemplated under the RSA) would significantly deleverage the company's balance sheet through a debt-for-equity swap pursuant either to a standalone restructuring or a combination transaction, and the Debtors' unsecured noteholders would obtain the majority of the reorganized company's new equity.

11.      On June 15, 2020, the Debtors filed *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Effective as of the Dates Specified Herein and (II) Granting Related Relief* [D.I. 14] (the "**Rejection Motion**").  Pursuant to the Rejection Motion, the Debtors seek authority to reject various agreements, including, *inter alia*, the TSAs and other transportation service agreements.

12.      On July 30, 2020, the Debtors filed the Plan.  On July 31, 2020, the Debtors filed the Disclosure Statement in connection with the solicitation of votes for acceptance of the Plan.

13.      On August 4, 2020, Grand Mesa filed an objection to the Rejection Motion [D.I. 363] (the "**Rejection Objection**") arguing, *inter alia*, that (i) as the TSAs are regulated by FERC,

a heightened "public interest" standard, rather than the "business judgment" standard, applies when evaluating the propriety of the Debtors' determination to reject the TSAs; (ii) should the "business judgment" standard apply, rather than the "public interest" standard, the Debtors fail to substantiate their decision to reject the TSAs, relying on conclusory statements, and raise concerns related to external influences over the Debtors' decision-making process; and (iii) dedication rights granted to Grand Mesa under the Bayswater TSA constitute valid and enforceable covenants running with the land precluding rejection of the Bayswater TSA pursuant to section 365 of the Bankruptcy Code and, if intended by the Debtors, the Rejection Motion is an improper mechanism to contest the validity of such rights and interests. Rejection Objection, ¶¶ 3-9.

14.     Contemporaneously with the filing of the Rejection Objection, Grand Mesa filed the *Motion of Grand Mesa Pipeline, LLC for Order Confirming That the Automatic Stay Does Not Apply Or, In the Alternative, For Relief from the Automatic Stay* [D.I. 364] (the "**Lift-Stay Motion**") seeking an order confirming that the automatic stay does not apply or, in the alternative, relief from the automatic stay to permit Grand Mesa to file a petition with FERC for an expedited determination regarding whether any modification or abrogation that would result from the Debtors' proposed rejection of the TSAs is consistent with the public interest under the ICA.

15.     On August 18, 2020, Platte River Midstream, LLC ("**PRM**"), DJ South Gathering, LLC ("**DJS**"), and Platte River Holdings, LLC ("**PRH**" and together with PRM and DJS, the "**TSA Counterparties**") joined the Rejection Objection and incorporated by reference companion arguments to those in the Lift-Stay Motion concerning the need for FERC to exercise its exclusive jurisdiction over any TSAs that are the target of the Debtors' rejection strategy. Like Grand Mesa, the TSA Counterparties intend to seek leave of this Court to file a petition with FERC seeking a

determination regarding whether rejection of the transportation services agreements by the Debtors in these bankruptcy cases is consistent with the public interest and the ICA.

16. On August 19, 2020, the Debtors filed a *Complaint for Declaratory Judgment* [D.I. 494] (the "**Complaint**") against Grand Mesa seeking a declaration that certain covenants contained in the Bayswater TSA do not "run with the land." The Debtors have also commenced other similar adversary proceedings against REP Processing, LLC, Platte River Midstream, LLC, DJS, Elevation Midstream, LLC, and Rocky Mountain Midstream LLC (collectively, the "**Midstream Parties**"), seeking declarations that certain covenants contained in the agreements (the "**Midstream Agreements**") with the Midstream Parties do not run with the land under Colorado (and any other applicable) law.

## OBJECTION

### A.    The Disclosure Statement Does Not Contain Adequate Information and Fails to Satisfy the Requirements of Section 1125 of the Bankruptcy Code.

17. The Disclosure Statement does not contain "adequate information" within the meaning of section 1125 of the Bankruptcy Code and cannot be approved. *See In re Unichem Corp.*, 72 B.R. 95, 98-100 (Bankr. N.D. Ill. 1987) *aff'd* 80 B.R. 448 (N.D. Ill. 1987) ("A disclosure statement that omits material facts cannot be approved.").

18. Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on the bankruptcy court's determination that the disclosure statement contains adequate information. The Bankruptcy Code defines "adequate information" as

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable

> investor typical of claims or interests in the relevant class
> to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999) (disclosure statement must contain information that is "reasonably practicable [to permit an] informed judgment" by holders of claims or interests entitled to vote on the plan); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement 'that would enable a hypothetical reasonable investor . . . to make an informed judgment about the plan.'") (quoting H.R. Rep. No. 95-595, at 408-09 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364-65); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution").

19.    A disclosure statement accompanying a chapter 11 plan is designed to provide sufficient information to creditors *in each particular class* to permit them to decide whether to vote for or against the proposed plan. *See* 11 U.S.C. § 1125(a)(1).  A court should examine each disclosure individually to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied.  *See In re Worldcom, Inc.*, No. M47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) ("[T]he approval of a disclosure statement . . . involves a fact-specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125.").  "Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

8

20.     The disclosure statement "plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties, so they can make their own decisions on the plan's acceptability."  *Nelson v. Dalkon Shield Claimants Trust* (*In re A.H. Robins Co., Inc.*), 216 B.R. 175, 180 (E.D. Va. 1997); *In re Stanley Hotel, Inc.*, 13 B.R. 926, 930 (Bankr. D. Colo. 1981) (noting that creditors need material information to make an "informed choice" with respect to acceptance or rejection of a plan).  Given the foregoing, the Court cannot approve the Disclosure Statement because it fails to adequately disclose certain material information, including the information described below.

### (1)     The Disclosure Statement Fails to Provide Any Information Regarding the TSAs.

21.     The Disclosure Statement makes no reference whatsoever to the TSAs or the Debtors' attempted rejection of those agreements.  The lack of disclosure includes no reference to the Rejection Motion, the Debtors' method, timing, or likelihood of success in effecting rejection of the TSAs, or even the potential financial risk/exposure related to any potential rejection of the TSAs.  The failure to include any disclosure relating to the TSAs is startling given the significance of the rejection proceedings to the Debtors' operations and the potential effects a determination in those proceedings may have on the Debtors' estates.

22.     In failing to disclose any information about the TSAs and the related rejection proceedings, the Disclosure Statement lacks information necessary for creditors to evaluate the financial risks associated with the Debtors' proposed restructuring and the potential recovery creditors may achieve in connection with any such restructuring.  While Grand Mesa believes it will prevail in its opposition to the Rejection Motion, even in the unlikely event that the Debtors prevail, Grand Mesa will be entitled to a claim against the Debtors' estates *in excess of $650*

*million*.  Grand Mesa's rejection damages claim would be one of the largest claims against the estates and would materially dilute the Class 6 - General Unsecured Claims pool.  The rejection proceedings, and any resulting damages claim, may, therefore, significantly change how general unsecured creditors view the Plan vis-à-vis their own personal interests and must be disclosed in detail in the Disclosure Statement in order for creditors to be sufficiently informed.

23.     The consequences of the Debtors not prevailing on the Rejection Motion must be equally disclosed.  While Grand Mesa would not have a rejection damages claim, the Debtors' financials—which assume shipping rates other than those set forth in the TSA—would be inaccurate and could not be reasonably relied upon by creditors in assessing the propriety of the Plan.

24.     Moreover, the Disclosure Statement makes no mention of the real property covenants—the dedication rights—set forth in the Bayswater TSA.  While the Debtors contend that the covenants in the Bayswater TSA do not "run with the land"—and recently filed a Complaint against Grand Mesa seeking a declaration with respect to the dedication rights— the Debtors' claims lack merit and the consequences of the declaratory action must be disclosed in the Disclosure Statement.

25.     The Disclosure Statement should also disclose that, for the TSAs to be rejected, the Debtors are required to not only meet the applicable requirements of section 365 of the Bankruptcy Code and the regulations thereunder, but must also obtain approval from FERC.  Because the TSAs include "filed rates" and terms and conditions subject to the exclusive jurisdiction of FERC, each TSA is subject to FERC's jurisdiction, which section 365 of the Bankruptcy Code does not, and was not intended to, override.

26.     Even if the Debtors were to prevail on all of the TSA-related litigation, the existence

of that litigation alone and the administrative cost associated with litigating these issues to conclusion with Grand Mesa (and other similarly situated midstream companies) must be sufficiently disclosed in the Disclosure Statement.

27.    The Disclosure Statement also fails to specify whether the Debtors will need to continue to use the Grand Mesa Pipeline upon rejection of the TSAs.  Along those same lines, the Disclosure Statement fails to consider the risk that the Debtors' use of the Grand Mesa Pipeline could be severely curtailed or prohibited if the Debtors are successful in rejecting the TSAs.  Even if the Debtors only intend to use the Grand Mesa Pipeline in a limited capacity on a go-forward basis, there is a risk that through statutory interpretation or regulatory changes such use will not be permitted or may be curtailed due to "free rider"[3] concerns.  The Disclosure Statement fails to articulate this significant risk to future operations and potential alternatives if access to the Grand Mesa Pipeline is restricted or completely foreclosed.

28.    The Disclosure Statement is woefully inadequate in light of the Debtors' failure to provide any information regarding the TSAs.  The Debtors cannot provide selective information.  All material information, including information regarding the TSAs, their potential rejection, and the financial impact with the foregoing, is necessary to evaluate the Plan and must be set forth in the Disclosure Statement.  The Debtors' omission of the TSAs is self-serving and renders the Disclosure Statement inadequate.  *See In re Egan*, 33 B.R. 672, 675-76 (Bankr. N.D. Ill. 1983) (A disclosure statement should "present material information relative to all material matters in an objective, impartial manner so as to allow creditors and parties in interest to independently evaluate the plan in that regard -- one cannot arrive at an informed decision based upon a proponent's self-

---

[3] A "free rider" is an entity that is subsidized by other entities because it refuses to invest in infrastructure development, allows other entities to pay for that development, and reaps the benefits.  *See El Paso Elec. Co. v. FERC*, 832 F.3d 495, 500 (2016) (referring to the free rider problem with electric transmission facilities).

serving opinion").

> **(2)     The Disclosure Statement Fails to Provide Any Information Regarding Other Transportation Services Agreements and the Debtors' Alternative Means of <u>Crude Oil Transposition.</u>**

29.     The Disclosure Statement also fails to provide any information regarding the potential rejection of other transportation services agreements to which the Debtors are a party or the alternative means through which the Debtors would transport their crude oil.

30.     Through the course of these chapter 11 proceedings, the Debtors are also seeking to reject several other transportation services agreements that, like the TSAs with Grand Mesa, are subject to FERC's jurisdiction.   Yet, the Disclosure Statement does not provide any of this information.   The Disclosure Statement fails to (i) provide any indication that there could be a series of significant rejection claims that would materially dilute recoveries to general unsecured creditors, (ii) set forth the risks associated with the Debtors' efforts to reject these midstream agreements, including the potential financial impact, whether successful or not, and (iii) identify the means through which the Debtors intend to transport their crude oil, if they prevail in rejecting the TSAs and other transportation services agreements.[4]

31.     The transportation services agreements between the Debtors and the various TSA Counterparties, if rejected, could subject the Debtors' estates to well over $100 million dollars of additional claims.[5]   The Debtors' proposed rejection of these agreements, therefore, poses a large

---

[4] Similarly, the Disclosure Statement fails to disclose the ongoing disputes among the Debtors and the Midstream Parties regarding whether certain covenants in the Midstream Agreements are covenants that run with the land under Colorado law.  Relying on the Disclosure Statement, a reasonable creditor would have no information regarding the potential risks associated with these disputes, the potential impact on the trajectory of the Debtors' cases and, even more importantly, how the claims pool and potential recoveries could be altered based on the outcome of these disputes.  The Debtors' failure to address in the Disclosure Statement these disputes, and their potential financial impact on the Debtors, further highlights the shortcomings of the Disclosure Statement.

[5] Such potential rejection damages are not disclosed in the Disclosure Statement and present a significant loss exposure that creditors must be advised of in order to make an informed decision as to whether or not to support the Plan.

outstanding financial risk to the Debtors' estates.  Without a clear understanding of how the Debtors' potential rejection of these other midstream agreements affects the financial interests of each creditor class, interested creditors lack adequate information to properly evaluate the Plan.

32.    In addition, this lack of disclosure leaves Grand Mesa and other creditors to surmise about how the Debtors would transport the substantial crude oil that the Debtors seek to divert from the Grand Mesa Pipeline and other pipelines, if they prevail in rejecting the related transportation services agreements.  For example, the Debtors fail to disclose whether their alternative oil transportation plans would result in an increase in oil transportation by rail or by the use of oil-laden trucks on public roadways in Weld County, Colorado and whether the Debtors have permits or other regulatory approval to allow for such non-pipeline transportation.  The Disclosure Statement should prominently disclose these pertinent details, which are necessary for creditors to be able to make an informed decision in connection with voting on the Plan.

33.    The Disclosure Statement must also inform creditors of the significant claims that would arise upon rejection of the TSAs and TSA Counterparties' transportation services agreements.  The rejection damages claims of Grand Mesa and each of the TSA Counterparties would be material claims that would drastically reduce recoveries for other unsecured creditors.

34.    The Disclosure Statement further fails to contemplate the possibility that the Debtors' rejection efforts may fail, given that FERC must, at the very least, weigh-in on the impact to the public interest.  Should that occur, the Debtors' ongoing obligations to Grand Mesa and the TSA Counterparties could materially change the financial outlook of the Debtors.  Creditors need this information to make an informed decision about how to vote on the Plan.

**(3)    The Disclosure Statement Fails to Sufficiently Disclose the Consenting Senior Noteholders' Significant Control over the Restructuring Process.**

35.    The Disclosure Statement should disclose the significant discretion and effective

control conferred upon the holders of unsecured Senior Notes who are party to the RSA (the "**Consenting Senior Noteholders**") over the restructuring process.  The Plan provides significant discretionary consent rights upon the Consenting Senior Noteholders, including consent rights with respect to the Confirmation Order, the Plan Supplement, any motion or other pleadings related to the Plan or confirmation of the Plan, the order approving the Disclosure Statement, the Definitive Documents, the Exit Facility Documents, and various related documents.  Creditors must be fully apprised of the basis for such control being conferred upon the Consenting Senior Noteholders.  Creditors must also be informed of the risks associated with self-interested parties asserting control over the chapter 11 plan process.

36.    The favorable treatment being granted to the Consenting Senior Noteholders in connection with the Rights Offering extends even further, as the Consenting Senior Noteholders have been provided with special access to information necessary to evaluate each of the material executory contracts or unexpired leases of the Debtors and access to books and records of the Debtors.  The Disclosure Statement provides little to no information in this regard, and is, therefore, deficient.

37.    In addition, under the Plan, the Debtors will pursue a Combination Transaction only if, among other criteria, (i) the transaction provides consideration in respect of the Senior Notes Claims acceptable to the Consenting Senior Noteholders, and (ii) the various transaction documents (and other matters) are acceptable to the Consenting Senior Noteholders. Plan art. I.A.47 (definition of "**Combination Transaction Documents**"), art. I.A.197 (definition of "**Successful Proposal**").  Such a provision is equivalent to a veto right and seems hardly justified where the Consenting Senior Noteholders have not yet committed to the backstop and the amount of the prospective backstop remains a mystery.  The presence of a fiduciary-out in the RSA does

little to mitigate this effect to the extent the Debtors will be practically motivated to preserve the RSA. Further highlighting the utter lack of adequate disclosure is the fact that the size of the Equity Rights Offering is not even reflected in the RSA, it is unclear whether the Consenting Senior Noteholders have even committed to any financing (and, if so, in what amounts). Solely based on the forgoing, the Disclosure Statement provides inadequate information.

**(4)    The Disclosure Statement Fails to Disclose Information Regarding the Unfair Discrimination as to Similarly Situated Claims.**

38.    The Disclosure Statement fails to provide sufficient information regarding the more favorable treatment being afforded the Consenting Senior Noteholders—who are unsecured—as compared to other general unsecured creditors. The concept of unfair discrimination is not defined in the Bankruptcy Code. *In re Lernout & Hauspie Speech Prods., N.V.,* 301 B.R. 651, 661 (Bankr. D. Del. 2003). Courts have examined the following factors when determining that a proposed plan unfairly discriminates:

> (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Id.* (quoting *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)); *see also In re Exide Techs., Inc.*, 303 B.R. 48, 79-80 (Bankr. D. Del. 2003).

39.    Under the RSA, the Debtors are pursuing a dual track restructuring, pursuant to which they seek to implement a stand-alone restructuring (the "**Stand-Alone Restructuring**") predicated upon an uncommitted rights offering purporting to be fully backstopped by the Consenting Senior Noteholders, while simultaneously soliciting interest in a potential stock-merger transaction (the "**Combination Transaction**").

40.     To the extent that the Debtors complete the Stand-Alone Restructuring, the Debtors have structured the eligibility for the Equity Rights Offering in a way that disadvantages holders of General Unsecured Claims and confers a significant advantage on the Consenting Senior Noteholders.  This disparate treatment arises from the limitations on the ability of holders of holders of General Unsecured Claims to participate in the Equity Rights Offering.  The Equity Rights Offering is a significant component of the value being provided to Unsecured Creditors under the Plan because, to the extent the Equity Rights Offering is actually consummated, those Consenting Senior Noteholders that participate (and even those that do not participate, but were afforded the option) will obtain more value than other creditors.

41.     Those unsecured creditors being excluded from participation in the Equity Rights Offering may be left only with heavily diluted New Common Stock while other similarly situated creditors receive much greater value.  Such disparate treatment among similarly situated unsecured creditors is not permissible and thus the Plan cannot be confirmed as currently structured.  *See Schroeder v. New Century Liquidating Trust (In re New Century Holding, Inc.)*, 407 B.R. 576, 592 (D. Del. 2009).

    **(5)**     **The Disclosure Statement is Deficient**
        **Because it Does Not Include a Valuation Analysis.**

42.     One of the most fundamental inadequacies of the Disclosure Statement is its omission of any valuation analysis prepared by the Debtors.  Valuation is a vital component of any disclosure statement.  It is one of the key factors that courts consider in determining whether to approve a disclosure statement and that claimants and interest holders consider in determining whether to accept or reject a plan of reorganization.  *See In re Integrated Pet Foods, Inc.*, No. 03-33362 (DWS), 2004 WL 2252119, at *3 (Bankr. E.D. Pa. Sept. 17, 2004) ("Absent a clear and prominent statement of market value of the assets, the disclosure statement does not contain

adequate information to allow creditors to vote for the plan."). In short, "[a]bsent a valuation of the assets with some factual basis, . . . the disclosure statement does not provide adequate information as required by the Bankruptcy Code." *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 570 (Bankr. N.D. Ga. 1984). The Disclosure Statement should not be approved unless and until the Debtors include a valuation analysis using one or more well-established methodologies.

43.    The Debtors' decision not to file a valuation analysis sufficiently advance of a hearing on the Disclosure Statement deprives creditors of the ability to assess the true earning capacity of these Debtors, to better evaluate the Debtors' projections and to make an informed determination as to the risks associated with the Debtors' business plan. Under the circumstances, a valuation analysis is crucial in light of the uncertainty surrounding the rejection of the TSAs and the other transportation service agreements and the prospect of significant rejection damages claims that may accrue as a result of the rejections. The Debtors' failure to timely disclose these issues renders the Disclosure Statement deficient, and not approvable in its current form.

   **(6)    The Disclosure Statement Fails to**
   **Sufficiently Disclose Risk Factors Related to Feasibility.**

44.    The Disclosure Statement fails to provide sufficient information in respect of the risks attendant to the feasibility of the Plan, including the Debtors' ability to consummate their proposed financings in the context of the Stand-Alone Restructuring, as well as their ability to service that debt going forward. The Debtors should disclose how they compare to their peers in terms of debt load and financial metrics upon the Effective Date. From a regulatory perspective, the Debtors must also provide adequate disclosure of pro forma equity holdings and address any anticipated regulatory challenges the Debtors may face in consummating the Plan.

45.    The Disclosure Statement should also provide any information regarding contingencies that form underlying assumptions for the Debtors' projected financial results. Such

information is necessary to evaluate the capital structure and corporate governance of the Reorganized Debtors in order to determine whether to accept New Common Stock, as well as to assess the feasibility of the Plan from a financial and regulatory perspective. *See In re Exide Techs.*, 303 B.R. 48, 60–61 (Bankr. D. Del. 2003) ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)."). At minimum, absent a clear and prominent disclosure regarding the potential rejection of the TSAs and other transportation services agreements, the attendant litigation risks and the financial and other consequences of these potential rejections, the Disclosure Statement does not contain adequate information to allow creditors to consider feasibility, let alone cast a vote for or against the Plan.

(7)    **The Disclosure Statement Fails to Adequately Describe the Basis for the Broad Third-Party Releases and Exculpations Offered Under the Plan.**

46.    The Plan contains impermissibly broad and vastly overreaching release, exculpation and injunction provisions. The Debtors fail to provide sufficient information demonstrating that the sweeping third party releases they seek approval of pursuant to the Plan are appropriate in this case. Specifically, the Disclosure Statement (a) does not include a sufficiently detailed assessment of the merits or value of potential claims against the non-debtor Released Parties, (b) does not explain to stakeholders "whether the benefits of the proposed plan [outweigh] what they would give up by agreeing to the third party release," (c) does not adequately explain what the non-debtor Released Parties are giving to the estates in exchange for the releases, and, critically, (d) does not explain why the releases are necessary. *In re Lower Bucks Hosp.*, 488 B.R. 303, 321 (E.D. Pa. 2013) (holding that failure to include these elements in disclosure statement fell short of "adequate information" standard); *see also Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y 2008) (disclosure statement should

18

include "specifics" justifying releases and settlements, including "reasons" for resolution and "merits of the potential litigation"). It is imperative that the Disclosure Statement provide adequate disclosure that justifies the breadth and scope of the releases.

47. The Disclosure Statement must also sufficiently disclose related party transactions and affiliate relationships. To provide creditors with facts enabling them to make an informed decision concerning the value of the releases to the Consenting Senior Noteholders, the Ad Hoc Noteholder Group and each of its members, the Backstop Parties and those other parties identified as a "Released Party" (and their respective affiliates), the Disclosure Statement must provide additional information concerning transactions and affiliate relationships. At a minimum, the Disclosure Statement should describe all prepetition and postpetition related party transactions involving any affiliates or related parties, along with the Debtors' assessment of any potentially colorable estate causes of action related to each such transaction.

48. Finally, the Disclosure Statement fails to provide adequate information explaining how and why exculpations are being proposed for non-estate fiduciaries. *See In re Washington Mutual, Inc.*, 442 B.R. 314, 350-351 (Bankr. D. Del. 2011) (limiting exculpation clause to estate fiduciaries).

**B.    The Disclosure Statement Should Not Be Approved Because the Plan Filed with the Disclosure Statement Violates the Absolute Priority Rule.**

49. On its face, the Plan violates the absolute priority rule, in contravention of 11 U.S.C. § 1129(b)(2)(B). The Plan proposes a recovery and valuable subscription rights to out-of-the-money parent-level equity holders, even while billions of dollars of unsecured claims may not be paid be in full.

50. The absolute priority rule "arose from the concern that because a debtor proposed its own reorganization plan, the plan could be 'too good a deal' for that debtor's owners." *In re*

*Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (quoting *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999)).  The rule is codified at 11 U.S.C. § 1129(b) and provides that "a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests."  *Armstrong World*, 432 F.3d at 512 (citing 11 U.S.C. § 1129(b)(2)(B)(i)-(ii)).

51.    In other words, the rule "precludes the bankruptcy court from approving a plan that gives the holder of a claim anything at all unless all objecting classes senior to him have been paid in full." *In re Perez*, 30 F.3d 1209, 1214 (9th Cir. 1994).  Furthermore, "[b]ecause claims of equity holders are always junior to claims of creditors, this means that a bankruptcy court may not approve a plan that gives the debtor any interest in the reorganized estate unless the plan provides for the full payment of claims of creditors in the objecting class." *Id.* at 1214.

52.    The Plan proposes to provide preferred and common shareholders of the Debtors with an allocation of shares in the reorganized debtors and certain warrants to acquire additional stock in the new company.  Given that the Plan does not propose to pay unsecured creditors in full, the treatment proposed to existing shareholders plainly violates the absolute priority rule.  Equity holders in the Debtors should not be entitled to any interest in the reorganized debtor until and unless all unsecured claims are paid in full.  This concern is further heightened where the rejection of the TSA and other similar agreements would significantly increase the general unsecured claims pool, only further distancing equity from being in the money.

53.    To the extent the Debtors are proposing to grant these exclusive rights, interest and opportunities to the Debtors' existing equity holders on account of "new value", the existing equity

holders' value contribution to receive new equity must first be market tested.  *See 203 N. LaSalle St. P'ship*, 526 U.S. at 458 (the absolute priority rule is violated where junior interest holders receive exclusive opportunities free from competition and without benefit of market valuation).  The Disclosure Statement omits necessary information in this regard as well.

## C.    The Disclosure Statement Should Not be Approved Because it Describes a Patently Unconfirmable Plan.

54.    It is well settled that a court must not approve a disclosure statement where the plan to which it relates is not confirmable on its face.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("[A] bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that . . . the plan described by the disclosure statement is patently unconfirmable . . . ."); *see also In re Phoenix Petroleum*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the [c]ourt will not subject the estate to the expense of soliciting votes and seeking confirmation.").  As discussed above, the Plan has at least three fatal flaws that render it unconfirmable: (i) it fails to satisfy section 1129(b) of the Bankruptcy Code because it is not "fair and equitable"; (ii) it unfairly discriminates between similarly situated unsecured creditors; and (iii) it contains impermissible third-party releases and exculpations.  On these bases alone, the Court should not approve the Disclosure Statement.

55.    The Plan is also patently unconfirmable on its face because it does not satisfy the requirements set forth under section 1129(a)(6) of the Bankruptcy Code.  Section 1129(a)(6) provides that a plan is confirmable only if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate

change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6).

56.    FERC plainly is a governmental regulatory commission that has jurisdiction over the TSAs and the tariff for the Grand Mesa Pipeline incorporated therein.  It is undisputed that the TSAs were filed with FERC and that the terms and conditions of the TSAs constitute the "filed rate."  Any change to the terms or conditions of the TSAs constitutes a change to the rate and requires FERC's approval.[6]  To comply with the requirements under section 1129(a)(6), the Debtors would first have to obtain full approval from FERC with respect to the proposed changes to the filed rate contemplated under the Plan.  *See In re Pacific Gas and Electric Co.*, 304 B.R. 395, 410 (Bankr. N.D. Cal. 2004) (finding that "[s]ection 1129(a)(6) specifically allows confirmation of a plan containing a rate change as long as the rate change is approved by the commission having jurisdiction over those rates").  FERC has made clear that it views rejection of the TSAs as a modification or abrogation of the filed rate that must be subject to a FERC public interest determination.  FERC has not approved any modification, abrogation or change to the filed rate, and the Disclosure Statement provides no indication that the Debtors even intend to seek FERC approval of the proposed modification of the filed rate.

57.    Because the Debtors have neither sought FERC's approval nor conditioned confirmation of the Plan on FERC's approval, the Debtors cannot satisfy the requirements of section 1129(a)(6) and this Court should not approve the Disclosure Statement because the Plan is patently unconfirmable.

---

[6] It makes no difference that the modification to the filed rate originated in a rejection motion rather than by some other means (e.g., from the Plan itself).  By its terms, section 1129(a)(6) applies whenever a Plan provides for a rate change, and nothing in the statute suggests that the regulatory-review requirement turns on why, how, or when the debtor sought to change the filed rate.

## **RESERVATION OF RIGHTS**

58.     Grand Mesa continues to analyze the Disclosure Statement and Plan.  As such, this Objection is submitted without prejudice to, and with a full reservation of, Grand Mesa's rights to supplement this Objection in advance of or in connection with the hearing to consider the Disclosure Statement.  Grand Mesa reserves all claims, defenses, and rights to object to any modification to the Disclosure Statement.  Grand Mesa further reserves the right to object to confirmation of the Plan or any other plan on any grounds whatsoever, regardless of whether those grounds are addressed herein.

WHEREFORE, Grand Mesa respectfully requests that the Court enter an order (i) sustaining this Objection; (ii) denying approval of the Disclosure Statement; and (iii) granting such other relief as is just and proper.

[Signature on next page]

Dated:  September 25, 2020
      Wilmington, Delaware

Respectfully submitted,

GREENBERG TRAURIG, LLP

*/s/ Dennis A. Meloro*
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, DE 19801
Telephone: 302-661-7000
Facsimile: 302-661-7360
Email: melorod@gtlaw.com

    and

Iskender H. Catto
Hal S. Shaftel
Ryan A. Wagner
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
Email: cattoi@gtlaw.com
      shaftelh@gtlaw.com
      wagnerr@gtlaw.com

    and

Ari Newman
Reginald Sainvil
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone:  (305) 579-0500
Facsimile:  (305) 579-0717
Email:    newmanar@gtlaw.com
      sainvilr@gtlaw.com

*Counsel for Grand Mesa Pipeline, LLC*