## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| EXTRACTION OIL & GAS, INC., *et al.*, | : | Case No.: 20-11548 (CSS) |
| | : | (Jointly Administered) |
| Debtor. | : | |
| EXTRACTION OIL & GAS, INC., *et al.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 20-50839 (CSS) |
| | : | |
| ELEVATION MIDSTREAM, LLC, | : | |
| | : | |
| Defendants. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST ELEVATION MIDSTREAM, LLC[1]

## INTRODUCTION

This adversary proceeding is one of several arising from the Chapter 11 case of Extraction and its affiliates.[2]  The Debtors are in the "upstream" business of extracting hydrocarbons from land in the State of Colorado.  In the Chapter 11 case, the Debtors have sought to reject several of what are commonly known as Transportation Services Agreements or TSA's.  Broadly speaking, the counterparties to these TSA's are "midstream" pipelines, which transport the Debtors' hydrocarbons to larger "downstream" pipelines or directly to the depot in Cushing, Oklahoma.

---

[1]    The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions or law constitute findings of fact, they are adopted as such.

[2]    Undefined terms used in this Introduction have the meaning set forth below.

In response to the motion to reject, many of the counterparties, including this defendant, have argued that the TSA's cannot be rejected because they include covenants that run with the land.  Moreover, they argue that a determination of whether there are covenants that run with the land requires an adversary proceeding.  Hence, the Debtors have filed several adversary proceedings in which they have sought a declaratory judgment that the TSA's do not create covenants that run with the land.  Currently, before the Court is the Debtor's motion for summary judgment to that effect (and Elevation's cross motion for summary judgment).[3]

As set forth in detail below, the Court will grant the Debtors' motion for summary judgment and deny Elevation's cross motion for summary judgment.  Under Colorado law, to create a covenant running with the land, the parties must intend to create a covenant running with the land and the covenant must touch and concern the land with which it runs.  In addition, there must also be privity of estate between the original covenanting parties at the time of the covenant's creation.  Under the unambiguous terms of the Commercial Agreements, the parties intended the covenants specified in section 2.4 of the Commercial Agreements to be a covenant that runs with the land (the parties did not intend that any other provision of the contracts to create a covenant that runs with the land); the Commercial Agreements do not touch and concern the land except for the Drilling Commitment; and there was no privity among the parties.  Thus, as not all

---

[3] The motions to reject are pending in the Chapter 11 case.  As of this writing, the motion to reject the Commercial Agreements with Elevation are in the midst of an evidentiary hearing.

the required elements are present in connection with any of the contracts, no covenant runs with the land.

Finally, while there are several issues discussed below, the central issue before the Court is whether the dedicated and committed interests in the Commercial Agreements touch and concern the land. Other than the Drilling Commitment, they do not. The dedications and commitments concern only personal property and do not affect the physical use of real property or closely relate to real property. Throughout the Commercial Agreements, the dedicated and committed interests are used to identify the particular minerals that are subject to, set apart for, pledged or committed to the parties' contractual obligations. They do not convey any interests in real property. Thus, they cannot serve to satisfy the touch and concern the land element of the test to establish a covenant that runs with the land.

## <u>THE GAS AGREEMENT, OIL AGREEMENT, AND WATER AGREEMENT.</u>

On July 3, 2018, Extraction Oil & Gas, Inc. ("Extraction") and Elevation Midstream, LLC ("Elevation") entered the Gas Gathering and Compression Agreement (the "Gas Agreement"). *Brief in Support of Plaintiff's Motion for Summary Judgment* (A. D.I. 4-1)("*Extraction MSJ*"), Ex. A.

On July 3, 2018, Extraction and Elevation entered the Crude Oil Gathering and Stabilization Agreement (the "Oil Agreement"). *Extraction MSJ* (A. D.I. 4-2), Ex. B.

On July 3, 2018, Extraction and Elevation entered the Produced Water Commercial Agreement (the "Water Agreement"). *Extraction MSJ* (A. D.I. 4-3), Ex. C.

The parties dispute whether the Gas Agreement, Oil Agreement, and Water Agreement (collectively, the "Commercial Agreements") create any covenants running with the land. *Complaint for Declaratory Judgment* (A. D.I. 2) ("*Extraction Complaint*") at p. 11–14.

## PROCEDURAL BACKGROUND.

On June 14, 2020, Extraction and its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

On August 10, 2020, Extraction filed a motion in the underlying chapter 11 case seeking the Court's authorization of its rejection of the Commercial Agreements. *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* (D.I. 377) ("*Motion to Reject*") at p. 1.

On September 4, 2020, Extraction filed the *Complaint for Declaratory Judgment* ("*Extraction Complaint*"), seeking a declaration that the Commercial Agreements do not create covenants that run with the land. *Extraction Complaint* (A. D.I. 2) at p. 11–14.

On September 4, 2020, Extraction filed *Plaintiff's Motion for Summary Judgment* (A. D.I. 3) and *Brief in Support of Plaintiff's Motion for Summary Judgment* (A. D.I. 4). On September 10, 2020, Elevation filed the *Defendant's Motion for Summary Judgment* (A. D.I. 11) and its *Brief in Support of Defendant's Cross-Motion for Summary Judgment* (A. D.I. 12) ("*Elevation Cross-MSJ*"). On September 23, 2020, Extraction filed *Plaintiff's Response in Opposition to Defendant's Cross-Motion for Summary Judgment* (A. D.I. 25) ("*Extraction Response*"). Also on September 23, 2020, Elevation filed *Defendant's Response to Plaintiff's Motion for Summary Judgment* (A. D.I. 26) ("*Elevation Response*"). On September 28, 2020,

4

Elevation filed *Defendant's Reply Brief in Support of its Cross-Motion for Summary Judgment* (A. D.I. 29) ("*Elevation Reply*"), and Extraction filed *Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment* (A. D.I. 30) ("*Extraction's Reply*"). The Court heard oral arguments on the summary judgment motions on September 30, 2020. The parties submitted proposed findings of fact and conclusions of law on October 8, 2020.

On September 10, 2020, Elevation filed its objection to the *Motion to Reject. Objection of Elevation Midstream, LLC and GSO EM Holdings LP to the Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* (D.I. 612) ("*Elevation Objection*") at p. 1.

As relevant to this adversary proceeding, Elevation's Objection argued that the Commercial Agreements created covenants running with the land, and, therefore, the Court could not authorize Elevation's rejection of the Commercial Agreements. *Id.* at p. 3.

In the *Extraction MSJ*, Extraction seeks summary judgment on its claim for declaratory judgment that the Commercial Agreements do not contain covenants running with the land, in order to seek to reject them pursuant to 11 U.S.C. § 365(a). In the *Elevation Cross-MSJ*, Elevation seeks summary judgment that the Commercial Agreements contain covenants running with the land.

## GAS AGREEMENT

Section 2.1 of the Gas Agreement states:

> Subject to the terms of this Agreement, and except as provided in Section 2.2, Producer, on its behalf and on behalf of its Affiliates, hereby commits and dedicates the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from Producer and its Affiliates at the Delivery Points all Gas therein and thereunder

> and as may be produced therefrom to the performance of this Agreement (collectively, the "Dedication") and agrees to connect all of Producer's wells within the Dedicated Area to the Gathering and Compression System and deliver to Elevation at the Delivery Points one hundred percent (100%) of the Gas produced from the Dedicated Interests and from the Other Interests ("Producer's Gas") (collectively, the "Delivery Obligation").

*Extraction MSJ* (A. D.I. 4-1) at § 2.1.

Extraction's dedications and commitments were made "to the performance of th[e] [Gas] Agreement . . . ." *Id.*

The Delivery Obligation obligates Extraction to deliver "one hundred percent (100%) of the Gas produced from the Dedicated Interests and from the Other Interests . . . ." *Id.* at § 2.1.

Section 2.2 of the Gas Agreement states:

> Producer reserves, excepts and excludes the following rights from Producer's and its Affiliates' commitment and dedication provided for in Section 2.1: (a) the right to pool, communitize or unitize all or part of the Dedicated Interests with other lands, leases and properties in the field in which the Dedicated Interests are located[.]

*Id.* at § 2.2(a).

Section 2.2(d) of the Gas Agreement states:

> [S]ubject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any oil and gas lease covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part[.]

*Id.* at § 2.2(d).

Section 2.3 of the Gas Agreement states, in relevant part:

> Producer agrees that any sale, assignment or pledge of all or any portion of the Dedicated Interests will be made expressly subject to this Agreement and will be sold, assigned or pledged in accordance with GTC Section XII.  Producer may or its Affiliates may enter into any agreement pursuant to which any of the Dedicated Interests may be conveyed from Producer to a third party as part of an acreage swap (an "Acreage Swap Agreement")[.]

*Id.* at § 2.3.

Section 2.4 of the Gas Agreement states:

> The Dedication and the Delivery Obligation, the grant of servitude hereinafter provided and other Property Rights and Producer's covenants under Section 2.3, together with all other related commitments in this Agreement and the matters set forth in GTC Section XV(a), GTC Section XV(b) and GTC Section XV(c) are not merely contract rights but are covenants running with (and touching and concerning) all of the Dedicated Interests (including the underlying Gas, lands, leases and wells) and, in addition, are binding upon the successors and assigns of Dedicated Interests and/or Producer's Gas. Producer acknowledges and agrees that the Dedication and Delivery Obligation made hereunder assigns and conveys to Elevation a servitude in the nature of a real covenant which touches and concerns the Dedicated Interests and are for the benefit of Elevation and its successors and permitted assigns, without which, Elevation would be unwilling to enter into or perform under this Agreement.

*Id.* at § 2.4.

The only covenants that the parties intended to run with the land were clearly and expressly identified in the Gas Agreement.  *Id.*

Section 2.5 of the Gas Agreement states:

> Following the in-service date with respect to any Delivery Point, Elevation shall accept at such Delivery Point and gather and compress, including Stabilizer Gas, for redelivery in accordance with the terms of this Agreement, all Producer's Gas delivered by Producer or its Affiliates at such Delivery Point other than the Gas described in Section 4.5.

*Id.* at § 2.5.

7

The Gas Agreement facilitates Elevation's provision of gathering and processing services to Extraction's produced gas in exchange for a contractual fee. *Id.* ("Elevation shall accept at such Delivery Point and gather and compress, including Stabilizer Gas, for redelivery in accordance with the terms of this Agreement, all Producer's Gas delivered by Producer or its Affiliates at such Delivery Point other than the Gas described in <u>Section 4.5</u>.").

Section 2.6(b) of the Gas Agreement states, in relevant part:

> [After initiation of Curtailment], upon Producer's written request, Elevation will permanently release from this Agreement that portion of the Dedicated Interests, Other Interests and Producer's Gas that is adversely affected by the Curtailment upstream of the affected Delivery Point(s)[.]

*Id.* at § 2.6(b).

Section 3.1 of the Gas Agreement states, in relevant part:

> Subject to the terms and conditions of this Agreement, Elevation or one of its Contracting Party Affiliates will, at Elevation's sole cost and expense, design, construct, own, operate, and maintain the Gathering and Compression System in order to gather and compress Producer's Gas produced from Dedicated Interests, including all related appurtenances and facilities and any modifications, additions or extensions thereto sufficient to gather and compress the quantities of Producer's Gas. Elevation or one of its Contracting Party Affiliates will also design, construct, own, operate, and maintain the Delivery Points initially identified in <u>Exhibit B</u> on the Gathering and Compression System (the "<u>Initial Delivery Points</u>") according to the specifications set forth in <u>Exhibit D</u>. Elevation will use its reasonable commercial efforts to connect to the Initial Delivery Points listed in <u>Exhibit B</u> and achieve Substantial Completion by the Substantial Completion Date.

*Id.* at § 3.1.

Section 4.1 of the Gas Agreement states:

> The delivery points for all Producer's Gas delivered by Producer under this Agreement will be at the locations where Producer's Gas enters the

inlet flange of Elevation's meter tubes/custody transfer meters located at the points identified on Exhibit B of this Agreement (the "Delivery Points").

*Id.* at § 4.1.

Under the Gas Agreement, Elevation receives Extraction's gas after it has been produced and severed. *Id.*

Section 4.3(a) of the Gas Agreement states:

> Producer will pay Elevation a Monthly fee for the services provided under this Agreement (the "Fee") equal to the sum of (x) (1) the Broomfield rates *multiplied by* (2) the aggregate volume of Producer's Gas in Mcfs (measured at the Delivery Points) from the Broomfield Dedicated Area during such Month and (y) (1) the Hawkeye Rates (together with the Broomfield Rates, the "Rates") *multiplied by* (2) the aggregate volume of Producer's Gas in Mcfs (measured at the Delivery Points) from the Hawkeye Dedicated Area during such Month. Except as expressly provided under this Agreement, the Fee shall be in full consideration of all services provided by Elevation to Producer under this Agreement.

*Id.* at § 4.3(a).

Section I(vv) of Exhibit A to the Gas Agreement states:

> **"Dedicated Interests"** means (i) Producer's and/or its Affiliates' interests now held in lands, mineral interests, easements, leases, wells and Gas therein and thereunder, including the leases described on Exhibit C in the Dedicated Area, that are not subject to an Current Existing Dedication as of the Effective Date and operated by Producer or its Affiliates and (ii) Producer's and/or its Affiliates' interests hereafter acquired during the term of this Agreement in lands, minerals interests, easements, leases, wells and Gas therein and thereunder in the Dedicated Area that are operated by Producer or its Affiliates and not subject to an existing conflicting dedication or commitment as of the date acquired.

*Id.* at (Ex. A) § I(vv).

Section I(aaa) of Exhibit A to the Gas Agreement states:

> **"Drilling Commitment"** means the multi-well drilling plan set forth in Exhibit F, which specifies the minimum number of Commitment Wells

to be Drilled, Completed and Equipped by Producer and its Affiliates pursuant to <u>GTC Section XV(c)</u>.

Id at (Ex. A) § I(aaa).

Section I(zzzz) of Exhibit A to the Gas Agreement states:

> **"Other Interests"** means all interests of parties other than Producer and its Affiliates in the Dedicated Area, when such other-party interests are represented and controlled by Producer or in respect of which it has the right to market or otherwise deal with their Gas, including working interests, royalty interests, overriding royalty interests, net profits interests or other interests in Gas, but excludes any interests for which a party has exercised its take-in-kind rights under its agreement with Producer.

*Id.* at (Ex. A) § I(zzzz).

Section XII of Exhibit A to the Gas Agreement states:

> This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Except for transfers and assignments to a Party's Contracting Party Affiliate ((i) for which the assigning Party shall remain liable for all obligations under this Agreement, and (ii) which shall require notice by the assigning Party, but no consent from the other Party), this Agreement (including the Drilling Commitment) may not be transferred or assigned, in whole or in part, by either Party without the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed; *provided* that a request for credit support associated with the obligations under this Agreement shall not be considered an unreasonable condition to a transfer or assignment.  Any assignment is a violation of the foregoing shall be void *ab initio.*  Additionally, any assignee of either Party's interest in this Agreement shall provide to the non-assigning Party, in a form reasonably acceptable to such non-assigning Party, a ratification of this Agreement (and related Memorandum of Agreement) whereby such assignee ratifies and assumes the obligations of the assigning Party, including with respect to the Property Rights.

*Id.* at (Ex. A) § XII.

Section XVI(d)(i) of Exhibit A to the Gas Agreement states:

> Producer hereby grants to Elevation, without warranty of title, either express or implied, to the extent that it may lawfully and is

contractually permitted to do so without the incurrence of additional expense, a non-exclusive easement and right of way upon all lands covered by the Dedicated Area for the purpose of constructing, operating, repairing, replacing, maintaining, and removing measurement facilities for the Delivery Points[.]

*Id.* at (Ex. A) § XVI(d)(i).

Extraction granted non-exclusive easements and rights-of-way upon lands in the Dedicated Area to the extent it possessed the ability to lawfully and contractually do so. *Id.* (granting "to Elevation, without warranty of title . . . to the extent that it may lawfully and is contractually permitted to do so without the incurrence of additional expense, a non-exclusive easement and right of way upon all lands covered by the Dedicated Area" for the construction, operation, and maintenance of Elevation's facilities).

Exhibit F to the Gas Agreement states:

> **Producer and its Affiliates hereby agree to Drill, Complete and Equip, in the aggregate, a number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells that equals or exceeds the applicable minimum number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells set forth below on or before the applicable Well Commitment Deadline[.]**

*Id.* at (Ex. F).

The Drilling Commitment requires Extraction to drill a certain number of wells into its mineral estates across particular lands within a certain timeframe. *Id.*

## OIL AGREEMENT.

Section 2.1 of the Oil Agreement states:

> Subject to the terms of this Agreement, and except as provided in <u>Section 2.2</u>, Producer, on its behalf and on behalf of its Affiliates, hereby commits and dedicates the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from Producer and its Affiliates at the Delivery Points all Crude Oil therein and thereunder and as may be produced therefrom to the performance of

> this Agreement (collectively, the "<u>Dedication</u>") and agrees to connect all of Producer's wells within the Dedicated Area to the Gathering and Stabilization System and deliver to Elevation at the Delivery Points one hundred percent (100%) of the Crude Oil produced from the Dedicated Interests and from the Other Interests ("<u>Producer's Crude Oil</u>") (collectively, the "<u>Delivery Obligation</u>").

*Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1

Extraction's dedications and commitments were made "to the performance of th[e] [Oil] Agreement . . . ." *Id.*

The Delivery Obligation obligates Extraction to deliver "one hundred percent (100%) of the Crude Oil produced from the Dedicated Interests and from the Other Interests . . . ." *Id.*

Section 2.2 of the Oil Agreement states:

> Producer reserves, excepts and excludes the following rights from Producer's and its Affiliates' commitment and dedication provided for in <u>Section 2.1</u>: (a) the right to pool, communitize or unitize all or part of the Dedicated Interests with other lands, leases and properties in the field in which the Dedicated Interests are located[.]

*Id.* at § 2.2(a).

Section 2.2(b) of the Oil Agreement states:

> [S]ubject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any oil and gas lease covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part[.]

*Id.* at § 2.2(b).

Section 2.3 of the Oil Agreement states, in relevant part:

> Producer agrees that any sale, assignment or pledge of all or any portion of the Dedicated Interests will be made expressly subject to this

Agreement and will be sold, assigned or pledged in accordance with
<u>GTC Section XII</u>.  Producer may or its Affiliates may enter into any
agreement pursuant to which nay of the Dedicated Interests may be
conveyed from Producer to a third party as part of an acreage swap (an
"<u>Acreage Swap Agreement</u>")[.]

*Id.* at § 2.3.

Section 2.4 of the Oil Agreement states:

The Dedication and the Delivery Obligation, the grant of servitude
hereinafter provided and other Property Rights and Producer's
covenants under <u>Section 2.3</u>, together with all other related
commitments in this Agreement and the matters set forth in <u>GTC
Section XV(a)</u>, <u>GTC Section XV(b)</u> and <u>GTC Section XV(c)</u> are not
merely contract rights but are covenants running with (and touching
and concerning) all of the Dedicated Interests (including the underlying
Crude Oil, lands, leases and wells) and, in addition, are binding upon
the successors and assigns of Dedicated Interests and/or Producer's
Crude Oil.  Producer acknowledges and agrees that the Dedication and
Delivery Obligation made hereunder assigns and conveys to Elevation
a servitude in the nature of a real covenant which touches and concerns
the Dedicated Interests and are for the benefit of Elevation and its
successors and permitted assigns, without which, Elevation would be
unwilling to enter into or perform under this Agreement.

*Id.* at § 2.4.

The only covenants that the parties intended to run with the land were clearly and

expressly identified in the Oil Agreement.  *Id.*

Section 2.5 of the Oil Agreement states:

Following the in-service date with respect to any Delivery Point,
Elevation shall accept at such Delivery Point and gather and stabilize
for redelivery in accordance with the terms of this Agreement, all
Producer's Crude Oil delivered by Producer or its Affiliates at such
Delivery Point other than the Crude Oil described in <u>Section 4.5</u>.

*Id.* at § 2.5.

The Oil Agreement's purpose was the facilitation of Elevation's provision of

services to Extraction's produced oil in exchange for a contractual fee.  *Id.* ("Elevation

13

shall accept at such Delivery Point and gather and stabilize for redelivery in accordance

with the terms of this Agreement, all Producer's Crude Oil delivered by Producer or its

Affiliates at such Delivery Point other than the Crude Oil described in <u>Section 4.5</u>.").

Section 2.6(b) of the Oil Agreement states, in relevant part:

> [After initiation of Curtailment], upon Producer's written request, Elevation will permanently release from this Agreement that portion of the Dedicated Interests, Other Interests and Producer's Crude Oil that is adversely affected by the Curtailment upstream of the affected Delivery Point(s)[.]

*Id.* at § 2.6(b).

Section 3.1 of the Oil Agreement states, in relevant part:

> Subject to the terms and conditions of this Agreement, Elevation or one of its Contracting Party Affiliates will, at Elevation's sole cost and expense, design, construct, own, operate, and maintain the Gathering and Stabilization System in order to gather and compress Producer's Crude Oil produced from Dedicated Interests, including all related appurtenances and facilities and any modifications, additions or extensions thereto sufficient to gather and stabilize the quantities of Producer's Crude Oil. Elevation or one of its Contracting Party Affiliates will also design, construct, own, operate, and maintain the Delivery Points initially identified in <u>Exhibit B</u> on the Gathering and Stabilization System (the "<u>Initial Delivery Points</u>") according to the specifications set forth in <u>Exhibit D</u>. Elevation will use its reasonable commercial efforts to connect to the Initial Delivery Points listed in <u>Exhibit B</u> and achieve Substantial Completion by the Substantial Completion Date.

*Id.* at § 3.1.

Section 4.1 of the Oil Agreement states:

> The delivery points for all Producer's Crude Oil delivered by Producer under this Agreement will be at the locations where Producer's Crude Oil enters the inlet flange of Elevation's meter tubes/custody transfer meters located at the points identified on <u>Exhibit B</u> of this Agreement (the "<u>Delivery Points</u>").

*Id.* at § 4.1.

Under the Oil Agreement, Elevation receives Extraction's crude oil after it has been produced and severed.  *Id.*

Section 4.3(a) of the Oil Agreement states:

> Producer will pay Elevation a Monthly fee for the services provided under this Agreement (the "Fee") equal to the sum of (x) (1) the Broomfield rates *multiplied by* (2) the aggregate volume of Producer's Crude Oil in Barrels (measured at the Delivery Points) from the Broomfield Dedicated Area during such Month and (y) (1) the Hawkeye Rates (together with the Broomfield Rates, the "Rates") *multiplied by* (2) the aggregate volume of Producer's Crude Oil in Barrels (measured at the Delivery Points) from the Hawkeye Dedicated Area during such Month.  Except as expressly provided under this Agreement, the Fee shall be in full consideration of all services provided by Elevation to Producer under this Agreement.

*Id.* at § 4.3(a).

Section I(ss) of Exhibit A to the Oil Agreement states:

> **"Dedicated Interests"** means (i) Producer's and/or its Affiliates' interests now held in lands, mineral interests, easements, leases, wells and Crude Oil therein and thereunder, including the leases described on Exhibit C in the Dedicated Area, that are not subject to an Current Existing Dedication as of the Effective Date and operated by Producer or its Affiliates and (ii) Producer's and/or its Affiliates' interests hereafter acquired during the term of this Agreement in lands, minerals interests, easements, leases, wells and Crude Oil therein and thereunder in the Dedicated Area that are operated by Producer or its Affiliates and not subject to an existing conflicting dedication or commitment as of the date acquired.

*Id.* at § I(ss).

Section I(xx) of Exhibit A to the Oil Agreement states:

> **"Drilling Commitment"** means the multi-well drilling plan set forth in Exhibit F, which specifies the minimum number of Commitment Wells to be Drilled, Completed and Equipped by Producer and its Affiliates pursuant to GTC Section XV(c).

*Id.* at (Ex. A) § I(xx).

Section I(uuuu) of Exhibit A to the Oil Agreement states:

> **"Other Interests"** means all interests of parties other than Producer and its Affiliates in the Dedicated Area, when such other-party interests are represented and controlled by Producer or in respect of which it has the right to market or otherwise deal with their Crude Oil, including working interests, royalty interests, overriding royalty interests, net profits interests or other interests in Crude Oil, but excludes any interests for which a party has exercised its take-in-kind rights under its agreement with Producer.

*Id.* at (Ex. A) § I(uuuu).

Section XII of Exhibit A to the Oil Agreement states:

> This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Except for transfers and assignments to a Party's Contracting Party Affiliate ((i) for which the assigning Party shall remain liable for all obligations under this Agreement, and (ii) which shall require notice by the assigning Party, but no consent from the other Party), this Agreement (including the Drilling Commitment) may not be transferred or assigned, in whole or in part, by either Party without the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed; *provided* that a request for credit support associated with the obligations under this Agreement shall not be considered an unreasonable condition to a transfer or assignment.  Any assignment is a violation of the foregoing shall be void *ab initio*.  Additionally, any assignee of either Party's interest in this Agreement shall provide to the non-assigning Party, in a form reasonably acceptable to such non-assigning Party, a ratification of this Agreement (and related Memorandum of Agreement) whereby such assignee ratifies and assumes the obligations of the assigning Party, including with respect to the Property Rights.

*Id.* at (Ex. A) § XII.

Section XVI(d)(i) of Exhibit A to the Oil Agreement states:

> Producer hereby grants to Elevation, without warranty of title, either express or implied, to the extent that it may lawfully and is contractually permitted to do so without the incurrence of additional expense, a non-exclusive easement and right of way upon all lands covered by the Dedicated Area for the purpose of constructing,

> operating, repairing, replacing, maintaining, and removing measurement facilities for the Delivery Points[.]

*Id.* at (Ex. A) § XVI(d)(i).

Extraction granted non-exclusive easements and rights-of-way upon lands in the Dedicated Area to the extent it possessed the ability to lawfully and contractually do so. *Id.* at (Ex. A) § XVI(d) (granting "to Elevation, without warranty of title . . . to the extent that it may lawfully and is contractually permitted to do so without the incurrence of additional expense, a non-exclusive easement and right of way upon all lands covered by the Dedicated Area" for the construction, operation, and maintenance of Elevation's facilities).

Exhibit F to the Oil Agreement states:

> **Producer and its Affiliates hereby agree to Drill, Complete and Equip, in the aggregate, a number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells that equals or exceeds the applicable minimum number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells set forth below on or before the applicable Well Commitment Deadline[.]**

*Id.* at (Ex. F).

The Drilling Commitment requires Extraction to drill a certain number of wells into its mineral estates across particular lands within a certain timeframe. *Id.*

## WATER AGREEMENT.

Section 2.1 of the Water Agreement states:

> Subject to the terms of this Agreement, and except as provided in Section 2.2, Producer, on its behalf and on behalf of its Affiliates, hereby commits and dedicates the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from Producer and its Affiliates at the Delivery Points all Water therein and thereunder and as may be produced therefrom to the performance of this Agreement (collectively, the "Dedication") and agrees to connect all of

Producer's wells within the Dedicated Area to the Gathering System and deliver to Elevation at the Delivery Points one hundred percent (100%) of the Water produced from the Dedicated Interests and from the Other Interests ("Producer's Water") (collectively, the "Delivery Obligation").

*Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1

Extraction's dedications and commitments were made "to the performance of th[e] [Water] Agreement . . . ." *Id.*

The Delivery Obligation was an agreement to deliver "one hundred percent (100%) of the Water produced from the Dedicated Interests and from the Other Interests . . . ." *Id.* at § 2.1.

Section 2.2 of the Water Agreement states:

Producer reserves, excepts and excludes the following rights from Producer's and its Affiliates' commitment and dedication provided for in Section 2.1: (a) the right to pool, communitize or unitize all or part of the Dedicated Interests with other lands, leases and properties in the field in which the Dedicated Interests are located[.]

*Id.* at § 2.2(a).

Section 2.2(b) of the Water Agreement states:

[S]ubject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any oil and gas lease covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part[.]

*Id.* at § 2.2(b).

Section 2.3 of the Water Agreement states, in relevant part:

Producer agrees that any sale, assignment or pledge of all or any portion of the Dedicated Interests will be made expressly subject to this Agreement and will be sold, assigned or pledged in accordance with

> GTC Section XII.  Producer may or its Affiliates may enter into any agreement pursuant to which any of the Dedicated Interests may be conveyed from Producer to a third party as part of an acreage swap (an "Acreage Swap Agreement")[.]

*Id.* at § 2.3.

Section 2.4 of the Water Agreement states:

> The Dedication and the Delivery Obligation, the grant of servitude hereinafter provided and other Property Rights and Producer's covenants under Section 2.3, together with all other related commitments in this Agreement and the matters set forth in GTC Section XV(a), GTC Section XV(b) and GTC Section XV(c) are not merely contract rights but are covenants running with (and touching and concerning) all of the Dedicated Interests (including the underlying Gas, lands, leases and wells) and, in addition, are binding upon the successors and assigns of Dedicated Interests and/or Producer's Water. Producer acknowledges and agrees that the Dedication and Delivery Obligation made hereunder assigns and conveys to Elevation a servitude in the nature of a real covenant which touches and concerns the Dedicated Interests and are for the benefit of Elevation and its successors and permitted assigns, without which, Elevation would be unwilling to enter into or perform under this Agreement.

*Id.* at § 2.4.

The only covenants that the parties intended to run with the land were clearly and expressly identified in the Water Agreement.  *Id.*

Section 2.5 of the Water Agreement states:

> Following the in-service date with respect to any Delivery Point, Elevation shall accept at such Delivery Point and gather for redelivery in accordance with the terms of this Agreement, all Producer's Water delivered by Producer or its Affiliates at such Delivery Point.  Other than normal loss of volumes of Water incident to transportation.

*Id.* at § 2.5.

The Water Agreement's purpose was the facilitation of Elevation's provision of

services to Extraction's produced oil in exchange for a contractual fee.  *Id.* ("Elevation

shall accept at such Delivery Point and gather for redelivery in accordance with the terms

of this Agreement, all Producer's Water delivered by Producer or its Affiliates at such

Delivery Point.  Other than normal loss of volumes of Water incident to transportation.").

Section 2.6(b) of the Water Agreement states, in relevant part:

> [After initiation of Curtailment], upon Producer's written request, Elevation will permanently release from this Agreement that portion of the Dedicated Interests, Other Interests and Producer's Water that is adversely affected by the Curtailment upstream of the affected Delivery Point(s)[.]

*Id.* at § 2.6(b).

Section 3.1 of the Water Agreement states, in relevant part:

> Subject to the terms and conditions of this Agreement, Elevation or one of its Contracting Party Affiliates will, at Elevation's sole cost and expense, design, construct, own, operate, and maintain the Gathering System in order to gather and compress Producer's Water produced from Dedicated Interests, including all related appurtenances and facilities and any modifications, additions or extensions thereto sufficient to gather the quantities of Producer's Water.  Elevation or one of its Contracting Party Affiliates will also design, construct, own, operate, and maintain the Delivery Points initially identified in <u>Exhibit B</u> on the Gathering System (the "<u>Initial Delivery Points</u>") according to the specifications set forth in <u>Exhibit D</u>.  Elevation will use its reasonable commercial efforts to connect to the Initial Delivery Points listed in <u>Exhibit B</u> and achieve Substantial Completion by the Substantial Completion Date.

*Id.* at § 3.1.

Section 4.1 of the Water Agreement states:

> The delivery points for all Producer's Water delivered by Producer under this Agreement will be at the locations where Producer's Water enters the inlet flange of Elevation's meter tubes/custody transfer meters located at the points identified on <u>Exhibit B</u> of this Agreement (the "<u>Delivery Points</u>").

*Id.* at § 4.1.

Under the Water Agreement, Elevation receives Extraction's water after it has been

produced and reduced to possession.  *Id.*

20

Section 4.3(a) of the Water Agreement states:

> Subject to GTC Section V(a), Producer will pay Elevation a Monthly fee for the services provided under this Agreement (the "Fee") equal to the sum of (x) (1) the Broomfield rates *multiplied by* (2) the aggregate volume of Producer's Water in Barrels (measured at the Delivery Points) from the Broomfield Dedicated Area during such Month and (y) (1) the Hawkeye Rates (together with the Broomfield Rates, the "Rates") *multiplied by* (2) the aggregate volume of Producer's Water in Barrels (measured at the Delivery Points) from the Hawkeye Dedicated Area during such Month.  Except as expressly provided under this Agreement, the Fee shall be in full consideration of all services provided by Elevation to Producer under this Agreement.

*Id.* at § 4.3(a).

Section I(qq) of Exhibit A to the Water Agreement states:

> **"Dedicated Interests"** means (i) Producer's and/or its Affiliates' interests now held in lands, mineral interests, easements, leases, wells and Water therein and thereunder, including the leases described on Exhibit C in the Dedicated Area, that are not subject to an Current Existing Dedication as of the Effective Date and operated by Producer or its Affiliates and (ii) Producer's and/or its Affiliates' interests hereafter acquired during the term of this Agreement in lands, minerals interests, easements, leases, wells and Water therein and thereunder in the Dedicated Area that are operated by Producer or its Affiliates and not subject to an existing conflicting dedication or commitment as of the date acquired.

*Id.* at (Ex. A) § I(qq).

Section I(vv) of Exhibit A to the Water Agreement states:

> **"Drilling Commitment"** means the multi-well drilling plan set forth in Exhibit F, which specifies the minimum number of Commitment Wells to be Drilled, Completed and Equipped by Producer and its Affiliates pursuant to GTC Section XV(c).

*Id.* at (Ex. A) § I(vv).

Section I(rrrr) of Exhibit A to the Water Agreement states:

> **"Other Interests"** means all interests of parties other than Producer and its Affiliates in the Dedicated Area, when such other-party interests are represented and controlled by Producer or in respect of which it has the

right to market or otherwise deal with their Water, including working interests, royalty interests, overriding royalty interests, net profits interests or other interests in Water, but excludes any interests for which a party has exercised its take-in-kind rights under its agreement with Producer.

*Id.* at (Ex. A) § I(rrrr).

Section XII of Exhibit A to the Water Agreement states:

This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Except for transfers and assignments to a Party's Contracting Party Affiliate ((i) for which the assigning Party shall remain liable for all obligations under this Agreement, and (ii) which shall require notice by the assigning Party, but no consent from the other Party), this Agreement (including the Drilling Commitment) may not be transferred or assigned, in whole or in part, by either Party without the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed; *provided* that a request for credit support associated with the obligations under this Agreement shall not be considered an unreasonable condition to a transfer or assignment.  Any assignment is a violation of the foregoing shall be void *ab initio*.  Additionally, any assignee of either Party's interest in this Agreement shall provide to the non-assigning Party, in a form reasonably acceptable to such non-assigning Party, a ratification of this Agreement (and related Memorandum of Agreement) whereby such assignee ratifies and assumes the obligations of the assigning Party, including with respect to the Property Rights.

*Id.* at (Ex. A) § XII.

Section XVI(d)(i) of Exhibit A to the Water Agreement:

Producer hereby grants to Elevation, without warranty of title, either express or implied, to the extent that it may lawfully and is contractually permitted to do so without the incurrence of additional expense, a non-exclusive easement and right of way upon all lands covered by the Dedicated Area for the purpose of constructing, operating, repairing, replacing, maintaining, and removing measurement facilities for the Delivery Points[.]

*Id.* at (Ex. A) § XVI(d)(i).

Extraction granted non-exclusive easements and rights-of-way upon land in the Dedicated Area to the extent it possessed the ability to lawfully and contractually do so. *Id.* at (Ex. A) § XVI(d) (granting "to Elevation, without warranty of title . . . to the extent that it may lawfully and is contractually permitted to do so without the incurrence of additional expense, a non-exclusive easement and right of way upon all lands covered by the Dedicated Area" for the construction, operation, and maintenance of Elevation's facilities).

Exhibit F to the Water Agreement states:

> **Producer and its Affiliates hereby agree to Drill, Complete and Equip, in the aggregate, a number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells that equals or exceeds the applicable minimum number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells set forth below on or before the applicable Well Commitment Deadline[.]**

*Id.* at (Ex. F).

The Drilling Commitment requires Extraction to drill a certain number of wells into its mineral estates across particular lands within a certain timeframe. *Id.*

## REAL PROPERTY LOCATION

The real property implicated under the Commercial Agreements is located in Colorado. *Extraction MSJ* (A. D.I. 4-1), Ex. A at Recital 1 (reciting the location of Extraction's lands in Colorado); *Extraction MSJ* (A. D.I. 4-2), Ex. B at Recital 1 (same); *Id.* at Recital 1 (same).

## RATIFICATION AGREEMENT

On July 3, 2018, the parties entered the Ratification Agreement. *Extraction MSJ* (A. D.I. 4-4), Ex. D.

The parties "desire[d] to enter into [the] [Ratification] Agreement to clarify certain responsibilities and obligations" respecting the Commercial Agreements.  *Id.* at Recital 2.

Section 2(a) of the Ratification Agreement states:

> The Ratifying Parties hereby ratify and confirm the dedication of all of their interests in (i) the Dedicated Interests and other Property Rights and Other Interests and (ii) the dedicated Gas, Crude Oil and Water, as the case may be, under the Commercial Agreements to the extent provided for in the Commercial Agreements (including with respect to any after acquired interests) and agree that such interests will be dedicated to Elevation and to the performance of the Commercial Agreements, subject to the terms in the Commercial Agreements.

*Id.* at § 2(a).

In the Ratification Agreement, the parties ratified and confirmed the dedication.  *Id.*

Section 2(b) of the Ratification Agreement states:

> The Dedication and the Delivery Obligation, the grant of servitude provided and other Property Rights and Producer's covenants under Section 2.3 of each of the Commercial Agreements, together with all other related commitments in the Commercial Agreements and the matters set forth in GTC Section XV(a), GTC Section XV(b) and GTC Section XV(c) of each of the Commercial Agreements are not merely contract rights but are covenants running with (and touching and concerning) all of the Dedicated Interests (including the underlying Gas, Crude Oil, Water, lands, leases and wells) and, in addition, are binding upon the successors and assigns of Dedicated Interests and/or the undersigned's Gas, Crude Oil and Water, as the case may be.  The undersigned acknowledges and agrees that the Dedication and Delivery Obligation made hereunder and under the Commercial Agreement [sic] assigns and conveys to Elevation a servitude in the nature of a real covenant which touches and concerns the Dedicated Interests and are for the benefit of Elevation and its successors and permitted assigns, without which, Elevation would be unwilling to enter into or perform under the Commercial Agreements.

*Id.* at § 2(b).

Section 2(b) of the Ratification Agreement is a nearly identical provision to the corresponding provisions in each of the Commercial Agreements.  *Id.*

The Ratification Agreement was "executed solely for the purpose of the ratification contemplated [t]herein and shall not amend or modify the Commercial Agreements in any way.  In the event of a conflict between this this [sic] [Ratification] Agreement and the Commercial Agreements, the Commercial Agreements shall govern in all respects." *Id.* at § 5.

## CONCLUSIONS OF LAW

### JURISDICTION

The Court has jurisdiction over this matter.  28 U.S.C. §§ 157, 1334.

The parties agree the Court has jurisdiction. *Elevation Answer* (A. D.I. 10) at p. 3.

### DECLARATORY JUDGMENT

Declaratory judgment is appropriate because there is an actual controversy between the parties: Extraction and Elevation dispute whether the Commercial Agreements create any covenants running with the land in the context of Extraction's rejection of the Commercial Agreements.  28 U.S.C § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

In its objection to Extraction's rejection motion, Elevation argued that Extraction's request to reject the Commercial Agreements was improper because the contracts created covenants running with the land. *Elevation Objection* (D.I. 612) at p. 3.

In the adversary proceeding, Elevation also argued that the Commercial Agreements created covenants running with the land.  *Elevation Answer* (A. D.I. 10) at p. 22 (arguing Extraction is not entitled to declaratory judgment because the contracts created covenants running with the land).

Extraction argues the Commercial Agreements did not create covenants running with the land.  *Extraction Complaint* (A. D.I. 2) at p. 11–16.

There is a justiciable controversy because the parties dispute the nature of their rights and obligations under the Commercial Agreements.  28 U.S.C. § 2201(a).

## CHOICE OF LAW

Colorado law governs the substantive real property questions in this case.  *Wolf v. Burke*, 32 P. 427, 429 (Colo. 1893) ("[T]he rights and titles to real property are governed by the law of the situs . . . ."); *United States v. Novotny*, 184 F. Supp. 2d 1071, 1087 (D. Colo. 2001) ("Colorado law applies to issues relating to the conveyance and ownership of real property located within Colorado.") (citation simplified).

## SUMMARY JUDGMENT

Summary judgment is appropriate when there are no genuine issues of material fact.  Fed. R. Civ. P. 56(a) (noting the "[C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact."); *Tamarind Resort Associates v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d

Cir. 1998) ("[I]t is a fundamental principle of contract law that 'disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment.'").

Elevation agrees that the covenant running with the land question raised in this adversary proceeding is resolvable as a matter of law. *Elevation Cross-MSJ* (A. D.I. 12) at p. 6.

Any ambiguity concerning whether the terms of the Commercial Agreements created covenants running with the land would be resolved in favor of the unrestricted use of the land. *B.B. & C. P'ship v. Edelweiss Condo. Ass'n*, 218 P.3d 310, 315 (Colo. 2009) ("When the covenant is unclear, courts resolve all doubts against the restriction and in favor of free and unrestricted use of property.").

The Commercial Agreements' terms are unambiguous. *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 120 (Colo. 2016) ("A contractual term is ambiguous 'if it is susceptible on its face to more than one reasonable interpretation.'").

The Court may resolve the question of whether the Commercial Agreements created a covenant running with the land as a matter of law. *Holiday Acres Prop. Owners Ass'n, Inc. v. Wise*, 998 P.2d 1106, 1108 (Colo. App. 2000), *as modified on denial of reh'g* (July 6, 2000) (noting the "[i]nterpretation and construction of covenants is a question of law"); *Pulte Home Corp., v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 826 (Colo. 2016) ("Covenants and other recorded instruments, like contracts, should be construed as a whole 'seeking to harmonize and give effect to all provisions so that none will be rendered meaningless.'").

## COVENANTS RUNNING WITH THE LAND

The Commercial Agreements' terms unambiguously do not create covenants running with the land.  *Extraction MSJ* (A. D.I. 4-1), Ex. A; *Extraction MSJ* (A. D.I. 4-2), Ex. B; *Extraction MSJ* (A. D.I. 4-3), Ex. C.

Colorado law disfavors the creation of covenants running with the land as a derogation of the common law's preference for the free alienability of land.  *Nelson v. Farr*, 354 P.2d 163, 166 (Colo. 1960) ("[A]s a fundamental principle of law of real property, restrictions on the alienation and use of land are not favored, and all doubt should be resolved in favor of the free use of property . . . .  'Restrictions on the use of property, being in derogation of the fee conveyed, will not be extended by implication to include anything not clearly expressed.'").

To create a covenant running with the land, the parties must intend to create a covenant running with the land and the covenant must touch and concern the land with which it runs.  *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (concerning intent and touch and concern).

In addition, to create a covenant running with the land, there must also be privity of estate between the original covenanting parties at the time of the covenant's creation. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) (same); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (same).

Failure to satisfy any one of the elements needed to create a covenant running with the land means that a covenant cannot run with the land as a matter of law. *See Cloud v. Ass'n of Owners,* 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment.").

Contracting parties cannot create covenants running with the land by agreement alone; party intent is necessary for a covenant to run with the land, but such intent is not sufficient. *Cloud* 857 P.2d at 440 ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment."); *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.,* 867 P.2d 70, 74 (Colo. App. 1993) ("In order for a covenant to run with the land, not only must the parties to the covenant intend that it do so . . . but the covenant must 'touch and concern' the land.").

The Court conducts a covenant-by-covenant analysis regarding whether each covenant runs with the land. In order to run with the land, each covenant must meet the elements required of real covenants. That one covenant meets these elements and runs with the land does not mean that all covenants contained in the contract run with the land, even if they do not themselves meet each of the elements. *MidCities Metro. Dist. No. 1 v. U.S. Bank Nat. Ass'n,* 12-CV-03322-LTB, 2013 WL 3200088, at *1 (D. Colo. June 24, 2013) (concluding that one covenant in a deed did not run with the land despite the presence of multiple covenants running with the land); *Shaffer v. George,* 171 P. 881, 882 (Colo. 1917) ("The assignee [of a lease] is in privity of estate, but not in privity of contract with the

lessor, and is only liable on covenants which run with the land, such as covenants for rent, to pay taxes, and to yield up premises in good repair."); 52 C.J.S. Landlord & Tenant § 458 ("A covenant in a lease runs with the land only where the act covenanted to be done or omitted concerns the land or the estate conveyed as where it affects the use, condition, value, and enjoyment of the premises.").

If only one covenant runs with the land, that covenant is enforceable against the contracting party through privity of contract, and it is also enforceable against successors-to-title in the land with which the covenant is intended to run through privity of estate; the remaining covenants that do not run with the land are enforceable only against parties bound by privity of contract. *Shaffer,* 171 P. at 882 ("The original lessee is bound by the contract to make the payments. The assignee is bound by his acceptance of the lease to make good the covenant to pay rent therein contained. His liability is upon the covenants and arises, not from any express assumption or agreement to pay it, which might be contained in the written assignment, but from the privity of estate by reason of his ownership and right to enjoy the benefits of the lease. The assignee is in privity of estate, but not in privity of contract with the lessor, and is only liable on covenants which run with the land, such as covenants for rent, to pay taxes, and to yield up premises in good repair.").

## I.   Intent to Create a Covenant Running with the Land.

To create covenants running with the land, the contracting parties must express an intent to create covenants running with the land in clear and unambiguous terms. *TBI Exploration v. Belco Energy Corp.*, 220 F.3d 586 (5th Cir. 2000) (applying Colorado law and

stating, "in the cases that have recognized a covenant running with the land, the covenants were in express terms"); *MidCities Metro.* 2013 WL 3200088, (applying Colorado law and noting that if a covenant is ambiguous, the Court must "resolve all doubts against the restriction and in favor of free and unrestricted use of property").

Intent is to be ascertained from a contract's written terms. *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. App. 1993) ("Whether a covenant runs with the land turns on the construction of relevant documents.").

The only covenants in the Commercial Agreements that the parties clearly intended to run with the land are the covenants specified in sections 2.4 of the Commercial Agreements. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.4 (expressly identifying particular covenants that were intended to run with the land); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.4 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.4 (same).

The parties intended the covenants to run with Extraction's mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.4 (stating the expressly identified covenants are "covenants running with (and touching and concerning) all of the Dedicated Interests (including the underlying Gas, lands, leases and wells . . . .)"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.4 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.4 (similar respecting water).

The parties did not clearly express an intent for other covenants in the Commercial Agreements to run with the land. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.4 (expressly

identifying particular covenants that were intended to run with the land); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.4 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.4 (same).

## II.    Privity of Estate is Not Satisfied.

The Court is bound to apply Colorado law as declared by the Colorado Supreme Court until the Colorado Supreme Court disturbs its prior holdings.  *Erie County v. Am. States Ins. Co.*, 573 F. Supp. 479, 486 (W.D. Pa. 1983) ("While plaintiff questions the continuing vitality of *Gordon,* we are bound to consider the [Pennsylvania] Supreme Court's undisturbed holding in *Gordon* as good law on this point."), *aff'd*, 745 F.2d 45 (3d Cir. 1984) *and aff'd sub nom. Am. States Ins. Co. v. Santafemia*, 745 F.2d 45 (3d Cir. 1984); *cf. Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

The Colorado Supreme Court requires privity of estate between the covenanting parties at the time of the covenant's creation in order for a covenant to run with the land. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (noting "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant"); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) ("[W]here there is the requisite privity of estate, and the covenant is connected with or concerns the land or estate conveyed, then a covenant imposing a burden will run with the land as readily as one conferring a benefit."); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (concluding a

covenant running with the land was created, in part, because privity of estate was not denied).

Colorado appellate courts confirm that Colorado law requires privity of estate. *Fed. Deposit Ins. Corp. v. Mars*, 821 P.2d 826, 829 (Colo. App. 1991) ("For contractual obligations between a lessor and lessee to pass to a successor in title of the lessee, there must be either privity of contract or privity of estate between the lessor and that successor in title."); *Fisk v. Cathcart*, 33 P. 1004, 1005 (Colo. App. 1893) ("Under these circumstances, there is no privity between him as a grantee from Beecher and the prior grantors subsequent to Parker which entitles him to maintain his suit upon his covenant.").

Colorado statutory law identifies several covenants that necessarily run with the land, provided that those covenants satisfy privity of estate.  Colo. Rev. Stat. § 38-30-121 ("Covenants of seisin, peaceable possession, freedom from encumbrances, and warranty contained in any conveyance of real estate, or any interest therein, shall run with the premises and inure to the benefit of all subsequent purchasers and encumbrancers.").

Real property treatises continue to cite Colorado Supreme Court cases for the proposition that privity of estate between the covenanting parties is required.  3 Tiffany Real Property § 851 n. 27 (3d ed. 2015) (citing *Taylor* for the proposition that privity of estate at the time of the creation of the covenant is required); 9 Richard R. Powell, Powell on Real Property § 60.04 n. 123 (citing *Farmers High Line Canal* for the proposition that either mutual or horizontal privity are required for a covenant to run with the land).

Elevation argues there is privity of estate between the parties.  To the extent privity is applicable, "the requisite privity exists in the case of a covenant by a grantor to do or

not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant." *Taylor v. Melton*, 274 P.2d 977, 982 (Colo. 1954) (quotation omitted).

Elevation further argues that privity is meant to provide notice. *In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 69 (Bankr. S.D.N.Y. 2016*), aff'd,* 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[T]he underlying purpose of the horizontal privity of estate requirement . . . is to ensure that a covenant that binds successors is formally recorded in connection with the real property that is being burdened by the covenant."). The Memoranda as to the Commercial Agreements were publicly recorded and provide adequate notice. *Elevation MSJ* (A. D.I. 12-8, 12-9, 12-10), Ex. 7 and Ex. 8 and Ex. 9.

Elevation continues that a covenant that burdens and benefits successors satisfies any privity requirement under Colorado law. *See Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. App. 1993), (covenants run with the land when they bind successors and assigns). According to Elevation, the Commercial Agreements, including Section 2.4 and Exhibit A, Section XII, are clear that successors and assigns are burdened by the covenants therein. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4, (Ex. A) § XII and Ex. 2 at § 2.4, (Ex. A) § XII and Ex. 3 at § 2.4, (Ex. A) § XII.

Additionally, Elevation argues that privity (even if required) was also created and further demonstrated pursuant to Extraction's granting of easements to Elevation under the Commercial Agreements to construct and maintain the midstream facilities. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XVI(d) and Ex. 2 at (Ex. A) § XVI(d) and

34

Ex. 3 at (Ex. A) § XVI(d).  The covenants in the Commercial Agreements adjoin the easements granted to Elevation under the Commercial Agreements and Extraction's real property interests therein and thereunder from which such conveyed easements arose. *See Taylor v. Melton*, 274 P.2d 977, 982 (Colo. 1954) (en banc).  Under Colorado law, "[a]n easement is an interest in property."  *Wright v. Horse Creek Ranches*, 697 P.2d 384, 387 (Colo. 1985) (en banc).  The granting of an easement for surface use is a conveyance of a property interest tied to the oil and gas leases, not the surface estate.  *See Frankfurt Oil Co. v. Abrams*, 413 P.2d 190, 194 (en banc) (indicating Colorado oil and gas leases include the right to use the surface land as necessary for operation).  And while an easement is "a privilege existing distinct from the ownership of the land itself; nevertheless it is an interest in land."  *Strole v. Guymon*, 37 P.3d 529, 533 (Colo. App. 2001).  Elevation continues that as "a surface easement is a crucial component of an oil and gas lease," and "integrally tied to the purpose of an oil and gas lease," the granting of an easement "is enough to show horizontal privity."  *In re Alta Mesa Resources*, 613 B.R. 90, 106 (Bankr. S.D. Tex. 2019).

Elevation argues that *Sabine* does not support Extraction's argument that the granting of an easement under the Commercial Agreements fails to create privity.  The easements at issue in *Sabine* were merely contemplated, not actually effective or granted by the producer under the Commercial Agreement at issue there.  *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 69 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018). In contrast, the easements in the Commercial Agreements were actually granted by Extraction upon execution of the Commercial Agreements.

*Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XVI(d) and Ex. 2 at (Ex. A) § XVI(d) and Ex. 3 at (Ex. A) § XVI(d).  The easements in the Commercial Agreements are therefore sufficient to create horizontal privity.

Finally, Elevation argues that the Dedication of the Dedicated Interests under the Commercial Agreements also creates privity.  The Dedication applies to the oil, gas, and water in and under the land, as well as the lands, mineral interests, easements, leases, and wells.  Through the Dedication, Extraction relinquished to Elevation certain rights under its oil and gas leases, including as to transportation, and committed the hydrocarbons in the Dedicated Area exclusively to Elevation.  *See Garman v. Conoco, Inc.,* 886 P.2d 652, 654 (Colo. 1994) (en banc).  This granting of a real property interest under the Dedication is therefore sufficient to create horizontal privity.

These arguments fail for several reasons.  Preliminarily, Elevation has not identified a single Colorado case from the Colorado Supreme Court holding that Colorado no longer requires privity of estate between the covenanting parties.  *Elevation Cross-MSJ* (A. D.I. 12) at p. 28-29; *Elevation Response* (A. D.I. 26) at p. 25–30; *Elevation Reply* (A. D.I. 29) at p. 12–15.

The Restatement (Third) of Property does not restate Colorado law regarding covenants that run with the land, and Colorado has not adopted the reforms suggested therein.  Restatement (Third) of Property Servitudes § 3.2 (Am. Law Inst. 2000) (dispensing with the required touch and concern element and stating "[n]either the burden nor the benefit of a covenant is required to touch or concern land in order for the covenant to be valid as a servitude").

Privity of estate requires that any covenant that allegedly runs with the land be accompanied by a contemporaneous conveyance of some interest in the land with which the covenant runs. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (noting "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant"); 9 Richard R. Powell, Powell on Real Property § 60.04(3)(c)(iii) ("'Horizontal privity' typically exists when the original covenanting parties make their covenant in connection with the conveyance of an estate in fee from one of the parties to the other. The covenant and the conveyance must be made at the same time . . . ."); 3 Tiffany Real Property § 851 (3d ed. 2015) (describing "privity of estate between the covenantor and the covenantee at the time the covenant was created").

The conveyance contemplated by privity of estate cannot be satisfied by the purported covenant running with the land itself; there must be a conveyance of an independent real property interest. *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) ("[W]here there is the requisite privity of estate, and the covenant is connected with or concerns the land or estate conveyed, then a covenant imposing a burden will run with the land as readily as one conferring a benefit.").

The Commercial Agreements did not convey to Elevation any interest in Extraction's mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A; *Extraction MSJ* (A. D.I. 4-2), Ex. B; *Extraction MSJ* (A. D.I. 4-3), Ex. C.

Elevation failed to identify any real property interest in Extraction's mineral estates that was conveyed contemporaneously with the alleged covenants running with the land.  *Elevation Cross-MSJ* (A. D.I. 12) at p. 28–29; *Elevation Response* (A. D.I. 26) at p. 25–30; *Elevation Reply* (A. D.I. 29) at p. 12–15.

Elevation argued that the Commercial Agreements "burdening and benefiting successors" is sufficient to satisfy privity of estate.  *Elevation Response* (A. D.I. 26) at p. 27.

The creation of a burden or benefit to successors in title is a consequence of a covenant running with the land, not the conveyance of an interest in the subject real property capable of satisfying privity of estate between the covenanting parties.  *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. App. 1993) ("[R]eal covenants 'run with the land' and burden or benefit successors in interest.").

Elevation also argued that Extraction's conveyance of "easements, rights-of-way and other surface rights to Elevation" satisfied privity of estate.  *Elevation Response* (A. D.I. 26) at p. 27.

The surface estate and mineral estate, once severed, are separate and distinct estates in real property.  *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 556 (Colo. 1995) ("[Colorado has] long recognized that a conveyance which severs a mineral interest from the surface estate creates a separate and distinct estate."); *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 927 (Colo. 1997), *as modified on denial of reh'g* (Oct. 20, 1997) ("As the owner of property subject to the easement, the surface owner 'continues to enjoy all the rights and benefits of proprietorship *consistent with the burden of the easement*.'").

38

Conveyances of easements or rights-of-way across the surface estate are interests in the surface estate that cannot satisfy privity of estate respecting a mineral estate. *Notch Mountain*, 898 P.2d at 556 (noting Colorado has "long recognized that a conveyance which severs a mineral interest from the surface estate creates a separate and distinct estate").

Because easements in gross are personal rights in the use of (and interests in) the surface estate, they are not interests in a severed mineral estate. *Lobato v. Taylor*, 71 P.3d 938, 945 (Colo. 2002) ("An easement in gross does not belong to an individual by virtue of her ownership of land, but rather is a personal right to use another's property."). As a result, the conveyance of an easement in gross in a surface estate cannot satisfy privity of estate respecting a mineral estate.

Elevation also argued that Extraction conveyed easements or rights-of-way associated with the mineral estate. *Elevation Response* (A. D.I. 26) at p. 28.

Extraction expressly did not (and could not) convey any property interest it lacked the ability to convey. *Extraction MSJ* (A. D.I. 4-1), Ex. A at (Ex. A) § XVI(d)(i); *Extraction MSJ* (A. D.I. 4-2), Ex. B at (Ex. A) § XVI(d)(i); *Extraction MSJ* (A. D.I. 4-3), Ex. C at (Ex. A) § XVI(d)(i).

Extraction lacked the ability to convey any easement appurtenant to the mineral estates separate and apart from the land the easement appurtenant is annexed to (here, Extraction's mineral estates). *Lewitz v. Porath Family Tr.*, 36 P.3d 120, 122 (Colo. App. 2001), *as modified on denial of reh'g* (Apr. 26, 2001) ("[A]n easement appurtenant is an 'incorporeal right' attached to and belonging with some other parcel of land. It runs with

that land and is incapable of existence separate and apart from the particular land to which it is annexed.").

Extraction also lacked the ability to convey its rights of ingress and egress upon the surface estates, which are incidental (and appurtenant) to ownership of Extraction's mineral estates. *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 926 (Colo. 1997), *as modified on denial of reh'g* (Oct. 20, 1997) ("In this sense, the right of access to the mineral estate is in the nature of an implied easement, since it entitles the holder to a limited right to use the land in order to reach and extract the minerals."); *Chase v. Colorado Oil & Gas Conservation Comm'n*, 284 P.3d 161, 171 n. 17 (Colo. App. 2012), *as modified on denial of reh'g* (July 19, 2012) ("Mineral estate owners have an implied easement, which burdens the surface interest and empowers mineral owners to make reasonable use of the surface in order to access the minerals below."); *Entek GRB, LLC v. Stull Ranches, LLC*, 885 F. Supp. 2d 1082, 1088 (D. Colo. 2012) ("Because the mineral estate is considered the dominant estate, it impliedly carries with it a right to use as much of the surface as may be reasonably necessary for operations relating to the mineral estate.").

Rights of ingress and egress are not real property interests capable of satisfying privity of estate; they are incidental rights. *Notch Mountain Corp. v. Elliot*, 898 P.2d 550, 556 (Colo. 1995) (en banc) ("Though the privilege to use the surface is recognized at law, this right does not create an ownership interest in the surface estate . . . but merely a right of access.").

Elevation also argued that the Commercial Agreements' dedications and commitments satisfy privity of estate. *Elevation Response* (A. D.I. 26) at p. 29.

Dedications and commitments to the performance of the agreements are not conveyances of real property interests, and they do not satisfy privity of estate. *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("This regulation clearly contemplates a 'conveyance' and not a 'dedication' which terms are not synonymous.").

As discussed below, the dedications identify the particular produced crude petroleum within a particular area that is subject to the parties' contractual obligations. *Cf. In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018).

The dedications and commitments identify the particular produced minerals and produced water that is subject to, set apart, pledged or committed to the parties' contractual obligations under the services contracts. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 ("Subject to the terms of this Agreement, and except as provided in Section 2.2, Producer, on its behalf and on behalf of its Affiliates, hereby commits and dedicates the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from Producer and its Affiliates at the Delivery Points all Gas therein and thereunder and as may be produced therefrom to the performance of this Agreement (collectively, the "Dedication") . . . .); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (similar respecting water).

The Dedicated Interests are used to identify the particular produced minerals or produced water that is subject to, set apart for, pledged or committed to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(a) (reserving to

Extraction "the right to pool, communitize or unitize all or part of the Dedicated Interests with other lands, leases and properties in the field in which the Dedicated Interests are located"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(a) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(a) (same); *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.3 (containing Extraction's agreement "that any sale, assignment or pledge of all or any portion of the Dedicated Interests will be made expressly subject to this Agreement" but noting Extraction "may enter into any agreement pursuant to which any of the Dedicated Interests may be conveyed from [Extraction] to a third party as part of an acreage swap"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.3 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.3 (same); *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.6(b) (noting "Elevation will permanently release from this Agreement that portion of the Dedicated Interests, Other Interests and Producer's Gas that is adversely affected by the Curtailment"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.6(b) (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.6(b) (similar respecting water).

The Commercial Agreements' dedications and commitments were not intended to convey anything implicated thereunder; Extraction still owns any real property interest that was dedicated and committed to the performance of the Commercial Agreements. *Compare Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 (dedicating and committing to the performance of the agreement "the Dedicated Interests") *and Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1 (same) *and Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (same) *with Extraction MSJ* (A. D.I. 4-1), Ex. A at (Ex. A) § I(vv) (**"Dedicated Interests"** means (i) Producer's and/or its Affiliates' interests now held in lands, mineral interests, easements, leases,

wells and Gas therein and thereunder, including the leases described on <u>Exhibit C</u> in the Dedicated Area, that are not subject to an Current Existing Dedication as of the Effective Date and operated by Producer or its Affiliates and (ii) Producer's and/or its Affiliates' interests hereafter acquired during the term of this Agreement in lands, minerals interests, easements, leases, wells and Gas therein and thereunder in the Dedicated Area that are operated by Producer or its Affiliates and not subject to an existing conflicting dedication or commitment as of the date acquired.") *and Extraction MSJ* (A. D.I. 4-2), Ex. B at (Ex. A) § I(ss) (similar respecting oil) *and Extraction MSJ* (A. D.I. 4-3), Ex. C at (Ex. A) § I(qq) (similar respecting water).

Subject to the Drilling Commitment, Extraction retains its rights, title, and interest in the Dedicated Interests. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(d) (reserving, "subject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any oil and gas lease covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(b) (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(b) (similar respecting water).

Accordingly, the original covenanting parties to the Commercial Agreements were not in privity of estate at the time of the creation of the covenants therein, and the Commercial Agreements contain no covenants that run with the land. *Taylor v. Melton*,

274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties).

## III.    Touch and concern.

To satisfy touch and concern, the particular covenant intended to run with the land must closely relate to the estate in real property with which it is intended to run (here, Extraction's mineral estate), its use, or enjoyment. *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment'").

"The 'touch and concern' requirement is fulfilled when the covenant operates to benefit the physical use of the land . . . ." *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991), *rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855 P.2d 1368 (Colo. 1993) (noting a subordination agreement was a personal covenant that did not run with the land because "the parties' entitlement to physical use of the land was not increased, nor was improvement made to the land as a result of subsequent loan proceeds").

Colorado generally follows the traditional common law approach to the touch and concern element. 3 Tiffany Real Property § 854 (3d ed. 2015) ("An important test for distinguishing a real or running covenant from a merely personal or collateral one, is whether or not the covenant so closely relates to the land or estate granted . . . that it may be said to 'touch and concern' it.").

Touch and concern is an objective analysis of a covenant's effect upon land and the element does not turn on party intent or word choice. *Cloud v. Ass'n of Owners,* 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with

the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment."); *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 875 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[T]he appellants have not purchased the minerals underlying the Dedicated Areas but, again, have merely agreed to provide services to the minerals' owner. The logical extension of Nordheim's argument—that any agreement relating to minerals in the ground constitutes the conveyance of a real property interest—is not supported by the cited caselaw."); 21 C.J.S. Covenants § 34 ("[T]he intent of the parties is not dispositive, insofar as obligations arising from restrictive covenants that are inherently personal cannot be made appurtenant to the land . . . ."); 9 Richard R. Powell, Powell on Real Property § 60.04(3)(a) ("The touch and concern requirement is the only essential requirement for the running of covenants which focuses on an objective analysis of the contents of the covenant itself rather than the intentions and relationships between the parties.").

None of the covenants, other than the Drilling Commitment, touch and concern Extraction's mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A; *Extraction MSJ* (A. D.I. 4-2), Ex. B; *Extraction MSJ* (A. D.I. 4-3), Ex. C.

Elevation argues that numerous covenants in the Commercial Agreements are closely related to, and therefore touch and concern, "the Dedicated Interests." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at § 2.4 and Ex. 2 at § 2.4 and Ex. 3 at § 2.4. "Dedicated Interests" is defined to include Extraction's and its affiliates' held and after-acquired interests in "lands, mineral interests, easements, leases, wells, and [gas, oil, and water] therein and thereunder." *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § I(vv)

and Ex. 2 at (Ex. A) § I(ss) and Ex. 3 at (Ex. A) § I(qq).  The benefits and burdens imposed on the Dedicated Interests make clear that the Commercial Agreements, and the covenants contained therein, run with the land.

Extraction admits that each Commercial Agreement contains a critical covenant that touches and concerns the land—the Drilling Commitment. *Extraction Complaint* (A. D.I 2) at ¶¶ 29, 48, 57, 66; *Extraction MSJ* (A. D.I. 4) at 12 n.12.  This covenant—Exhibit A, Section XV(c) and Exhibit F of each Commercial Agreement— requires Extraction to drill, complete and equip a defined number of wells in the Dedicated Area by the end of 2022. *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-4), Ex. 1 at (Ex. A) § XV(c), (Ex. F) and Ex. 2 at (Ex. A) § XV(c), (Ex. F) and Ex. 3 at (Ex. A) § XV(c), (Ex. F).  It is undisputed that the Drilling Commitment touches and concerns the land.

The Drilling Commitment is a critical and integral covenant in each Commercial Agreement.  Substantially all of Elevation's income is dependent on Extraction's continued hydrocarbon production from actively drilling in the Dedicated Area. *Elevation MSJ* (A. D.I. 12-1), Ex. A at ¶ 20.  Elevation argues that the Drilling Commitment cannot be separated from other covenants in the Commercial Agreements.

Elevation argues that Extraction incorrectly asserts that the Court must perform an isolated covenant-by-covenant review.  Elevation asserts that a contract may run with the land as a whole even where certain covenants do not.  *See Cloud v. Association of Owners*, 857 P.2d 435, 440–41 (Colo. App. 1992) (covenant that would constitute a personal covenant standing alone was held to run with the land where it was integrally connected with another real property covenant); *Reishus v. Bullmasters, LLC*, 409 P.3d 435,

441 (Colo. App. 2016) (finding agreement as a whole ran with the land even where one provision was a personal covenant standing alone); *Lookout Mountain Paradise Hills*, 867 P.2d 70, 75 (Colo. App. 1993) (holding one obligation in a covenant requiring owners to submit plans for approval to the homeowners' association was "an integral part of the whole contract" such that the entire covenant ran with the land).  *MidCities Metropolitan District No. 1 v. U.S. Bank National Association*, which Extraction cites, held that a covenant did not apply to the grantee's successor because it was never intended to as endorsing a stand-alone review of covenants.  No. 12-cv-03322-LTC, 2013 WL 3200088, at *4-6 (D. Colo. 2013).

The Drilling Commitment acts as a limitation on Extraction's reservation under Section 2.2 as to the drilling and operating of wells.  Section 2.2 is expressly subject to the terms of the Drilling Commitment.  *Elevation MSJ* (A. D.I. 12-2, 12-3, 12-5), Ex. 1 at § 2.2(d) and Ex. 2 at § 2.2(b) and Ex. 3 at § 2.2(b).

The Drilling Commitment is a critical and integral component of each Commercial Agreement and was part of the entire agreement to construct and operate the midstream facilities.  *Elevation MSJ* (Doc. 12-1), Ex. A at ¶ 22.

However, this argument is directly contrary to Colorado law. *See MidCities Metro. Dist.* 2013 WL 3200088, at *1 (concluding that one covenant in a deed did not run with the land despite the presence of multiple covenants running with the land); *Shaffer v. George*, 171 P. 881, 882 (Colo. 1917) ("The assignee [of a lease] is in privity of estate, but not in privity of contract with the lessor, and is only liable on covenants which run with the land, such as covenants for rent, to pay taxes, and to yield up premises in good repair.");

52 C.J.S. Landlord & Tenant § 458 ("A covenant in a lease runs with the land only where the act covenanted to be done or omitted concerns the land or the estate conveyed as where it affects the use, condition, value, and enjoyment of the premises.").

Moreover, if only one covenant runs with the land, that covenant is enforceable against the contracting party through privity of contract, and it is also enforceable against successors-to-title in the land with which the covenant is intended to run through privity of estate; the remaining covenants that do not run with the land are enforceable only against parties bound by privity of contract. *Shaffer*, 171 P. 881, 882 ("The original lessee is bound by the contract to make the payments. The assignee is bound by his acceptance of the lease to make good the covenant to pay rent therein contained. His liability is upon the covenants and arises, not from any express assumption or agreement to pay it, which might be contained in the written assignment, but from the privity of estate by reason of his ownership and right to enjoy the benefits of the lease. The assignee is in privity of estate, but not in privity of contract with the lessor, and is only liable on covenants which run with the land, such as covenants for rent, to pay taxes, and to yield up premises in good repair.").

### A.    The Drilling Commitment touches and concerns the land.

The Drilling Commitment touches and concerns Extraction's mineral estates because it closely relates to the land by altering the parties' legal relationship thereto. *Extraction MSJ* (A. D.I. 4-1), Ex. A at (Ex. A) § I(aaa) ("**'Drilling Commitment'** means the multi-well drilling plan set forth in <u>Exhibit F</u>, which specifies the minimum number of Commitment Wells to be Drilled, Completed and Equipped by Producer and its Affiliates

48

pursuant to <u>GTC Section XV(c)</u>.”); *Extraction MSJ* (A. D.I. 4-2), Ex. B at (Ex. A) § I(xx)

(same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at (Ex. A) § I(vv) (same).

The Drilling Commitment requires Extraction to drill a certain number of wells

into its mineral estates within a particular area in certain timeframes. *Extraction MSJ* (A.

D.I. 4-1), Ex. A at (Ex. F) (**<u>Producer and its Affiliates hereby agree to Drill, Complete</u>**

**<u>and Equip, in the aggregate, a number of Broomfield Gross Qualified Wells and</u>**

**<u>Hawkeye Gross Qualified Wells that equals or exceeds the applicable minimum</u>**

**<u>number of Broomfield Gross Qualified Wells and Hawkeye Gross Qualified Wells set</u>**

**<u>forth below on or before the applicable Well Commitment Deadline[.]</u>**); *Extraction MSJ*

(A. D.I. 4-2), Ex. B at (Ex. F) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at (Ex. F) (same).

The Drilling Commitment directly affects the parties’ physical use and enjoyment

of the land because the obligation to drill a certain number of wells on a certain schedule

affects Extraction’s drilling and development of its mineral estates. *Reishus v. Bullmasters*,

*LLC, 409 P.3d 435, 440 (Colo. 2016)* (noting “[a] covenant touches and concerns the land if

it ‘closely relate[s] to the land, its use, or enjoyment’”); *cf.* Harry Bigelow, *The Content of*

*Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914) (explaining that indirect effects are

insufficient).

### B.    The Dedication does not touch and concern the land.

Extraction’s dedications and commitments were made “to the performance of th[e]

[Commercial] Agreement[s] . . . .” *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1; *Extraction*

*MSJ* (A. D.I. 4-2), Ex. B at § 2.1 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (same).

Under the Commercial Agreements, Elevation committed to service Extraction's produced minerals and water in exchange for a contractual fee. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.5 ("Elevation shall accept at such Delivery Point and gather and compress, including Stabilizer Gas, for redelivery in accordance with the terms of this Agreement, all Producer's Gas delivered by Producer or its Affiliates at such Delivery Point other than the Gas described in <u>Section 4.5</u>."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.5 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.5 (similar respecting water).

The dedications and commitments of Extraction's mineral interests to the performance of these services do not change the nature of the covenants contained in the Commercial Agreements; they simply identify the produced minerals and produced water subject to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1; *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1; *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1; *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) (holding a similar contract merely "identif[ies] and delineat[es] the [parties'] contractual rights and obligations").

The dedications and commitments do not touch and concern Extraction's mineral estates because the obligations and services for which they were made concern only personal property and do not closely relate to real property, specifically Extraction's mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 (granting to Elevation the "exclusive right to receive from [Extraction] and its Affiliates at the Delivery Points all Gas therein and thereunder and as may be produced therefrom"); *Extraction MSJ* (A. D.I.

4-2), Ex. B at § 2.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (similar respecting water).

Neither party argues the Commercial Agreements employed the conventional legal definition of a dedication, which would have meant that the parties intended the donation of Extraction's real property to the public use. *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("[A] dedication has been defined as an appropriation of land by the owner of the fee to some public use and the adoption thereof by the public."); Dedication, *Black's Law Dictionary* (11th ed. 2019) (defining "dedication" as "[t]he donation of land or creation of an easement for public use").

The plain and ordinary meaning of the word "dedicate" is "to set apart to a definite use." *Dedicate*, Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

The plain and ordinary meaning of "commit" is "to pledge . . . to some particular course or use." *Commit*, Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003)

In accordance with this plain language, the dedications identify the particular produced minerals and produced water that are subject to, set apart, pledged or committed to the parties' contractual obligations under the services contracts. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 (Subject to the terms of this Agreement, and except as provided in Section 2.2, Producer, on its behalf and on behalf of its Affiliates, hereby commits and dedicates the Dedicated Interests (whether now owned or hereafter acquired) and the exclusive right to receive from Producer and its Affiliates at the Delivery Points all Gas therein and thereunder and as may be produced therefrom to the performance of this Agreement (collectively, the "Dedication") . . . .); *Extraction MSJ* (A.

51

D.I. 4-2), Ex. B at § 2.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (similar respecting water).

Throughout the Commercial Agreements, the Dedicated Interests are used to identify the particular produced minerals or produced water that is subject to, set apart for, pledged or committed to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(a) (reserving to Extraction "the right to pool, communitize or unitize all or part of the Dedicated Interests with other lands, leases and properties in the field in which the Dedicated Interests are located"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(a) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(a) (same); *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.3 (containing Extraction's agreement "that any sale, assignment or pledge of all or any portion of the Dedicated Interests will be made expressly subject to this Agreement" but noting Extraction "may enter into any agreement pursuant to which any of the Dedicated Interests may be conveyed from [Extraction] to a third party as part of an acreage swap"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.3 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.3 (same); *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.6(b) (noting "Elevation will permanently release from this Agreement that portion of the Dedicated Interests, Other Interests and Producer's Gas that is adversely affected by the Curtailment"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.6(b) (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.6(b) (similar respecting water).

Dedications, generally, only identify the particular produced minerals or produced water subject to, set apart for, pledged or committed to the parties' contractual obligations under midstream agreements. *Cf. In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 81

(Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd,* 734 Fed. Appx. 64 (2d Cir. 2018) ("[The] 'dedication' [is not] a burdening of the Debtors' property interests, but rather an identification of what property and products are the subject of the Agreement and will be made available . . . in furtherance of the purposes of the Agreements."); *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1170 (10th Cir. 1999) (noting that dedication contracts are contracts "wherein the producer 'contracts to furnish the purchaser all the gas produced from specified reserves, thus dedicating those reserves to the customer'"); *Nordan-Lawton Oil & Gas Corp. of Tex. v. Miller*, 272 F. Supp. 125, 129 (W.D. La. 1967), *aff'd,* 403 F.2d 946 (5th Cir. 1968) ("In this contract the lessee 'dedicated' all the reserves under the Miller lease to the pipeline company which in essence means that the company was given exclusive rights to purchase the reserves under the premises when and if produced."); Latham & Watkins LLP, The Book of Jargon, Oil & Gas, The Latham & Watkins Glossary to Oil and Gas Terminology (1st ed. 2016) at 24 (defining a dedication as "a promise or commitment of a certain amount of Production from a Dedicated Area . . . to the services provider in a Midstream service agreement").

Produced minerals, such as oil or gas, are personal property and are not real property. *Smith v. El Paso Gold Mines, Inc.*, 720 P.2d 608, 609 (Colo. App. 1985) ("[A]t some point after they are severed from the land, minerals lose their character as realty and 'become' personalty.").

Produced water is also personal property. *W. End Irr. Co. v. Garvey*, 184 P.2d 476, 479 (Colo. 1947) ("Water in possession is personal property.").

Indeed, it is impossible to touch and concern Extraction's real property interest in unproduced water because Extraction does not own water "in place" (prior to it being reduced to possession) and, as a result owns no real property interest in unproduced water. *Grand Valley Water Users Ass'n v. Busk-Ivanhoe, Inc.*, 386 P.3d 452, 461 (Colo. 2016) (noting "[o]ne does not 'own' water, but owns the right to use water within the limitations of this doctrine").

The dedications and commitments do not limit Extraction's right to the use or enjoyment of its mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(d) (reserving, "subject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion . . . ."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(b) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(b) (same).

Also, the contractual obligations—the performance of which these dedications were made—require the delivery of a certain volume of produced minerals and produced water to Elevation for the provision of services in exchange for a fee. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.5 ("Elevation shall accept at such Delivery Point and gather and compress, including Stabilizer Gas, for redelivery in accordance with the terms of this Agreement, all Producer's Gas delivered by Producer or its Affiliates at such Delivery Point other than the Gas described in <u>Section 4.5</u>."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.5 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.5 (similar respecting water).

The provision of such services does not affect the use or enjoyment of minerals or water in place, or the use of the mineral estate, but instead minerals that have been severed from the mineral estate and water that has been reduced to possession and that now constitute the personal property of Extraction, as a merchant in these commodities. As a result, the covenants in the Commercial Agreements do not benefit Extraction in its capacity as a landowner but benefit and affect Extraction's use of its personal property (*i.e.*, its produced minerals and produced water).  *Cf.* Harry Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914).

Even assuming that the Commercial Agreements have an indirect effect upon Extraction's mineral estates, such as an incidental increase in value, this effect is not closely related to the mineral estates and, therefore, cannot satisfy touch and concern, as its primary effect is on the use and enjoyment of personal property, and not real property. *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment'"); *cf.* Harry Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914) (explaining that indirect effects are insufficient).

The dedication and commitment of real property interests to the performance of contractual obligations and services that closely relate to and affect only the use and enjoyment of personal property does not change this result.  To hold otherwise would render the objective touch and concern element beholden to the subjective intent of the parties, and would allow the parties to convert covenants that do not closely relate to real

property into covenants that bind successors and assigns simply by recitation of a set phrase.

Reference to minerals in the ground, including through the use of the words "therein and thereunder," do not change the objective effect of the dedication. 21 C.J.S. Covenants § 34 ("[T]he intent of the parties is not dispositive, insofar as obligations arising from restrictive covenants that are inherently personal cannot be made appurtenant to the land . . . .").

Finally, the dedications and commitments are not conveyances of an interest in real property. *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("This regulation clearly contemplates a 'conveyance' and not a 'dedication' which terms are not synonymous.").

The Commercial Agreements' dedications and commitments were not intended to convey anything implicated thereunder; Extraction still owns any real property interest that was dedicated and committed to the performance of the Commercial Agreements. *Compare Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 (dedicating and committing to the performance of the agreement "the Dedicated Interests") *and Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1 (same) *and Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (same) *with Extraction MSJ* (A. D.I. 4-1), Ex. A at (Ex. A) § I(vv) (**"Dedicated Interests"** means (i) Producer's and/or its Affiliates' interests now held in lands, mineral interests, easements, leases, wells and Gas therein and thereunder, including the leases described on Exhibit C in the Dedicated Area, that are not subject to an Current Existing Dedication as of the Effective Date and operated by Producer or its Affiliates and (ii) Producer's and/or its Affiliates'

interests hereafter acquired during the term of this Agreement in lands, minerals interests, easements, leases, wells and Gas therein and thereunder in the Dedicated Area that are operated by Producer or its Affiliates and not subject to an existing conflicting dedication or commitment as of the date acquired.") *and Extraction MSJ* (A. D.I. 4-2), Ex. B at (Ex. A) § I(ss) (similar respecting oil) *and Extraction MSJ* (A. D.I. 4-3), Ex. C at (Ex. A) § I(qq) (similar respecting water).

Because the dedications and commitments do not touch and concern Extraction's mineral estates, they cannot be a covenant that runs with the land as a matter of Colorado law.

### C.   The Delivery Obligation does not touch and concern Extraction's mineral estates.

The delivery obligation only touches and concerns personal property, Extraction's produced hydrocarbons and water. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 (requiring delivery "at the Delivery Points one hundred percent . . . of the Gas produced from the Dedicated Interests and from the Other Interests"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (similar respecting water).

Reference to the Delivery Points confirms the gas, oil, and water have been reduced to possession and are personal property when the obligation to deliver to Elevation for services accrues. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 4.1 (defining the Delivery Points as "the locations where [Extraction's] Gas enters the inlet flange of Elevation's meter tubes/custody transfer meters"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at §

4.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 4.1 (similar respecting water).

The reference to Other Interests in the Commercial Agreements also confirms the delivery obligation does not closely relate to Extraction's real property. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.1 (requiring delivery "at the Delivery Points one hundred percent . . . of the Gas produced from the Dedicated Interests and from the Other Interests"); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.1 (similar respecting water).

The Other Interests include real property that Extraction does not own, but merely controls. *Extraction MSJ* (A. D.I. 4-1), Ex. A (Ex. A) at § I(zzzz) (defining Other Interests as "all interests of parties other than [Extraction] and its Affiliates in the Dedicated Area, when such other-party interests are represented and controlled by [Extraction] or in respect of which it has the right to market or otherwise deal with their Gas" but excluding "any interests for which a party has exercised its take-in-kind rights under its agreement with [Extraction]"); *Extraction MSJ* (A. D.I. 4-2), Ex. B (Ex. A) at § I(uuuu) (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C (Ex. A) at § I(rrrr) (similar respecting water).

Extraction cannot burden the use of real property it does not own. *Cottonwood Farms v. Bd. of County Com'rs of County of Jefferson*, 763 P.2d 551, 556 (Colo. 1988) ("Among the attributes of property ownership is the right in general to use it as the owner desires, subject only to valid governmental regulation."); *McDonald v. McDonald*, 374 P.2d 690, 691 (Colo. 1962) (noting "[t]he right to use and possession and the income of real property

are but incidents of the ownership of that property"); 63C Am. Jur. 2d Property § 30 ("Ownership is the legal right to use and enjoy property and to exercise exclusive dominion and control over a particular piece of property. The key elements of ownership are control and the right to enjoy the benefits of the property."); *Id.* at § 31 ("The primary incidents or elements of ownership include the following: the right to possession[;] the use and enjoyment of the property[;] the right to change or improve the property[;] the right to alienate the property at will . . . .").

It can, however, bind itself personally to the delivery of another entity's personal property which it has the right to control and market. *Id.* at § 37 ("Constructive possession of personal property by its owner exists where the owner has intentionally given the actual possession, namely, the direct physical control, of the property to another for the purpose of having him or her do some act for the owner to or with the property. One may have possession of a chattel, even in the absence of actual personal custody, if the chattel is under his or her control and in a place where it must have been put by his or her act or in his or her behalf, or where the chattel is within his or her power in such a sense that he or she can and does command its use.").

Because the Delivery Obligation does not touch and concern Extraction's mineral estates, it cannot be a covenant that runs with the land as a matter of Colorado law.

### D.    The assignment provisions do not touch and concern the land.

First, the general assignment provision does not touch and concern Extraction's mineral estates because it does not even purport to bind successors-in-title, but relates solely to contractual successors and assigns. *Extraction MSJ* (A. D.I. 4-1), Ex. A (Ex. B) at §

XII; *Extraction MSJ* (A. D.I. 4-2), Ex. B (Ex. A) at § XII; *Extraction MSJ* (A. D.I. 4-3), Ex. C (Ex. A) at § XII.

Second, the more specific sale and assignment provision does not restrict Extraction's ability to alienate its mineral estates; it requires Extraction to assign the contracts pursuant to the general assignment provision. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.3; *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.3; *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.3.

The sale and assignment provision does not touch and concern Extraction's mineral estates because it does not closely relate to or effect the use or enjoyment of the mineral estates, but simply Extraction's personal contractual rights and obligations under the Commercial Agreements. *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 876 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("While the HPIP Agreements provide that any subsequent purchaser of Sabine's interests in the leases covering the HPIP Dedicated Area must assume Sabine's obligations under those agreements, such a provision merely equates to another statement that the agreements are enforceable against Sabine's successors.").

Both assignment provisions are surplusage if covenants actually run with the land, as they bind successors-in-title to the obligations imposed by a covenant that runs with the land through privity of estate. *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. App. 1993) ("[R]eal covenants 'run with the land' and burden or benefit successors in interest.").

Because these assignment provisions do not touch and concern Extraction's mineral estates, they cannot be covenants that run with the land as a matter of Colorado law.

> **E.    The facilities obligation does not touch and concern Extraction's mineral estates.**

Elevation's obligation to construct and operate the midstream facilities to service produced gas, oil, and water do not touch and concern the land; the midstream facilities benefit Extraction as the owner of personal—and not real—property. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 3.1; *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 3.1; *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 3.1.

The midstream facilities enable Elevation to provide the services it is obligated to provide to Extraction's personal property under the Commercial Agreements. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 3.1; *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 3.1; *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 3.1.

The midstream facilities do not touch and concern the land because they facilitate services to personal property and do not closely relate to or affect the use of Extraction's mineral estates. *Cloud v. Ass'n of Owners*, 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment.").

Elevation argues the midstream facilities "affects the use and enjoyment of the Dedicated Interests by facilitating the extraction of oil, gas, and water . . . and increased the value of the underlying real property . . . ." *Elevation Response* (A. D.I. 26) at p. 24

Absent Elevation's obligations under the Commercial Agreements, however, the midstream facilities are not beneficial to Extraction as owner of personal property, let alone beneficial to Extraction's mineral estates.  Extraction has no right to the use of the midstream facilities; only Elevation has that right.  *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 3.1 ("Elevation or one of its Contracting Party Affiliates will, at Elevation's sole cost and expense, design, construct, own, operate, and maintain the Gathering and Compression System in order to gather and compress Producer's Gas produced from Dedicated Interests, including all related appurtenances and facilities and any modifications, additions or extensions thereto sufficient to gather and compress the quantities of Producer's Gas."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 3.1 (similar respecting oil); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 3.1 (similar respecting water).

Accordingly, the midstream facilities neither closely relate to the mineral estates nor directly affect them.  *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment'"); *cf.* Harry Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914) (explaining that indirect effects are insufficient).

The midstream facilities do not limit Extraction's rights to produce from or develop its mineral estates in its sole discretion.  *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(d) (reserving, "subject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any

oil and gas lease covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part . . . ."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(b) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(b) (same).

Regardless, the construction of midstream facilities is Elevation's obligation under the Commercial Agreements.  Extraction, the beneficiary of this covenant, is not required to accept the benefit of a purely beneficial covenant.  9 Richard R. Powell, *Powell on Real Property* § 60.10(1) ("A person entitled to enforce the benefit of a covenant may extinguish this right by means of a written and recorded release."); Restatement (First) of Property § 556 (Am. Law. Inst. 1944) ("The obligation arising out of a promise respecting the use of land can be extinguished as between any person subject to the obligation and any person entitled to enforce it by a release given by the latter person to the former."); *Brown v. McDavid*, 676 P.2d 714, 718 (Colo. App. 1983) ("[T]he general law is well established that a covenant running with the land in a subdivision may be modified or terminated, when the covenant permits termination, upon the consent of a specified percentage of lot owners.").

Elevation's obligation to build the midstream facilities in order to provide the contracted-for services does not touch and concern Extraction's mineral estates, and Elevation's obligation cannot be a covenant that runs with the land as a matter of Colorado law.

**F.  The fixed fee provisions do not touch and concern Extraction's mineral estates.**

The fixed fee provisions for the services to personal property do not touch and concern Extraction's mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 4.3 (requiring Extraction to "pay Elevation a Monthly fee for the services provided under" the contract); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 4.3 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 4.3 (same).

The fixed fee provisions burden Extraction in its personal capacity and relate to fees for services to personal property. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 4.3; *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 4.3 (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 4.3 (same).

The mere payment of money is a personal commitment that does not closely relate to the land and, therefore, does not run with the land. *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991), *rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855 P.2d 1368 (Colo. 1993) (holding a subordination agreement did not run with the land because "the parties' entitlement to physical use of the land was not increased, nor was improvement made to the land as a result of subsequent loan proceeds").

Extraction may produce from or develop its mineral estates without regard to the requirement to pay these fees. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(d) (reserving, "subject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any oil and gas lease

covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part . . . ."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(b) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(b) (same).

Because the fixed fee provisions do not touch and concern Extraction's mineral estates, they cannot be a covenant that runs with the land as a matter of Colorado law.

### G.    Exclusivity does not cause covenants to touch and concern Extraction's mineral estates.

The exclusive nature of a services agreement, alone, does not render it closely related to real property or make a covenant touch and concern the land. *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 876 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[T]he Court concludes that the Agreements . . . granted [appellants] the merely contractual right to be the exclusive providers of certain services for gas and condensate produced in certain areas.").

Extraction's contractual obligation to exclusively utilize Elevation for the provision of certain services to its produced hydrocarbons or water does not affect Extraction's use of its mineral estates, but simply restricts its personal freedom to contract with other suppliers for these services. *See Clear Lake City Water Auth. v. Clear Lake Utilities Co.*, 549 S.W.2d 385, 388 (Tex. 1977) ("Enforcement of the exclusive service provision would not have restricted NCL in the use of its real property . . . . At most NCL's promise limited NCL's freedom to contract with other suppliers of water and sewer service. Such a limitation affects the use of land only collaterally[.]"

Extraction may produce or not produce from its mineral estates as it sees fit, and Elevation may not compel any action in the use or enjoyment of Extraction's mineral estates. *Extraction MSJ* (A. D.I. 4-1), Ex. A at § 2.2(d) (reserving, "subject to the terms of the Drilling Commitment, the right to operate the Dedicated Interests as Producer and its Affiliates deem advisable in their sole discretion, including the right, but never the obligation, to drill new wells, to repair and rework wells, to temporarily shut in wells, to renew or extend, in whole or in part, any oil and gas lease covering any of the Dedicated Interests, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part . . . ."); *Extraction MSJ* (A. D.I. 4-2), Ex. B at § 2.2(b) (same); *Extraction MSJ* (A. D.I. 4-3), Ex. C at § 2.2(b) (same).

Because Extraction's obligations to exclusively use Elevation for the provision of certain gathering and processing services to its personal property do not touch and concern Extraction's mineral estates, they cannot be covenants that runs with the land as a matter of Colorado law.

### H. The easements and rights-of-way do not touch and concern Extraction's mineral estates.

Easements are rights to the use of land that constitute real property interests in the estate in real property they burden. Easements are not covenants (or contractual obligations) that need to touch and concern the subject land in order to run with that land to bind successors-in-title. Restatement (First) of Property § 450 (Am. Law Inst. 1944) ("An easement is an interest in land in the possession of another which (a) entitles the owner of such interest to a limited use or enjoyment of the land in which the interest

exists; (b) entitles him to protection as against third persons from interference in such use or enjoyment; (c) is not subject to the will of the possessor of the land; (d) is not a normal incident of the possession of any land possessed by the owner of the interest, and (e) is capable of creation by conveyance.").

The easements and rights-of-way that were purportedly granted under the Commercial Agreements are interests in the surface estate, which is a separate and distinct estate in real property from Extraction's mineral estates. *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 556 (Colo. 1995) (noting Colorado has "long recognized that a conveyance which severs a mineral interest from the surface estate creates a separate and distinct estate.").

As a result, even if easements were covenants that could run with the land, they do not closely relate to or affect the use or enjoyment of Extraction's mineral estates because they are, by definition, rights in the use of a different estate in land. *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 927 (Colo. 1997), *as modified on denial of reh'g* (Oct. 20, 1997) ("As the owner of property subject to the easement, the surface owner 'continues to enjoy all the rights and benefits of proprietorship *consistent with the burden of the easement*.'").

These easements could not be related to Extraction's mineral estates because any easements appurtenant to and for the benefit of the mineral estate could not be conveyed separate and apart from the mineral estate. *Lewitz v. Porath Family Tr.*, 36 P.3d 120, 122 (Colo. App. 2001), *as modified on denial of reh'g* (Apr. 26, 2001) ("[A]n easement appurtenant is an 'incorporeal right' attached to and belonging with some other parcel of

land.  It runs with that land and is incapable of existence separate and apart from the particular land to which it is annexed.").

Because the easements and rights-of-way do not touch and concern Extraction's mineral estates, they cannot be covenants that run with the land as a matter of Colorado law.

I.      **The Ratification Agreement does not cause the covenants to touch and concern Extraction's mineral estates.**

The Ratification Agreement does not closely relate to or affect the use or enjoyment of Extraction's mineral estate.  The Ratification Agreement merely restates the parties intent to create a covenant running with the land.  *Extraction MSJ* (A. D.I. 4-4), Ex. D at § 5 (noting the Ratification Agreement was "executed solely for the purpose of the ratification contemplated [t]herein and shall not amend or modify the Commercial Agreements in any way.  In the event of a conflict between this this [sic] [Ratification] Agreement and the Commercial Agreements, the Commercial Agreements shall govern in all respects.").  Although relevant to the intent of the parties, it does not affect whether the covenant intended to run with the land (the Commercial Agreements' dedications and commitments) closely relates to or affects the use or enjoyment of Extraction's mineral estate.

## CONCLUSION

As set forth above, the Commercial Agreements are unambiguous and the question of whether the Commercial Agreements contain any covenants that run with the land is a legal one.  There is no genuine issue of material fact.  Extraction has met its

burden for entry of summary judgment against Elevation based on the plain meaning of the Commercial Agreements.  The parties intended the covenants specified in section 2.4 of the Commercial Agreements to be a covenant that runs with the land (the parties did not intend that any other provision of the contracts to create a covenant that runs with the land); the Commercial Agreements do not touch and concern the land except for the Drilling Commitment; and there was no privity among the parties.  Thus, as not all the required elements are present, the Court will enter summary judgment in favor of Extraction and deny Elevation's motion for summary judgment.  An Order and Judgment will be entered.

By the Court:

_____
Christopher S. Sontchi
Chief United States Bankruptcy Judge

Date: October 14, 2020