## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| EXTRACTION OIL & GAS, INC., *et al.*, | : | Case No.: 20-11548 (CSS) |
| | : | (Jointly Administered) |
| Debtor. | : | |
| EXTRACTION OIL & GAS, INC., *et al.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 20-50833 (CSS) |
| | : | |
| PLATTE RIVER MIDSTREAM, LLC, | : | |
| and DJ SOUTH GATHERING, LLC, | : | |
| | : | |
| Defendants. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST PLATTE RIVER MIDSTREAM, LLC AND DJ SOUTH GATHERING, LLC[1]

## <u>INTRODUCTION</u>

This adversary proceeding is one of several arising from the Chapter 11 case of Extraction and its affiliates.[2]  The Debtors are in the "upstream" business of extracting hydrocarbons from land in the State of Colorado.  In the Chapter 11 case, the Debtors have sought to reject several of what are commonly known as Transportation Services Agreements or TSA's.  Broadly speaking, the counterparties to these TSA's are

---

[1]    The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions or law constitute findings of fact, they are adopted as such.

[2]    Undefined terms used in this Introduction have the meaning set forth below.

"midstream" pipelines, which transport the Debtors' hydrocarbons to larger "downstream" pipelines or directly to the depot in Cushing, Oklahoma.

In response to the motion to reject, many of the counterparties, including these defendants, have argued that the TSA's cannot be rejected because they include covenants that run with the land. Moreover, they argue that a determination of whether there are covenants that run with the land requires an adversary proceeding. Hence, the Debtors have filed several adversary proceedings in which they have sought a declaratory judgment that the TSA's do not create covenants that run with the land. Currently, before the Court is the Debtor's motion for summary judgment to that effect.[3]

As set forth in detail below, the Court will grant the Debtors' motion for summary judgment. Under Colorado law, to create a covenant running with the land, the parties must intend to create a covenant running with the land and the covenant must touch and concern the land with which it runs. In addition, there must also be privity of estate between the original covenanting parties at the time of the covenant's creation. Under the unambiguous terms of the Platte River Contract, none of the required elements are met—the parties did not intend to create a covenant that runs with the land, the covenant does not touch or concern the land, and there is no privity of the estate. Similarly, under the unambiguous terms of the DJ South Contract, while the parties did intend the dedication and commitment to run with the land, it nonetheless does not touch or concern

---

[3] The motions to reject are pending in the Chapter 11 case. As of this writing, the motion to reject the Transportation Agreements with Platte River and DJ South are in the midst of an evidentiary hearing.

the land and there is no privity of the estate.  Thus, as not all the required elements are present in connection with either contract, no covenant runs with the land.

Finally, while there are several issues discussed below, the central issue before the Court is whether the dedicated and committed interests in the Transportation Agreements touch and concern the land.  They do not.  The dedications and commitments concern only personal property and do not affect the physical use of real property or closely relate to real property.  Throughout the Transportation Agreements, the dedicated and committed interests are used to identify the particular minerals that are subject to, set apart for, pledged or committed to the parties' contractual obligations.  They do not convey any interests in real property.  Thus, they cannot serve to satisfy the touch and concern the land element of the test to establish a covenant that runs with the land.

## THE TRANSPORTATION AGREEMENTS.

This proceeding concerns two agreements for the transportation of crude oil from wells owned and operated by Extraction Oil & Gas, Inc. ("Extraction") north of Denver, Colorado.  *Brief in Support of Plaintiff's Motion for Summary Judgment* ("*Extraction MSJ*") (A. D.I. 4) at p. 1-2.  Extraction owns leasehold interests in the crude oil and related hydrocarbons, and has contracted with Platte River Midstream, LLC ("Platte River") and DJ South Gathering, LLC ("DJ South" and, collectively with Platte River, the "Defendants") to transport the oil downstream for eventual sale.  *Extraction MSJ* (A. D.I. 5-1), Ex. A; (A. D.I. 5-2), Ex. B.  The issue presented by *Extraction MSJ* is whether these agreements create covenants running with the land under Colorado law.  *Extraction MSJ* (A. D.I. 4) at p. 1.

3

Extraction and Platte River entered into the First Amended and Restated Transportation Services Agreement (the "Platte River Contract") on April 14, 2017. *Extraction MSJ* Ex. A at p. 1.

On the same day, Extraction and Platte River entered into the April 14, 2017 Storage Tank Lease Option Agreement—a side letter agreement that the parties stated was "intended to be a covenant that runs with the land . . . ." *Reply in Support of the Motion for Summary Judgment* (A. D.I. 23) Ex. 2 at § 7.

Extraction and DJ South entered into the Transportation Services Agreement (the "DJ South Contract," together with the Platte River Contract, the "Transportation Agreements") on May 16, 2018. *Extraction MSJ* (A. D.I. 5-2), Ex. B at p. 1.

The Transportation Agreements are construed in accordance with, and are governed by, Colorado law, without regard to Colorado's conflict of laws provisions. *Extraction MSJ* (A. D.I. 5), Ex. A at § 13.14; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 14.14. The real property implicated by the Transportation Agreements is located within Colorado. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1(t); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(u).

Extraction did not grant any easement or rights-of-way to the Defendants contemporaneously with the Transportation Agreements. *Defendants' Response in Opposition to the Motion for Summary Judgment* (A. D.I. 21) (the "*Platte River Response*"), Ex. G (A. D.I. 21-7) (Extraction not a party to the contract); Ex. H (A. D.I. 21-8) (same); Ex. N (A. D.I. 21-14) (same); Ex. S (A. D.I. 21-19) (same); Ex. L (A. D.I. 21-12) (right-of-way granted to Platte River on July 17, 2019).

4

## PROCEDURAL BACKGROUND

On June 14, 2020, Extraction and its affiliates filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

On August 11, 2020, the Debtors filed the *Debtors' Second Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Effective as of the Dates Specified Herein and (II) Granting Related Relief* (D.I. 412) (the "*Motion to Reject*").

In connection with the Debtors' chapter 11 cases, Extraction instituted this adversary proceeding by filing its *Complaint for Declaratory Judgment* (A. D.I. 2) against Platte River and DJ South on August 25 (the "*Extraction Complaint*").  The parties dispute whether the Transportation Agreement creates any covenants running with the land. *Extraction Complaint* (A. D.I. 2) at p. 8 and 10.

On the same day, Extraction filed its *Motion for Summary Judgment* (A. D.I. 3).

On September 18, Platte River and DJ South filed their *Response in Opposition to the Motion for Summary Judgment* (A. D.I. 21).

On September 23, Extraction filed its *Reply in Support of the Motion for Summary Judgment* (A. D.I. 23).

On September 30, 2020, the parties argued the motion for summary judgment before this Court.

On October 8, 2020, the parties submitted proposed findings of fact and conclusions of law under the direction of this Court.

## CONTRACTUAL TERMS

The Platte River Contract's term ends on "October 31, 2026 unless earlier terminated pursuant to the terms of this Agreement or extended" under the contract's terms.  *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 4.1.

The DJ South Contract's term ends ten years following the Commencement Date. *Extraction MSJ* (A. D.I. 5-2), Ex. B at §§ 1.1(o) and 5.1.

Section 1.1(o) of the Platte River Contract states: "'Committed Volume' means, subject to Section 3.1, the number of Barrels of Crude Petroleum per day Shipper commits to ship on the Pipeline System as set forth on Schedule A."  *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1(o).

Section 1.1(p) of the DJ South Contract states: "'Committed Volume' means, subject to Section 4.1, the number of Barrels of Crude Petroleum per day Shipper commits to ship on the Pipeline System as set forth on Schedule A."  *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(p).

Section 1.1(s) of the Platte River Contract states: "'Crude Petroleum' has the meaning set forth in the Tariff."  *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1(s).

Section 1.1(t) of the DJ South Contract also states: "'Crude Petroleum' has the meaning set forth in the Tariff."  *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(t).

The Tariff attached to the Platte River Contract defines "Crude Petroleum" as "the direct liquid product of oil wells, or the indirect liquid petroleum products of oil or gas wells, or a mixture of such products."  *Extraction MSJ* (A. D.I. 5-1), Ex. A, (Ex. C) at Item 5.

Section 1.1(bb) of the Platte River Contract states:

> "Interests" means all interests that Shipper (or any of its Affiliates) now or hereinafter owns, controls, acquires or has the right to market (as such marketing rights may change from time to time) in Crude Petroleum of all formations in, under or attributable to the Dedication Area, together with any pool, communitized area or unit, and all interests in any wells, whether now existing or drilled hereafter, on or completed within the Dedication Area, or within any such pool, communitized area or unit, even though such interests may be incorrectly or incompletely stated, all as the same shall be enlarged by the discharge of any burdens or by the removal of any charges or encumbrances to which any of same may be subject as of the Execution Date, and any and all replacements, renewals and extensions or amendments of any of the same; provided, however, that "Interests" shall not include any interest of Shipper or any of its Affiliates that must be offered to a working interest partner pursuant to any applicable agreement with such partner in effect on the Execution Date.

*Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1(bb).

Section 1.1(dd) of the DJ South Contract states:

> "Interests" means all interests that Shipper (or any of its Affiliates) now or hereinafter owns, controls, acquires or has the right to market (as such marketing rights may change from time to time) in Crude Petroleum of all formations in, under or attributable to the Dedication Area, and all interests in any wells, whether now existing or drilled hereafter, on or completed within the Dedication Area, all as the same shall be enlarged by the discharge of any burdens or by the removal of any charges or encumbrances to which any of same may be subject as of the Execution Date, and any and all replacements, renewals and extensions or amendments of any of the same; provided, however, that "Interests" shall not include (i) any interest of Shipper or any of its Affiliates that must be offered to a working interest partner pursuant to any applicable agreement with such partner in effect on the Execution Date or (ii) any interest that Shipper (or any of its Affiliates) now or hereinafter owns, controls, acquires or has the right to market (as such marketing rights may change from time to time) in gas, natural gas liquids or any other gaseous hydrocarbons.

*Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(dd).

Section 1.1(rr) of the Platte River Contract states: "'Services' means transportation on the Pipeline System of Crude Petroleum for Shipper's account from the origination points set forth on Exhibit A to Lucerne Station and redelivering such Crude Petroleum for Shipper's account into the Grand Mesa Pipeline, any other third party pipeline that connects to the Lucerne Station or any storage tank owned or controlled by Shipper at the Lucerne Station." *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1(rr).

Section 1.1(aaa) of the DJ South Contract states: "'Services' means transportation on the Pipeline System of Crude Petroleum for Shipper's account from the Receipt Points and redelivery of such Crude Petroleum for Shipper's account at the Delivery Points." *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(aaa).

Section 1.1(ccc) of the Platte River Contract states: "'Total Financial Commitment' means, at a given time, the aggregate of the Fixed Monthly Payments due under this Agreement for all Months of the Term remaining at such time." *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1(ccc).

Section 1.1(kkk) of the DJ South Contract states: "Total Financial Commitment" means, at a given time, the aggregate of the Fixed Monthly Payments due under this Agreement for all Months of the Term remaining at such time." *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(kkk).

Extraction is required to pay DJ South and Platte River a monthly tariff approved by FERC for the volumes Extraction delivers into the Transportation Systems. Extraction MSJ (A. D.I. 5-1, 5-2), Ex. A at § 5.1 and Ex. B at § 6.1.

Extraction is obligated to make a fixed monthly payment to DJ South and Platte River, regardless of the volumes Extraction delivers. *Id.* at § 6.1 and Ex. B at § 7.1. The fixed monthly payment sets a minimum that Platte River and DJ South will be paid, although it is offset, and usually exceeded, by tariff payments. *Id.*

Section 2.1 of the Platte River Contract states: "Dedication. Subject to Section 2.2, Shipper hereby dedicates and commits to the Services to be provided by Platte River hereunder all of the Interests." *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2.1.

Section 2.1 of the DJ South Contract states: "Dedication. Subject to Sections 2.2, 2.5 and 2.6, Shipper hereby dedicates and commits to the Services to be provided by Transporter hereunder all of the Interests. Notwithstanding the foregoing, Transporter temporarily releases all of the Interests from the dedication hereunder until (a) with respect to the Interests served by the Badger CGF, the Badger Commencement Date, and (b) with respect to the Interests served by Matador CGF, the Matador Commencement Date." *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.1.

Section 2.5 of the DJ South Contract states:

> **Covenant.** Subject to Section 2.6, the dedication and commitment by Shipper under this Article II shall be deemed an interest that runs with the land in the Dedication Area, and the Parties agree that the dedications and commitments with regard to any Interest existing as of the Effective Date shall be deemed fully vested, and, subject to Section 2.2(b), further agree that the dedications and commitments with regard to future interests in the Interests shall vest upon Shipper's acquiring ownership, control or right to market such Interest(s). Shipper agrees to execute and deliver a memorandum substantially in the form attached hereto as Exhibit C for each of Adams County, Arapahoe County, Weld County, Boulder County, and the City and County of Broomfield to Transporter for recording in the real property records of

each such county in which any portion of the Dedication Area is located in order to evidence the dedication provision of this Article II.

*Id.* at § 2.5.

There is no provision resembling section 2.5 of the DJ South Contract in the Platte

River Contract.

Section 3.1 of the Platte River Contract states:

> **Volume Commitment; Ship or Pay Obligations.** Commencing as of the Commencement Date and continuing thereafter during the Term of this Agreement, Shipper agrees to tender to Platte River for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff and the terms of this Agreement; provided, that Shipper's obligation to ship or pay its Committed Volume under this Agreement shall be satisfied in full upon the earlier to occur of (a) Shipper's shipment of eighty five million (85,000,000) Barrels under the terms of this Agreement or (b) by satisfaction of Shipper's Total Financial Commitment. Upon satisfaction of either of such obligations, (i) the Committed Volume shall immediately be reduced to zero and (ii) Shipper may elect to terminate this Agreement upon written notice to Platte River.

*Extraction MSJ* (A. D.I. 5-1), Ex. A at § 3.1.

Section 4.1 of the DJ South Contract states:

> **Volume Commitment; Ship or Pay Obligations.** Commencing as of the Commencement Date and continuing thereafter during the Term of this Agreement, Shipper agrees to tender to Transporter for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff and the terms of this Agreement; provided, that Shipper's obligation to ship or pay its Committed Volume under this Agreement shall be satisfied in full and Shipper's Total Financial Commitment will be zero (0) upon the earlier to occur of (a) Shipper's shipment of one hundred sixteen million, seventy thousand (116,070,000) Barrels under the terms of this Agreement or (b) by satisfaction of Shipper's Total Financial Commitment. Upon satisfaction of either of such obligations, (i) the Committed Volume shall immediately be reduced to zero and (ii) Shipper may elect to terminate this Agreement upon written notice to Transporter.

*Extraction MSJ* (A. D.I. 5-2), Ex. B at § 4.1.

Section 6.2 of the Platte River Contract states:

> **Total Financial Commitment.** Unless this Agreement is terminated by Shipper due to an Event of Default by Platte River (as more fully described in Section 11.3), or under Section 13.2, upon termination of this Agreement, if, for any reason, Shipper has not paid to Platte River the Total Financial Commitment, Shipper will pay to Platte River the amount due within thirty (30) days following receipt of an invoice from Platte River for such amount due. For the avoidance of doubt, the Total Financial Commitment will be satisfied by payment by Shipper of the aggregate of the Fixed Monthly Payments in accordance with the terms of this Agreement, or at Shipper's option, any payment made by Shipper to accelerate the satisfaction of that obligation. At the end of each Contract Year, Platte River will provide Shipper a statement of dollars accumulated towards the Total Financial Commitment, as well as Barrels shipped to date.

*Extraction MSJ* (A. D.I. 5-1), Ex. A at § 6.2.

Section 7.2 of the DJ South Contract states:

> **Total Financial Commitment.** Unless this Agreement is terminated by Shipper due to an Event of Default by Transporter (as more fully described in Section 12.3), or under Section 14.2, upon termination of this Agreement, if, for any reason, Shipper has not paid to Transporter the Total Financial Commitment, Shipper will pay to Transporter the amount due within thirty (30) days following receipt of an invoice from Transporter for such amount due; provided, however, that if Shipper's failure to pay the Total Financial Commitment is due to Transporter's failure to accept volumes nominated by Shipper, Shipper shall have the option to extend the Term of this Agreement for such period of time as required to pay the Total Financial Commitment at the same Volume Commitment level as in effect on the date Shipper exercises such extension option. For the avoidance of doubt, the Total Financial Commitment will be satisfied by payment by Shipper of the aggregate of the Fixed Monthly Payments in accordance with the terms of this Agreement, or at Shipper's option, any payment made by Shipper to accelerate the satisfaction of that obligation. At the end of each Contract Year, Transporter will provide Shipper a statement of dollars accumulated towards the Total Financial Commitment, as well as Barrels shipped to date.

*Extraction MSJ* (A. D.I. 5-2), Ex. B at § 7.2.

Section 6.6 of the Platte River Contract states:

> **Title.** Shipper warrants that it possesses either title to, or the right to deliver to Platte River for transportation hereunder, all of the Crude Petroleum delivered or caused to be delivered by Shipper to the Pipeline System for shipment under this Agreement. Shipper warrants that all Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement is free from all liens, security interests, and adverse claims of every kind and agrees to release, indemnify, defend and hold Platte River and its affiliate and subsidiary companies and their respective shareholders, members, partners, directors, managers, officers, employees, agents and representatives harmless from all suits, actions, claims, judgments, debts, accounts, damages, costs, liabilities, losses, and expenses arising from or out of adverse claims of any or all persons, including Governmental Authorities, as to title to, or otherwise claiming an interest in or right to payment on account of, such Crude Petroleum including, but not limited to, royalties and other charges payable with respect thereto. Platte River will have the right to reject any Crude Petroleum that, when tendered for transportation on the Pipeline System, is the subject of litigation or that is encumbered by any lien, security interest, or other form of burden, and Platte River may require Shipper to provide satisfactory evidence of unencumbered title prior to accepting deliveries of Crude Petroleum from Shipper.

*Extraction MSJ* (A. D.I. 5-1), Ex. A at § 6.6.

Section 7.6 of the DJ South Contract states:

> **Title.** Shipper warrants that it possesses either title to, or the right to deliver to Transporter for transportation hereunder, all of the Crude Petroleum delivered or caused to be delivered by Shipper to the Pipeline System for shipment under this Agreement. Shipper warrants that all Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement will be delivered to Shipper free of all liens, security interests, and adverse claims of every kind (other than statutory liens and liens in favor of Persons who have provided debt financing to Shipper) and agrees to release, indemnify, defend and hold Transporter and its affiliate and subsidiary companies and their respective shareholders, members, partners, directors, managers, officers, employees, agents and representatives harmless from all suits, actions, claims, judgments, debts, accounts, damages, costs, liabilities, losses, and expenses arising from or out of adverse claims of any or all persons, including Governmental Authorities, as to

title to, or otherwise claiming an interest in or right to payment on account of, such Crude Petroleum including, but not limited to, royalties and other charges payable with respect thereto. Transporter will have the right to reject any Crude Petroleum that, when tendered for transportation on the Pipeline System, is the subject of litigation or that is encumbered by any lien, security interest, or other form of burden, and Transporter may require Shipper to provide satisfactory evidence of unencumbered title prior to accepting deliveries of Crude Petroleum from Shipper.

*Extraction MSJ* (A. D.I. 5-2), Ex. B at § 7.6.

Section 6.7 of the Platte River Contract states:

**Custody.** Shipper will be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the inlet flange of LACT units provided by Platte River for delivery into the Pipeline System, and after redelivery of such Crude Petroleum to Shipper or its designee at the Lucerne Station. Platte River shall be in exclusive control and possession of (although title will remain in Shipper or other person for whom Shipper has the right to transport Crude Petroleum) Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement after delivery thereof into the Pipeline System and prior to redelivery thereof to Shipper or its designee at the Lucerne Station. The Party that is in exclusive control and possession of the Crude Petroleum will be responsible for all injury, damage, pollution, or contamination, or violation of or the need to comply with Applicable Law caused thereby, except (a) to the extent attributable to the gross negligence or willful misconduct of the other Party and (b) to the extent caused by the failure of the Crude Petroleum to meet the quality specifications described in the Tariff. Further, the Party having responsibility for Crude Petroleum under the preceding sentences (except with respect to Platte River to the extent such Crude Petroleum does not meet the specification set forth in Item No. 30 of the Tariff), will release, defend, indemnify, and hold the other Party, its Affiliates, and its and their officers, employees, and agents harmless from and against any and all Claims arising from (i) personal injury, death, damage, pollution or contamination, or violation of or the need to comply with any Applicable Law, caused by Crude Petroleum deliverable under the Tariff while such Crude Petroleum was in the exclusive control and possession of the Party as set forth in this Section 6.7; or (ii) personal injury, death, damage, pollution or contamination, or violation of or the

need to comply with any Applicable Law, arising out of the Party's facilities or operations WITHOUT REGARD TO WHETHER THE ACT, OCCURRENCE, OR CIRCUMSTANCE GIVING RISE TO THE INDEMNIFICATION OBLIGATION IS THE RESULT OF THE SOLE, ACTIVE, PASSIVE, CONCURRENT, OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, BREACH OF DUTY (STATUTORY OR OTHERWISE), OR OTHER FAULT OF OR VIOLATION OF ANY APPLICABLE LAW BY THE INDEMNIFIED PERSON, PROVIDED THAT NO INDEMNIFICATION WILL BE APPLICABLE TO THE EXTENT OF ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PERSON.

*Extraction MSJ* (A. D.I. 5-1), Ex. A at § 6.7.

Section 7.7 of the DJ South Contract states:

**Custody.** Shipper will be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the inlet flange of LACT units provided by Shipper for delivery into the Pipeline System, and after redelivery of such Crude Petroleum to Shipper or its designee at the Delivery Points. Transporter shall be in exclusive control and possession of (although title will remain in Shipper or other person for whom Shipper has the right to transport Crude Petroleum) Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement after delivery thereof at the Receipt Point and prior to redelivery thereof to Shipper or its designee at the Delivery Points. The Party that is in exclusive control and possession of the Crude Petroleum will be responsible for all injury, damage, pollution, or contamination, or violation of or the need to comply with Applicable Law caused thereby, except (a) to the extent attributable to the gross negligence or willful misconduct of the other Party and (b) to the extent caused by the failure of the Crude Petroleum to meet the quality specifications described in the Tariff. Further, the Party having responsibility for Crude Petroleum under the preceding sentences (except with respect to Transporter to the extent (1) such Crude Petroleum does not meet the specification set forth in Item No. 30 of the Tariff, (2) Transporter did not knowingly accept such off-specification Crude Petroleum, and (3) the injury or other loss was caused by such Crude Petroleum failing to meet the specifications), will release, defend, indemnify, and hold the other Party, its Affiliates, and its and their officers, employees, and agents harmless from and against any and all Claims arising from (i) personal injury, death, damage, pollution or contamination, or violation of or the

need to comply with any Applicable Law, caused by Crude Petroleum deliverable under the Tariff while such Crude Petroleum was in the exclusive control and possession of the Party as set forth in this Section 7.7; or (ii) personal injury, death, damage, pollution or contamination, or violation of or the need to comply with any Applicable Law, arising out of the Party's facilities or operations WITHOUT REGARD TO WHETHER THE ACT, OCCURRENCE, OR CIRCUMSTANCE GIVING RISE TO THE INDEMNIFICATION OBLIGATION IS THE RESULT OF THE SOLE, ACTIVE, PASSIVE, CONCURRENT, OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, BREACH OF DUTY (STATUTORY OR OTHERWISE), OR OTHER FAULT OF OR VIOLATION OF ANY APPLICABLE LAW BY THE INDEMNIFIED PERSON, PROVIDED THAT NO INDEMNIFICATION WILL BE APPLICABLE TO THE EXTENT OF ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PERSON.

*Extraction MSJ* (A. D.I. 5-2), Ex. B at § 7.7.

Section 13.9 of the Platte River Contract states:

> **Successors and Assignability.** This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective permitted successors and assigns. This Agreement shall not be assigned or transferred in whole or in part by either Party except upon the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, either Party may make a Permitted Transfer of this Agreement at any time, without the other Party's consent. In the event of any assignment made by Shipper as a Permitted Transfer, Shipper shall remain obligated for all obligations under this Agreement jointly and severally with its assignee unless such assignee demonstrates sufficient financial viability and creditworthiness equivalent or better than Shipper or otherwise sufficient to fulfill the obligations of Shipper under this Agreement to the reasonable satisfaction of Platte River. With respect to all other assignments to which Platte River has consented pursuant to this Section 13.9, Shipper shall not remain obligated for all obligations under this Agreement jointly and severally with its assignee.

*Extraction MSJ* (A. D.I. 5-1), Ex. A at § 13.9.

Section 14.9 of the DJ South Contract states:

> **Successors and Assignability.** This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective

permitted successors and assigns. This Agreement shall not be assigned or transferred in whole or in part by either Party except upon the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, either Party may make a Permitted Transfer of this Agreement at any time, without the other Party's consent. In the event of any assignment made by Shipper as a Permitted Transfer, Shipper shall remain obligated for all obligations under this Agreement jointly and severally with its assignee unless such assignee demonstrates, consistent with the Tariff, sufficient financial viability and creditworthiness equivalent or better than Shipper or otherwise sufficient to fulfill the obligations of Shipper under this Agreement to the reasonable satisfaction of Transporter. With respect to all other assignments to which Transporter has consented pursuant to this Section 14.9, Shipper shall not remain obligated for all obligations under this Agreement jointly and severally with its assignee.

*Extraction MSJ* (A. D.I. 5-2), Ex. B at § 14.9.

## CONCLUSIONS OF LAW

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter.  28 U.S.C. §§ 157 and 1334.

No party has challenged the Court's jurisdiction.  *Extraction Complaint* (A. D.I. 2); *Platte River Response* (A. D.I. 21).  Extraction consents to entry of a final order or judgment by this Court in this proceeding; however, pursuant to Local Rule 7012-1, Platte River and DJ South do not consent to the entry of a final order or judgment by this Court.

## DECLARATORY JUDGMENT

Declaratory judgment is appropriate because the parties dispute whether the Transportation Agreements create any covenants running with the land in connection with the Debtors' *Motion to Reject* the Transportation Agreements.  28 U.S.C § 2201 (a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

## LEGAL STANDARD

To succeed on summary judgment, the movant must show that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *In re Maxus Energy Corp.*, 615 B.R. 62, 68 (Bankr. D. Del. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The movant "bears the burden of proving that no genuine issue of material fact exists." *In re Quintas Corp.*, 397 B.R. 710, 714 (Bankr. D. Del. 2008) (citation omitted).

In determining whether summary judgment is appropriate, the court accepts all evidence presented by the non-movant as true and draws all inferences in the non-movants' favor and against summary judgment. *See In re LTC Holdings, Inc.*, 597 B.R. 554, 559 (Bankr. D. Del. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

"[W[here the record could leave reasonable minds to draw conflicting inferences, summary judgment is improper and the action must proceed to trial." *In re Maxus Energy Corp.*, 615 B.R. at 69 (citations and internal quotations omitted).

## GOVERNING LAW

Colorado law governs the substantive real property questions in this case. *Wolf v. Burke*, 32 P. 427, 429 (Colo. 1893) ("[T]he rights and titles to real property are governed by the law of the situs . . . ."); *United States v. Novotny*, 184 F. Supp. 2d 1071, 1087 (D. Colo.

2001) ("Colorado law applies to issues relating to the conveyance and ownership of real property located within Colorado.") (citation simplified).

## SUMMARY JUDGMENT

Summary judgment is appropriate when there are no genuine issues of material fact. Fed. R. Civ. P. 56(a) (noting the "[C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact."); *Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998) ("[I]t is a fundamental principle of contract law that 'disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment.'").

In Colorado, the "[i]nterpretation and construction of covenants is a question of law." *Holiday Acres Prop. Owners Ass'n, Inc. v. Wise*, 998 P.2d 1106, 1108 (Colo. App. 2000), *as modified on denial of reh'g* (July 6, 2000); *accord Pulte Home Corp., v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 826 (Colo. 2016) ("Covenants and other recorded instruments, like contracts, should be construed as a whole "seeking to harmonize and give effect to all provisions so that none will be rendered meaningless.").

The Defendants have not raised any genuine issue of material fact concerning whether the Transportation Agreements create covenants running with the land. *Platte River Response* (A. D.I. 21).

Any ambiguity concerning whether the terms of the Transportation Agreements created covenants running with the land would be resolved in favor of the unrestricted use of the land. *B.B. & C. P'ship v. Edelweiss Condo. Ass'n*, 218 P.3d 310, 315 (Colo. 2009) ("When the covenant is unclear, courts resolve all doubts against the restriction and in favor of free and unrestricted use of property.").

The Transportation Agreements' terms are unambiguous. *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 120 (Colo. 2016) ("A contractual term is ambiguous 'if it is susceptible on its face to more than one reasonable interpretation.'").

## COVENANTS RUNNING WITH THE LAND

The unambiguous terms of the Transportation Agreements do not create any covenants running with the land. *Extraction MSJ* (A. D.I. 4), Ex. A; *Extraction MSJ* (A. D.I. 5-2), B.

Under Colorado law, "[u]nlike personal covenants, which operate like a general contract provision and bind only the actual parties to the covenant, real covenants "run with the land" and burden or benefit successors in interests." *Cloud v. Ass'n of Owners*, 857 P.2d 435, 440 (Colo. App. 1992).

A real covenant, or covenant running with the land, creates "an equitable property interest in the burdened land." 9 Powell, Powell on Real Property § 60.01; *see also* Restatement (Third) of Property (Servitudes) § 7.9 (2000) (servitudes, such as covenants running with the land, are not a lien or executory contract but rather, "an interest in land"); *id.* at § 1.4 (abolishing distinction between the terms "real covenant" and "equitable servitude" as they both "describe servitudes encompassed within the term

19

'covenant that runs with the land'").   Colorado courts long have recognized that a covenant running with the land is a burden on real property.  *See Farmers' High Line Canal & Reservoir Co.  v. N.H. Real Estate Co.*, 92 P. 290, 294 (Colo. 1907) ("A covenant which runs with the land is a promise, the effect of which is to bind the promisor and his lawful successors to the burdened land for the benefit of the promisee and his lawful successors to the benefited land.  According to this the covenant binds the person of the owner of the burdened land, provided he comes by his title legally, and benefits the owner of the benefited land, provided he comes by his title legally.") (citation and internal quotations omitted); *see also In re Lonesome Pine Holdings, LLC*, 2011 Bankr. LEXIS 5775, at *9 (Bankr. D. Colo. Sept. 1, 2011) ("restrictions that run with the land create equitable interests") (citation and internal quotations omitted).

Colorado law disfavors the creation of covenants running with the land as a derogation of the common law's preference for the free alienability of land.  *Nelson v. Farr*, 354 P.2d 163, 166 (Colo. 1960) ("[A]s a fundamental principle of law of real property, restrictions on the alienation and use of land are not favored, and all doubt should be resolved in favor of the free use of property . . . .'Restrictions on the use of property, being in derogation of the fee conveyed, will not be extended by implication to include anything not clearly expressed.'").

In addition, to create a covenant running with the land, the parties must intend to create a covenant running with the land and the covenant must touch and concern the land with which it runs.  *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (concerning intent and touch and concern).

Finally, to create a covenant running with the land, there must also be privity of estate between the original covenanting parties. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties); *Farmers' High Line Canal & Reservoir Co.*, 92 P. at 293 (same); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (same).

Failure to satisfy any of the three elements needed to create a covenant running with the land means that a covenant cannot run with the land as a matter of law. *See Cloud v. Ass'n of Owners*, 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment.").

Contracting parties cannot create covenants running with the land by agreement alone; intent of the parties is necessary for a covenant to run with the land, but not sufficient. *Id.* ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment."); *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. App. 1993) ("In order for a covenant to run with the land, not only must the parties to the covenant intend that it do so . . . but the covenant must 'touch and concern' the land.").

## I.    Intent.

The parties dispute whether the Platte River Contract was intended to create a covenant running with the land.  Extraction argues that the absence of express language in the Platte River Contract evidences the parties' lack of intent.  *See Extraction MSJ* (A.

D.I. 4) at p. 11-12.  Platte River and DJ South argue that although there is no express language, the contract as a whole, as well as the underlying purpose of the Transportation Agreements, demonstrate an intent to create a covenant running with the land and bind successors in interest.  *See Platte River Response* (A. D.I. 21), at p. 16-22.

Platte River further argues that the absence of language in the Platte River Contract expressly stating that it creates a covenant running with the land is not dispositive under Colorado law, as a covenant running with the land need not "be expressed in specific or magical terms."  *TBI Expl. v. Belco Energy Corp.*, No. 99-10872, 2000 WL 960047, at *4 (5th Cir. June 14, 2000) (conducting a survey of Colorado case law).  Rather, Colorado courts look at agreements "as a whole…, giving effect to all provisions contained therein." *Lookout Mtn.*, 867 P.2d at 75 (citation omitted).

To create covenants running with the land, the parties must express their intent to create a covenant running with the land in clear and unambiguous terms.  *TBI Explr.*, 2000 WL 960047, at *4 (applying Colorado law and stating "[I]n the cases that have recognized a covenant running with the land, the covenants were in express terms."); *MidCities Metro. Dist. No. 1 v. U.S. Bank Nat. Ass'n*, 12-CV-03322-LTB, 2013 WL 3200088, at *3 (D. Colo. June 24, 2013) (applying Colorado law and noting that if a covenant is ambiguous, the Court must "resolve all doubts against the restriction and in favor of free and unrestricted use of property.").

The Platte River Contract was not intended to create a covenant running with the land.  The Platte River Contract does not contain any language evincing a clear intent to create a covenant running with the land.  *See*, *e.g.*, *Lookout Mountain* 867 P.2d at 75; *TBI*

*Explr.*, *2000 WL 960047*, at *4 (applying Colorado law and stating "[I]n the cases that have recognized a covenant running with the land, the covenants were in express terms."). Defendants' attempts to manufacture a genuine issue of material fact are based on inappropriate extrinsic evidence and, in any event, are unavailing.

Reference to successors and assigns in Section 13.9 of the Platte River Contract is insufficient to demonstrate an intent to create a covenant that runs with the land because the language does not purport to bind successors-to-title to any identified real property, but simply relates to contractual successors and assigns to the Platte River Contract. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 13.9; *see Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 167 (Colo. App. 1994).

The DJ South Contract contains this same provision despite also containing covenant running with the land language. *See Extraction MSJ* (A. D.I. 5-2), Ex. B at § 14.9 ("This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective permitted successors and assigns.") *and* § 2.5 ("[T]he dedication and commitment . . . shall be *deemed an interest that runs with the land* . . . .") (emphasis added).

In contrast to the Platte River Contract, the DJ South Contract similarly contains the requisite language to show intent to create a covenant running with the land. *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.5 ("[T]he dedication and commitment . . . shall be *deemed an interest that runs with the land* . . . .") (emphasis added).

The only covenant in the DJ South Contract that the parties clearly expressed an intent to run with the land is the dedication and commitment for the performance of the

transportation services obligations. *Id.* ("[T]he dedication and commitment by [Extraction] under this Article II shall be deemed an interest that runs with the land in the Dedication Area . . . .").

The parties intended the dedication and commitment in the DJ South Contract to run with Extraction's mineral estates. *Extraction MSJ* (A. D.I. 5-2), Ex. B at §§ 1.1(dd) ("'Interests' means all interests that Shipper (or any of its Affiliates) now or hereinafter owns, controls, acquires or has the right to market (as such marketing rights may change from time to time) in Crude Petroleum of all formations in, under or attributable to the Dedication Area, and all interests in any wells, whether now existing or drilled hereafter, on or completed within the Dedication Area . . . .") and § 2.1 ("Shipper hereby dedicates and commits to the Services to be provided by Transporter hereunder all of the Interests.").

The parties did not express an intent to allow any other covenants in the DJ South Contract to run with the land. *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.5.

Because the Platte River Contract does not clearly evince an intent for any covenants contained therein to run with the land and bind successors-to-title to any estate in real property, the Platte River Contract does not create covenants that run with the land as a matter of Colorado law. *TBI Explr. v. Belco Energy Corp.*, No. 99-10872, 2000 WL960047, at *4 (5th Cir. June 14, 2000) (applying Colorado law and stating "[I]n the cases that have recognized a covenant running with the land, the covenants were in express terms.").

II.    **Touch and Concern.**

The parties dispute whether the Transportation Agreements touch and concern the land. Extraction argues that the Transportation Agreements do not touch and concern the land because the dedications only identify crude petroleum from particular lands that are subject to the agreements and because they affect only personal property. *Extraction MSJ* (A. D.I. 4), at p. 24. Defendants argue the Transportation Agreements touch and concern the land because they both benefit and burden Extraction's real property interests. *Platte River Response* (A. D.I. 21), at p. 22-24.

To satisfy touch and concern, the covenant intended to run with the land—here, the dedication and commitment—must closely relate to the estate in real property with which it is intended to run (here, Extraction's mineral estate), its use, or enjoyment. *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment.'").

"The 'touch and concern' requirement is fulfilled when the covenant operates to benefit the physical use of the land . . . ." *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991), *rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855 P.2d 1368 (Colo. 1993) (noting a subordination agreement was a personal covenant that did not run with the land because "the parties' entitlement to physical use of the land was not increased, nor was improvement made to the land as a result of subsequent loan proceeds").

Colorado generally follows the traditional common law approach to the touch and concern element. 3 Tiffany Real Property § 854 (3d ed. 2015) ("An important test for

distinguishing a real or running covenant from a merely personal or collateral one, is whether or not the covenant so closely relates to the land or estate granted . . that it may be said to 'touch and concern' it.").

Touch and concern is an objective analysis of a covenant's effect upon land and the element does not turn on party intent or word choice. *Cloud v. Ass'n of Owners*, 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment."); *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 875 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[T]he appellants have not purchased the minerals underlying the Dedicated Areas but, again, have merely agreed to provide services to the minerals' owner. The logical extension of Nordheim's argument—that any agreement relating to minerals in the ground constitutes the conveyance of a real property interest—is not supported by the cited caselaw."); 21 C.J.S. Covenants § 34 ("[T]he intent of the parties is not dispositive, insofar as obligations arising from restrictive covenants that are inherently personal cannot be made appurtenant to the land[.]"); 9 Richard R. Powell, Powell on Real Property § 60.04(3)(a) ("The touch and concern requirement is the only essential requirement for the running of covenants which focuses on an objective analysis of the contents of the covenant itself rather than the intentions and relationships between the parties.").

The dedications and commitments in Sections 2.1 were "to the Services to be provided" by Platte River and DJ South under the Transportation Agreements (*i.e.*, the transportation of certain produced crude petroleum from Receipt Points to Delivery

Points, or to Lucerne Station). *Extraction MSJ* (A. D.I. 5-1), Ex. A at §§ 1.1(rr) and 2.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at §§ 1.1(aaa) and 2.1.

Under the Transportation Agreements, Platte River and DJ South committed to transport a certain volume of Extraction's crude petroleum in exchange for a contractual fee. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 3.1 ("Commencing as of the Commencement Date and continuing thereafter during the Term of this Agreement, Shipper agrees to tender to Platte River for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff and the terms of this Agreement); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 4.1 (same but respecting DJ South).

The dedications in Section 2.1 of both Transportation Agreements do not change the nature of the covenants contained in the Transportation Agreements; they simply identify the produced minerals subject to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.1; *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) (holding a similar contract merely "identif[ies] and delineat[es] the [parties'] contractual rights and obligations").

In the Transportation Agreements, Defendants dedicated and committed "to the Services to be provided" under the Transportation Agreements "all of the Interests." *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.1.

Defendants argue that, although Extraction claims the dedication relates only to personal property in the form of produced crude oil, the Transportation Agreements

27

clearly dedicate more than Extraction's current production.  Rather, they dedicate all of Extraction's "interests" "in, under, or attributable to" the Dedication Areas.  *Id.*

In support of this argument, Defendants cite to the recent decision by the Colorado Bankruptcy Court that a production dedication with similar language touched and concerned the land under Utah law.  *See In re Badlands Energy, Inc.*, 608 B.R. 854, 869 (Bankr. D. Colo. 2019).  The court explained because the "dedicated reserves" under the gathering agreement were defined broadly to include "the interest of Producer in all Gas reserves <u>in and under</u>" the dedicated area, the gathering agreement encompassed real property.  *Id.* (emphasis in original).  As in Utah, "real property" under Colorado law includes non-extracted minerals.  *See Bill Barrett Corp.*, 2018 WL 4225030, at *5 (citation omitted).

Nonetheless, the dedications do not touch and concern Extraction's mineral estates because they concern only personal property and do not affect the physical use of real property or closely relate to real property.  *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2.1, Ex. C ("Form of Tariff") at Item 5 (defining "Crude Petroleum" as "the direct liquid product of oil wells, or the indirect liquid petroleum products of oil or gas wells, or a mixture of such products"); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.1.

No party argues that the Transportation Agreements employed the conventional legal definition of a dedication, which would have meant that the parties intended the donation of Extraction's real property to the public use.  *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("[A] dedication has been defined as an appropriation of land by the owner of the fee to some public use and the adoption

thereof by the public."); Dedication, *Black's Law Dictionary* (11th ed. 2019) (defining "dedication" as "[t]he donation of land or creation of an easement for public use").

The plain and ordinary meaning of the word "dedicate" is "to set apart to a definite use." *Dedicate*, Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

The plain and ordinary meaning of "commit" is "to pledge . . . to some particular course or use." *Commit*, *id*.

Throughout the Transportation Agreements, the Interests are used to identify the particular minerals that are subject to, set apart for, pledged or committed to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1.(bb) (defining "Interests" as "all interests that [Extraction] . . . now or hereinafter owns, controls, acquires or has the right to market . . . in Crude Petroleum of all formations in, under or attributable to the Dedication Area . . . and all interests in any wells . . . on or completed within the Dedication Area"); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 1.1(dd) (defining "Interests" as all interests that [Extraction] . . . now or hereinafter owns, controls, acquires or has the right to market . . . in Crude Petroleum of all formations in, under or attributable to the Dedication Area, and all interests in any wells . . . on or completed within the Dedication Area"); *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2.2(a) (reserving from the dedication "[a]ny Interest which is, at any time during the Term . . . operated by an operator other than Shipper"); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.2(a) (reserving from the dedication "[a]ny Interest which is, at any time during the Term . . . operated by an operator other than Shipper or . . . owned by a non-operator in a property operated by Shipper"); *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2.2(b) (reserving from the dedication any

interest subject to a prior dedication); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.2(b) (reserving from the dedication any interest subject to a prior dedication).

Dedications, generally, only identify the particular produced minerals that are subject to, set apart for, pledged or committed to the parties' contractual obligations under the contracts for transportation services. *Cf. In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 81 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[The] 'dedication' [is not] a burdening of the Debtors' property interests, but rather an identification of what property and products are the subject of the Agreement and will be made available . . . in furtherance of the purposes of the Agreements."); *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1170 (10th Cir. 1999) (noting that dedication contracts are contracts "wherein the producer 'contracts to furnish the purchaser all the gas produced from specified reserves, thus dedicating those reserves to the customer'"); *Nordan-Lawton Oil & Gas Corp. of Tex. v. Miller*, 272 F. Supp. 125, 129 (W.D. La. 1967), *aff'd*, 403 F.2d 946 (5th Cir. 1968) ("In this contract the lessee 'dedicated' all the reserves under the Miller lease to the pipeline company which in essence means that the company was given exclusive rights to purchase the reserves under the premises when and if produced."); Latham & Watkins LLP, The Book of Jargon, Oil & Gas, The Latham & Watkins Glossary to Oil and Gas Terminology (1st ed. 2016) at 24 (defining a dedication as "a promise or commitment of a certain amount of Production from a Dedicated Area . . . to the services provider in a Midstream service agreement").

Produced minerals, such as crude petroleum, are personal property and not real property. *Smith v. El Paso Gold Mines, Inc.*, 720 P.2d 608, 609 (Colo. App. 1985) ("[A]t some

point after they are severed from the land, minerals lose their character as realty and 'become' personalty.").

The dedications do not limit Extraction's rights to the use or enjoyment of its mineral estates. *Extraction MSJ* (A. D.I. 5-1), Ex. A at §2.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.1. And the dedications do not increase the Defendants' rights (or convey to Defendants rights) respecting Extraction's mineral estates. *Extraction MSJ* (A. D.I. 5-1), Ex. A at §2.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 2.1.

Extraction retains exclusive control and possession of all minerals from severance from the ground through delivery into the pipeline systems. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 6.7 ("Shipper will be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the inlet flange of LACT units provided by Platte River for delivery into the Pipeline System . . . ."); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 7.7 (similar but respecting DJ South).

Extraction retains title to the crude petroleum throughout the entire transportation process, and the Defendants never obtain title to the crude petroleum at any point. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 6.7 ("Platte River shall be in control and possession of (although title will remain in Shipper or other person for whom Shipper has the right to transport Crude Petroleum) Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement after delivery thereof into the Pipeline System . . . ."); *Extraction MSJ* (A. D.I. 5-2), Ex. B at §7.7 (similar but respecting DJ South).

Additionally, the contractual obligations and Services—the performance of which by Defendants this dedication and commitment was made—require the delivery of a certain volume of produced crude petroleum to the Defendants for the provision of transportation services from in exchange for a fee, or the payment of a certain amount of money. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 3.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 4.1.

The provision of such services does not affect the use or enjoyment of oil in place, or the use of the mineral estate, but crude petroleum that has been severed from the mineral estate and now constitutes the personal property of Extraction, as a merchant tin this commodity. As a result, the covenants contained in the Transportation Agreements do not benefit Extraction in its capacity as a landowner, but benefits and affects Extraction's use of its personal property (*i.e.*, its produced crude oil). *Cf.* Harry Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914).

Even assuming that the Transportation Agreements' dedications have an indirect effect upon Extraction's mineral estates, such as an incidental increase in value, this effect is not closely related to the land and, therefore, cannot satisfy touch and concern, as its primary affect is on the use and enjoyment of personal property, and not real property. *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment.'"); *cf.* Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914) (explaining that indirect effects are insufficient).

The "dedication" and "commitment" of real property interests to the performance of contractual obligations and services that closely relate to and affect only the use and enjoyment of personal property does not change this result.  To hold otherwise would render the objective "touch and concern" element beholden to the subjective intent of the parties, and allow parties to convert covenants that do not closely relate to real property into covenants that bind successors and assigns simply by recitation of a set phrase.

Extraction's tender options confirm that the Transportation Agreements do not closely relate to Extraction's mineral estates.  Extraction may fully perform under the Transportation Agreements without providing crude petroleum produced from its own mineral estates and may instead provide crude petroleum produced from the land of third parties.  *Extraction MSJ* (A. D.I. 5-1), Ex. A § 3.1 (reciting Extraction's agreement to tender "for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff and the terms of this Agreement . . . .") ; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 4.1 (same).

Extraction's payment options similarly confirm that the Transportation Agreements' covenants do not closely relate to Extraction's real property.  *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 3.1; *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 4.1.

Extraction could satisfy its obligations under the Transportation Agreements by either (1) shipping certain amounts of crude petroleum or (2) payment of the Total Financial Commitment.  *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 3.1 ("Shipper's obligation to ship or pay its Committed Volume under this Agreement shall be satisfied in full upon

the earlier" of shipment of a certain volume of crude petroleum or payment of the Total

Financial Commitment); *Extraction MSJ* (A. D.I. 5-2), Ex. B at § 4.1 (same).

Payment of the Total Financial Commitment is purely the payment of a specified

amount of money set forth in the Transportation Agreements. *Extraction MSJ* (A. D.I. 5-

1), Ex. A at § 6.2 ("For the avoidance of doubt, the Total Financial Commitment will be

satisfied by payment by Shipper of the aggregate of the Fixed Monthly Payments in

accordance with the terms of this Agreement, or at Shipper's option, any payment made

by Shipper to accelerate the satisfaction of that obligation."); *Extraction MSJ* (A. D.I. 5-2),

Ex. B at § 7.2 (same).

Moreover, Extraction may accelerate the satisfaction of the Total Financial

Commitment, and its obligations under the Transportation Agreement, through

payment. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 6.2 ("For the avoidance of doubt, the

Total Financial Commitment will be satisfied by payment by [Extraction] of the aggregate

of the Fixed Monthly Payments in accordance with the terms of this Agreement, or at

[Extraction's] option, any payment made by [Extraction] to accelerate the satisfaction of

that obligation."); Ex. B at § 7.2 (same).

The payment of money is a personal commitment that does not touch and concern

Extraction's mineral estates. *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991),

*rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855 P.2d 1368 (Colo. 1993) (holding

that a subordination agreement was a personal covenant that did not run with the land

because "the parties' entitlement to physical use of the land was not increased, nor was

improvement made to the land as a result of subsequent loan proceeds").

The dedications contained in the Transportation Agreements do not closely relate to, or affect, the use or enjoyment of Extraction's mineral estates. As a result, they do not touch and concern Extraction's mineral estates, and do not create covenants that run with the land.

## III.    Privity of Estate.

The Court is bound to apply Colorado law as declared by the Colorado Supreme Court until the Colorado Supreme Court disturbs its prior holdings. *Erie County v. Am. States Ins. Co.*, 573 F. Supp. 479, 486 (W.D. Pa. 1983) ("While plaintiff questions the continuing vitality of *Gordon,* we are bound to consider the [Pennsylvania] Supreme Court's undisturbed holding in *Gordon* as good law on this point."), *aff'd*, 745 F.2d 45 (3d Cir. 1984*) and aff'd sub nom. Am. States Ins. Co. v. Santafemia*, 745 F.2d 45 (3d Cir. 1984); *cf. Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

The Colorado Supreme Court requires privity of estate between the covenanting parties at the time of the covenant's creation before the covenant may run with the land. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (noting "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant"); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) ("[W]here there is the requisite privity of estate, and the covenant is connected with or concerns the land or estate conveyed,

then a covenant imposing a burden will run with the land as readily as one conferring a benefit."); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (concluding a covenant running with the land was created, in part, because privity of estate was not denied).

Colorado appellate courts confirm that Colorado law requires this privity of estate. *Fed. Deposit Ins. Corp. v. Mars*, 821 P.2d 826, 829 (Colo. App. 1991) ("For contractual obligations between a lessor and lessee to pass to a successor in title of the lessee, there must be either privity of contract or privity of estate between the lessor and that successor in title."); *Fisk v. Cathcart*, 33 P. 1004, 1005 (Colo. App. 1893) ("Under these circumstances, there is no privity between him as a grantee from Beecher and the prior grantors subsequent to Parker which entitles him to maintain his suit upon his covenant.").

Colorado statutory law identifies several covenants that necessarily run with the land, provided that those covenants satisfy privity of estate between the covenanting parties. Colo. Rev. Stat. § 38-30-121 ("Covenants of seisin, peaceable possession, freedom from encumbrances, and warranty contained in any conveyance of real estate, or any interest therein, shall run with the premises and inure to the benefit of all subsequent purchasers and encumbrancers.").

Real property treatises continue to cite Colorado Supreme Court cases for the proposition that privity of estate between the covenanting parties is required. 3 Tiffany Real Property § 851 n. 27 (3d ed. 2015) (citing *Taylor* for the proposition that privity of estate at the time of the creation of the covenant is required); *see also* 9 Richard R. Powell,

Powell on Real Property § 60.04 n. 123 (citing *Farmers' High Line* for the proposition that either mutual or horizontal privity are required for a covenant to run with the land).

Defendants argue that no Colorado court has referenced the concept of privity of estate or horizontal privity since 1954. Indeed, they argue, the year after *Taylor* was decided, the Colorado Supreme Court held a restrictive covenant ran with the land, even though it was never in the defendant's chain of title, and that it could be enforced even between parties that had no direct contractual relations. *See Pagel v. Gisi*, 286 P.2d 636, 638-39 (Colo. 1955). Privity was unnecessary to create the covenant then, and it is unnecessary now. *See id.*

Defendants further argue that every subsequent Colorado decision regarding covenants running with the land—including the cases cited by Extraction—has expressly stated the only requirements to create a real covenant are (1) the parties' intent, and (2) the covenant touches and concerns the land. *See, e.g., Reishus v. Bullmaters, LLC*, 409 P.3d 435, 440 (Colo. App. 2106) (containing no reference to horizontal privity requirement); *DeJean v. Grosz*, 412 P.3d 733, 739 (Colo. App. 2015) (same); *In re Banning Lewis Ranch Co.*, 532 B.R. 335, 345 n.11 (Bankr. D. Co. 2015) (same); *MidCities Metro. Dist. No. 1. v. U.S. Bank Nat'l Ass'n*, Civil No. 12-cv-03322, 2013 WL 3200088, at *3 (D. Colo. June 24, 2013) (same); *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 Col. App. 1993) (same); *Cloud v. Association of Owners*, 857 P.2d 435, 440 (Colo. App. 1992) (same); *Bigelow v. Nottingham*, 833 P.2d 764, 767-68 (Colo. App. 1991), *rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855, P.2d 1368 (Colo. 1993)(same). The Fifth Circuit reached the same conclusion after conducting a "survey of Colorado case law." *TBI Expl.,*

No. 99-10872, 2000 WL 960047, at *4 (5th Cir. June 14, 2000) (only elements required under Colorado law are "intent by the parties to the covenant that the covenant runs with the land" and "the covenant must 'touch and concern' the land.") (collecting cases).

Nonetheless, the Defendants have not identified a single case from the *Colorado Supreme Court holding that Colorado law no longer requires privity of estate* between the original covenanting parties to create a covenant running with the land. *Platte River Response* (A. D.I. 21).

The Restatement (Third) of Property does not restate Colorado law regarding covenants that run with the land, and Colorado has not adopted the reforms suggested therein. *See* Restatement (Third) of Property Servitudes § 3.2 (Am. Law Inst. 2000) (dispensing with the acknowledged touch and concern requirement and stating "[n]either the burden nor the benefit of a covenant is required to touch or concern land in order for the covenant to be valid as a servitude.")

Privity of estate requires that the covenants that allegedly run with the land be accompanied by a contemporaneous conveyance of some interest in the land with which the covenant runs. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (noting "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant"); 9 Richard R. Powell, Powell on Real Property § 60.04(3)(c)(iii) ("'Horizontal privity' typically exists when the original covenanting parties make their covenant in connection with the conveyance of an estate in fee from one of the parties to the other. The covenant and the conveyance

must be made at the same time . . . ."); 3 Tiffany Real Property § 851 (3d ed. 2015) (describing "privity of estate between the covenantor and the covenantee at the time the covenant was created").

The Transportation Agreements do not convey to the Defendants any real property interest in Extraction's mineral estate. *Extraction MSJ* (A. D.I. 5-1), Ex. A; *Extraction MSJ* (A. D.I. 5-2), Ex. B.

The Defendants failed to identify any real property interest in Extraction's mineral estate that was purportedly conveyed contemporaneously with the alleged covenant running with the land, choosing instead to argue that privity of estate was not required. *Platte River Response* (A. D.I. 21).

The surface estate and mineral estate, once severed, are separate and distinct estates in real property. *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 556 (Colo. 1995) ("[Colorado has] long recognized that a conveyance which severs a mineral interest from the surface estate creates a separate and distinct estate."); *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 927 (Colo. 1997), *as modified on denial of reh'g* (Oct. 20, 1997) ("As the owner of property subject to the easement, the surface owner 'continues to enjoy all the rights and benefits of proprietorship *consistent with the burden of the easement.*'").

The Defendants point to the following as interests sufficient to satisfy Colorado's privity of estate requirement: (1) an above-ground pipeline transportation system conveyed by XTR Midstream, a non-party to the Transportation Agreements; (2) equity interests through an LLC agreement acquired by non-parties to the Transportation Agreements; (3) purported easements or rights-of-way on Extraction's surface estate; and

(4) the Transportation Agreements' dedications. *Platte River Response* (A. D.I. 21) at ¶¶ 95 and 98. As a matter of law, these alleged interests cannot satisfy Colorado's privity of estate requirement to create a covenant running with the land.

*First*, an equity interest in the pipeline transportation system is not a real property interest in Extraction's mineral estate. To satisfy Colorado law's requirement for privity of estate between the covenanting parties, the interest must be conveyed between the covenanting parties and it must be an interest in the mineral estate (the estate in real property with which the covenant is intended to run). *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties).

The conveyance here was with a non-party to the relevant covenant and not Extraction. *Platte River Response* (A. D.I. 21-6), Ex. F (Extraction not a party to the contract).

An equity interest in the pipeline is not an interest in Extraction's oil in place.

Further, the pipeline is not an interest in the mineral estate. *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 556 (Colo. 1995) ("[Colorado has] long recognized that a conveyance which severs a mineral interest from the surface estate creates a separate and distinct estate.")

*Second*, the sale of a subsidiary is not a sale of an interest in the mineral estate. Nor is an equity interest in a company an interest in real property. *See* Property, *Black's Law Dictionary* (11th ed. 2019) (defining "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land").

*Third*, any purported easements or rights-of-way on Extraction's surface estate fail to satisfy privity of estate for several reasons.  As an initial matter, all of the easements or rights-of-way at issue here are either between parties that are not the covenanting parties or they were conveyed long after the dedication was executed.  *Platte River Response* (A. D.I. 21), Ex. G (A. D.I. 21-7) (Extraction not a party to the contract); Ex. H (A. D.I. 21-8) (same); Ex. N (A. D.I. 21-14) (same); Ex. S (A. D.I. 21-19) (same); Ex. L (A. D.I. 21-12) (right-of-way granted to Platte River on July 17, 2019).

The conveyance needed to satisfy privity of estate must be made between the covenanting parties and contemporaneously with the creation of the covenant running with the land.  3 Tiffany Real Property § 851 (3d ed. 2015) (cited approvingly by the Colorado Supreme Court to describe the requirements of privity of estate in *Taylor v. Melton*, 274 P.2d 977, 982 (Colo. 1954).   A stranger to the covenant cannot grant or receive a real property interest that establishes privity of estate between the contracting parties. *Id.* at 982–83 (requiring privity of estate between the covenanting parties); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) (same).

The single conveyance of rights-of-way from Extraction to Platte River occurred on July 17, 2019.  *Platte River Response* (A. D.I. 21-12), Ex. L at p. 1.  The parties, however, entered the Platte River Contract two years prior, on May 14, 2017.  Consequently, the right-of-way grant cannot satisfy privity of estate, which requires the grant of a real property interest ***contemporaneous*** with the creation of the covenant intended to run.  3

Tiffany Real Property § 851 (3d ed. 2015) (cited approvingly by the Colorado Supreme Court to describe the requirements of privity of estate in *Taylor*, 274 P.2d at 982.

Next, an interest in the surface estate cannot qualify as a conveyance as an interest in Extraction's mineral estate as a matter of Colorado law.  Conveyances of easements or rights-of-way across the surface estate are interests in the surface estate that cannot satisfy privity of estate respecting a mineral estate.  *Notch Mountain Corp. v. Elliott*, 898 P.2d 550, 556 (Colo. 1995) (noting Colorado has "long recognized that a conveyance which severs a mineral interest from the surface estate creates a separate and distinct estate").

Because easements in gross are personal rights in the use of (and interests in) the surface estate, they are not interests in a severed mineral estate.  *Lobato v. Taylor*, 71 P.3d 938, 945 (Colo. 2002) ("An easement in gross does not belong to an individual by virtue of her ownership of land, but rather is a personal right to use another's property.").  As a result, the conveyance of an easement in gross in a surface estate cannot satisfy privity of estate respecting a mineral estate.

The Defendants also implied that Extraction conveyed easements or rights-of-way associated with the mineral estate.  *Elevation Response* (A. D.I. 21) at ¶ 96.

However, Extraction expressly cannot convey any property interest it lacked the ability to convey.

Extraction lacked the ability to convey any easement appurtenant separate and apart from the land the easement is annexed to (here, Extraction's mineral estates). *Lewitz v. Porath Family Tr.*, 36 P.3d 120, 122 (Colo. App. 2001), as modified on denial of reh'g (Apr. 26, 2001) ("[A]n easement appurtenant is an 'incorporeal right' attached to

and belonging with some other parcel of land.  It runs with that land and is incapable of existence separate and apart from the particular land to which it is annexed.").

Extraction also lacked the ability to convey its rights of ingress and egress upon the surface estates, which are incidental (and appurtenant) to ownership of Extraction's mineral estates.  *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 926 (Colo. 1997), as modified on denial of reh'g (Oct. 20, 1997) ("In this sense, the right of access to the mineral estate is in the nature of an implied easement, since it entitles the holder to a limited right to use the land in order to reach and extract the minerals."); *Chase v. Colorado Oil & Gas Conservation Comm'n*, 284 P.3d 161, 171 n. 17 (Colo. App. 2012), as modified on denial of reh'g (July 19, 2012) ("Mineral estate owners have an implied easement, which burdens the surface interest and empowers mineral owners to make reasonable use of the surface in order to access the minerals below."); *Entek GRB, LLC v. Stull Ranches, LLC*, 885 F. Supp. 2d 1082, 1088 (D. Colo. 2012) ("Because the mineral estate is considered the dominant estate, it impliedly carries with it a right to use as much of the surface as may be reasonably necessary for operations relating to the mineral estate.").

Rights of ingress and egress are not real property interests capable of satisfying privity of estate; they are incidental rights.  *Smith v. Moore*, 474 P.2d 794 (Colo. 1970) ("Though the privilege to use the surface is recognized at law, this right does not create an ownership interest in the surface estate . . . but merely a right of access.").

*Fourth*, and finally, the dedication itself is not a conveyance in real property.  The dedication cannot be both the real covenant and the element that satisfies privity of estate to create a real covenant. Dedications are not conveyances of real property interests

capable of satisfying privity of estate. *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("This regulation clearly contemplates a 'conveyance' and not a 'dedication' which terms are not synonymous.").

Dedications only identify the particular produced crude petroleum within a particular area that is subject to the parties' contractual obligations. *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018).

Accordingly, the original covenanting parties to the Transportation Agreements were not in privity of estate at the time of the creation of the covenants therein, and the Transportation Agreements contain no covenants that run with the land. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties).

## CONCLUSION

As set forth above, the Transportation Agreements are unambiguous and the question of whether the Transportation Agreements contain any covenants that run with the land is a legal one. There is no genuine issue of material fact. Extraction has met its burden for entry of summary judgment against Defendants based on the plain meaning of the Transportation Agreements. As to Platte River, there was no intent by the parties to create a covenant that runs with the land; the Platte River Contract does not touch and concern the land; and there is no privity among the parties. As to DJ South, the parties intended the dedication and commitment in section 2.5 of the DJ South Contract to be a covenant that runs with the land (the parties did not intend that any other provision of

the contract to create a covenant that runs with the land); the DJ South Contract does not touch and concern the land; and there was no privity among the parties.  Thus, as not all the required elements are present in either contract, the Court will enter summary judgment in favor of Extraction.  An Order and Judgment will be entered.

.

By the Court:

_____
Christopher S. Sontchi
Chief United States Bankruptcy Judge

Date: October 14, 2020