**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| EXTRACTION OIL & GAS, INC., *et al.,* | : | Case No.: 20-11548 (CSS) |
| | : | (Jointly Administered) |
| Debtor. | : | |
| EXTRACTION OIL & GAS, INC., *et al.,* | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 20-50816 (CSS) |
| | : | |
| GRAND MESA PIPELINE, LLC, | : | |
| | : | |
| Defendant. | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AGAINST DEFENDANT, GRAND MESA PIPELINE,
LLC; AND DEFENDANT'S MOTION FOR PERMISSIVE ABSTENTION**[1]

**INTRODUCTION**

This adversary proceeding is one of several arising from the Chapter 11 case of

Extraction and its affiliates.[2]  The Debtors are in the "upstream" business of extracting

hydrocarbons from land in the State of Colorado.  In the Chapter 11 case, the Debtors

have sought to reject several of what are commonly known as Transportation Services

Agreements or TSA's.  Broadly speaking, the counterparties to these TSA's are

---

[1]    The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. Pro. 52, as made applicable herein by Fed. R. Bank. P. 7052, which is applicable to this matter by virtue of Fed. R. Bankr. P. 9014.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions or law constitute findings of fact, they are adopted as such.

[2]    Undefined terms used in this Introduction have the meaning set forth below.

"midstream" pipelines, which transport the Debtors' hydrocarbons to larger "downstream" pipelines or directly to the depot in Cushing, Oklahoma.

In response to the motion to reject, many of the counterparties, including this defendant, have argued that the TSA's cannot be rejected because they include covenants that run with the land. Moreover, they argue that a determination of whether there are covenants that run with the land requires an adversary proceeding. Hence, the Debtors have filed several adversary proceedings in which they have sought a declaratory judgment that the TSA's do not create covenants that run with the land. Currently, before the Court is the Debtor's motion for summary judgment to that effect.[3]

As set forth in detail below, the Court will grant the Debtors' motion for summary judgment. Under Colorado law, to create a covenant running with the land, the parties must intend to create a covenant running with the land and the covenant must touch and concern the land with which it runs. In addition, there must also be privity of estate between the original covenanting parties at the time of the covenant's creation. Under the unambiguous terms of the Transportation Agreement, the parties intended that the dedication and commitment under section 1.1 of the Transportation Agreement to be a covenant that runs with the land. Nonetheless, the dedication and commitment covenant does not touch or concern the land, and there is no privity of the estate. Thus, as not all the required elements are present, no covenant runs with the land.

---

[3] The motions to reject are pending in the Chapter 11 case. As of this writing, the motion to reject the Transportation Agreement with Grand Mesa is in the midst of an evidentiary hearing.

Finally, while there are several issues discussed below, the central issue before the Court is whether the dedicated and committed interests in the Transportation Agreement referenced above touch and concern the land.  They do not.  The dedications and commitments concern only personal property and do not affect the physical use of real property or closely relate to real property.  Throughout the Transportation Agreement, the dedicated and committed interests are used to identify the particular minerals that are subject to, set apart for, pledged or committed to the parties' contractual obligations. They do not convey any interests in real property.  Thus, they cannot serve to satisfy the touch and concern the land element of the test to establish a covenant that runs with the land.

Also, before the Court is Defendant's motion requesting this Court to abstain from hearing this adversary proceeding.  As the overwhelming number of the applicable factors weigh against abstention, the Court will deny the motion to abstain.

## THE TRANSPORTATION AGREEMENT.

On June 21, 2016, Extraction Oil & Gas, Inc. ("Extraction"), Grand Mesa Pipeline, LLC ("Grand Mesa") and Bayswater Exploration & Production, LLC ("Bayswater") entered into the Amended and Restated Transportation Services Agreement (the "Transportation Agreement"). *Brief in Support of Plaintiff's Motion for Summary Judgment* (A. D.I. 5-1) ("*Extraction MSJ*"), Ex. A at p. 1.

## PROCEDURAL BACKGROUND.

On June 14, 2020, Extraction and its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3

On June 15, 2020, Extraction filed a motion in the underlying chapter 11 case seeking the Court's authorization of its rejection of the Transportation Agreement. *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Effective as of the Dates Specified Herein and (II) Granting Related Relief* (D.I. 14) ("*Motion to Reject*") at p. 1.

On August 4, 2020, Grand Mesa filed its objection to the *Motion to Reject*. *Objection of Grand Mesa Pipeline, LLC to Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Rejection of Unexpired Leases of Nonresidential Real Property and Executory Contracts Effective as of the Dates Specified Herein and (II) Granting Related Relief* (D.I. 363) ("*Grand Mesa Objection*") at p. 1.

As relevant to this adversary proceeding, Grand Mesa's objection argued that the Transportation Agreement created covenants running with the land, and, therefore, the Court could not authorize Extraction's rejection of the Transportation Agreement. *Id.* at p. 6.

Grand Mesa's objection also argued that the Court's resolution of whether the Transportation Agreement created covenants running with the land could only be properly decided in an adversary proceeding. *Id.*

On August 19, 2020, Extraction instituted the instant adversary proceeding by filing the Complaint for Declaratory Judgment. *Complaint for Declaratory Judgment* (A. D.I. 2) ("*Extraction Complaint*") at p. 1.

4

In the Extraction Complaint, Extraction requested a declaratory judgment declaring that the Transportation Agreement did not create any covenants running with the land. *Id.* at p. 2.

On August 19, 2020, Extraction filed a motion for summary judgment and brief in support of the motion for summary judgment, and requested that the Court rule in Extraction's favor on its declaratory judgment claim as a matter of law. *Plaintiff's Motion for Summary Judgment* (A. D.I. 4) at p. 1–7; *Brief in Support of Plaintiff's Motion for Summary Judgment* (A. D.I. 5) ("*Extraction MSJ*") at p. 7–9.

On September 17, 2020, Grand Mesa filed a motion to allow its motion for permissive abstention. *Motion to Allow Defendant's Motion for Permissive Abstention* (A. D.I. 19) at p. 1.

On September 17, 2020, Grand Mesa also filed its response to Extraction's summary judgment briefing and a brief in support of Grand Mesa's permissive abstention motion. *Brief in Support of Defendant's Motion for Abstention and Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment* (A. D.I. 20) ("*Grand Mesa Response*") at p. 1.

On September 25, 2020, Extraction filed a notice informing the Court that briefing on the motion for summary judgment in the adversary proceeding was complete. *Notice of Completion of Briefing* (A. D.I. 25) at p. 1.

On September 30, 2020, Grand Mesa and Extraction participated in oral argument on Extraction's motion for summary judgment in the adversary proceeding.

On October 1, 2020, Grand Mesa filed a notice informing the Court that briefing on its permissive abstention motion in the adversary proceeding was complete. *Notice of Completion of Briefing* (A. D.I. 33) at p. 1. The Court informed the parties that oral argument was not necessary.

On October 8, 2020, the parties submitted proposed findings of fact and conclusions of law.

## CONTRACTUAL INTERPRETATION

The first recital of the Transportation Agreement states:

> WHEREAS, Grand Mesa is planning to construct, own, operate and maintain an interstate crude oil pipeline and certain associated appurtenant facilities as described in Exhibit A to this Agreement (said pipeline and all associated appurtenances and facilities, the **"Pipeline System"**) that will originate at a station to be constructed near Lucerne, Weld County, Colorado with an injection station near Kersey (Riverside Reservoir), Colorado (collectively, the **"Colorado Stations"**) and terminate at NGL Energy Partners LP's terminal in Cushing, Oklahoma (the **"Cushing Terminal"**)[.]

*Extraction MSJ* (A. D.I. 5-1), Ex. A at First Recital.

The second recital of the Transportation Agreement states:

> WHEREAS, in consideration and support of Grand Mesa's commitment to construct the Pipeline System, Shipper and Grand Mesa mutually desire to enter into this Agreement pursuant to which Shipper will commit to ship, and will ship after the Pipeline System becomes operational, specified volumes of Crude Petroleum through the Pipeline System from the Colorado stations to the Cushing Terminal and to pay a minimum payment each month in addition to

> a fee applicable to any incremental volumes shipped through the
> Pipeline System, subject to the terms and conditions set forth below[.]

*Id*. Ex. A at Second Recital.

The primary purpose of the Transportation Agreement was to govern Grand
Mesa's transportation of produced crude petroleum from Lucerne, Colorado to Cushing,
Oklahoma via Grand Mesa's pipelines in exchange for a fee from Extraction. *Id*. at First
and Second Recitals.

Section 1.1 of the Transportation Agreement states:

> As assurance for Shipper's performance under this Agreement, and
> subject to the terms and conditions of this Agreement and Shipper's
> Reservations, Shipper hereby dedicates and commits to the
> performance of this Agreement, all of Shipper's right, title and interest
> in and to: (i) the Subject Leases; (ii) the Wells; (iii) the Dedicated
> Reserves; and (iv) Shipper's Crude Petroleum all to the extent located
> within, or produced from the Dedication Area (collectively, the
> **"Dedicated Interests"**), for and during the Term of this Agreement, for
> the purpose of exclusively dedicating and committing the Dedicated
> Interests to Grand Mesa for the performance of this Agreement.

*Id*. at § 1.1.

Extraction's dedication and commitment was "to the performance of th[e]
[Transportation] Agreement" and the dedication and commitment was done "for the
purpose of exclusively dedicating and committing the Dedicated Interests to Grand Mesa
for the performance of this Agreement." *Id*.

Section 1.2 of the Transportation Agreement states:

> The dedication by Shipper described in the preceding paragraph for
> the performance of this Agreement shall be a covenant running with
> the land (and for clarity, shall also apply to any Dedicated Interests
> acquired by Shipper subsequent to the Effective Date), shall be
> deemed to touch and concern all of Shipper's oil and gas leasehold
> interests in the lands within the Dedication Area, and shall be binding
> upon all of Shipper's permitted successors and assigns. To that end,

counterparts of a recording memorandum for this Agreement, in the form attached hereto as <u>Exhibit E</u>, shall be filed of record in all counties in which any of the Dedicated Interests are located.

*Id.* at § 1.2.

The dedication is the only covenant that was specifically stating that it was intended to run with the land. *Id.* ("The dedication by Shipper described in the preceding paragraph for the performance of this Agreement shall be a covenant running with the land . . . .").

Section 2 ("Committed Volume") of the Transportation Agreement states:

**"Committed Volume"** means the first fourteen million six hundred six thousand (14,606,000) Barrels of Shipper's Crude Petroleum over the initial seven (7) year term of this Agreement and the first nine million one hundred five thirty thousand (9,135,000) Barrels of Shipper's Crude Petroleum over the additional five (5) year term of this Agreement if extended pursuant to <u>Section 6.1</u>.

*Id.* at § 2.

Section 2 ("Dedication Area") of the Transportation Agreement states:

**"Dedication Area"** means the following described lands located within Weld County, Colorado . . . .

*Id.*

Section 2 ("Dedicated Reserves") of the Transportation Agreement states:

**"Dedicated Reserves"** means all of the right, title and interest of Shipper in and to all Crude Petroleum reserves in and under the Subject Leases and the Wells Owned or Controlled by Shipper, whether now owned or hereafter acquired by Shipper.

*Id.*

Section 2 ("Shipper's Crude Petroleum") of the Transportation Agreement states:

**"Shipper's Crude Petroleum"** means all Crude Petroleum Owned or Controlled by Shipper, including, without limitation, Crude Petroleum produced from the Subject Leases and the Wells, whether now owned or hereafter acquired by Shipper. For the purposes hereof, Crude

Petroleum is **"Owned or Controlled"** by Shipper if Shipper has title to such Crude Petroleum, whether by virtue of its ownership of a Subject Lease or otherwise, or, if Shipper does not have title to such Crude Petroleum, Shipper has the right, under any joint operating agreement, unit operating agreement, or other contractual arrangement or arising by operation of the Applicable Laws, to commit and dedicate such Crude Petroleum to the performance of this Agreement.

*Id.*

Section 2 ("Shipper's Reservations") of the Transportation Agreement states, in

relevant part:

**"Shipper's Reservations"** means the following rights reserved to Shipper with respect to the Dedicated Interests: (i) to operate (or cause to be operated) the Wells in its sole discretion, including the right (but not the obligation) to drill new Wells, to repair and rework old Wells, temporarily shut in Wells, renew or extend, in whole or in part, any of the Subject Leases, and to cease production from or abandon any Well or surrender any such Subject Lease, in whole or in part, when no longer deemed by Shipper to be capable of producing Crude Petroleum or other hydrocarbons in paying quantities under normal methods of operation[.]

*Id.*

Section 2 ("Subject Leases") of the Transportation Agreement states:

**"Subject Leases"** means the oil, gas, and mineral leases (including any extensions or renewals of such leases and any new leases taken in replacement thereof prior to or within six (6) months after the expiration of any such lease), deeds, conveyances, and other instruments described in Exhibit D, as such exhibit may be amended from time to time, but only to the extent that such leases are located within the Dedication Area.

*Id.*

Section 2 ("Total Financial Commitment") of the Transportation Agreement states:

**"Total Financial Commitment"** means the aggregate of the Fixed Monthly Payment Volumes set out in Schedule A, multiplied by the per-barrel rate set out in Schedule B that is applicable to Committed Shippers at the time the calculation is made, for all months remaining in the Term.

*Id.*

Section 2 ("Wells") of the Transportation Agreement states:

> **"Wells"** means a horizontal well for the production of hydrocarbons located on the Subject Leases or on lands otherwise pooled, communitized or unitized therewith, in which Shipper owns an interest, that is either producing or intended to produce Dedicated Reserves, but expressly excluding vertical wells and further expressly excluding the wells described on Exhibit F.

*Id.*

Section 4.1 of the Transportation Agreement states:

> Commencing as of the Commencement Date and continuing thereafter during the Term of this Agreement, Shipper agrees to tender to Grand Mesa for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff.  For the avoidance of doubt, Shipper's obligation to ship or pay its Committed Volume under this Agreement is satisfied in full upon the earlier of (a) Shipper's shipment of (i) fourteen million six hundred six thousand (14,606,000) Barrels under the terms of this Agreement during the initial seven (7) year term of this Agreement and (ii) nine million one hundred thirty five thousand (9,135,000) Barrels under the terms of this Agreement during the additional five (5) year term of this Agreement if extended pursuant to <u>Section 6.1</u> or (b) by satisfaction of Shipper's Total Financial Commitment.  This Agreement shall terminate upon satisfaction of Shipper's obligations under this <u>Section 4.1</u>.

*Id.* at § 4.1.

The Transportation Agreement's purpose was the facilitation of Grand Mesa's transportation of crude petroleum from Colorado to Oklahoma in exchange for a contractual fee.  *Id.* (noting Extraction agreed to "tender to Grand Mesa for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff").

Extraction can satisfy its obligations under the Transportation Agreement by either (1) shipping certain amounts of crude petroleum or (2) payment of the Total Financial Commitment. *Id.* ("For the avoidance of doubt, Shipper's obligation to ship or pay its Committed Volume under this Agreement is satisfied in full upon the earlier of" shipment of a certain volume of crude petroleum or payment of the Total Financial Commitment).

Section 8.2 of the Transportation Agreement states:

> Unless this Agreement is terminated by Shipper due to an Event of Default by Grand Mesa (as more fully described in Section 13.3.1) or due to failure by Grand Mesa to provide Service by the Completion Due Date, as extended pursuant to Section 3.1, upon termination of this Agreement if, for any reason, Shipper has not paid to Grand Mesa the Total Financial Commitment, Shipper will pay to Grand Mesa the amount due within thirty (30) days following receipt of an invoice from Grand Mesa for such amount due. For the avoidance of doubt, the Total Financial Commitment will be satisfied by payment by Shipper of the aggregate of the Fixed Monthly Payments in accordance with the terms of this Agreement, or at Shipper's option, any payment made by Shipper to accelerate the satisfaction of that obligation. At the end of each Contract Year, Grand Mesa will provide Shipper a statement of dollars accumulated towards the Total Financial Commitment, as well as Barrels shipped to date.

*Id.* at § 8.2.

The Total Financial commitment is "satisfied by payment by [Extraction] of the aggregate of the Fixed Monthly Payments," and Extraction has the option "to accelerate the satisfaction of that obligation." *Id.*

Section 8.5 of the Transportation Agreement states, in relevant part:

> Shipper will be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the Pipeline System and after redelivery of such Crude

11

> Petroleum to Shipper or its designee at the Cushing Terminal. Grand
> Mesa shall be in control and possession of (although title will remain in
> Shipper or other person for whom Shipper has the right to transport
> Crude Petroleum) Crude Petroleum delivered by or for Shipper to the
> Pipeline System for shipment under this Agreement after delivery
> thereof into the Pipeline System and prior to redelivery thereof to
> Shipper or its designee at the Cushing Terminal.

*Id.* at § 8.5.

Extraction retained exclusive control and possession of all crude petroleum until its severance from the ground and delivery into Grand Mesa's pipeline system. *Id.* ("Shipper will be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the Pipeline System and after redelivery of such Crude Petroleum to Shipper or its designee at the Cushing Terminal.").

Extraction retained title to the crude petroleum throughout transportation, and Grand Mesa never obtained title to the crude petroleum at any point. *Id.* ("Grand Mesa shall be in control and possession of (although title will remain in Shipper or other person for whom Shipper has the right to transport Crude Petroleum) Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement after delivery thereof into the Pipeline System . . . .").

The real property implicated under the Transportation Agreement is located in Colorado. *Id.* at § 2 (defining the Dedication Area).

12

## CONCLUSIONS OF LAW

## JURISDICTION

The Court has jurisdiction over this matter.  28 U.S.C. §§ 157 and 1334.

Neither Extraction nor Grand Mesa has challenged the Court's jurisdiction. *Extraction Complaint* (A. D.I. 2) at p. 2; *Grand Mesa Response* (A. D.I. 20) at p. 1–6.

## DECLARATORY JUDGMENT

Declaratory judgment is appropriate because there is an actual controversy between the parties: Extraction and Grand Mesa dispute whether the Transportation Agreement creates covenants running with the land in the context of Extraction's rejection of the Transportation Agreement.  28 U.S.C § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").

In its objection to the Rejection Motion, Grand Mesa argued that Extraction's attempt to reject the Transportation Agreement was improper because the contract created a covenant running with the land. *Grand Mesa Objection* (D.I. 363) at p. 5–6.

Grand Mesa argues that the Transportation Agreement created a covenant running with the land in the adversary proceeding and that this insulates the contract from rejection. *Grand Mesa Response* (A. D.I. 20) at p. 1–2.

Extraction argues the Transportation Agreement did not create a covenant running with the land. *Extraction Complaint* (A. D.I. 2) at p. 7.

There is a justiciable controversy because the parties dispute the nature of their rights and obligations under the Transportation Agreement.  28 U.S.C § 2201(a).

## CHOICE OF LAW

Colorado law governs the substantive real property questions in this case.  *Wolf v. Burke*, 32 P. 427, 429 (Colo. 1893) ("[T]he rights and titles to real property are governed by the law of the situs . . . ."); *United States v. Novotny*, 184 F. Supp. 2d 1071, 1087 (D. Colo. 2001) ("Colorado law applies to issues relating to the conveyance and ownership of real property located within Colorado.") (citation simplified).

## SUMMARY JUDGMENT

Summary judgment is appropriate when there are no genuine issues of material fact.  Fed. R. Civ. P. 56(a) (noting the "[C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact."); *Tamarind Resort Associates v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998) ("[I]t is a fundamental principle of contract law that 'disputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment.'").

Grand Mesa has not raised any genuine issue of material fact concerning whether the Transportation Agreement creates a covenant running with the land.  *Grand Mesa Response* (A. D.I. 20) at p. 14–21.

Any ambiguity concerning whether the terms of the Transportation Agreement created a covenant running with the land would be resolved in favor of the unrestricted use of the land. *B.B. & C. P'ship v. Edelweiss Condo. Ass'n*, 218 P.3d 310, 315 (Colo. 2009) ("When the covenant is unclear, courts resolve all doubts against the restriction and in favor of free and unrestricted use of property.").

The Transportation Agreement's terms are unambiguous. *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 120 (Colo. 2016) ("A contractual term is ambiguous 'if it is susceptible on its face to more than one reasonable interpretation.'").

The Court may resolve the question of whether the Transportation Agreement created a covenant running with the land as a matter of law. *Holiday Acres Prop. Owners Ass'n, Inc. v. Wise*, 998 P.2d 1106, 1108 (Colo. App. 2000), as modified on denial of reh'g (July 6, 2000) (noting the "[i]nterpretation and construction of covenants is a question of law"); *Pulte Home Corp., v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 826 (Colo. 2016) ("Covenants and other recorded instruments, like contracts, should be construed as a whole 'seeking to harmonize and give effect to all provisions so that none will be rendered meaningless.'").

## COVENANTS RUNNING WITH THE LAND.

The Transportation Agreement's terms unambiguously do not create covenants running with the land. *Extraction MSJ* (A. D.I. 5-1), Ex. A.

Colorado law disfavors the creation of covenants running with the land as a derogation of the common law's preference for the free alienability of land. *Nelson v. Farr*, 354 P.2d 163, 166 (Colo. 1960) ("[A]s a fundamental principle of law of real property,

restrictions on the alienation and use of land are not favored, and all doubt should be resolved in favor of the free use of property . . . . 'Restrictions on the use of property, being in derogation of the fee conveyed, will not be extended by implication to include anything not clearly expressed.'").

To create a covenant running with the land, the parties must intend to create a covenant running with the land and the covenant must touch and concern the land with which it runs. *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (concerning intent and touch and concern).

In addition, to create a covenant running with the land, there must be privity of estate between the original covenanting parties at the time of the covenant's creation. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) (same); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (same).

Failure to satisfy any one of the elements needed to create a covenant running with the land means a covenant cannot run with the land as a matter of law. *See Cloud v. Ass'n of Owners, Inc.*, 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment.").

Contracting parties cannot create covenants running with the land by agreement alone; party intent is necessary for a covenant to run with the land, but such intent is not sufficient. *Id*. ("Even if there is an intent to make a covenant run with the land, the

covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment."); *Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 74 (Colo. App. 1993) ("In order for a covenant to run with the land, not only must the parties to the covenant intend that it do so . . . but the covenant must 'touch and concern' the land.").

The Transportation Agreement does not create covenants that run with the land because these covenants fail to touch and concern Extraction's mineral estates and the original parties were not in privity of estate at the time of the creation of the covenants.

## I.    Intent.

To create covenants running with the land, parties must express an intent to create covenants running with the land in clear and unambiguous terms. *TBI Expl. v. Belco Energy Corp.*, No. 99-10872, 2000 WL 960047, at *4 (5th Cir. June 14, 2000) (applying Colorado law and stating "[I]n the cases that have recognized a covenant running with the land, the covenants were in express terms."); *MidCities Metro. Dist. No. 1 v. U.S. Bank Nat. Ass'n*, 12-CV-03322-LTB, 2013 WL 3200088, at *3 (D. Colo. June 24, 2013) (applying Colorado law and noting that if a covenant is ambiguous, the Court must "resolve all doubts against the restriction and in favor of free and unrestricted use of property.").

The only covenant in the Transportation Agreement that the parties clearly intended to run with the land is the dedication for the performance of the Transportation Agreement in Section 1.1. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.2 ("The dedication by Shipper described in the preceding paragraph for the performance of this Agreement shall be a covenant running with the land . . . .").

The parties intended the dedication to run with Extraction's mineral estates.  *Id.* ("The dedication by Shipper described in the preceding paragraph for the performance of this Agreement . . . shall be deemed to touch and concern all of Shipper's oil and gas leasehold interests in the lands within the Dedication Area, and shall be binding upon all of Shipper's permitted successors and assigns.").

The parties did not clearly express an intent for other covenants in the Transportation Agreement to run with the land.  *Id.* ("The dedication by Shipper described in the preceding paragraph for the performance of this Agreement shall be a covenant running with the land . . . .").

## II.    Touch and Concern.

To satisfy touch and concern, the covenant intended to run with the land—the dedication—must closely relate to land with which it is intended to run (here, Extraction's mineral estates), its use, or enjoyment.  *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment.'").

"The 'touch and concern' requirement is fulfilled when the covenant operates to benefit the physical use of the land . . . ."  *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991), *rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855 P.2d 1368 (Colo. 1993) (noting a subordination agreement was a personal covenant that did not run with the land because "the parties' entitlement to physical use of the land was not increased, nor was improvement made to the land as a result of subsequent loan proceeds").

Colorado generally follows the common law approach to the touch and concern element. 3 Tiffany Real Property § 854 (3d ed. 2015) ("An important test for distinguishing a real or running covenant from a merely personal or collateral one, is whether or not the covenant so closely relates to the land or estate granted . . . that it may be said to 'touch and concern' it.").

Touch and concern is an objective analysis of a covenant's effect upon land and the element does not turn on party intent or word choice.  *Cloud v. Ass'n of Owners,* 857 P.2d 435, 440 (Colo. App. 1992) ("Even if there is an intent to make a covenant run with the land, the covenant must still 'touch and concern' the land, that is, it must closely relate to the land, its use, or its enjoyment."); *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 875 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[T]he appellants have not purchased the minerals underlying the Dedicated Areas but, again, have merely agreed to provide services to the minerals' owner.  The logical extension of Nordheim's argument—that any agreement relating to minerals in the ground constitutes the conveyance of a real property interest—is not supported by the cited caselaw."); 21 C.J.S. Covenants § 34 ("[T]he intent of the parties is not dispositive, insofar as obligations arising from restrictive covenants that are inherently personal cannot be made appurtenant to the land[.]"); 9 Richard R. Powell, Powell on Real Property § 60.04(3)(a) ("The touch and concern requirement is the only essential requirement for the running of covenants which focuses on an objective analysis of the contents of the covenant itself rather than the intentions of and relationships between the parties.").

Grand Mesa argues that the Transportation Agreement and its covenants also touch and concern the land. In support, Grand Mesa cites to Colorado law, which provides that a covenant touches and concerns the land if it is "closely tied with the use, possession and enjoyment" of the land. *Reishus v. Bullmasters, LLC*, 409 P.3d 435 (Colo. App. 2016) (citing Lookout Mountain, 867 P.2d at 74-75). The stated purposes of the Transportation Agreement are to: gain access to the Grand Mesa pipeline system, with sufficient expanded volume capacity to ship Plaintiff's crude produced from the Dedicated Interests (Transportation Agreement 3rd and 4th Recitals and § 10), establish a tariff rate for the cost of shipment (*Id*. at § 7), and obtain priority service on the Grand Mesa pipeline system (*Id*. at § 10.2).

Grand Mesa argues that being able to ship the oil Extraction produces from the Dedicated Interests at stable volumetric rates, for a predictable fee with priority service undoubtedly adds to the enjoyment of Extraction's use and possession of its dedicated leases and wells. In fact, Grand Mesa argues, to further secure these benefits to the Dedicated Interests, the "Original Transportation Services Agreement" was renegotiated and amended (see *Id*. at 3rd and 4th Recitals and § 7.1.5), and replaced by the Transportation Agreement. *Id*. at § 10.2.

The Court disagrees that the Dedicated Interests set forth in the Transportation Agreement satisfy the "touch and concern" element under Colorado law.

### A.    The Dedication to the performance of the agreement.

The dedication and commitment in Section 1.1 was "to the performance of th[e] [Transportation] Agreement" and the provision was included "for the purpose of exclusively dedicating and committing the Dedicated Interests to Grand Mesa for the performance of this Agreement." *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1.

Under the Transportation Agreement, Grand Mesa committed to transport a certain volume of Extraction's crude petroleum from Lucerne, Weld County, Colorado to Cushing, Oklahoma in exchange for a contractual fee. *Id.* at § 4.1 (noting Extraction agreed to "tender to Grand Mesa for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff"); *Id.* at First Recital (discussing the contract in general).

### B.    The dedication and commitment effects personal, and not real, property.

The dedication and commitment in Section 1.1 does not change the nature of the covenants contained in the Transportation Agreement; it simply identifies the produced minerals subject to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1; *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) (holding a similar contract merely "identif[ies] and delineat[es] the [parties'] contractual rights and obligations").

The dedication does not touch and concern Extraction's mineral estates because it concerns only personal property and does not affect the physical use of real property or closely relate to real property. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1.

Neither party argues that the Transportation Agreement employed the conventional legal definition of a dedication, which would have meant that the parties intended the donation of Extraction's real property to the public use. *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("[A] dedication has been defined as an appropriation of land by the owner of the fee to some public use and the adoption thereof by the public."); Dedication, *Black's Law Dictionary* (11th ed. 2019) (defining "dedication" as "[t]he donation of land or creation of an easement for public use").

The plain and ordinary meaning of the word "dedicate" is "to set apart to a definite use." *Dedicate*, *Id.*

The plain and ordinary meaning of "commit" is "to pledge . . . to some particular course or use." *Commit*, *id.*

In accordance with this plain language, the dedication in Section 1.1 identifies the particular produced crude petroleum that is subject to, set apart for, pledged or committed to the parties' contractual obligations under the contract for transportation services. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1 ("As assurance for Shipper's performance under this Agreement, and subject to the terms and conditions of this Agreement and Shipper's Reservations, Shipper hereby dedicates and commits to the performance of this Agreement, all of Shipper's right, title and interest in and to: (i) the Subject Leases; (ii) the Wells; (iii) the Dedicated Reserves; and (iv) Shipper's Crude Petroleum all to the extent located within, or produced from the Dedication Area (collectively, the **"Dedicated Interests"**), for and during the Term of this Agreement, for

the purpose of exclusively dedicating and committing the Dedicated Interests to Grand Mesa for the performance of this Agreement.").

Throughout the Transportation Agreement, terms making up the Dedicated Interests—the Subject Leases, the Wells, the Dedicated Reserves, and Shipper's Crude Petroleum—are used to identify the particular produced crude petroleum that is subject to, set apart for, pledged or committed to the parties' contractual obligations. *Id.* (describing the Subject Leases as "the oil, gas, and mineral leases . . ., deeds, conveyances, and other instruments described in <u>Exhibit D</u> . . . but only to the extent such leases are located within the Dedication Area."); *Id.* (describing the Wells as "a horizontal well for the production of hydrocarbons located on the Subject Leases or on lands otherwise pooled . . . in which [Extraction] owns an interest, that is either producing or intended to produce Dedicated Reserves, but expressly excluding vertical wells and further expressly excluding the wells described on Exhibit F"); *Id.* (describing the Dedicated Reserves as "all of the right, title and interest of [Extraction] in and to all Crude Petroleum reserves in and under the Subject Leases and the Wells Owned or Controlled by [Extraction] . . . ."); *Id.* (describing Shipper's Crude Petroleum as "all Crude Petroleum Owned or Controlled by Shipper, including, without limitation, Crude Petroleum produced from the Subject Leases and the Wells, whether now owned or hereafter acquired by Shipper").

Dedications, generally, only identify the particular produced minerals subject to, set apart for, pledged or committed to the parties' contractual obligations under midstream agreements. *Cf. In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 81 (Bankr. S.D.N.Y.

2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[The] 'dedication' [is not] a burdening of the Debtors' property interests, but rather an identification of what property and products are the subject of the Agreement and will be made available . . . in furtherance of the purposes of the Agreements."); *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1170 (10th Cir. 1999) (noting that dedication contracts are contracts "wherein the producer 'contracts to furnish the purchaser all the gas produced from specified reserves, thus dedicating those reserves to the customer'"); *Nordan-Lawton Oil & Gas Corp. of Tex. v. Miller*, 272 F. Supp. 125, 129 (W.D. La. 1967), *aff'd*, 403 F.2d 946 (5th Cir. 1968) ("In this contract the lessee 'dedicated' all the reserves under the Miller lease to the pipeline company which in essence means that the company was given exclusive rights to purchase the reserves under the premises when and if produced."); Latham & Watkins LLP, The Book of Jargon, Oil & Gas, The Latham & Watkins Glossary to Oil and Gas Terminology (1st ed. 2016) at 24 (defining a dedication as "a promise or commitment of a certain amount of Production from a Dedicated Area . . . to the services provider in a Midstream service agreement").

Produced minerals, such as crude petroleum, are personal property and are not real property. *Smith v. El Paso Gold Mines, Inc.*, 720 P.2d 608, 609 (Colo. App. 1985) ("[A]t some point after they are severed from the land, minerals lose their character as realty and 'become' personalty.").

The dedication does not limit Extraction's rights to the use of its mineral estates. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 2 (reserving to Extraction the right to operates its Wells in its sole discretion, including the ability to cease production).

Extraction retained exclusive control and possession of all crude petroleum until its severance from the ground and delivery into Grand Mesa's pipeline system. *Id.* at § 8.5 ("Shipper will be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the Pipeline System and after redelivery of such Crude Petroleum to Shipper or its designee at the Cushing Terminal.").

Extraction retained title to the crude petroleum throughout the entire transportation process, and Grand Mesa never obtained title to the crude petroleum at any point. *Id.* ("Grand Mesa shall be in control and possession of (although title will remain in Shipper or other person for whom Shipper has the right to transport Crude Petroleum) Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement after delivery thereof into the Pipeline System . . . .").

Extraction retained the right "to operate (or cause to be operated) the Wells in its sole discretion" and this included the rights "to drill new Wells, to repair and rework old Wells, temporarily shut in Wells . . . and to cease production from or abandon any Well or surrender any such Subject Leases . . . ." *Id.* at § 2.

Also, the contractual obligations—the performance of which this dedication was made—require the delivery of a certain volume of produced crude petroleum to Grand Mesa for the provision of transportation services from Colorado to Oklahoma in exchange for a fee, or the payment of a certain amount of money. *Id.* at First Recital; *Id.* at Second Recital; *Id.* at § 4.1.

The provision of such services does not affect the use or enjoyment of crude petroleum in place, or the use of the mineral estate, but crude petroleum that has been severed from the mineral estate and now constitutes the personal property of Extraction, as a merchant in this commodity.  As a result, the covenants in the Transportation Agreement do not benefit Extraction in its capacity as a landowner, but benefit and affect Extraction's use of its personal property (*i.e.*, its produced crude petroleum).  *Cf.* Harry Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914).

Even assuming that the Transportation Agreement has an indirect effect upon Extraction's mineral estates, such as an incidental increase in value, this effect is not closely related to the mineral estates and, therefore, cannot satisfy touch and concern, as its primary effect is on the use and enjoyment of personal property, and not real property. *Reishus v. Bullmasters, LLC*, 409 P.3d 435, 440 (Colo. 2016) (noting "[a] covenant touches and concerns the land if it 'closely relate[s] to the land, its use, or enjoyment'"); *cf.* Harry Bigelow, *The Content of Covenants in Leases*, 12 Mich. L. Rev. 639, 652 (1914) (explaining that indirect effects are insufficient).

The "dedication" and "commitment" of real property interests to the performance of contractual obligations and services that closely relate to and affect only the use and enjoyment of personal property does not change this result.  To hold otherwise would render the objective "touch and concern" element beholden to the subjective intent of the parties, and allow parties to convert covenants that do not closely relate to real property into covenants that bind successors and assigns simply by recitation of a set phrase.

Extraction's tender options confirm that the Transportation Agreement does not closely relate to Extraction's mineral estates.  Extraction may fully perform without providing crude petroleum produced from its own mineral estates and may instead provide crude petroleum produced from the land of third parties. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 4.1 (reciting Extraction's agreement to "tender to Grand Mesa for transportation, or otherwise to pay for the transportation of, the Committed Volume in accordance with the tender procedures set forth in the Tariff"); *Id*. at § 2 (noting the "Committed Volume" is a set amount of crude petroleum that must be delivered within certain timeframes).

Extraction's payment option also confirms that the Transportation Agreement's covenants do not closely relate to Extraction's mineral estates.  *Id*. at §§ 4.1 and 8.2.

Extraction could satisfy its obligations under the Transportation Agreement by either (1) shipping certain amounts of crude petroleum or (2) payment of the Total Financial Commitment.  *Id*. at § 4.1 ("For the avoidance of doubt, Shipper's obligation to ship or pay its Committed Volume under this Agreement is satisfied in full upon the earlier of" shipment of a certain volume of crude petroleum or payment of the Total Financial Commitment).

Payment of the Total Financial Commitment is purely the payment of a specified amount of money set forth in the Transportation Agreement.  *Id*. ("For the avoidance of doubt, Shipper's obligation to ship or pay its Committed Volume under this Agreement is satisfied in full upon the earlier of (a) [shipment of certain amounts of Crude Petroleum within certain timeframes] or (b) by satisfaction of Shipper's Total Financial

Commitment.  This Agreement shall terminate upon satisfaction of Shipper's obligations under this Section 4.1.").

Moreover, Extraction can accelerate payment of the Total Financial Commitment and relieve itself of any obligation to provide crude petroleum.  *Id*. at § 8.2 ("For the avoidance of doubt, the Total Financial Commitment will be satisfied by payment by Shipper of the aggregate of the Fixed Monthly Payments in accordance with the terms of this Agreement, or at Shipper's option, any payment made by Shipper to accelerate the satisfaction of that obligation.").

The payment of money is a personal commitment that does not touch and concern Extraction's mineral estates.  *Bigelow v. Nottingham*, 833 P.2d 764, 767 (Colo. App. 1991), *rev'd in part sub nom. on other grounds Haberl v. Bigelow*, 855 P.2d 1368 (Colo. 1993) (holding that a subordination agreement was a personal covenant that did not run with the land because "the parties' entitlement to physical use of the land was not increased, nor was improvement made to the land as a result of subsequent loan proceeds").

Grand Mesa's own arguments reveal that the Transportation Agreement only touches and concerns personal property.  *Grand Mesa Response* (A. D.I. 20) at p. 18 (arguing the "stated purposes of the [Transportation Agreement] are to: gain access to the Pipeline System, with sufficient expanded volume capacity to ship Plaintiff's crude produced from the Dedicated Interests . . ., establish a tariff rate for the cost of shipment . . ., and obtain priority service on the Pipeline System . . . .").

The dedication contained in the Transportation Agreement does not closely relate to, or affect the use or enjoyment of Extraction's mineral estates.  As a result, it does not

touch and concern Extraction's mineral estates, and the Transportation Agreement does not create covenants that run with the land.

## III.    Privity of Estate.

The Court is bound to apply Colorado law as declared by the Colorado Supreme Court until the Colorado Supreme Court overrules its prior holdings. *Erie County v. Am. States Ins. Co.*, 573 F. Supp. 479, 486 (W.D. Pa. 1983) ("While plaintiff questions the continuing vitality of *Gordon,* we are bound to consider the [Pennsylvania] Supreme Court's undisturbed holding in *Gordon* as good law on this point."), *aff'd*, 745 F.2d 45 (3d Cir. 1984) *and aff'd sub nom. Am. States Ins. Co. v. Santafemia*, 745 F.2d 45 (3d Cir. 1984); *cf. Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

The Colorado Supreme Court requires privity of estate between the covenanting parties at the time of the covenant's creation before the covenant may run with the land. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (noting "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant"); *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) ("[W]here there is the requisite privity of estate, and the covenant is connected with or concerns the land or estate conveyed, then a covenant imposing a burden will run with the land as readily as one conferring a benefit."); *Hottell v. Farmers' Protective Ass'n*, 53 P. 327, 330 (Colo. 1898) (concluding a

covenant running with the land was created, in part, because privity of estate was not denied).

Colorado appellate courts confirm that Colorado law requires privity of estate. *Fed. Deposit Ins. Corp. v. Mars*, 821 P.2d 826, 829 (Colo. App. 1991) ("For contractual obligations between a lessor and lessee to pass to a successor in title of the lessee, there must be either privity of contract or privity of estate between the lessor and that successor in title."); *Fisk v. Cathcart*, 33 P. 1004, 1005 (Colo. App. 1893) ("Under these circumstances, there is no privity between him as a grantee from Beecher and the prior grantors subsequent to Parker which entitles him to maintain his suit upon his covenant.").

Colorado statutory law identifies several covenants that necessarily run with the land, provided that those covenants satisfy privity of estate between the covenanting parties. Colo. Rev. Stat. § 38-30-121 ("Covenants of seisin, peaceable possession, freedom from encumbrances, and warranty contained in any conveyance of real estate, or any interest therein, shall run with the premises and inure to the benefit of all subsequent purchasers and encumbrancers.").

Real property treatises continue to cite Colorado Supreme Court cases for the proposition that privity of estate between the covenanting parties is required. 3 Tiffany Real Property § 851 n. 27 (3d ed. 2015) (citing *Taylor* for the proposition that privity of estate at the time of the creation of the covenant is required); *see also* 9 Richard R. Powell, Powell on Real Property § 60.04 n. 123 (citing *Farmers' High Line* for the proposition that either mutual or horizontal privity are required for a covenant to run with the land).

Grand Mesa has not identified a single Colorado case from the Colorado Supreme Court holding that Colorado law no longer requires the privity of estate between the covenanting parties. *Grand Mesa Response* (A. D.I. 20) at p. 14–21.

The Restatement (Third) of Property does not restate Colorado law regarding covenants that run with the land, and Colorado has not adopted the reforms suggested therein. *See* Restatement (Third) of Property Servitudes § 3.2 (Am. Law Inst. 2000) (dispensing with the required touch and concern element and stating "[n]either the burden nor the benefit of a covenant is required to touch or concern land in order for the covenant to be valid as a servitude.").

Privity of estate requires that any covenant that allegedly runs with the land be accompanied by a contemporaneous conveyance of some interest in the land with which the covenant runs. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (noting "the requisite privity exists in the case of a covenant by a grantor to do or not to do something on land retained by him, adjoining that conveyed, so that one to whom the former is subsequently conveyed by him may be bound by the covenant"); 9 Richard R. Powell, Powell on Real Property § 60.04(3)(c)(iii) ("'Horizontal privity' typically exists when the original covenanting parties make their covenant in connection with the conveyance of an estate in fee from one of the parties to the other. The covenant and the conveyance must be made at the same time . . . ."); 3 Tiffany Real Property § 851 (3d ed. 2015) (describing "privity of estate between the covenantor and the covenantee at the time the covenant was created").

31

The conveyance contemplated by privity of estate cannot be satisfied by the purported covenant running with the land itself; there must be a conveyance of some independent real property interest. *Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co.*, 92 P. 290, 293 (Colo. 1907) ("[W]here there is the requisite privity of estate, and the covenant is connected with or concerns the land or estate conveyed, then a covenant imposing a burden will run with the land as readily as one conferring a benefit.").

The Transportation Agreement did not convey to Grand Mesa any real property interest in Extraction's mineral estate. *Extraction MSJ* (A. D.I. 5-1), Ex. A.

Grand Mesa failed to identify any real property interest in Extraction's mineral estate that was purportedly conveyed contemporaneously with the alleged covenant running with the land. *Grand Mesa Response* (A. D.I. 20) at p. 14–21.

The dedication is not a conveyance of a real property interest in Extraction's mineral estates capable of satisfying privity of estate. *Stagecoach Prop. Owners Ass'n v. Young's Ranch*, 658 P.2d 1378, 1381 (Colo. App. 1982) ("This regulation clearly contemplates a 'conveyance' and not a 'dedication' which terms are not synonymous.").

As discussed above, the dedication simply identifies the particular produced crude petroleum that is subject to the parties' contractual obligations. *Extraction MSJ* (A. D.I. 5-1), Ex. A at § 1.1; *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018).

The Transportation Agreement's dedication was not intended to convey any real property interest implicated thereunder; Extraction still owns real property interests that

32

it dedicated to the performance of the Transportation Agreement. *Id*. at §1.1 (dedicating and committing to the performance of the agreement "all of Shipper's right, title and interest in and to: (i) the Subject Leases; (ii) the Wells; (iii) the Dedicated Reserves; and (iv) Shipper's Crude Petroleum").

Extraction retains its rights, title, and interest in its leases. *Id*. at § 2 (reserving to Extraction the right to "renew or extend, in whole or in part, any of the Subject Leases, and to cease production from or abandon any Well or surrender any such Subject Lease, in whole or in part, when no longer deemed by Shipper to be capable of producing Crude Petroleum or other hydrocarbons in paying quantities under normal methods of operation").

Extraction retains its rights, title, and interest in its wells. *Id*. at §1.1 (reserving to Extraction the right "to operate (or cause to be operated) the Wells in its sole discretion, including the right (but not the obligation) to drill new Wells, to repair and rework old Wells, temporarily shut in Wells, renew or extend, in whole or in part, any of the Subject Leases, and to cease production from or abandon any Well or surrender any such Subject Lease . . . .").

Extraction retains its rights, title and interest in its dedicated reserves and unproduced crude petroleum. *Id*. (reserving to Extraction the right "to operate (or cause to be operated) the Wells in its sole discretion, including the right (but not the obligation) to drill new Wells, to repair and rework old Wells, temporarily shut in Wells, renew or extend, in whole or in part, any of the Subject Leases, and to cease production from or abandon any Well or surrender any such Subject Lease . . . ."); *Id*. at § 8.5 ("Shipper will

be deemed to be in exclusive control and possession of the Crude Petroleum delivered by or for Shipper to the Pipeline System under this Agreement prior to and until such Crude Petroleum is delivered into the Pipeline System and after redelivery of such Crude Petroleum to Shipper or its designee at the Cushing Terminal."); *Id.* ("Grand Mesa shall be in control and possession of (although title will remain in Shipper or other person for whom Shipper has the right to transport Crude Petroleum) Crude Petroleum delivered by or for Shipper to the Pipeline System for shipment under this Agreement after delivery thereof into the Pipeline System . . . .").

As a result, the original covenanting parties to the Transportation Agreement were not in privity of estate at the time of the creation of the covenants therein, and the Transportation Agreement contains no covenants that run with the land. *Taylor v. Melton*, 274 P.2d 977, 988–89 (Colo. 1954) (requiring privity of estate between the covenanting parties).

## PERMISSIVE ABSTENTION

Grand Mesa argues that the Complaint is a non-core, state law predicated action, which requires a determination of a real property law issue arising in Colorado, governed by Colorado law, and related to property located in Colorado. Grand Mesa further argues that the Complaint involves a determination of an unsettled issue under Colorado law, with implications that go beyond solely the Plaintiff's property rights in this case. Thus, it concludes that this Court should exercise its discretion to permissively abstain.

The Court disagrees. Permissive abstention is not warranted. *In re Cubic Energy, Inc.*, 603 B.R. at 755.

34

Generally, abstention is an extraordinary exception to the Court's responsibility to rule on the matters before it. *In re Venoco, LLC*, 596 B.R. 480, 492 (Bankr. D. Del. 2019) (citation simplified) ("The Court recognizes that abstention is an extraordinary exception to its responsibility to rule on matters before it. The Court is therefore generally reluctant to abstain from a case properly before it.").

The Third Circuit has identified twelve factors for consideration when assessing whether permissive abstention is appropriate. *In re Cubic Energy, Inc.*, 603 B.R. 743, 755 (Bankr. D. Del. 2019) ("The Third Circuit has identified twelve factors when considering whether permissive abstention is appropriate. These factors include the: (1) effect or lack thereof on the efficient administration of the estate, (2) extent to which state law issues predominate over bankruptcy issues, (3) difficulty or unsettled nature of the applicable state law, (4) presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) jurisdictional basis, if any, other than 28 U.S.C. § 1334(c)(1), (6) degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) substance rather than form of an asserted 'core' proceeding, (8) feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) burden of the court's docket, (10) likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) existence of a right to a jury trial, and (12) presence in, the proceeding of non-debtor parties.).

"The Court's analysis of the relevant factors 'is not a mathematical formula.' And this list is not exhaustive." *In re Cubic Energy, Inc.*, 603 B.R. at 755.

Permissive abstention involves an equitable consideration of the circumstances and is not formulaic. *In re Maxus Energy Corp.*, 597 B.R. 235, 247 (Bankr. D. Del. 2019), *leave to appeal denied*, 611 B.R. 532 (D. Del. 2019) ("Permissive abstention is not formulaic and involves an equitable consideration of the circumstances and weighing of the factors.").

Grand Mesa's (1) argument concerning the necessity and propriety of an adversary proceeding; and (2) agreement to respond to the motion for summary judgment warrant denial of Grand Mesa's request for permissive abstention. *Id.* ("Permissive abstention is not formulaic and involves an equitable consideration of the circumstances and weighing of the factors.").

A vast majority of the Third Circuit's twelve factors also favor the Court's exercise of its jurisdiction and refusal of Grand Mesa's request for permissive abstention. *In re Cubic Energy, Inc.*, 603 B.R. at 755.

## I.   Permissive Abstention - First Factor.

The first factor concerning the "effect or lack thereof on the efficient administration of the estate" strongly weighs against abstention. *Id.*

The Court has an obligation to exercise its jurisdiction because resolution of the issues in the adversary proceeding affects the claims resolution process; Grand Mesa requested this adversary proceeding to be filed because it sought to avoid rejection based on the presence of an alleged covenant running with the land. *In re Welded Constr., L.P.*, 609 B.R. 101, 113 (Bankr. D. Del. 2019) (noting the "bankruptcy court has an inherent responsibility to exercise its jurisdiction to effectuate one of the core features of the bankruptcy process itself—the claims resolution process").

Abstaining from deciding the matters in this adversary proceeding would be an inefficient use of resources. Briefing on the motion for summary judgment is complete, and Grand Mesa raises no genuine issues of material fact. The parties have participated in oral argument on the motion for summary judgment, and the issue has been submitted to the Court for adjudication. Other adversary proceedings currently pending before this Court also involve application of this same area of Colorado law in the context of the rejection of oil and gas midstream agreements, and will be decided regardless of the Court's abstention in this adversary proceeding. Permissively abstaining from resolution of these issues while they are relitigated in Colorado state court to a non-appealable judgment could potentially delay resolution of the adjudication of the Debtors' rejection of the contract at issue for several months, if not over a year. *In re Maxus Energy Corp.*, 597 B.R. at 247 ("Granting [the] [m]otion would require two separate courts to consider a similar set of operative facts [and legal issues] concerning related defendants and with respect to similar issues. This would neither conserve judicial resources nor avoid . . . inconsistent rulings—traditional arguments for abstention.").

## II.    Permissive Abstention - Second Factor.

The second factor concerning whether "state law issues predominate" likely weighs in favor of abstention, but is of lesser significance. *In re Venoco, LLC*, 596 B.R. 480, 493 (Bankr. D. Del. 2019), aff'd, 610 B.R. 239 (D. Del. 2020) ("Clearly, state law issues predominate, which favors the Defendants. The Court is, however, very accustomed to deciding state law issues which somewhat reduces the significance of this factor.").

III.     **Permissive Abstention - Third Factor.**

The third factor concerning the "difficulty or unsettled nature of the applicable state law" weighs against abstention. *In re Cubic Energy, Inc.*, 603 B.R. at 755.

The law is settled; Colorado has consistently applied the traditional common law elements for covenants that run with the land to decide similar cases since before it was a state. *See Hayes v. New York Gold Min. Co.*, 2 Colo. 273, 279 (1874) (concluding a promise affected "the quality and value of the premises demised, and [was] therefore within the definition of real covenants which run with the land").

Bankruptcy courts are competent to resolve these issues. *In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 61 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018).

IV.     **Permissive Abstention - Fourth Factor.**

The fourth factor concerning the "presence of a related proceeding commenced in state court or other non-bankruptcy court" weighs against abstention. *In re Cubic Energy, Inc.*, 603 B.R. at 755.

Grand Mesa concedes there is no pending non-bankruptcy case. *Grand Mesa Response* (A. D.I. 20) at p. 11.

V.     **Permissive Abstention - Fifth Factor.**

The fifth factor concerning the jurisdictional basis, if any, other than section 1334 weighs against abstention. *In re Cubic Energy, Inc.*, 603 B.R. at 755.

This proceeding arises from the chapter 11 case and seeks a declaratory judgment that the Transportation Agreement does not create covenants running with the land in

order to support Extraction's motion to reject the contract (and in response to Grand Mesa's objection). *Extraction Complaint* (A. D.I. 2) at 7.

First, the adversary proceeding is a core proceeding because Extraction's ability to reject the Transportation Agreement under the Bankruptcy Code is at issue, which directly implicates the administration of the estate. *In re DBSI, Inc.*, 409 B.R. 720, 727 (Bankr. D. Del. 2009) ("In short, a 'core' proceeding 'must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment although of necessity there may be peripheral state law involvement.'"); 28 U.S.C. § 157(b)(2)(A) (stating that core proceedings include "matters concerning the administration of the estate").

Second, the adversary proceeding is a core proceeding because Grand Mesa asserts that the Transportation Agreement creates covenants running with the land in objection to Extraction's ability to reject the Transportation Agreement. *In re DBSI, Inc.*, 409 B.R. at 728 ("Moreover, even if the instant proceeding does not fall within one of § 157(b)(2)'s enumerated categories, I find that it is a 'core' proceeding. Republic challenges the effect of orders that sought to reject certain leases and assume and assign certain subleases pursuant to § 365. The rejection and assumption and assignment of leases and executory contracts are fundamental issues of bankruptcy law unique to the Bankruptcy Code.").

Moreover, the relationship between the resolution of the adversary proceeding and rejection is such that this factor favors Extraction. *In re Venoco, LLC*, 596 B.R. 480, 493 (Bankr. D. Del. 2019) (citation simplified) ("[E]ven if the adversary proceeding is non-

core, the relationship to the Chapter 11 case is [of] such strength that the advantage remains with Debtors.").

## VI.    Permissive Abstention - Sixth Factor.

The sixth factor concerning the "degree of relatedness or remoteness of the proceeding to the main bankruptcy case" strongly weighs against abstention.  *In re Cubic Energy, Inc.*, 603 B.R. at 755.

This adversary proceeding was filed in response to Grand Mesa's objection raising the purported creation of a covenant running with the land and to facilitate the Court's resolution of Grand Mesa's objection to the rejection of its executory contract.  *Grand Mesa Objection* (D.I. 363) at p. 6.

## VII.    Permissive Abstention - Seventh Factor.

The seventh factor concerning the "substance rather than form of an asserted 'core' proceeding" likely weighs in favor of abstention because of the adversary proceeding's state law focus.  *In re Cubic Energy, Inc.*, 603 B.R. at 755.

## VIII.    Permissive Abstention - Eighth Factor.

The eighth factor concerning the "feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court" either weighs against abstention or is neutral.  *Id.*

It is not efficient to sever this proceeding from the motion to reject.  *See In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 73 (Bankr. S.D.N.Y. 2016), *aff'd*, 567 B.R. 869 (S.D.N.Y. 2017), *aff'd*, 734 Fed. Appx. 64 (2d Cir. 2018) ("[B]ifurcating the motion to reject and further proceedings to finally resolve the underlying property law dispute is an inefficient use of

judicial and private resources; it would have been far preferable for the Court to hear the two together.").

## IX.    Permissive Abstention - Ninth Factor.

The ninth factor concerning the "burden of the court's docket" is neutral.  *In re Cubic Energy, Inc.*, 603 B.R. at 755 ("The question of docket burden is neutral, as the burden would eventually fall on *some* court and [the] Court can not ascertain the degree of burden the [other] court would suffer would this Court abstain.").

## X.    Permissive Abstention - Tenth Factor.

The tenth factor concerning the "likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties" weighs in favor of abstention. *Id.*

Extraction is not forum-shopping; the adversary proceeding was filed at Grand Mesa's insistence in response to Grand Mesa's objection to Extraction's motion to reject. *Grand Mesa Objection* (D.I. 363) at p. 6.

## XI.    Permissive Abstention - Eleventh Factor.

The eleventh factor concerning the "existence of a right to a jury trial" weighs against abstention.  *In re Cubic Energy, Inc.*, 603 B.R. at 755.

Grand Mesa concedes it has no right to a jury trial.  *Grand Mesa Response* (A. D.I. 20) at p. 14.

**XII.   Permissive Abstention - Twelfth Factor.**

The twelfth factor concerning the "presence in, the proceeding of non-debtor parties" weighs against abstention. *In re Cubic Energy, Inc.*, 603 B.R. at 755.

Grand Mesa concedes there are no non-debtor parties whose presence would support permissive abstention. *Grand Mesa Response* (A. D.I. 20) at p. 14.

## CONCLUSION

As set forth above, the Transportation Agreement is unambiguous and the question of whether the Transportation Agreement contains any covenants that run with the land is a legal one. There is no genuine issue of material fact. Extraction has met its burden for entry of summary judgment against Grand Mesa based on the plain meaning of the Transportation Agreement. The parties intended the dedication and commitment in section 1.1 of the Transportation Agreement to be a covenant that runs with the land (the parties did not intend that any other provision of the contract to create a covenant that runs with the land); the Transportation Agreement does not touch and concern the land; and there was no privity among the parties. Thus, as not all the required elements are present, no covenant runs with the land and the Court will enter summary judgment in favor of Extraction on the sole count of the complaint. In addition, as the overwhelming number of the applicable factors weight against abstention, the Court will

deny the motion to abstain.  An Order and Judgment will be entered.

By the Court:

_____

Christopher S. Sontchi
Chief United States Bankruptcy Judge

Date: October 14, 2020