**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXTRACTION OIL & GAS, INC. *et al.*,[1] | ) | Case No. 20-11548 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## FIRST AMENDED DISCLOSURE STATEMENT FOR THE FIRST
## AMENDED JOINT PLAN OF REORGANIZATION OF EXTRACTION OIL & GAS, INC.
## AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (admitted *pro hac vice*)
Allyson Smith Weinhouse (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    christopher.marcus@kirkland.com
    allyson.smith@kirkland.com
    ciara.foster@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**WHITEFORD, TAYLOR & PRESTON LLC**
Marc R. Abrams (DE No. 955)
Richard W. Riley (DE No. 4052)
Stephen B. Gerald (DE No. 5857)
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 353-4144
Facsimile:    (302) 661-7950
Email:    mabrams@wtplaw.com
    rriley@wtplaw.com
    sgerald@wtplaw.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 23, 2020

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Extraction Oil & Gas, Inc. (3923); 7N, LLC (4912); 8 North, LLC (0904); Axis Exploration, LLC (8170); Extraction Finance Corp. (7117); Mountaintop Minerals, LLC (7256); Northwest Corridor Holdings, LLC (9353); Table Mountain Resources, LLC (5070); XOG Services, LLC (6915); and XTR Midstream, LLC (5624).  The location of the Debtors' principal place of business is 370 17th Street, Suite 5300, Denver, Colorado 80202.

**TABLE OF CONTENTS**

Page

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT** ......................................1

**I.      INTRODUCTION** ..............................................................................................................5

**II.     PRELIMINARY STATEMENT** ......................................................................................5

**III.    OVERVIEW OF THE PLAN** ..........................................................................................6

    A.      The Stand-Alone Restructuring...........................................................................6
    B.      The Combination Transaction Restructuring. ......................................................7
    C.      Releases.................................................................................................................7

**IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** ...............................................................................................8

    A.      What is chapter 11?...............................................................................................8
    B.      Why are the Debtors sending me this Disclosure Statement?..............................9
    C.      Am I entitled to vote on the Plan?........................................................................9
    D.      What will I receive from the Debtors if the Plan is consummated?......................9
    E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?..........................................................................12
    F.      Are any regulatory approvals required to consummate the Plan?......................12
    G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ..................12
    H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"...........................................................12
    I.       Will royalty and working interests be affected by the Plan?..............................13
    J.       How do I know if my Claim is a Trade Claim or a General Unsecured Claim? ..........................13
    K.      What are the sources of Cash and other consideration required to fund the Plan?........................13
    L.      Are there risks to owning the New Common Stock upon emergence from Chapter 11?...............13
    M.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ...............13
    N.      What is the deadline to vote on the Plan? ...........................................................17
    O.      How do I vote for or against the Plan?................................................................17
    P.      Why is the Bankruptcy Court holding a Confirmation Hearing?........................17
    Q.      When is the Confirmation Hearing set to occur? ...............................................17
    R.      What is the purpose of the Confirmation Hearing?............................................17
    S.      What is the effect of the Plan on the Debtors' ongoing business? ......................17
    T.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ...............................................................18
    U.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ...........18
    V.      What are the terms of the Exit Facility?.............................................................18
    W.      What election is available to Holders of Revolving Credit Agreement Claims pursuant to the Plan?......................................................................................18
    X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ...............................................................................19
    Y.      Do the Debtors recommend voting in favor of the Plan?...................................19

**V.      THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE**.................19

    A.      The Debtors' Corporate Structure and History. .................................................19
    B.      The Debtors' Assets and Operations. .................................................................20
    C.      The Debtors' Operations.....................................................................................21
    D.      Environmental Matters........................................................................................24
    E.      The Debtors' Prepetition Capital Structure. .......................................................24

**VI.     EVENTS LEADING TO THESE CHAPTER 11 CASES** ..............................................26

|  |  | A. | Initial Stakeholder Outreach and Retention of Restructuring Advisors. | 26 |
|  |  | B. | Market and Industry-Specific Challenges. | 26 |
|  |  | C. | Exploration of Potential Alternatives. | 27 |
| **VII.** | **EVENTS OF THE CHAPTER 11 CASES** | | | **28** |
|  |  | A. | Corporate Structure upon Emergence. | 28 |
|  |  | B. | Expected Timetable of the Chapter 11 Cases. | 28 |
|  |  | C. | First Day Relief. | 28 |
|  |  | D. | Other Requested First-Day Relief and Retention Applications. | 29 |
|  |  | E. | Schedules and Statements. | 29 |
|  |  | F. | Appointment of Creditors' Committee. | 29 |
|  |  | G. | Midstream Litigation. | 29 |
| **VIII.** | **RISK FACTORS** | | | **29** |
|  |  | A. | Risks Related to the Restructuring. | 30 |
|  |  | B. | Risks Related to Recoveries Under the Plan. | 35 |
|  |  | C. | Risks Related to the Debtors' Businesses. | 36 |
|  |  | D. | Miscellaneous Risk Factors and Disclaimers. | 42 |
| **IX.** | **SOLICITATION AND VOTING PROCEDURES** | | | **43** |
|  |  | A. | Classes Entitled to Vote on the Plan. | 43 |
|  |  | B. | Votes Required for Acceptance by a Class. | 44 |
|  |  | C. | Certain Factors to Be Considered Prior to Voting. | 44 |
|  |  | D. | Classes Not Entitled To Vote on the Plan. | 44 |
|  |  | E. | Solicitation Procedures. | 45 |
|  |  | F. | Voting Procedures. | 46 |
|  |  | G. | Voting Tabulation. | 47 |
|  |  | H. | Ballots Not Counted. | 47 |
| **X.** | **CONFIRMATION OF THE PLAN** | | | **47** |
|  |  | A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 47 |
|  |  | B. | Best Interests of Creditors—Liquidation Analysis. | 48 |
|  |  | C. | Feasibility. | 49 |
|  |  | D. | Acceptance by Impaired Classes. | 49 |
|  |  | E. | Confirmation Without Acceptance by All Impaired Classes. | 49 |
| **XI.** | **IMPORTANT SECURITIES LAWS DISCLOSURES** | | | **51** |
|  |  | A. | Issuance of Securities under the Plan; Registration Rights | 51 |
|  |  | B. | Subsequent Transfers of Securities Issued under the Plan. | 51 |
| **XII.** | **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** | | | **52** |
|  |  | A. | Introduction. | 52 |
|  |  | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors. | 53 |
|  |  | C. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests Entitled to Vote. | 56 |
|  |  | D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims or Interests Entitled to Vote. | 61 |
|  |  | E. | FATCA. | 64 |
|  |  | F. | Information Reporting and Backup Withholding. | 65 |
| **XIII.** | **RECOMMENDATION OF THE DEBTORS** | | | **66** |

**EXHIBITS**

EXHIBIT A    Plan

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Liquidation Analysis

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Financial Projections

EXHIBIT F    Valuation Analysis

EXHIBIT G    Rights Offering Procedures

EXHIBIT H    Exit Facility Term Sheet[2]

---

[2]    To be filed in advance of the Disclosure Statement Hearing.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
DISCLOSURE STATEMENT, DATED OCTOBER 23, 2020

**SOLICITATION OF VOTES TO ACCEPT OR REJECT**
**THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST OR INTEREST IN THE DEBTORS IN ONE OF THE FOLLOWING CLASSES AND THEREFORE YOU ARE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| 3 | Revolving Credit Agreement Claims |
| 4 | Senior Notes Claims |
| 6 | General Unsecured Claims |
| 7 | Existing Preferred Interests |
| 8 | Existing Common Interests |

<table>
<tr><td colspan="2" align="center"><strong>DELIVERY OF BALLOTS</strong></td></tr>
<tr><td>1.</td><td>Ballots must be actually received by the Notice and Claims Agent before the Voting Deadline (<u>4:00 p.m., prevailing Eastern Time, on [●], 2020</u>).</td></tr>
<tr><td>2.</td><td>Ballots may be returned by the following methods:  (a) in the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the address set forth below; or (c) via electronic submission through the Notice and Claims Agent's online voting portal at to https://eballot.kccllc.net/extractionog.</td></tr>
</table>

Extraction Oil & Gas Ballots Processing Center
c/o Kurtzman Carson Consultants LLC
222 N. Pacific Coast Highway, Suite 300
El Segundo, CA 90245

If you have any questions on the procedures for voting on the Plan, please contact the Notice and Claims Agent by emailing XOGInfo@kccllc.com and referencing "Extraction Oil & Gas" in the subject line, or by calling (866) 571-1791 (U.S./Canada) or (781) 575-2049 (International).

### RECOMMENDATION BY THE DEBTORS

EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT NO LATER THAN [●], 2020 AT 4:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS. THE BOARD OF DIRECTORS, SOLE STOCKHOLDER, MEMBER, OR MANAGER, AS APPLICABLE FOR EACH OF THE DEBTORS HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERIES TO CLAIM AND INTEREST HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF EXTRACTION OIL & GAS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

**Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.**

**This Disclosure Statement has been prepared pursuant to sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under applicable state securities law (collectively, the "Blue Sky Laws"). The solicitation of votes on the Plan is being made in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) of the Securities Act (the "Solicitation"). The Debtors intend to rely on section 1145 of the Bankruptcy Code and section 4(a)(2) of the Securities Act to exempt the offer, issuance, and distribution of Securities of the Reorganized Debtors in connection with the Solicitation and the Plan from registration under the Securities Act and the Blue Sky Laws. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Readers are cautioned that any forward-looking statements in this Disclosure Statement are based on assumptions that are believed to be reasonable, but are subject to a wide range of risks, including risks associated with the following:**

- **The Debtors' Plans, Objectives, and Expectations;**

- **The Debtors' Business Strategy;**

- **The Debtors' Financial Strategy, Budget, Projections, and Operating Results;**

- **The Debtors' Financial Condition, Revenues, Cash Flows, and Expenses;**

- **The Success of the Debtors' Operations;**

- **The Costs of Conducting the Debtors' Operations;**

- **The Debtors' Levels of Indebtedness, Liquidity, and Compliance With Debt Covenants;**

- **The Level of Uncertainty Regarding the Debtors' Future Operating Results;**

- **The Amount, Nature, and Timing of the Debtors' Capital Expenditures;**

- **The Terms of Capital Available to the Debtors;**

- **The Debtors' Ability to Satisfy Future Cash Obligations;**

- **The Integration and Benefits of Asset and Property Acquisitions and/or the Effects of Asset and Property Acquisitions or Dispositions on the Debtors' Cash Position and Levels of Indebtedness;**

- **The Risks Associated with Certain of the Debtors' Acquisitions;**

- **The Effectiveness of the Debtors' Risk Management Activities;**

- **The Debtors' Environmental Liabilities;**

- **The Debtors' Counterparty Credit Risk;**

- **The Outcome of Pending and Future Litigation Claims;**

- **General Economic and Business Conditions;**

- **Oil, Natural Gas, and Natural Gas Liquid Prices and the Overall Health of the Exploration and Production Industry;**

- **Developments in Oil-producing and Natural Gas-Producing Countries;**

- **Governmental Regulations and Taxation of the Oil And Natural Gas Industry; and**

- **The Potential Adoption of New Governmental Regulations.**

**You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

## I.    INTRODUCTION

The Debtors submit this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Plan. A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[3]

**THE DEBTORS AND CERTAIN CONSENTING CREDITORS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT, INCLUDING HOLDERS OF APPROXIMATELY 80% OF SENIOR NOTES CLAIMS, BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors operate an independent exploration and production ("E&P") company that is focused on the acquisition, development and production of oil, natural gas and natural gas liquids reserves in the Rocky Mountain region—primarily in the Wattenberg Field in the Denver-Julesburg Basin of Colorado.  Headquartered in Denver, Colorado, the Debtors have approximately 130 employees.  As of the Petition Date, the Debtors had approximately $1.7 billion in total funded debt obligations.

The Debtors, like many of their industry peers, experienced significant challenges over the past several years due to sustained downturns and volatility in commodities markets.  In March 2020, such challenges were exacerbated by an unprecedented drop in global energy prices and market uncertainty due to the combined effects of the COVID-19 pandemic and tensions between OPEC and Russia.  XOG and its Board of Directors immediately snapped into action to address the unprecedented situation.

In April 2020, the Debtors initiated discussions to consider potential paths forward to address their liquidity constraints and various debt obligations with their stakeholders, primarily including the Ad Hoc Noteholder Group, a group of holders of the Debtors' Existing Preferred Stock (the "Preferred Holdings Group"), and the Revolving Credit Agreement Lenders via the Revolving Credit Agreement Agent.

In light of their significantly constrained liquidity, on May 13, 2020, XOG's Board of Directors determined, in a sound exercise of their fiduciary duties, to forego the semiannual interest payment due in respect of the 2024 Senior Notes to preserve liquidity and permit additional time to (a) fully investigate an out of-court financing effort, (b) effectuate an out-of-court restructuring transaction, or (c) reach agreement with their existing stakeholders regarding a comprehensive deleveraging through a chapter 11 process.  The Debtors' failure to make the 2024 Senior Notes interest payment triggered a 30-calendar-day cure period before such non-payment would constitute an "Event of Default" under the 2024 Senior Notes Indenture.  Non-payment would also cause a cross-default under the RBL Facility.  Over the following weeks, while operating within the grace period afforded under the 2024 Senior Notes Indenture, the Debtors continued to engage in arms'-length negotiations, exchanging numerous term sheets and participating in dozens of telephonic conferences, with the Ad Hoc Noteholder Group and the Preferred Holdings Group regarding a comprehensive deleveraging of their balance sheet.

To facilitate these discussions, several members of the Ad Hoc Committee of Noteholders became restricted under confidentiality agreements and the Debtors provided certain requested diligence to the Ad Hoc Noteholder

---

[3]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

Group and its advisors. The Debtors and the Ad Hoc Noteholder Group ultimately exchanged numerous term sheets regarding a consensual restructuring to be implemented pursuant to a prearranged chapter 11 plan of reorganization.

In connection therewith, the Debtors entered into the Restructuring Support Agreement, attached hereto as **Exhibit B**, with over 80% of the Senior Noteholders on the Petition Date. After careful evaluation, the Revolving Credit Agreement Lenders declined to join the Restructuring Support Agreement; however, a subset of the Revolving Credit Agreement Lenders continued to work to provide the DIP financing (as described below) and all Revolving Credit Agreement Lenders worked to provide consensual use of cash collateral upon filing. The Restructuring Support Agreement and subsequent restructuring term sheet outline the terms of a consensual restructuring of the Debtors' funded debt obligations through the Plan. The Debtors will continue their efforts to garner additional support for the Plan and anticipate that additional Senior Noteholders and other stakeholders will execute the Restructuring Support Agreement or formally support the Plan in advance of Confirmation.

Further, upon the Debtors' decision to forego the 2024 Senior Notes interest payment, the Debtors began discussions with their Revolving Credit Agreement Lenders via the Revolving Credit Agreement Agent regarding a potential DIP financing. On or about June 14, 2020, the Debtors executed a commitment letter for a $125 million postpetition financing facility (comprised of $50 million in new money), substantially on the same terms as set forth in the DIP Motion and DIP Credit Agreement. On July 20, 2020, the Bankruptcy Court approved the DIP Facility on a final basis through the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 303]. The DIP Facility represents the culmination of a hard-fought process, provides the Debtors and their creditor constituencies with postpetition financing on the best available terms, allows the Debtors to continue operating their businesses and operations on a postpetition basis, halts the further accrual of interest under the Debtors' various prepetition unsecured or under secured debt instruments, and gives the Debtors (and their stakeholders) an opportunity to negotiate and consummate an orderly and efficient deleveraging.

## III.    OVERVIEW OF THE PLAN

The Plan provides for the restructuring of the Debtors through a Stand-Alone Restructuring. The Debtors contemplated a dual-track process that included a Combination Transaction,[4] but ultimately determined the Stand-Alone Restructuring was the superior path forward. The key terms of the Plan are as follows:

### A.    The Stand-Alone Restructuring.

On the Effective Date, (i) Reorganized XOG shall issue the New Common Shares and the New Warrants to fund distributions to certain Holders of Allowed Claims and Allowed Interests in accordance with Article III of the Plan, (ii) Reorganized XOG shall enter into the Exit Facility, which shall be a new credit facility and/or term loan in an amount sufficient to pay on the Effective Date certain Holders of Claims as set forth in Article III of the Plan, and to provide incremental liquidity, and (iii) the New Board shall be authorized to implement the Management Incentive Plan.[5]

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, the Exit Facility, the Equity Rights Offering (if any), the New Common Shares, and the New Warrants.

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed,

---

[4]    "*Combination Transaction*" means any sale to, or combination merger with, a third party involving all or substantially all of the Debtors' restructured equity or assets pursuant to a successful proposal and a Combination Transaction agreement or as otherwise authorized by order of the Bankruptcy Court or the Bankruptcy Code.

[5]    Management Incentive Plan and executive compensation are subject to ongoing negotiations among the Debtors and the Consenting Senior Noteholders.

assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; *provided* that notwithstanding anything to the contrary herein, no Executory Contract or Unexpired Lease shall be assumed, assumed and assigned, or rejected without the reasonable consent of the Required Consenting Senior Noteholders; *provided, further,* that the Debtors shall consult with the DIP Agent regarding the assumption, assumption and assignment, or rejection (or related settlement) of any Executory Contract or Unexpired Lease.

### B.    The Combination Transaction Restructuring.

In pursuing the Combination Transaction, the Bankruptcy Court granted approval of the Proposal Submission Guidelines[6] through the *Order (I) Approving Initial Submission Proposal Guidelines in connection with a Combination Transaction, and (II) Granting Related Relief* [Docket No. 299]. Subsequently, the Bankruptcy Court granted approval of the the stage 2 guidelines through the *Order Approving Stage 2 Process Procedures in Connection with a Combination Transaction* [Docket No. 455]. The Bankruptcy Court approved the following timeline, which set forth certain key dates and deadlines with respect to the Combination Transaction process:

| Event or Deadline | Date and Time |
|---|---|
| Initial Proposal Date | July 29, 2020, at 11:00 a.m. Mountain Daylight Time |
| Notification of Stage 2 Participants | Within five (5) business days after the Initial Proposal Date |
| Stage 2 Guidelines Filed with the Bankruptcy Court | No later than fourteen (14) calendar days prior to the hearing to consider the Bankruptcy Court's approval of the Stage 2 Guidelines |
| Hearing to Approve the Stage 2 Guidelines | August 14, 2020, at 9:00 a.m. Mountain Daylight Time |
| Firm Proposal Deadline | August 28, 2020, at 11:00 a.m. Mountain Daylight Time |
| Definitive Transaction Document Executed and Delivered, if a Combination Transaction is to be Pursued | September 17, 2020 |

The Bankruptcy Court-sanctioned Proposal Submission Guidelines allowed the Debtors to optimally and expeditiously solicit, receive, and evaluate any proposals in a fair, accessible, and timely manner. Pursuant to the Proposal Submission Guidelines, on July 29, 2020, the Debtors received five initial indications of interest and subsequently, on August 28, 2020, the Debtors received four firm proposals. Ultimately, when considering the Combination Transaction and the Stand-Alone Restructuring, the Debtors determined that the Stand-Alone Restructuring provides the Debtors the best and most value-maximizing path forward. The Debtors filed the *Notice of Termination of Discussions with Potential Merger Counterparty Regarding Combination Transaction Restructuring* [Docket No. 813] informing the Bankruptcy Court and parties in interest of the Debtors' decision.

### C.    Releases.

The Plan contains certain releases (as described more fully in Article IV.L of the Plan), including mutual releases between the Debtors and the Reorganized Debtors on the one hand, and:  (i) the Consenting Senior

---

[6]    "*Proposal Submission Guidelines*" means the guidelines governing the submission of firm proposals pursuant to the M&A Process (as defined in the Restructuring Support Agreement) and the marketing process for the Combination Transaction, in form and substance reasonably acceptable to the Required Consenting Senior Noteholders.

Noteholders; (ii) the Ad Hoc Noteholder Group and each of its members; (iii) each Trustee; (iv) the Backstop Parties; (v) the DIP Agent and the DIP Lenders; (vi) the Revolving Credit Agreement Agent and the Revolving Credit Agreement Lenders; (vii) the Exit Facility Agent and Exit Facility Lenders; (viii) any Releasing Party; (ix) with respect to each of the foregoing Persons, in clauses (i) through (viii), such Person's Related Parties, in each case in their capacity as such; ***provided, however, that any Holder of a Claim or Interest that opts out of the releases in the Plan shall not be a "Released Party***."

The Plan includes releases of claims held by the Debtors against the Debtors' current and former directors and officers, subject to certain exceptions. The Plan does not preserve any Claims or Causes of Action held by the Debtors against the Debtors' directors and officers except those specifically retained. The Debtors have analyzed and are not aware of any colorable Claims or Causes of Action against the Debtors' directors and officers; provided, however, that the Debtors' Investigation Special Committee has not concluded its investigation into potential claims arising from the buyback of certain shares in 2018 and 2019, which claims to the extent they exist are referred to herein as the "Buyback Claims."

The Plan also provides that all Holders of Claims and Interests that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan or vote to reject the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Importantly, all Holders of Claims and Interests that are not in voting Classes that do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties. The releases are an integral element of the Plan.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (i) the releases, exculpations, and injunctions are specific; (ii) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (iii) the releases are a necessary part of the Plan; and (iv) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring. Further, the releases, exculpations, and injunctions have the support of the vast majority of the Debtors' creditors. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor (whether or not such creditor or equity interest Holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of Claims and Interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Revolving Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | Trade Claims | Unimpaired | Deemed to Accept |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Existing Preferred Interests | Impaired | Entitled to Vote |
| 8 | Existing Common Interests | Impaired | Entitled to Vote |
| 9 | Other Equity Interests | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 11 | Intercompany Interests | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 12 | Section 510(b) Claims | Impaired | Deemed to Reject |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit C**.  Accordingly, recoveries actually received by holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE**

**DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[7]**

| Class | Claim or Interest | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim, at the Debtors' election (subject to the reasonable consent of the Required Consenting Senior Noteholders and the Majority Lenders) either:<br><br>(i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter;<br><br>(ii) Reinstatement of such Allowed Other Secured Claim; or<br><br>(iii) other treatment rendering such Allowed Other Secured Claim Unimpaired. | 100% | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim, at the Debtors' election (subject to the reasonable consent of the Required Consenting Senior Noteholders and Majority Lenders), either:<br><br>(i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter; or<br><br>(ii) such other treatment rendering such Allowed Other Priority Claim Unimpaired. | 100% | N/A |
| 3 | Revolving Credit Agreement Claims | Except to the extent that a Holder of an Allowed Revolving Credit Agreement Claim and the Debtors against which such Allowed Revolving Credit Agreement Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Revolving Credit Agreement Claim, each Holder of such Allowed Revolving Credit Agreement Claim shall receive, either:<br><br>(i) if such Holder elects to participate in the Exit RBL Facility on a pro rata basis, determined on a ratable basis with respect to its percentage of the Obligations (as defined in the Revolving Credit Agreement) under the Revolving Credit Agreement, such Holder of an Allowed Revolving Credit Agreement Claim shall become an Exit RBL Facility Lender in accordance with the terms of the Exit RBL Facility Documents; or<br><br>(ii) if such Holder does not elect to participate in the Exit RBL Facility as provided above (including by not making any election with respect to the Exit RBL Facility on the ballot), its Pro Rata Share of the Exit Term Loans.[8] | 100% | 63.8% |

---

[7]    The recoveries set forth below may change based upon changes in the amount of Claims that are allowed as well as other factors related to the Debtors' business operations and general economic conditions.

[8]    The Revolving Credit Agreement Agent is supportive of the Exit Facility Revolving Term Loans Term Sheet attached as **Exhibit H** to this Disclosure Statement. The Debtors will seek to enter into a "best efforts" commitment letter with respect to

| Class | Claim or Interest | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|
| 4 | Senior Notes Claims | Each Holder of an Allowed Senior Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Senior Notes Claim, its Pro Rata share of (A) the Claims Equity Allocation and (B) the Senior Noteholder Subscription Rights. | 26.9% | 0.00% |
| 5 | Trade Claims | Each Holder of an Allowed Trade Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Trade Claim, payment in full of such Allowed Trade Claim on the Effective Date or otherwise in the ordinary course of the Debtors' business. | 100% | 0.00% |
| 6 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of the Claims Equity Allocation. | 17.6% | 0.00% |
| 7 | Existing Preferred Interests | Each Existing Preferred Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and each Holder of an Allowed Existing Preferred Interest shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Existing Preferred Interest, its Pro Rata share of (A) 50% of the Existing Interests Equity Allocation, (B) the Existing Preferred Interest Subscription Rights, (C) 50% of the Tranche A Warrants, and (D) 50% of the Tranche B Warrants | 3.2% | 0.00% |
| 8 | Existing Common Interests | Each Existing Common Interest shall be canceled, released, and extinguished, and will be of no further force or effect, and each Holder of an Allowed Existing Common Interest shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Existing Common Interest its Pro Rata share of (A) 50% of the Existing Interests Equity Allocation, (B) the Existing Common Interest Subscription Rights, (C) 50% of the Tranche A Warrants, and (D) 50% of the Tranche B Warrants. | N/A | N/A |
| 9 | Other Equity Interests | On the Effective Date, all Other Equity Interests will be cancelled, released, and extinguished and will be of no further force and effect, and Holders of Other Equity Interests will not receive any distribution on account thereof. | 0.00% | 0.00% |
| 10 | Intercompany Claims | On the Effective Date, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, shall be adjusted, Reinstated, modified, or cancelled at the Debtors' election, subject to the reasonable consent of the Required Consenting Senior Noteholders and the Majority Lenders. | 0% / 100% | 0.00% |
| 11 | Intercompany Interests | On the Effective Date, each Allowed Intercompany Interest shall, at the option of the Debtors, unless otherwise provided for under the Plan, and subject to the reasonable consent of the Required Consenting Senior Noteholders and the Majority Lenders, be (A) Reinstated or modified or recharacterized as Intercompany Claims or (B) canceled or otherwise eliminated without any distribution on account of such interests. | 0% / 100% | 0.00% |
| 12 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, | N/A | N/A |

the syndication of the proposed Exit Facility as contemplated by Article III.B of the Plan regarding treatment of the Revolving Credit Agreement Claims, which letter shall be included in the Plan Supplement.

| Class | Claim or Interest | Treatment | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|
| | | and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | | |

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Expense Claims | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses. | Article II, Section A |
| Professional Fee Claims | All Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid. | Article II, Section B |
| DIP Claims | Any and all Claims against a Debtor arising under, derived from, based upon, or related to the DIP Facility Documents. | Article II, Section C |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section D |

**F.      Are any regulatory approvals required to consummate the Plan?**

There are no known U.S. regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Art. VIII.D.3 of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit C**.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by

the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan. *See* Article IX of the Plan for a description of the conditions precedent to consummation of the Plan.

**I.        Will royalty and working interests be affected by the Plan?**

All royalty and working interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such royalty and working Interest, and no royalty and working interests shall be compromised or discharged by the Plan. The Plan shall not impair the related legal and equitable rights, interests, defenses, or obligations of the Debtors or the Reorganized Debtors. To the extent applicable, such Interests shall be Reinstated pursuant to the Plan; *provided* that nothing in the Plan shall limit the Debtors' rights to reject any Executory Contract or Unexpired Lease in accordance with the Bankruptcy Code or pursuant to Article V of the Plan; *provided*, *further*, that overriding royalty interests and joint-interest billings shall not constitute Executory Contracts or Unexpired Leases. Accordingly, for the avoidance of doubt, overriding royalty interests and joint-interest billings are not eligible to be assumed or rejected pursuant to the Plan.

**J.        How do I know if my Claim is a Trade Claim or a General Unsecured Claim?**

Trade Claim means any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors. For the avoidance of doubt, Trade Claims shall not include any Claim arising from or based upon rejection of any Executory Contract or Unexpired Lease, nor any Claim that is not Secured resulting from litigation against one or more of the Debtors.

General Unsecured Claim means any Claim against any of the Debtors that is not Secured and is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) Revolving Credit Agreement Claims; (f) a Senior Notes Claim; (g) an Existing Common Interest; (h) an Existing Preferred Interest; (i) an Other Equity Interest; (j) a Trade Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim. For the avoidance of doubt, all (i) claims resulting from the rejection of Executory Contracts and Unexpired Leases, and (ii) Claims that are not Secured resulting from litigation against one or more of the Debtors are General Unsecured Claims.

**K.        What are the sources of Cash and other consideration required to fund the Plan?**

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date, the revenues and proceeds of all assets of the Debtors, including proceeds from all Causes of Action not settled, released, discharged, enjoined, or exculpated under the Plan or otherwise on or prior to the Effective Date, the Exit Facility, the Equity Rights Offering (if any), the New Common Shares, and the New Warrants.

**L.        Are there risks to owning the New Common Stock upon emergence from Chapter 11?**

Yes. See "Risk Factors," which begins on page 29 of this Disclosure Statement. The Debtors intend to seek a listing of the New Common Stock on the New York Stock Exchange (the "NYSE"), the Nasdaq Stock Market (the "Nasdaq"), or another comparable national securities exchange on or as soon as reasonably practicable after the Effective Date.

**M.        Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide releases to the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the stakeholders.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

13

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT (I) VOTE TO ACCEPT OR ARE DEEMED TO ACCEPT THE PLAN OR (II) ARE IN VOTING CLASSES WHO ABSTAIN FROM VOTING ON THE PLAN OR VOTE TO REJECT THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.**

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE NOT IN VOTING CLASSES THAT DO NOT OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, to the extent requested by the Bankruptcy Court, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### 1.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Confirmation Order, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, as applicable.  The DIP Agent and the Revolving Credit Agreement Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests on such assets of the Debtors that are subject to the Stand-Alone Restructuring.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then such Holder (or the agent for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder) and take any and all steps requested by the Debtors, the Reorganized Debtors, or Exit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the execution and delivery of such releases and the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  Notwithstanding the foregoing paragraph, Article VIII.D of the Plan shall not apply to any Secured Claims that are Reinstated pursuant to the terms of this Plan.**

### 2.    *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause**

of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof, including any draws under the Revolving Credit Facility, or any claims or causes of action related to the Revolving Credit Facility Documents) the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Definitive Documents (including, for the avoidance of doubt, the DIP Facility, the DIP Facility Documents, the Exit Facility, the Exit Facility Documents, the Disclosure Statement, and the Backstop Commitment Agreement), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the Plan, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any Buyback Claims, (iii) claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iv) the rights of any current employee of the Debtors under any employment agreement or plan, (v) the rights of the Debtors with respect to any confidentiality provisions or other covenants restricting competition in favor of the Debtors under any employment or other agreement with a current or former employee of the Debtors, or (vi) the rights of holders of Allowed Claims or Interests to receive distributions under the Plan.

3.    *Release by Holders of Claims or Interests*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof, including any draws under the Revolving Credit Facility or any claims or causes of action related to the Revolving Credit Facility Documents), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Definitive Documents (including, for the avoidance of doubt, the DIP Facility, the DIP Facility Documents, the Exit Facility, the Exit Facility Documents, the Disclosure Statement, and the Backstop Commitment Agreement), or any aspect of the Restructuring, including any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Backstop Commitment Agreement, the Plan, or the Definitive Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the

15

issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any Buyback Claims or claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of any current employee of the Debtors under any employment agreement or plan, (iv) the rights of the Debtors with respect to any confidentiality provisions or other covenants restricting competition in favor of the Debtors under any employment or other agreement with a current or former employee of the Debtors, or (v) the rights of holders of Allowed Claims or Interests to receive distributions under the Plan.

4.      *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions (including any draws under the Revolving Credit Facility or any claims or causes of action related to the Revolving Credit Facility Documents), the Plan, the Plan Supplement, the Definitive Documents (including, for the avoidance of doubt, the DIP Facility, the DIP Facility Documents, the Exit Facility, the Exit Facility Documents, the Disclosure Statement, and the Backstop Commitment Agreement), or any transaction related to the Restructuring, any contract, instrument, release or other agreement or document created or entered into before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

5.      *Injunction*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold Claims or Interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or Reorganized Debtors, or the other Released Parties or the Exculpated Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

N.      **What is the deadline to vote on the Plan?**

The Voting Deadline is twenty-eight (28) days after Solicitation Launch, but in no event later than [●], 2020, at 4:00 p.m. (prevailing Eastern Time).

O.      **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "<u>Ballot</u>") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **<u>actually received</u>** before the Voting Deadline by Kurtzman Carson Consultants LLC ("<u>KCC</u>" or the "<u>Notice and Claims Agent</u>").  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

P.      **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

Q.      **When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for [●] (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the consent of the Required Consenting Senior Noteholders, and the Majority Lenders, or the Majority Exit RBL Facility Lenders, as applicable, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than twenty-eight (28) days after solicitation on the Plan launches, but in no event later than [●], at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition) and *Denver Post* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

R.      **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

S.      **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the first business day after which all conditions to Consummation

have been satisfied or waived. *See* Article IX of the Plan. On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the New Board and new officers of each of the Reorganized Debtors shall be appointed, in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor, by the Required Consenting Senior Noteholders.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will serve as officers of the Reorganized Debtors. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Provisions regarding the removal, appointment, and replacement of members of the New Boards will be disclosed in the New Organizational Documents.

**U.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Section V. herein, as well as in the *Declaration of Matthew R. Owens, Co-Founder, President and Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including their options relating to mergers and acquisitions, sales, and consensual recapitalizations, to expand the size of their business enterprise and address their funded indebtedness, particularly their senior note maturities in 2024 and 2026.

**V.      What are the terms of the Exit Facility?**

The Exit Facility Term Sheet is attached as **Exhibit H** to this Disclosure Statement. The Revolving Credit Agreement Agent is supportive of the Exit Facility Term Sheet. The Debtors will seek to enter into a "best efforts" commitment letter with respect to the syndication of the proposed Exit RBL Facility as contemplated by Article III.B of the Plan regarding treatment of the Revolving Credit Agreement Claims, which letter shall be included in the Plan Supplement.

**W.      What election is available to Holders of Revolving Credit Agreement Claims pursuant to the Plan?**

The Ballot for Holders of Revolving Credit Agreement Claims includes an election to participate in the Exit Facility. Only Holders of Revolving Credit Agreement Claims that elect to participate ratably in the Exit RBL Facility shall receive Exit Facility Revolving Commitments. Any Holder of a Revolving Credit Agreement Claim that does not elect to participate ratably in the Exit RBL Facility (including by not making any election with respect to the Exit RBL Facility on the Ballot) will receive only its pro rata share of the Exit Facility Term Loans.

X.     **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent:

By electronic mail at:
Email: XOGInfo@kccllc.com with a reference to "XOG" or "Extraction" in the subject line.

By telephone at:
(866) 571-1791 (U.S./Canada) or (781) 575-2049 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing and Solicitation Agent at https://www.kccllc.net/extractionog (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov (for a fee).

Y.     **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan is in the best interest of all Holders of Claims, and that other alternatives (if any) fail to realize or recognize the value inherent under the Plan.

## V.     THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

A.     **The Debtors' Corporate Structure and History.**

Headquartered in Denver, Colorado, XOG and its Debtor affiliates are an independent oil and gas company focused on the acquisition, development and production of oil, natural gas and natural gas liquids reserves in the Rocky Mountain region—primarily in the Wattenberg Field in the Denver-Julesburg Basin (the "DJ Basin") of Colorado.  The Debtors operate primarily in the "upstream" oil and gas sector and conduct their exploration and production activities across approximately 295,000 net acres, approximately 169,000 net acres of which are in some of the most productive areas of the DJ Basin.

In the eight years since its founding in November 2012, XOG has grown to become one of the largest oil producers in Colorado, with substantial upstream operations.  Through strategic leasing and acquisition programs, the Debtors' management team has built a large, contiguous acreage position while enhancing drilling economics by allowing the drilling of longer horizontal wellbores.  In 2016, after a roughly two-year hiatus of United States E&P company initial public offerings, XOG successfully launched an initial public offering and began trading on the

NASDAQ Global Select Market under the ticker symbol XOG.  A simplified version of the Debtors' current corporate structure is as follows:



### B.    The Debtors' Assets and Operations.

The Debtors have built a strong asset base through a combination of property acquisitions, development of reserves, and exploration activities.  The Debtors have consistently maintained a high degree of operational control over their lease development and producing wells under the belief that retaining control of production enables increased recovery rates, lower well costs, improved drilling performance and increased ultimate hydrocarbon recovery through optimization of drilling and completion techniques.  Additionally, operating their production allows the Debtors to manage the pace of their horizontal development program and the gathering and marketing of their production more efficiently.  The Debtors have sought to continuously monitor and adjust their drilling program with the objective of achieving the highest total returns on their portfolio of drilling opportunities.  As the Debtors' acreage and production expanded, they proactively sought to secure the necessary midstream and associated operational infrastructure to support their drilling schedule and keep pace with their expected production growth.

- **February 2020 Divestiture**:  In February 2020, the Debtors completed the sale of certain non-operated producing properties for aggregate sales proceeds of approximately $12.2 million, subject to customary purchase price adjustments.

- **December 2019 Divestiture**:  In December 2019, the Debtors completed the sale of certain non-operated producing properties for aggregate sales proceeds of approximately $10.0 million, subject to customary purchase price adjustments.

- **August 2019 Divestiture**:  In August 2019, the Debtors completed the sale of certain non-operated producing properties for aggregate sales proceeds of approximately $22.0 million, subject to customary purchase price adjustments.

- **March 2019 Divestiture**:  In March 2019, the Debtors completed the sale of its interests in approximately 5,000 net acres of leasehold and producing properties for aggregate sales proceeds of approximately $22.4 million.  The effective date for the March 2019 Divestiture was July 1, 2018 with purchase price adjustments calculated as of the closing date of $5.9 million, resulting in net proceeds of $16.5 million.

- **December 2018 Divestitures**:  In December 2018, the Debtors completed various sales of its interests in approximately 31,200 net acres of leasehold and primarily non-producing properties, for aggregate sales proceeds of approximately $8.5 million, subject to customary purchase price adjustments.

- **August 2018 Divestitures**: In August 2018, Elevation received proceeds of $83.6 million, upon the sale of assets held by DJ Holdings, LLC, a subsidiary of Discovery Midstream Partners, LP, of which Elevation held a 10% membership interest.  Elevation acquired this membership interest in exchange for the contribution of an acreage dedication from certain of the Debtors, which is considered a nonfinancial asset.

- **April 2018 Divestitures**: In April 2018, the Debtors completed various sales of its interests in approximately 15,100 net acres of leasehold and primarily nonproducing properties for aggregate sales proceeds of approximately $72.3 million.

- **April 2018 Acquisition**: In April 2018, the Debtors acquired an unaffiliated oil and gas company's interest in approximately 1,000 net acres of non-producing leasehold primarily located in Arapahoe County, Colorado for approximately $9.4 million in cash, providing the Debtors with new asset development opportunities in certain "core" areas of the DJ Basin.

- **January 2018 Acquisition**:  On January 8, 2018, the Debtors acquired an unaffiliated oil and gas company's interest in approximately 1,200 net acres of non-producing leasehold located in Arapahoe County, Colorado for approximately $11.6 million in cash.

- **November 2017 Acquisition**:  On November 15, 2017, the Debtors acquired an unaffiliated oil and gas company's interest in approximately 36,600 net acres of leasehold and primarily non-producing properties located in Arapahoe County, Colorado for approximately $214.3 million in cash, subject to customary purchase price adjustments.

- **July 2017 Acquisition**:  On July 7, 2017, the Debtors acquired an unaffiliated oil and gas company's interests in approximately 12,500 net acres of leasehold and primarily non-producing properties located primarily in Adams County, Colorado for total consideration of approximately $84.0 million in cash.

- **June 2017 Acquisition**:  On June 8, 2017, the Debtors acquired an unaffiliated oil and gas company's interests in approximately 160 net acres of leasehold and related producing properties located in Weld County, Colorado for approximately $13.4 million in cash consideration.

C.      **The Debtors' Operations.**

     1.      *The Upstream Industry.*

     The oil and gas industry is typically divided into three major sectors: "upstream," "midstream," and "downstream."  The upstream sector is comprised of "exploration and production," or E&P, activities that focus on locating and extracting crude oil, raw natural gas, and other hydrocarbons from beneath the surface.  Common upstream assets include mineral leases, producing wells, and associated production equipment.  The midstream sector includes the activities involved in gathering, transporting, processing, and storing hydrocarbons.  Common midstream assets include gathering pipelines, separation facilities, and tankage.  The downstream sector is focused on the marketing and distribution of the products derived from the extracted hydrocarbons to the ultimate end users.  Common downstream assets include refineries and retail sites.  Many industry companies operate in two or more of these sectors.  The majority of the Debtors' assets are considered to be in the upstream sector, but the Debtors also have limited ownership[9] in midstream assets, primarily via their non-Debtor affiliate, Elevation Midstream, LLC.

---

[9]      Following deconsolidation in March 2020, and as discussed further herein, as of the Petition Date, XOG has less than a 0.01% interest in Elevation Midstream, LLC.

### 2.    *Upstream Activities.*

As noted, the Debtors conduct their business operations primarily in the "upstream" sector, meaning their E&P operations involve the capture and sale of oil and natural gas, operations they conduct in domestic, onshore hydrocarbon-bearing basins. Through oil and natural gas leases entered into with mineral rights owners throughout the regions in which the Debtors conduct business, the Debtors hold working interests and revenue interests in oil and gas properties that give them the right to drill, produce, and maintain wells in the applicable geographic areas.

As an "operator," the Debtors are the parties engaged in the production of oil and natural gas for certain geographic units, often established pursuant to state law, for the benefit of themselves and other parties with mineral interests or leasehold interests in the same unit. Acting as operator, the Debtors conduct the day-to-day business operations of producing oil and natural gas at well sites and initially cover their own expenses as well as the expenses incurred on behalf of the owners of working interests in a designated unit covered by a joint operating agreement, pooling order, or similar agreement. The Debtors transport the majority of their hydrocarbon production by pipeline or tanker truck for sale to their customers. After receipt of gross proceeds, the Debtors—when acting as operator—distribute funds to various working interest holders, royalty interest holders, governmental entities, and other parties with an interest in production. The remaining proceeds are retained by the Debtors as operating revenues. As of December 31, 2019, the Debtors' revenue interest in their properties after lessor royalties and other leasehold burdens was approximately 80 percent, and the Debtors' working interest for all producing wells averaged approximately 72 percent with a proportionally reduced net revenue interest of approximately 60 percent.

In areas where the Debtors own interests in oil and natural gas leases but do not act as operator, a third party typically will serve as the operator for the wells relating to the Debtors' oil and natural gas leasehold interests and will distribute an allocable share of any productive sale proceeds to the Debtors and will invoice to the Debtors the Debtors' share of operating expenses and capital investments.

### 3.    *Midstream Activities.*

Primarily for the benefit of their production activities, the Debtors, through Elevation Midstream, LLC ("Elevation"), a non-Debtor affiliate of XOG, also provide "midstream" services, which involve the gathering, transportation, and processing of produced water and hydrocarbons, to serve the development of the Debtors' acreage in the Hawkeye and Southwest Wattenberg areas. Historically, Elevation had been a consolidated subsidiary of XOG for accounting purposes.

In October 2019, Elevation commenced moving crude oil, natural gas and water through its newly constructed Badger central gathering facility servicing the Debtors' production from the Southwest Wattenberg area. This facility enabled the Debtors and others to efficiently transport crude oil, natural gas, and water production, as well as supplying a portion of water used during the completion process. Revenues and operating expenses associated with the gathering systems and facilities operations were derived primarily from intersegment transactions for services provided to the Debtors' exploration, development and production operations as well as to third parties. However, effective March 16, 2020, Elevation became a separate, deconsolidated entity.

#### (a)    Elevation Gathering Agreements.

In July 2018, XOG entered into three long-term gathering agreements with Elevation (the "Elevation Gathering Agreements") for gas, crude oil and produced water. In April 2019, the Elevation Gathering Agreements were amended to provide for, among other changes, the inclusion of additional gathering facilities. Pursuant to this amendment, Elevation has recently asserted that the additional gathering facilities were required to be completed by April 1, 2020, subject to a right by Elevation, within 30 days of such date, to demand a payment from XOG in the amount of 135 percent of all costs incurred by Elevation as of such date for the development and construction of such additional gathering facilities. As of March 31, 2020, the costs incurred by Elevation for these additional gathering facilities totaled approximately $34.8 million.

As of April 1, 2020, the additional gathering facilities had yet to be completed, leading Elevation to allege that XOG is obligated to pay Elevation $46.8 million in purported damages. On May 26, 2020, XOG filed suit against

Elevation and certain of its affiliates seeking a declaratory judgment regarding this demand for payment. As of July 30, 2020, XOG voluntarily dismissed the suit without prejudice.

In connection with these chapter 11 cases, the Debtors are seeking to reject the Elevation Gathering Agreements through the *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 377]. On September 4, 2020, the Debtors filed the *Complaint for Declaratory Judgment* [Docket No. 591] to determine that the Elevation Gathering Agreements do not run with the land and for authority to reject the Elevation Gathering Agreements as executory contracts. On September 10, 2020, Elevation filed the *Objection of Elevation Midstream, LLC and GSO EM Holdings LP to the Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 612]. On October 14, 2020, the Bankruptcy Court published the *Findings of Fact and Conclusions of Law on Plaintiff's Motion for Summary Judgment against Elevation Midstream, LLC* [Docket No. 832], which determined that the covenant did not run with the land and thus, that the Executory Contracts are eligible for rejection under section 365 of the Bankruptcy Code.

### 4.    *Sales and Marketing Arrangements.*

The Debtors generally sell their oil and natural gas production from their operated properties, both for their own account and for the accounts of other working interest owners in these properties, at market prices to credit-worthy purchasers, including independent marketing companies, gas-processing companies, and other purchasers who have the ability to pay the highest price for the oil and natural gas production and move the oil and natural gas under the most efficient and effective transportation agreements. Until June 2020, the Debtors' largest purchaser was an oil marketer who had the ability to sell production into multiple markets. For the fiscal year ended December 31, 2019, approximately 77 percent of the Debtors' production was sold to this purchaser. Beginning in July 2020, the Debtors have been marketing their production directly.

Because the Debtors' oil and natural gas production from their operated properties is sold under market-priced agreements, the Debtors are positioned to take advantage of future increases in oil and natural gas prices, but they are also subject to any future price declines. This potential volatility is partially offset through hedging arrangements, as discussed further herein.

The Debtors' natural gas is transported through their own and third-party gathering systems and pipelines. As such, the Debtors incur processing, gathering and transportation expenses to move their natural gas from the wellheads to specified delivery points. These expenses vary based on the volume and distance shipped, and the fee charged by the third-party gatherer, processor or transporter. Capacity on these gathering systems and pipelines is occasionally limited and at times unavailable because of repairs or improvements, or as a result of priority transportation agreements with other gas shippers. If transportation space is restricted or is unavailable, the Debtors' cash flow from the affected properties could be adversely affected. In certain instances, the Debtors may enter into firm transportation agreements to provide for pipeline capacity to flow and sell a portion of their gas volumes. These agreements have term delivery commitments of fixed and determinable quantities of natural gas.

### 5.    *Prepetition Hedging Arrangements.*

To achieve more predictable cash flow and reduce their exposure to adverse fluctuations in commodity prices, the Debtors periodically enter into commodity derivative arrangements, or "hedging arrangements," for their oil and natural gas production. By removing a significant portion of price volatility associated with their oil and natural gas production, the Debtors believe they are able to mitigate, but not eliminate, the potential negative effects of reductions in oil and natural gas prices on their cash flow from operations for the periods covered under hedging arrangements. The Debtors realize gains on the derivatives to the extent their hedging contract prices are higher than market prices. In certain circumstances, where the Debtors have unrealized gains in their hedging portfolio, they may choose to restructure existing derivative contracts or enter into new transactions to modify the terms of current contracts in order to realize the current value of their existing positions.

All of the counterparties to the Debtors' hedging agreements are also lenders or affiliates of lenders under the Debtors' RBL Facility (as defined herein). Eight of these counterparties and the non-RBL Facility lender counterparty (each, a "Non-Consenting Prepetition Hedging Provider") informed the Debtors of their intent to exercise their rights under the "safe harbor" protections of the Bankruptcy Code to terminate such hedging agreements upon

the Debtors' filing of these chapter 11 cases. As a result, the Debtors negotiated with four of the Non-Consenting Prepetition Hedging Providers to effect an orderly unwinding of those hedges in advance of the Petition Date. The the remaining four Non-Consenting Prepetition Hedging Providers terminated their hedging agreements shortly after the Petition Date, and the proceeds of the hedges were applied to prepay amounts outstanding under the Revolving Credit Agreement.

Additionally, prior to the Petition Date, XOG further negotiated amendments to its hedging arrangement with the secured counterparty with which it had and continues to have the largest outstanding hedge positions (the "Consenting Prepetition Hedging Provider") to reflect terms on which the Consenting Prepetition Hedging Provider was willing to forbear from terminating its hedging arrangement upon the Debtors' commencement of these chapter 11 cases.

### D. Environmental Matters.

The Debtors are subject to complex and stringent environmental laws and regulations at the federal, state, and local levels in connection with the development, ownership, and operation of their facilities, which both governmental units and third parties have sought to enforce. In the course of operating the business, the Debtors have entered into consent orders and agreements involving federal and state environmental governmental units and third parties to resolve disputes regarding compliance with, and liabilities arising under, applicable environmental laws and regulations. Certain of these consent orders and agreements impose ongoing obligations on the Debtors to monitor and address environmental conditions.

### E. The Debtors' Prepetition Capital Structure.

#### 6. *The Debtors' Debt Obligations.*

As of the Petition Date, the Debtors had approximately $1.7 billion in total funded debt, consisting of (a) the Revolving Loan Facility, in an aggregate outstanding amount of approximately $600.5 million; (b) the Senior 2024 Notes, in an outstanding principal amount of $400.0 million; and (c) the Senior 2026 Notes, in an outstanding principal amount of $700.2 million. The chart below reflects the Debtors' capital structure as of the Petition Date.



¹ Excludes $49.5mm in outstanding letters of credit

### (a) Revolving Loan Facility.

XOG is the borrower under the approximately $600.5 million Revolving Loan Facility by and among XOG, the Revolving Credit Agreement Lenders, and the Administrative Agent. The Revolving Loan Facility is guaranteed

by each of XOG's subsidiaries (excluding Northwest Corridor (collectively, the "RBL Guarantors")) and is secured on a first-priority basis by substantially all of XOG's and the RBL Guarantors' assets.

The RBL Facility matures on August 16, 2022, subject to a "springing" maturity of April 15, 2021 if (a) the shares of Preferred Stock (as defined herein) have not been either converted into shares of Common Stock (as defined herein) or redeemed by April 14, 2021 and (b) a sufficient extension has not been granted. The RBL Facility accrues interest at a rate per annum equal to: (y) the adjusted base rate plus an applicable margin of between 0.5% and 1.5% based on the utilization percentage; or (z) adjusted LIBOR plus an applicable margin of between 1.5% and 2.5% based on the utilization percentage.

The RBL Facility is subject to a limitation on borrowing in an amount equal to the least of (a) the commitments thereunder, (b) the borrowing base then in effect, and (c) the maximum cap then in effect. The borrowing base under the RBL Facility is subject to scheduled redeterminations and redeterminations at the election of the Revolving Credit Agreement Lenders and XOG. In November 2019, the RBL Facility's borrowing base was decreased from $1.1 billion to $950.0 million and the maximum cap was decreased from $1.0 billion to $950.0 million in connection with the scheduled borrowing base redetermination. On April 27, 2020, the borrowing base and the maximum cap under the RBL Facility were decreased further to $650.0 million. As of the Petition Date, approximately $600.5 million in principal amount is outstanding under the RBL Facility in addition to approximately $49.5 million in outstanding letters of credit issued under the RBL Facility—together reducing the borrowing base availability to close to $0.

### (a)    The Senior 2024 Notes.

Pursuant to the 2024 Senior Notes Indenture, XOG issued a series of 7.375% 2024 Senior Notes in an aggregate principal amount of $400.0 million. Interest is payable on the 2024 Senior Notes on May 15 and November 15 of each year beginning on November 15, 2017. The 2024 Senior Notes mature on May 15, 2024. As of the Petition Date, approximately $400 million in principal amount remains outstanding under the 2024 Senior Notes.

### (b)    The Senior 2026 Notes

Pursuant to the 2026 Senior Notes Indenture, XOG issued a series of 5.625% Senior 2026 Notes in an aggregate principal amount of $750.0 million. Interest is payable on the 2026 Senior Notes on February 1 and August 1 of each year beginning on August 1, 2018. The 2026 Senior Notes mature on February 1, 2026. As of the Petition Date, approximately $700.2 million in principal amount remains outstanding under the 2026 Senior Notes.

### 7.    *The Equity Interests in the Debtors.*

As of the Petition Date, XOG's issued and outstanding share capital consisted of approximately 138 million shares of common stock (the "Common Stock"), the majority of which is publicly traded on NASDAQ, and approximately 185,280 shares of Series A Convertible Preferred Stock (the "Preferred Stock"), which are convertible into shares of Common Stock at the election of the holders. Affiliated funds of Yorktown Partners, LLC hold approximately 36 percent of the Common Stock.

Holders of the Preferred Stock are entitled to a cash dividend of 5.875% per year, payable quarterly in arrears; however, commencing with the fourth fiscal quarter of 2019, XOG elected to begin paying the dividend in-kind, which accrues interest at a rate of 2.5% per quarter. Prior to its maturity date of October 15, 2021, the Preferred Stock is convertible into shares of Common Stock at the holder's election at a conversion ratio of 61.9195 shares of Common Stock per share of Preferred Stock. As of October 15, 2019, pursuant to the terms of the Certificate of Designations governing the Preferred Stock (the "Certificate of Designations"), XOG is no longer able to force conversion of the Preferred Stock into shares of Common Stock. XOG may, however, still redeem the Preferred Stock at any time for the liquidation preference, equal to $1,050.625 per share of Preferred Stock, subject to adjustment in accordance with the terms of the Certificate of Designations. Upon maturity, the Preferred Stock is mandatorily redeemable for cash at the liquidation preference in accordance with the terms of the Certificate of Designations.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Initial Stakeholder Outreach and Retention of Restructuring Advisors.

While the oil and gas sector is presently experiencing unprecedented financial pressure, the Debtors entered into 2020 with a relatively secure financial position.  Despite debt service payments on their approximately $1.7 billion of funded debt and the potential for a springing maturity under their RBL Facility in April 2021, the Debtors maintained financial flexibility.  Most importantly, the Debtors began 2020 with committed financing of up to $950 million under their RBL Facility—sufficient liquidity to service their debt and fund anticipated capital expenditure needs throughout the year.  Indeed, the Debtors secured a "clean" audit report as recently as March 12, 2020.

Nonetheless, recognizing that their then-current asset mix was likely insufficient to best position their business for the long term, in late 2019, the Debtors sought to take proactive steps to optimize their balance sheet and capital needs.  The Debtors engaged advisors—including Moelis and Petrie as investment bankers and Kirkland as legal advisors—to assist charting a path forward to reduce their funded indebtedness.  Through January and February 2020, the Debtors and their advisors evaluated strategic alternatives (including a potential restructuring) to address their leverage position.  Beginning in January 2020, the Debtors and their advisors initiated discussions with certain of their key stakeholders, including members of the current Ad Hoc Noteholder Group and Preferred Holdings Group, to explore a potential holistic liability management transaction.  Ultimately, these initial efforts did not materialize into a viable out-of-court restructuring alternative and negotiations with the Debtors' various stakeholders regarding a potential out-of-court restructuring ceased in late February 2020.   In connection with a review of prior events, the Debtors had executed a program to repurchase stock in 2018 and 2019.  This program was authorized in November 2018 and it concluded in the summer of 2019.  Given the liquidity issues experienced in 2020, the Board deemed it appropriate to review the repurchase of the stock in prior periods, and to determine whether any potential claims exist arising from the share buyback program.  As a result, the Board established a Special Committee to investigate and review the share buyback program, which such process is ongoing.

### B.    Market and Industry-Specific Challenges.

#### 1.    *Recent Market Volatility and March 2020 Oil Market Crash.*

The Debtors' near and long-term liquidity projections were completely upended by the sudden crash of oil prices in March followed by a continuing downward spiral through April and May.  Historically, markets for oil, natural gas, and natural gas liquid have been volatile.  The natural volatility, however, has been greatly exacerbated by the sudden, combined impact of the COVID-19 pandemic and the oil price war between the Kingdom of Saudi Arabia and Russia.

In early 2020, the initial spread of COVID-19 caused decreased factory output and transportation demand, resulting in a sharp decline in energy prices.  In an effort to rectify this strong downward pressure on prices, the Organization of Petroleum Exporting Countries ("OPEC"), led by the Kingdom of Saudi Arabia, called for additional cuts in oil production, subject to agreement by Russia, a non-OPEC member.  Yet, those efforts faltered, and the parties failed to reach an agreement as to production levels.  In the aftermath, both the Kingdom of Saudi Arabia and Russia announced that they would *increase*, rather than decrease, oil production, resulting in significant excess global supply of crude oil amidst the backdrop of an already severely depressed demand environment.

In addition, the uncertainty regarding the impact of COVID-19 and various governmental actions taken to mitigate its impact resulted in an unprecedented decline in demand for oil and natural gas.  At the same time, the decision by Saudi Arabia in March 2020 to drastically reduce export prices and increase oil production followed by curtailment agreements among OPEC and other countries, such as Russia, further increased uncertainty and volatility around global oil supply-demand dynamics.  Decreased demand resulting from "shelter-in-place" orders implemented across much of the United States in order to prevent the further spread of COVID-19 caused domestic storage capacity to peak during March and April, prompting further volatility and ultimately leading the price of crude oil to crater into negative territory for the first time in United States history.  Independent exploration and production companies, such as the Debtors, were hit especially hard, as their revenues are generated primarily from the sale of unrefined oil, natural gas, and natural gas liquids.

### 2.    *Borrowing Base Redetermination.*

While oil prices have tentatively begun to recover, they remain meaningfully below levels seen in the recent past (e.g., June 12, 2020 WTI oil pricing was approximately 40 percent below levels seen at the beginning of 2020), and the extreme and sudden downturn fundamentally changed the economic landscape surrounding the Debtors' deleveraging options.  As a direct effect of the substantial drop in oil and natural gas prices, the borrowing base under the RBL Facility, which is subject to periodic redeterminations, was reduced from $950.0 million to $650.0 million on April 27, 2020.  Combined with the other financial and operational challenges described herein, this borrowing base redetermination further strained the Debtors' liquidity.

### C.    **Exploration of Potential Alternatives.**

The Debtors instituted measures to preserve capital, including measures to increase operational efficiency and the reduction of employment-related expenses through two separate rounds of headcount reductions and salary reductions.  Additionally, over recent months, the Debtors undertook extensive efforts, in consultation with Petrie and A&M, to renegotiate the terms of their existing midstream contracts.  These renegotiation efforts, which remain ongoing, include numerous hours of analysis, formulation of proposals and counterproposals, and discussions with their midstream contract counterparties.

Nonetheless, it became increasingly clear that such measures alone would be insufficient to meet future capital requirements and satisfy financial obligations.  In April 2020, the Debtors again commenced stakeholder outreach to explore potential alternatives and address their liquidity, as discussed below.

### 3.    *Solicitation of Out-of-Court Financing.*

Beginning in April 2020, the Debtors retained Parkman Whaling LLC ("Parkman") to, together with Petrie, conduct a formal out-of-court financing solicitation process to address the Debtors' tightening liquidity needs. Simultaneously, the Debtors commenced contingency planning efforts in concert with the out-of-court financing process efforts as a backstop should such financing efforts not produce a viable proposal.  Shortly thereafter, A&M was retained as restructuring advisor to assist with liquidity management and contingency planning efforts.

Pursuant to the financing solicitation process, Parkman and Petrie, on behalf of the Debtors, contacted over 60 potential investors, including existing equityholders, to explore securing an out-of-court financing.  Ultimately, these efforts did not result in an actionable out-of-court restructuring alternative, and the Debtors elected to discontinue the out-of-court solicitation efforts.  In connection with doing so, the Debtors terminated Parkman's retention.

### 4.    *Restructuring Negotiations and the DIP Financing Solicitation Process.*

As part of their contingency planning efforts, the Debtors re-engaged with certain of their stakeholders, including the Ad Hoc Noteholder Group and the Preferred Holdings Group, regarding the terms of a potential in-court restructuring.  The Debtors' failure to make the 2024 Senior Notes interest payment triggered a 30-calendar-day cure period before such non-payment would constitute an "Event of Default" under the 2024 Senior Notes Indenture.  Non-payment would also cause a cross-default under the RBL Facility.

Following the Board's decision to forego the 2024 Senior Notes interest payment and instead enter the grace period, on May 14, 2020, the Debtors, with the assistance of Moelis, contacted 21 parties in total (including 18 third-parties, the current RBL Lenders via the Revolving Credit Agreement Agent, the Ad Hoc Noteholder Group, and the Preferred Holdings Group), to solicit proposals for debtor-in-possession financing.  Of the 18 third-parties contacted, only four parties requested and executed non-disclosure agreements and were granted access to due diligence through the Debtors' virtual data room.  Ultimately, none of the third-parties submitted a proposal, and the only proposal the Debtors received was from the Revolving Credit Agreement Agent.

In the week leading up to the Petition Date, the Preferred Holdings Group expressed a desire to avoid an in-court proceeding.  The Debtors and their advisors, both with the Ad Hoc Noteholder Group and separately, engaged in meaningful discussions with the Preferred Holdings Group in the hopes of ultimately reaching agreement on a value-maximizing path forward on an out-of-court basis.  Ultimately, the Debtors determined that their severe liquidity

constraints did not allow for the timeline necessary to effect a viable and comprehensive deleveraging out-of-court transaction.

The Debtors and their advisors had numerous discussions with the Ad Hoc Noteholder Group, the RBL Group (including the Revolving Credit Agreement Agent), and the Preferred Holdings Group on a potential plan of reorganization structure. Although the Debtors were not able to achieve consensus across their entire prepetition capital structure prior to filing, the parties made significant progress, and the Debtors ultimately reached an agreement with the Ad Hoc Noteholder Group, representing over 80% in aggregate principal amount of the Senior Notes, and entered into the Restructuring Support Agreement. The Restructuring Support Agreement contemplates the terms of the Restructuring Transactions provided in the Plan.

Additionally, the Debtors, in consultation with their advisors, determined that the financing proposal provided by the RBL Group afforded the Debtors the best (and in fact the only) financing arrangement to enable the Debtors to continue to operate through the chapter 11 process, and was in the best interests of the Debtors and their estates. Although the Debtors were unable to achieve a global consensus prior to filing, the proposed DIP Facility provides the bedrock upon which the Debtors hope to build such accord. At the core, it was the Debtors' tightening liquidity that dictated the timeline on which the Debtors could negotiate and ultimately necessitated a chapter 11 filing without a broader agreement among all parties in place—the Debtors needed to file for chapter 11 in order to access the additional liquidity provided by the DIP Facility to avoid halting operations entirely. Nevertheless, the Debtors continued negotiations with the hope of entering into an agreement as soon as possible following the Petition Date.

On or about June 14, 2020, the Debtors executed a commitment letter for a $125 million postpetition financing facility (comprised of $50 million in new money), substantially on the same terms as set forth in the DIP Motion and DIP Credit Agreement. The proposed DIP Facility represents the culmination of a hard-fought process, provides the Debtors and their creditor constituencies with postpetition financing on the best available terms, allows the Debtors to continue operating their businesses and operations on a postpetition basis, halts the further accrual of interest under the Debtors' various unsecured or under secured prepetition debt instruments, and gives the Debtors (and their stakeholders) an opportunity to negotiate and consummate an orderly and efficient deleveraging, as set forth in the Milestones.

## VII.    EVENTS OF THE CHAPTER 11 CASES

### A.    Corporate Structure upon Emergence.

Except as otherwise provided in the Plan, the New Corporate Governance Documents, the New Common Shares Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval

### B.    Expected Timetable of the Chapter 11 Cases.

The Restructuring Support Agreement, which is attached as **Exhibit B**, and as amended from time to time consistent with the Final DIP Order and any amendments thereto, set forth certain milestones. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.    First Day Relief.

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement

of the Chapter 11 Cases. At a hearing on June 16, 2020 (the "First Day Hearing"), the Bankruptcy Court granted all of the relief requested in the First Day Motions. Subsequently, the Bankruptcy Court granted the relief requested in the First Day Motions on a final basis. The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/extractionog.

### D.  Other Requested First-Day Relief and Retention Applications.

In addition, the Debtors filed motions and/or applications seeking certain customary relief, including an order directing the joint administration of the three Chapter 11 Cases under a single docket and orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland as their legal advisors, WTP as their local counsel, Moelis and Petrie as their investment bankers, A&M as their restructuring advisors, Deloitte Tax LLP as their tax services provider, PricewaterhouseCoopers LLP as their independent auditor and tax compliance provider, KCC as their Notice and Claims Agent, and has engaged Riveron Consulting LLC as their financial reporting and fresh start accounting advisor, and Protiviti Inc. as their internal control servicer.

### E.  Schedules and Statements.

The Debtors filed their Schedules on July 31, 2020.

### F.  Appointment of Creditors' Committee.

On June 30, 2020, the Creditors' Committee was appointed pursuant to section 1102(a)(1) of the Bankruptcy Code. *See* Docket No. 155.

### G.  Midstream Litigation.

The Debtors are party to various adversary proceedings to determine whether certain agreements are subject to section 365 of the Bankruptcy Code. Accordingly, the Debtors filed various adversary proceedings to determine the nature of the agreements. On August 14, 2020, the Debtors filed an adversary proceeding against REP Processing, LLC [Ad. Pr. No. 20-50813]. On August 19, 2020, the Debtors filed an adversary proceeding against Grand Mesa Pipeline, LLC [Ad. Pr. No. 20-50816]. On August 25, 2020, the Debtors filed an adversary proceeding against Platte River Midstream, LLC and DJ South Gathering, LLC [Ad. Pr. No. 20-50833]. On September 4, 2020, the Debtors filed an adversary proceeding against Elevation Midstream, LLC [Ad. Pr. No. 20-50839]. On September 8, 2020, the Debtors filed an adversary proceeding against Rocky Mountain Midstream LLC [Ad. Pr. No. 20-50840]. On October 14, 2020, the Bankruptcy Court published the *Findings of Fact and Conclusions of Law on Plaintiff's Motion for Summary Judgment against Platte River Midstream, LLC and DJ South Gathering, LLC* [Docket No. 833], which determined that the covenant did not run with the land and thus, that the Executory Contracts are eligible for rejection under section 365 of the Bankruptcy Code. On October 14, 2020, the Bankruptcy Court published the *Findings of Fact and Conclusions of Law on Plaintiff's Motion for Summary Judgment against Defendant, Grand Mesa Pipeline, LLC; and Defendant's Motion for Permissive Abstention* [Docket No. 834], which determined that the covenant did not run with the land and thus, that the Executory Contracts are eligible for rejection under section 365 of the Bankruptcy Code. On October 20, 2020, Grand Mesa Pipeline, LLC filed the *Notice of Appeal* [Docket No. 864], appealing the Bankruptcy Court's decision. On October 20, 2020, the Federal Energy Regulatory Commission filed the *Notice of Appeal and Statement of Election*, appealing the Bankruptcy Court's decision with respect to Grand Mesa Pipeline, LLC.

## VIII.  RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH**

**OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### 1.    *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies; and

- the Debtors' enterprise value.

### 2.    *There Is a Risk of Termination of the Restructuring Support Agreement.*

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 3.    *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a)    Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims under the Plan complies with the requirements

set forth in the Bankruptcy Code because the Debtors created Classes of Claims, each encompassing Claims that are substantially similar to the other Claims in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(b)        **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

(c)        **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

(d)        **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions as described in Article XI of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, with the consent of the Required Consenting Senior Noteholders, and the Majority Lenders, or the Majority Exit RBL Facility Lenders, as applicable in accordance with Article I.A.56 of the Plan, and subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

(e)        **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition,

31

the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Accrued Professional Compensation Claims.

**(f)**        **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan or the DIP Orders, as applicable, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(g)**        **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(h)**        **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies could affect solutions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**(i)**        **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article X of the Plan provides for certain releases, injunctions, and exculpations.  However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

**4.**        *Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.*

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, and changes in commodity prices.  As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**5.**        *Risks Related to the New Common Shares.*

The following are some of the risks that apply to Holders of Claims against the Debtors who become Holders of the New Common Shares if any are distributed pursuant to the Plan.  There are additional risk factors attendant to ownership of the New Common Shares that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

(a)      **The Estimated Value of the New Common Shares in Connection with the Plan May Differ from the Actual Value of the New Common Shares.**

The estimated value of the New Common Shares for purposes of estimating recovery percentages under the Plan represents a valuation of the Reorganized Debtors and assumes that, among other things, such Reorganized Debtors continue as an operating business.  Such valuation does not purport to constitute an appraisal of the Reorganized Debtors or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors or their assets, which may be materially different than the estimated value of the New Common Shares.  Accordingly, the estimated value of the New Common Shares does not necessarily reflect the actual market value of the New Common Shares that might be realized after Confirmation and Consummation of the Plan, which may be materially lower than the estimated valuation of the New Common Shares as set forth in this Disclosure Statement.  Accordingly, such estimated value is not necessarily indicative of the prices at which the New Common Shares may trade after giving effect to the transactions set forth in the Plan.

(b)      **An Active Trading Market May Not Develop for the New Common Shares.**

The New Common Shares are a new issue of securities and, accordingly, there is currently no established public trading market for the New Common Shares.  If no active trading market in the New Common Shares develops, the market price and liquidity of the New Common Shares may be adversely affected.  If a trading market does not develop or is not maintained, holders of New Common Shares may experience difficulty in reselling such securities at an acceptable price or may be unable to sell them at all.  Even if a trading market were to exist, such market could have limited liquidity and the New Common Shares could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, markets for similar securities, industry conditions, financial performance, prevailing interest rates, conditions in financial markets, or prospects and investor expectations thereof.  As a result, there may be limited liquidity in any trading market that does develop for the New Common Shares.  Finally, the New Organizational Documents may also contain restrictions on the transferability of the New Common Shares (such as rights of first refusal/offer, tag-along rights, and/or drag-along rights, among others), which may adversely affect the liquidity in the trading market for the New Common Shares.

(c)      **The Trading Prices for the New Common Shares May Be Depressed Following the Effective Date.**

Following the Effective Date, recipients of the New Common Shares under the Plan may seek to dispose of such securities to obtain liquidity, which could cause the initial trading prices for these securities to be depressed, particularly in light of the lack of established trading markets for these securities.  Further, the possibility that recipients of New Common Shares may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the New Common Shares.

(d)      **A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors.**

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding New Common Shares in the Reorganized Debtors.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors or managers and approve significant mergers and other material corporate transactions.

(e)      **The Issuance of New Common Shares under the Management Incentive Plan and the Issuance of Common Shares upon Any Exercise of the New Warrants Will Dilute the New Common Shares.**

The New Board will be authorized to implement the Management Incentive Plan.[10]  If the Reorganized Debtors distribute such equity-based awards to management pursuant to the Management Incentive Plan, it is

---

[10]    The Management Incentive Plan and executive compensation are subject to ongoing negotiations among the Debtors and Consenting Senior Noteholders.

contemplated that such distributions will dilute the New Common Shares issued on account of Claims under the Plan and the ownership percentage represented by the New Common Shares distributed under the Plan.

Furthermore, the Plan contemplates the issuance of the New Warrants to holders of Existing Equity Interests and Existing Preferred Interests.  The issuance of Common Shares upon any exercise of the New Warrants will also dilute the New Common Shares.

**(f)      The New Common Shares are an Equity Interest and Therefore Subordinated to the Indebtedness of the Reorganized Debtors.**

In any liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Shares would rank junior to all debt claims against the Reorganized Debtors.  As a result, holders of New Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all of their obligations to their debt holders have been satisfied.

**(g)      Certain Holders of New Common Shares May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

To the extent that the New Common Shares are issued under the Plan pursuant to section 1145(a) of the Bankruptcy Code, such New Common Shares may be resold by the holders thereof without registration under the Securities Act, unless the holder is an "underwriter" with respect to such securities.  Resales by Persons who receive New Common Shares pursuant to the Plan that are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Such Persons would only be permitted to sell such securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act or another applicable exemption.

The New Common Shares will not be registered under the Securities Act or any state securities law, and the Reorganized Debtors make no representation regarding the right of any holder of New Common Shares to freely resell the New Common Shares.

The New Common Shares issued on account of the Backstop Obligations and the Backstop Commitment Premium are being issued and sold pursuant to an exemption from registration under applicable securities laws.  Accordingly, such securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law.

**(h)      The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors.**

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

**(i)      The Terms of the New Common Shares Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Common Shares have not been finalized and are subject to ongoing negotiations.  The results of such negotiations may alter the terms of the New Common Shares in a material manner.  As a result, the final terms of the New Common Shares may be less favorable to Holders of Claims or Interests than as described herein and in the Plan.

**6.      *Necessary Governmental Approvals May Not Be Granted.***

Consummation of the Restructuring Transactions depends upon the approval of FERC, approval by the United States Department of Justice under the HSR Act, and any other approvals may be required by a Governmental

Unit.  Failure by any Governmental Unit to grant a necessary approval could prevent consummation of the Restructuring Transactions and Confirmation of the Plan.

### B.    Risks Related to Recoveries Under the Plan.

**7.    *The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.***

The Financial Projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.  There is no guarantee that the Financial Projections will be realized, and actual financial results may differ significantly from the Financial Projections.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the Exit Facility and the New Common Shares.  Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Debtors to seek additional working capital.  The Reorganized Debtors may be unable to obtain such working capital when it is required, or may only be able to obtain such capital on unreasonable or cost prohibitive terms.  For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors, and also have a negative effect on the value of the New Common Shares.  In addition, if any such required capital is obtained in the form of equity, the New Common Shares to be issued to Holders of Allowed Claims in Class 3 under the Plan could be diluted.

**8.    *Estimated Valuations of the Debtors, the New Common Shares, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.***

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.  In addition, there can be no guarantee that the Reorganized Debtors will have adequate liquidity to fund the New Organizational Documents.

**9.    *Holders of Claims or Interests That Acquire the New Common Shares May Assert Significant Control Over the Reorganized Debtors.***

On the Effective Date, the Reorganized Debtors shall issue the New Common Shares to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan, as well as options, or other equity awards, if any, under the Management Incentive Plan.[11]  As a result, following the Consummation of a Stand-Alone Restructuring, certain Holders of Allowed Claims may exercise substantial influence over the Reorganized Debtors and their affairs.

---

[11]    The Management Incentive Plan and executive compensation are subject to ongoing negotiations among the Debtors and Consenting Senior Noteholders.

      10.     *The Tax Implications of the Debtors' Bankruptcy and Reorganization Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Section XII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

**C.     Risks Related to the Debtors' Businesses.**[12]

      1.     *The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.*

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control. The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit Facility upon emergence.

      2.     *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, independent contractors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, independent contractors, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

      3.     *Financial Results May Be Volatile and May Not Reflect Historical Trends.*

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of

---

[12]    For the avoidance of doubt, as used in this section, the term Debtors shall refer to both the Debtors prior to the Effective Date and the Reorganized Debtors after the Effective Date.

revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The financial projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on such financial projections.

## 4. *The Debtors' Substantial Liquidity Needs May Impact Revenue*.

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, decreased E&P sector capital expenditures, or otherwise, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

## 5. *Oil, Natural Gas, and Natural Gas Liquids Prices Are Volatile, and Continued Low Oil, Natural Gas, or Natural Gas Liquids Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition*.

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on the willingness of their operator customer base to make operating and capital expenditures to explore and drill for, develop, produce, and extract oil, natural gas, and NGLs. Operators' willingness to conduct such activities are in turn dependent on prevailing oil, natural gas, and NGLs prices. Further, since operators are reluctant to increase drilling activities in a high-volatility commodities pricing environment, demand for the Debtors' services is affected as much by oil, natural gas, and NGLs price expectations as actual pricing. In short, the Debtors face a high level of exposure to oil, natural gas, and NGLs price swings. Oil, natural gas, and NGLs are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand and are subject to both short-term and long-term cyclical trends. Oil, natural gas, and NGLs prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The Debtors expect such volatility to continue in the future. The prices for oil, natural gas, and NGLs are volatile due to a variety of factors, including, but not limited to:

- worldwide and regional economic conditions impacting the global supply and demand for oil and natural gas, including the economic impacts of the COVID-19 virus;

- the domestic and foreign supply of oil and natural gas;

- the ability of members of the Organization of Petroleum Exporting Countries and other producing countries to agree upon production levels which has an impact on oil prices;

- social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or terrorist attacks, whether or not in oil or natural gas producing regions;

- the level and growth of consumer product demand;

- labor unrest in oil and natural gas producing regions;

- weather conditions, including hurricanes and other natural occurrences that affect the supply and/or demand of oil and natural gas;

- the price and availability of alternative fuels and renewable energy sources;

- the impact of the U.S. dollar exchange rates on commodity prices;

- the price of foreign imports;

- technological advances affecting energy consumption;

- worldwide economic conditions; and

- the availability of liquid natural gas imports and exports.

As set forth in Article VI.B of this Disclosure Statement, in early 2020, the continued spread of COVID-19 led to a decline in factory output and transportation demand, causing oil and gas prices to suffer.  Subsequently, in March 2020, a breakdown in dialogue between OPEC and Russia over proposed oil production cuts in the midst of the COVID-19 pandemic caused oil and gas prices to fall to their lowest levels in nearly twenty years.  It is impossible to tell with certainty whether a deal will be reached regarding production levels and whether such a deal would ultimately correct commodity prices.  Further, it is impossible to tell with certainty how, or to what degree, the COVID-19 pandemic will affect the macro-economy and commodity prices in the long term.

Continued volatility or weakness in oil, natural gas, and NGLs prices (or the perception that oil, natural gas, and NGLs prices will remain depressed) generally leads to decreased upstream spending, which in turn negatively affects demand for the Debtors' services.  A sustained decline in oil, natural gas, or NGLs prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.  As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

6.    ***Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition, and Results of Operations.***

The Debtors' future success will depend on, among other things, the success of their development and production activities.  The Debtors must incur significant expenditures to identify and acquire properties and to drill and complete wells.  The costs of drilling and completing wells are often uncertain, and drilling operations may be curtailed, delayed, or canceled as a result of a variety of factors, including unexpected drilling conditions, pressure or irregularities in formations, equipment failures or accidents, weather conditions, and shortages or delays in the delivery

of equipment.  Additionally, seismic and other technology does not allow the Debtors to know conclusively prior to drilling a well that oil and natural gas is present or economically producible.  The results of drilling in new or emerging formations, including the Debtors' properties in shale formations, are more uncertain initially than drilling results in areas that are developed, have established production, or where the Debtors have a longer history of operation.  Overruns in budgeted expenditures are common risks that can make a particular project uneconomical.

Further, the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment, materials, and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as releases, spills, leaks, ruptures or discharges of toxic gases, brine, well fluids or other hazardous substances, materials or wastes (including petroleum) into the environment;

- adverse weather conditions;

- reductions in oil and natural gas prices;

- natural gas and oil property title problems; and

- market limitations for natural gas and oil.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

In addition, the Debtors' operations are subject to the risks inherent in the oil and natural gas industry, including the risks of fires, explosions, and blowouts; pipe failures; abnormally pressured formations; and environmental hazards such as releases, spills, leaks, ruptures or discharges of toxic gases, brine, well fluids or other hazardous substances, materials or wastes (including petroleum) into the environment.  As is customary in the oil and natural gas industry, the Debtors maintain insurance against some, but not all, of these risks.  The Debtors' insurance may not be adequate to cover these potential losses or liabilities.  Further, insurance coverage may not continue to be available at commercially acceptable premium levels or at all.  Although the Debtors historically have maintained certain insurance policies, due to cost considerations, from time to time the Debtors may decline to obtain or maintain

coverage for certain drilling activities. Losses and liabilities arising from uninsured or under-insured events could require the Debtors to make large unbudgeted Cash expenditures that could adversely impact the results of operations and Cash flow.

Further, the Debtors' success depends upon their ability to find, develop or acquire additional oil and natural gas reserves that are profitable to produce. Factors that may hinder the Debtors' ability to acquire or develop additional oil and natural gas reserves include competition, access to capital, prevailing oil and natural gas prices, and the number and attractiveness of properties for sale. The Debtors' decisions to purchase, explore, develop or otherwise exploit properties or prospects will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic and other information, the results of which are often inconclusive and subject to various interpretations. These decisions could significantly reduce the Debtors' ability to generate Cash needed to service the Debtors' debt and other working capital requirements.

> **7.** ***Contracted Revenues May Not Be Fully Realized and May Reduce Significantly in the Future, Which May Have a Material Adverse Effect on the Debtors' Financial Position, Results of Operations, or Cash Flows.***

The Debtors' expected revenues under existing contracts may not be fully realized due to a number of factors, including rig or equipment downtime or suspensions of operations. Several factors could cause downtime or a suspension of operations, many of which are beyond the Debtors' control, including:

- breakdowns of equipment or the equipment of others necessary for continuation of operations;

- work stoppages, including labor strikes;

- shortages of material and skilled labor;

- severe weather or harsh operating conditions;

- the occurrence or threat of epidemic or pandemic diseases or any government response to such occurrence or threat (including the COVID-19 pandemic);

- the early termination of contracts; or

- force majeure events.

Liquidity issues could lead the Debtors' customers to file for bankruptcy and/or could encourage the Debtors' customers to seek to repudiate, cancel, or renegotiate their contracts for various reasons. Some of the Debtors' contracts permit early termination of the contract by the customer for convenience (without cause), generally exercisable upon advance notice to the Debtors and in some cases without making an early termination payment to the Debtors. There can be no assurance that the Debtors' customers will be able or willing to fulfill their contractual commitments.

Significant declines in oil prices, the perceived risk of low oil prices for an extended period, and the resulting downward pressure on utilization may cause some customers to consider early termination of select contracts despite having to pay early termination fees in some cases. In addition, customers may request to re-negotiate the terms of existing contracts. Furthermore, as the Debtors' existing contracts roll off, the Debtors may be unable to secure replacement contracts for the Debtors' rigs, equipment, or services. The Debtors have been in discussions with some of their customers regarding these issues. Therefore, revenues recorded in future periods could differ materially from current contracted revenues, which could have a material adverse effect on the Debtors' financial position, results of operations, or cash flows.

8.      *The Debtors' Operations or Ability to Emerge from Bankruptcy May Be Impacted By the Continuing COVID-19 Pandemic.*

The continued spread of COVID-19 could have a significant impact on the Debtors' business, both in the context of consumer demand and production capacity.  On a macro level, this pandemic could dampen global growth and ultimately lead to an economic recession.  If this occurs, demand for oil, natural gas, or NGLs would likely decline, as would commodity prices generally (including oil and natural gas).  Such a scenario would negatively impact the Debtors' financial performance.  In addition, government lockdowns and employee infections could both inhibit the Debtors' ability to extract and transport their hydrocarbon production.  This diminished production capacity would negatively affect the Debtors' financial performance.

9.      *The Debtors' Business Is Subject to Complex Laws and Regulations that Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.*

The Debtors' oil and natural gas operations are subject to various federal, state and local governmental regulations, including environmental laws and regulations that impose penalties and other sanctions for noncompliance and that require measures to remediate or mitigate pollution and environmental impacts from current and former operations.  Significant expenditures may be required to comply with these laws and regulations.  The Debtors could be liable for costs of investigation, removal and remediation, damages to and loss of use of natural resources, loss of profits or impairment of earning capacity, property damages, costs of increased public services, as well as administrative, civil and criminal fines and penalties, and injunctive relief.  Certain environmental statutes impose strict, joint and several liability for costs required to investigate, clean up and restore sites where hazardous substances or other waste products have been disposed of or otherwise released (i.e., liability may be imposed regardless of whether the current owner or operator was responsible for the release or contamination or whether the operations were in compliance with all applicable laws at the time the release or contamination occurred).  In general, oil and natural gas operations (including hydraulic fracturing operations) recently have been the subject of increased legislative and regulatory attention with respect to public health and environmental matters, which could result in increased costs for environmental compliance, such as emissions control, permitting, or waste handling, storage, transport, remediation or disposal for the oil and natural gas industry and could have a significant impact on the Debtors' operating costs.

10.     *The Debtors' Operations Are Subject to Hazards Inherent in the E&P Sector.*

Risks inherent in the E&P sector, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment.  These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could result in a variety of claims, losses, and remedial obligations that could have an adverse effect on the Debtors' business and results of operations.  The existence, frequency, and severity of such incidents will affect operating costs, insurability and relationships with customers, employees, independent contractors, and regulators.

11.     *The Debtors Operate in a Highly-Competitive Industry with Significant Potential for Excess Capacity.*

The E&P sector is highly competitive and fragmented and includes several large companies that compete in many of the markets in which the Debtors operate, as well as numerous small companies that compete with the Debtors on a local basis.  The Debtors' operations may be adversely affected if their current competitors or new market entrants expand into service areas where the Debtors operate.  Competitive pressures and other factors may result in significant price competition, particularly during industry downturns, which could have a material adverse effect on the results of operations and the Debtors' financial condition.

12. *The Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.*

In the future, the Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Debtors' businesses and financial stability, however, could be material.

13. *The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

14. *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before Confirmation of the Plan (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a Plan could be asserted against the reorganized entity and may have an adverse effect on the Debtors' financial condition and results of operations.

D.    **Miscellaneous Risk Factors and Disclaimers.**

1. *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. *No Legal or Tax Advice Is Provided By This Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

3. *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other

legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

### 4.    *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

### 5.    *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

### 6.    *No Representations Outside This Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.    ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.    VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE.**

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Disclosure Statement Order attached hereto as **Exhibit D**.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Revolving Credit Agreement Claims | Impaired |
| 4 | Senior Notes Claims | Impaired |
| 6 | General Unsecured Claims | Impaired |
| 7 | Existing Preferred Interests | Impaired |
| 8 | Existing Common Interests | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s). Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provided to you. If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

**B.      Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**C.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article IX of this Disclosure Statement.

**D.      Classes Not Entitled To Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Other Secured Claims | Presumed to Accept |
| 2 | Other Priority Claims | Presumed to Accept |
| 5 | Trade Claims | Presumed to Accept |
| 9 | Other Equity Interests | Presumed to Reject |
| 10 | Intercompany Claims | Deemed to Accept / Presumed to Reject |
| 11 | Intercompany Interests | Deemed to Accept / Presumed to Reject |
| 12 | Section 510(b) Claims | Deemed to Reject |

### E.    Solicitation Procedures.

#### 1.    *Notice and Claims Agent.*

The Debtors have applied to retain KCC to act, among other things, as the Notice and Claims Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2.    *Solicitation Package.*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order);

- the applicable form of Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope;

- the Cover Letter (as defined in the Disclosure Statement Order);

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order);

- the Equity Rights Offering Procedures[13] ; and

- such other materials as the Bankruptcy Court may direct.

#### 3.    *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors are causing the Notice and Claims Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on November 9, 2020 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Notice and Claims Agent by:  (a) calling the Notice and Claims Agent at (866) 571-1791 (U.S./Canada) or (781) 575-2049 (International) and asking for the "Solicitation Group" or (b) writing to the Notice and Claims Agent at Extraction Oil & Gas Ballots Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, California 90245.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://kccllc.net/extractionog, or the

---

[13]    The Equity Rights Offering Procedures will only be included in Solicitation Packages for Holders of Claims or Interests in Class 4, Class 7, and Class 8.

Bankruptcy Court's website at http://www.deb.uscourts.gov (for a fee).  Holders should choose only one method to return their Ballot.

By the earlier of (a) 14 days before the Confirmation Hearing or (b) 7 days prior to the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Notice and Claims Agent by:  (a) calling the Notice and Claims Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://kccllc.net/extractionog; or (c) writing to the Notice and Claims Agent at Extraction Oil & Gas Ballots Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, California 90245.

### F.    Voting Procedures

[●], 2020 (the "Voting Record Date"), is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (i) using the enclosed pre-paid, pre-addressed return envelope or (ii) via first class mail, overnight courier, or hand delivery to Extraction Oil & Gas Ballots Processing Center, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, California 90245, so that such Holder's Ballot is actually received by the Notice and Claims Agent on or before the Voting Deadline, *i.e.* twenty-eight (28) days after Solicitation Launch, but in no event later than [●] at 4:00 p.m. (prevailing Eastern Time).

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser and agent for the relevant facility provide satisfactory confirmation of the transfer to the Notice and Claims Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.  You may also receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately.  Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan (as applicable).  If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be (i) treated as a single creditor for voting purposes and (ii) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME

CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

> ### G.    Voting Tabulation.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Notice and Claims Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Notice and Claims Agent.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

> ### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL-FREE NUMBER AT (866)-989-6149. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

## X.    CONFIRMATION OF THE PLAN

> ### A.    Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for Confirmation are the following:  (i) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Revolving

Credit Agreement Claims, Holders of Class 4 Senior Notes Claims, Holders of Class 5 Trade Claims, Holders of Class 6 General Unsecured Claims, Holders of Class 7 Existing Preferred Interests, Holders of Class 8 Existing Common Interests, Holders of Class 9 Other Equity Interests, Holders of Class 10 Intercompany Claims, Holders of Class 11 Intercompany Interests, and and Holders of Class 12 Section 510(b) Claims).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.    Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property

of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit C**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### C.    Feasibility.

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the deleveraging of the Debtors and the distribution of their assets. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### E.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.     *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

### 2.     *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

#### (a)     Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

#### (b)     Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

#### (c)     Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XI.    IMPORTANT SECURITIES LAWS DISCLOSURES

The Debtors believe the New Common Shares to be issued pursuant to the Plan to be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities laws.

### A.    Issuance of Securities under the Plan; Registration Rights

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property.  In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.  In reliance upon this exemption, the Debtors believe that the offer and sale of the New Common Shares and the New Warrants to be issued pursuant to the Plan  (other than the New Common Shares issued on account of the Backstop Obligations and the Backstop Commitment Premium (each as defined in the Backstop Commitment Agreement and the Plan)) (collectively, the "<u>1145 Securities</u>") will be exempt from registration under the Securities Act and state securities laws with respect to any such holder who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

The Debtors and the Reorganized Debtors, as applicable, will use best efforts to promptly make the New Common Shares eligible for deposit with the DTC and posted on Bloomberg.  To the extent the Reorganized XOG has not yet become an SEC registered reporting entity, any New Common Shares issued under the Plan will entitle the beneficial owner of such securities to certain information rights, including the following: (1) quarterly unaudited financials (with MD&A); (2) annual audited financials (with MD&A); (3) quarterly management calls with Q&A; (4) prompt reporting of material acquisitions, dispositions, restructurings, mergers, issuances of debt or similar transactions; (5) all other material publicly available reports; and (6) sufficient financial information about the Reorganized Debtors shall be provided to market makers to allow the New Common Shares to be "pink sheets" eligible.  For the avoidance of doubt, the foregoing shall not be required with respect to such New Common Shares to the extent that the Reorganized XOG is an SEC registered reporting entity.

Furthermore, on the Effective Date, the Reorganized Debtors, each Consenting Senior Noteholder and any other holders of 10% or more of the New Common Shares will be party to the Registration Rights Agreement..

### B.    Subsequent Transfers of Securities Issued under the Plan.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any entity who, except with respect to ordinary trading transactions of an entity that is not an issuer:

- purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

- offers to sell securities offered or sold under the plan of reorganization for the holders of such securities;

- offers to buy securities offered or sold under the plan of reorganization from the holders of such securities, if the offer to buy is (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

You should confer with your own legal advisors to help determine whether or not you are an "underwriter."

To the extent that persons who receive the securities issued under the Plan that are exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be "underwriters" may, however, be permitted to sell such securities without registration pursuant to the provisions of Rule 144 under the Securities Act. These rules generally permit the public sale of securities received by "underwriters" subject to certain holding periods if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to any securities issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving securities under the Plan would be an "underwriter" with respect to such securities.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

## XII.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims and Interests entitled to vote on the Plan (i.e., Holders of Revolving Credit Agreement Claims, Senior Notes Claims, General Unsecured Claims, Existing Preferred Interests, and Existing Common Interests). It does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS or any other taxing authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules, such as persons who are related to the Debtors or Reorganized Debtors within the meaning of section 267 of the Tax Code, persons liable for alternative minimum tax, the so-called "Medicare tax" or the base erosion and anti-abuse tax, persons subject to special tax accounting rules as a result of preparing an "applicable financial statement" (as defined in section 451 of the Tax Code), persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or Interests or who will hold the New Common Shares, New Warrants or Exit Facility as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and persons who are themselves in bankruptcy. Furthermore, this summary assumes that a Holder of a Claim or an Interest holds only Claims or Interests in a single Class and holds such Claim or Interest only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors or Reorganized Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Revolving Credit Agreement Claims, Senior Note Claims and Exit Facility constitute or will constitute interests in the Debtors or Reorganized Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims or Interests that act as backstop parties or otherwise act or receive consideration in a capacity other than any other holder of a Claim or Interest, and the tax consequences for such Holders may differ materially from those described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors and Holders of Claims or Interests described below also may vary depending on the nature of any restructuring transactions that the Debtors and/or Reorganized Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary supervision over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim or Interest that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of the partner (or other beneficial owner) generally will depend upon the status of the partner and the activities of the partnership and the partner.  Partnerships and partners of such partnerships that are Holders of Claims or Interests are urged to consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**B.**      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors.**

  *1.*      *Effects of Restructuring on Tax Attributes of Debtors.*

As of December 31, 2019, the Debtors estimate they had approximately $1.1 billion of federal NOL carryforwards, $400 million of capitalized intangible drilling costs, and $1.6 billion of tax basis in their oil and gas

assets. They further estimate that they may generate additional NOLs and potentially other tax attributes, including capitalized intangible drilling costs, in the 2020 tax year.

### 2.    COD Income.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any cash (e.g., any proceeds from a new reserve-based lending facility or the Equity Rights Offering), (ii) the issue price of any new indebtedness of the taxpayer (e.g., the Exit Facility), and (iii) the fair market value of any other consideration (e.g., New Common Shares), in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case, or (b) to the extent that the taxpayer is insolvent immediately before the discharge. Instead, as a consequence of such exclusion, a taxpayer must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business tax credits; (c) capital loss carryovers; (d) tax basis in assets (including, in the case of a partner in a partnership such partner's outside basis in its partnership interest), but not below the amount of liabilities to which the debtor remains subject; (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the debtor's net income or loss for the taxable year of the debt discharge has been determined. Any COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

No determination has yet been made as to whether the Reorganized Debtors would elect first to reduce tax basis in their property or to first reduce NOLs. At this time, regardless of whether the Reorganized Debtors make this election, no assurance can be given that the Reorganized Debtors would have NOLs or other tax attributes remaining after reduction for COD income.

The amount of COD Income that may result in a reduction of the Debtors' tax attributes will depend on the fair market value (or issue price as determined for U.S. federal income tax purposes, in the case of new debt) of the consideration received by holders of Claims against the Debtors. The fair market value and issue price, as applicable, of such consideration cannot be known with certainty until after the Effective Date.

### 3.    Limitation on Utilization of NOLs and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors anticipate that the ability to use any remaining tax attributes post-emergence will be subject to certain limitations under Section 382 and Section 383 of the Tax Code.

Under Sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes allocable to periods prior to the ownership change (collectively, the "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including depletion, amortization, or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the Plan will result in an "ownership change" of XOG on the Effective Date for these purposes, and that the

Reorganized Debtors' use of any available Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

 (a)   **General Section 382 Annual Limitation.**

  In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs).[14]  The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[15]  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

  Notwithstanding the rules described above, if post-ownership change a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

 (b)   **Special Bankruptcy Exceptions.**

  An exception to the foregoing annual limitation rules generally applies when former equity holders and so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Interests or Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors were to undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

  Under the exception in Section 382(l)(6) of the Tax Code (the "382(l)(6) Exception"), the annual limitation is calculated by reference to the lesser of (a) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation from any such subsequent change of ownership would be determined under the regular rules for ownership changes.

---

[14] The applicable rate is 0.85 percent in October 2020, 0.76 percent in September 2020 and 0.85 percent in August 2020; as such, an ownership change occurring in October 2020, would utilize a 0.85 percent rate.  The Debtors cannot estimate what the applicable rate will be on the Effective Date (or on any other date on which an ownership change might occur).

[15] The IRS issued proposed regulations in September 2019 that would make substantial changes to these rules.  However, the IRS has also issued proposed regulations that would cause any company that has an ownership change pursuant to a plan of reorganization in a bankruptcy case filed before the proposed regulations are finalized to be "grandfathered."  Accordingly, the September 2019 proposed regulations are not expected to have an impact on the Debtors with respect to the ownership change that will occur pursuant to the Plan.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception. Additionally, as discussed above, no assurance can be given that the Reorganized Debtors would have NOLs allocable to periods prior to the Effective Date remaining after giving after reduction for COD Income. Even if the 382(l)(5) Exception could apply, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change may occur within two years after emergence. Given the uncertainty regarding whether the 382(l)(5) Exception may apply or be elected out of, the Debtors anticipate that their use of the Pre-Change Losses (if any) after the Effective Date likely will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the U.S. Tax Code were to occur after the Effective Date.

**C.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests Entitled to Vote.**

**1.    *Consequences to Holders of Allowed Revolving Credit Agreement Claims.***

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Allowed Revolving Credit Agreement Claims, each holder thereof will receive the revolving loans, letter-of-credit participations, and other fees under the Exit Facility and may also receive term loans.

Although the matter is not free from doubt, we believe and intend to take the position that the Revolving Credit Agreement Claims should not be treated as "securities" for U.S. federal income tax purposes, and the remainder of this discussion assumes that the Revolving Credit Agreement Claims are not treated as "securities" for U.S. federal income tax purposes. Additionally, although the treatment of the Exit Facility cannot be known with certainty at this time, the discussion assumes that the Exit Facility will not be treated as a "security" for U.S. federal income tax purposes. The exchange of Allowed Revolving Credit Agreement Claims for the Exit Facility is expected to be treated as a taxable exchange under Section 1001 of the Tax Code. In that case, a U.S. Holder of an Allowed Revolving Credit Agreement Claim would generally recognize gain or loss in an amount equal to (a) the issue price of the Exit Facility, as applicable, received for such Revolving Credit Agreement Claim (other than any Exit Facility treated as received in satisfaction of accrued but untaxed interest on the Allowed Revolving Credit Agreement Claims as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such Revolving Credit Agreement Claim. A U.S. Holder's initial aggregate tax basis in the Exit Facility would generally equal the issue price of the Exit Facility. A U.S. Holder's holding period for the Exit Facility would begin the day following the exchange. Any gain or loss recognized by a U.S. Holder from the exchange will be capital gain or loss, except to the extent described below under "Market Discount." Capital gain will generally be taxable at preferential rates to any non-corporate U.S. Holder whose holding period in its Allowed Revolving Credit Agreement Claim is greater than one year at the time of the exchange. The deductibility of capital losses is subject to limitations.

**2.    *Consequences to Holders of Allowed Senior Notes Claims.***

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of Allowed Senior Note Claims, each holder thereof will receive its Pro Rata share of the Claims Equity Allocation and the Senior Noteholders Subscription Rights.

The extent to which a U.S. Holder of Allowed Senior Note Claims will recognize gain or loss pursuant to the Plan will depend upon whether the receipt of New Common Shares and Subscription Rights in respect of its Claims qualifies as a recapitalization within the meaning of Section 368(a)(1)(E) of the Tax Code. In general, receipt of New Common Shares in respect of its Claims will qualify as a recapitalization if the Senior Notes are treated as "securities" for U.S. federal income tax purposes. Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the original term of a debt instrument is an important factor in determining whether a debt instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument generally is not a security, whereas a term of ten years or more is evidence that the instrument generally is a security. The 2024 Senior Notes had a term to maturity of 7 years when issued and the 2026 Senior Notes had a term to maturity of 8 years when issued. There are numerous other factors that could be taken into account in determining whether a debt instrument is a

security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. Although the matter is not free from doubt, we believe and intend to take the position that (i) the 2024 Notes and 2026 Notes should each be treated as securities and (ii) the receipt of New Common Shares and Subscription Rights by a U.S. Holder in respect of its Senior Notes Claims should be treated as a transaction that qualifies as a recapitalization for U.S. federal income tax purposes.

Assuming the receipt of New Common Shares and Subscription Rights in respect of Senior Notes Claims is treated as a transaction that qualifies as a recapitalization for U.S. federal income tax purposes, a U.S. Holder will generally not recognize gain or loss on the exchange except to the extent that New Common Shares or Subscription Rights are treated as received in satisfaction of accrued but untaxed interest on Senior Notes (see the "Accrued Interest" discussion below). In addition, any market discount on the Senior Notes would carry over to the New Common Share or Subscription Rights (see "Market Discount" discussion below). A U.S. Holder's aggregate tax basis in its New Common Shares and Subscription Rights should be equal to the tax basis of the Senior Notes surrendered therefor, and a U.S. Holder's holding period for its New Common Shares and Subscription Rights should include the holding period for Senior Notes exchanged therefor.

If any of the Senior Notes are not treated as securities for U.S. federal income tax purposes, an exchange of such Senior Notes for New Common Shares and Subscription Rights would be treated as a taxable exchange under Section 1001 of the Tax Code. In that case, a U.S. Holder would generally recognize gain or loss in an amount equal to (a) the fair market value of New Common Shares and Subscription Rights received for such Senior Notes (other than any New Common Shares or Subscription Rights treated as received in satisfaction of accrued but untaxed interest on Senior Notes as discussed below under "Accrued Interest") less (b) such U.S. Holder's adjusted tax basis in such Senior Notes. A U.S. Holder's initial aggregate tax basis in the New Common Shares and Subscription Rights received would generally equal their respective fair market values. A U.S. Holder's holding period for such New Common Shares and Subscription Rights would begin the day following the exchange. Any such gain or loss recognized by a U.S. Holder will be capital gain or loss, except to the extent described below under "Accrued Interest" or "Market Discount". Capital gain will generally taxable at preferential rates to non-corporate U.S. Holders whose holding period in the Senior Notes is greater than one year at the time of such exchange. The deductibility of capital losses is subject to limitations.

### 3.     *Consequences to Holders of Allowed General Unsecured Claims.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of Allowed General Unsecured Claims, each holder thereof will receive its Pro Rata share of the Claims Equity Allocation.

A U.S. Holder of a General Unsecured Claim will be treated as receiving its distributions under the Plan in a taxable exchange pursuant to Section 1001 of the Code. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the Cash or the fair market value of the New Common Shares, as applicable, to be received by such U.S. Holder (other than any Cash or New Common Shares treated as received in satisfaction of accrued interest on Senior Notes as discussed below under "Accrued Interest") and (b) such U.S. Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (except to the extent described below under "Market Discount") and should be long-term capital gain or loss if the debts constituting the surrendered Claim were held for more than one year. U.S. Holders of Allowed General Unsecured Claims that receive New Common Shares should obtain a tax basis in the New Common Shares equal to the fair market value thereof as of the date such property is distributed to the U.S. Holder. The holding period for any such New Common Shares should begin on the day following the Effective Date.

### 4.     *Consequences to Holders of Allowed Existing Preferred Interests.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of Allowed Existing Preferred Interests, each holder thereof will receive its Pro Rata share of 50% of the Existing Interests Equity Allocation, the Existing Preferred Interest Subscription Rights, 50% of the Tranche A Warrants and 50% of the Tranche B Warrants.

A U.S. holder will be treated as receiving its distributions under the Plan in a transaction that qualifies as a recapitalization for U.S. federal income tax purposes. Therefore, a U.S. Holder will generally not recognize loss on the exchange but will recognize gain to the extent of the lesser of (i) the amount of gain realized from the exchange and (ii) the aggregate fair market value of the New Warrants and Subscription Rights received. A U.S. Holder's aggregate tax basis in its New Common Shares should equal the tax basis of the Existing Preferred Interests surrendered therefor, decreased by the fair market value of the New Warrants and Subscription Rights received and increased by the amount of any gain recognized and the tax basis in its New Warrants and Subscription Rights should equal their respective fair market values. A U.S. Holder's holding period for its New Common Shares should include the holding period for Existing Preferred Interests surrendered therefor and the tax basis in its New Warrants and Subscription Rights should begin on the day following the Effective Date.

### 5.    *Consequences to Holders of Allowed Existing Common Interests.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of Allowed Existing Common Interests, each holder thereof will receive its Pro Rata share of 50% of the Existing Interests Equity Allocation, the Existing Common Interest Subscription Rights, 50% of the Tranche A Warrants and 50% of the Tranche B Warrants.

A U.S. holder will be treated as receiving its distributions under the Plan in a transaction that qualifies as a recapitalization for U.S. federal income tax purposes. Therefore, a U.S. Holder will generally not recognize loss on the exchange but will recognize gain to the extent of the lesser of (i) the amount of gain realized from the exchange and (ii) the aggregate fair market value of the New Warrants and Subscription Rights received. A U.S. Holder's aggregate tax basis in its New Common Shares should equal the tax basis of the Existing Common Interests surrendered therefor, decreased by the fair market value of the New Warrants and Subscription Rights received and increased by the amount of any gain recognized and the tax basis in its New Warrants and Subscription Right should equal their respective fair market values. A U.S. Holder's holding period for its New Common Shares should include the holding period for Existing Common Interests surrendered therefor and the tax basis in its New Warrants and Subscription Rights should begin on the day following the Effective Date.

### 6.    *Accrued Interest.*

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest on such Claims.  Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any property determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such property should begin on the day following the Effective Date.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest in such event. U.S. Holders of Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 7.    *Market Discount.*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the stated redemption price on the debt instrument at maturity or (b) in the case of a debt instrument issued with OID, its "revised issue price," in each case, by at least a de minimis amount (equal to 0.25 percent of the stated redemption price of the debt instrument at maturity, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).  In addition, in the event of recapitalization treatment (as described above), the Tax Code indicates that, under Treasury regulations to be issued, any accrued market discount in respect of the Allowed Senior Notes Claims should not be currently includable in income. However, such accrued market discount should carry over to any non-recognition property received in exchange therefor (*i.e.,* to the New Common Shares and the Subscription Rights). Any gain recognized by a U.S. Holder upon a subsequent disposition of such property would be treated as ordinary income to the extent of any accrued market discount carried over not previously included in income. To date, specific Treasury regulations implementing this rule have not been issued.  U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 8.    *Subscription Rights.*

A U.S. Holder that elects to exercise its Subscription Rights should be treated as purchasing, in exchange for its Subscription Rights and the amount of cash paid by the U.S. Holder to exercise such Subscription Rights, New Common Shares. Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Subscription Rights. A U.S. Holder's aggregate tax basis in the New Common Shares should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise the Subscription Rights plus (ii) such U.S. Holder's tax basis in the Subscription Rights immediately before the Subscription Rights are exercised. A U.S. Holder's holding period for the New Common Shares received pursuant to such exercise should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the Subscription Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their Subscription Rights are urged to consult with their own tax advisors as to the tax consequences of such decision.

### 9.    *Exercise or Lapse of a New Warrant.*

Except as discussed below with respect to the cashless exercise of a New Warrant, a U.S. Holder generally will not recognize taxable gain or loss on the acquisition of New Common Shares upon exercise of a New Warrant for cash. The U.S. Holder's tax basis in the share of our New Common Shares received upon exercise of the New Warrant generally will be an amount equal to the sum of the U.S. Holder's initial tax basis in the New Warrant and the exercise price of such New Warrant. The U.S. Holder's holding period for the New Common Shares received upon exercise of the New Warrants will begin on the date following the date of exercise (or possibly the date of exercise) of the New Warrants and will not include the period during which the U.S. Holder held the Warrants. If a New Warrant is allowed to lapse unexercised, a U.S. Holder generally will recognize a capital loss equal to such U.S. Holder's tax basis in the New Warrant.

The tax consequences of a cashless exercise of a New Warrant are not clear under current tax law. A cashless exercise may be tax-free, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-free situation, a U.S. Holder's basis in the New Common Shares received would equal the U.S. Holder's basis in the New Warrant. If the cashless exercise was treated as not being a gain realization event (and not a recapitalization), a U.S. Holder's holding period in the New Common

Shares would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the New Warrant. If the cashless exercise was treated as a recapitalization, the holding period of the New Common Shares would include the holding period of the New Warrant.

It is also possible that a cashless exercise could be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. Holder could be deemed to have surrendered New Warrants equal to the number of shares of New Common Shares having a value equal to the exercise price for the total number of New Warrants to be exercised. The U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the fair market value of the New Common Shares represented by the New Warrants deemed surrendered and the U.S. Holder's adjusted tax basis in the New Warrants deemed surrendered. In this case, a U.S. Holder's tax basis in the New Common Shares received would equal the sum of the fair market value of the New Common Shares represented by the New Warrants deemed surrendered and the U.S. Holder's adjusted tax basis in the New Warrants exercised. A U.S. Holder's holding period for the New Common Shares would commence on the date following the date of exercise (or possibly the date of exercise) of the New Warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders are urged to consult their tax advisors regarding the tax consequences of a cashless exercise.

### 10.    *Possible Constructive Distributions.*

The terms of each New Warrant provide for an adjustment to the number of shares of New Common Shares for which the New Warrant may be exercised or to the exercise price of the New Warrant in certain events. An adjustment which has the effect of preventing dilution generally is not taxable. The U.S. Holders of the New Warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the New Warrant holders' proportionate interest in our assets or earnings and profits (*e.g.*, through an increase in the number of shares of New Common Shares that would be obtained upon exercise) as a result of a distribution of cash to the holders of shares of our New Common Shares which is taxable to the U.S. Holders of such shares. Such constructive distribution would be subject to tax as described under that section in the same manner as if the U.S. Holders of the New Warrants received a cash distribution from us equal to the fair market value of such increased interest. Generally, a U.S. Holder's adjusted tax basis in its New Warrant would be increased to the extent any such constructive distribution is treated as a dividend.

### 11.    *Distributions on New Common Shares.*

Any distributions made on account of the New Common Shares will generally constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized XOG as determined under U.S. federal income tax principles.  Such income will be includable in the gross income of a U.S. Holders as ordinary income on the day actually or constructively received by such U.S. Holder.  "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

12.      *Sale, Redemption or Repurchase of New Common Shares or New Warrants.*

Unless a non-recognition provision applies and except as discussed below, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Shares or New Warrants.  Such capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period in the New Common Shares or New Warrants is more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below. Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Share or New Warrants as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Common Shares or New Warrants.  In addition, in the event the Allowed Senior Notes Claims are subject to recapitalization treatment, any gain recognized by a U.S. Holder upon a subsequent disposition of the New Common Shares (or any stock or property received for it in a later tax-free exchange) received will be treated as ordinary income for U.S. federal income tax purposes to the extent of any accrued market discount carried over to the New Common Shares not previously included in income (*see* "Market Discount" above).

13.      *Consequences of Owning and Disposing of the Exit Facility.*

(a)      **Interest on the Exit Facility.**

This discussion assumes that the Exit Facility will be issued with no more than a *de minimis* amount of original issue discount (if any) for U.S. federal income tax purposes. Stated interest on the Exit Facility generally will be taxable to a U.S. Holder of the Exit Facility as ordinary income at the time it is paid or accrued in accordance with the U.S. Holder's usual method of accounting for tax purposes.

(b)      **Sale, Redemption, or Repurchase of the Exit Facility.**

Unless a non-recognition provision applies, a U.S. Holder of the Exit Facility generally will recognize capital gain or loss upon the sale, redemption, or other disposition of the Exit Facility.  Such capital gain or loss will be long-term capital gain or loss if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder's holding period in the Exit Facility is more than one year.  Long-term capital gain of an individual taxpayer generally is taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as discussed in "Limitations on Use of Capital Losses" below.

14.      *Limitation on Use of Capital Losses.*

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are also allowed to carry back unused capital losses to the three years preceding the capital loss year.

D.      **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims or Interests Entitled to Vote.**

The following discussion assumes that the Debtors will pursue the Stand-Alone Restructuring currently contemplated by the Plan. Non-U.S. Holders of Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Stand-Alone Restructuring. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S.

tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Shares, the New Warrants and the Exit Facility.

### 1.    *Gain Recognition.*

Any gain realized by a non-U.S. Holder on the exchange of its Claim or Interest generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the restructuring transactions occur and certain other conditions are met (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) or (iii) in the case of Existing Interests, XOG is a "United States real property holding corporation" ("USRPHC") for U.S. federal income tax purposes at any time within the shorter of the five-year period preceding the disposition or the non-U.S. Holder's holding period for the Existing Interest.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

If the exception in the third bullet applies, a non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its Existing Interests under the Foreign Investment in Real Property Tax Act ("FIRPTA"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such non-U.S. Holder's adjusted tax basis in such Existing Interest) will constitute effectively connected income. A non-U.S. Holder will also be subject to withholding tax equal to 15% of the amount realized on the sale and the non-U.S. Holder generally will be required to file a U.S. federal income tax return. The amount of any such withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS.

The Debtors expect that Reorganized XOG will be a USRPHC. However, currently, the Debtors believe that the Existing Common Interests are, but the Existing Preferred Interests are not, treated as "regularly traded" on an established securities market. Therefore, in general, the FIRPTA provisions will not apply upon a disposition of Existing Common Interests if (x) such Existing Common Interests continue to be regularly traded on an established securities market and (y) the non-U.S. Holder did not directly or indirectly own more than 5% of the value of the Existing Common Interests during a specified testing period. Additionally, the FIRPTA provisions generally will not apply upon a disposition of Existing Preferred Interests if (i) the Existing Preferred Interests continue to not be regularly traded on an established securities market, (ii) the Existing Common Interests continue to be regularly traded on an established securities market and (iii) the non-U.S. Holder did not own Existing Preferred Interests with a value greater than 5% of the value of the Existing Common Interests during a specified testing period. In general, a corporation is a USRPHC as to a non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the Tax Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or such non-U.S. Holder's holding period.

### 2.    *Interest.*

Payments made to a non-U.S. Holder pursuant to the Plan that are attributable to accrued but untaxed interest and interest payments made in respect of the Exit Facility generally will not be subject to U.S. federal income or withholding tax, provided that (i) such non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of XOG or Reorganized XOG, as applicable, (ii) such

non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to XOG or Reorganized XOG, as applicable (each, within the meaning of the Tax Code) and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person (the "Portfolio Interest Exception"), unless such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).  A non-U.S. Holder that does not qualify for the Portfolio Interest Exception to withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

3.      *Distributions on New Common Shares.*

Distributions made (or deemed made) on the New Common Shares and distributions deemed made on the New Warrants (see "Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims and Interests Entitled to Vote--Possible Constructive Distributions") will generally constitute dividends for U.S. federal income tax purposes to the extent paid out of Reorganized XOG's accumulated earnings and profits, as determined under U.S. federal income tax principles.  Distributions in excess of Reorganized XOG's current and accumulated earnings and profits will generally constitute a return of capital, which generally would be subject to withholding under FIRPTA (as defined below) at a rate of 15%, and will first be applied against and reduce a non-U.S. Holder's adjusted tax basis in its New Common Shares or New Warrants, but not below zero.  Distributions not treated as dividends and in excess of a Holder's adjusted basis will generally be treated as capital gain subject to the rules discussed under "--Gain on Disposition of New Common Shares or New Warrants".

Dividends paid to a non-U.S. Holder of New Common Shares or New Warrants will generally be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.  However, dividends that are effectively connected with the conduct of a trade or business by the non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the non-U.S. Holder) are not subject to withholding, provided certain certification and disclosure requirements are satisfied.  Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. Holder were a United States person as defined under the Tax Code.  Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. Holder of New Common Shares or New Warrants who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends, will be required (a) to complete the applicable IRS Form W-8BEN or Form W-8BEN-E and certify under penalty of perjury that such Holder is not a United States person as defined under the Tax Code and is eligible for treaty benefits or (b) if the New Common Share or New Warrants are held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable U.S. Treasury regulations.  Special certification and other requirements apply to certain non-U.S. Holders that are pass-through entities rather than corporations or individuals.  A non-U.S. Holder of New Common Shares or New Warrants eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

4.      *Gain on Disposition of New Common Shares, New Warrants or the Exit Facility.*

Any gain realized on the sale, exchange or other taxable disposition of New Common Shares, New Warrants or the Exit Facility generally will not be subject to U.S. federal income tax unless:

(i)      the gain is effectively connected with a trade or business of the non-U.S. Holder in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment of the non-U.S. Holder);

(ii)     the non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

(iii)    in the case of a disposition of New Common Shares or New Warrants, Reorganized XOG is a USRPHC for U.S. federal income tax purposes at any time within the shorter of the five-year period preceding the disposition or the non-U.S. Holder's holding period for New Common Shares or New Warrants.

A non-U.S. Holder described in the first bullet point above will generally be subject to tax on the net gain derived from the sale or other disposition under regular graduated U.S. federal income tax rates applicable to such Holder as if it were a United States person as defined under the Tax Code. In addition, if a non-U.S. Holder described in the first bullet point above is a corporation for U.S. federal income tax purposes, it may be subject to a "branch profits tax" equal to 30% of its effectively connected earnings and profits (subject to adjustments) or at such lower rate as may be specified by an applicable income tax treaty.

An individual non-U.S. Holder described in the second bullet point above will generally be subject to a flat 30% (or such lower rate as may be specified by an applicable income tax treaty) tax on the gain derived from the sale or other disposition, which may be offset by its U.S. source capital losses, even though the individual is not considered a resident of the United States, provided such non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

If the exception in the third bullet applies, a non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Shares or New Warrants under FIRPTA. If the FIRPTA provisions apply with respect to a non-U.S. Holder, taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further the buyer of the New Common Shares or New Warrants may be required to withhold tax equal to 15% of the amount realized on the sale and the non-U.S. Holder generally will be required to file a U.S. federal income tax return. The amount of any such withholding would be allowed as a credit against the non-U.S. Holder's federal income tax liability and may entitle the non-U.S. Holder to a refund, provided that the non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply (a) upon a disposition of a New Warrant if, either (1) (x) our common stock is "regularly traded" as defined by applicable Treasury Regulations, on an established securities market, (y) the New Warrants are not "regularly traded" and (z) the fair market value of the New Warrants owned, actually or constructively, by the non-U.S. Holder on the date the New Warrants were acquired was equal to or less than the fair market value of 5% of our outstanding shares of common stock or (2) the New Warrants are considered regularly traded and, at all times during the shorter of the five-year period preceding the disposition date or the non-U.S. Holder's holding period, the non-U.S. Holder owns, actually or constructively, 5% or less of the outstanding New Warrants or (b) upon a disposition of New Common Shares if (x) the non-U.S. Holder does not directly or indirectly own more than 5% of the value of such interests during a specified testing period and (y) such interest is regularly traded on an established securities market.

The Debtors expect that Reorganized XOG will be a USRPHC. At this time the Reorganized Debtors have not determined whether it is likely that its New Common Shares or New Warrants will be treated as "regularly traded" for U.S. federal income tax purposes.

**E.      FATCA.**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including

dividends, if any, on shares of New Common Shares and interest payments on the Exit Facility). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Previously, withholding with respect to gross proceeds from the disposition of certain property like the New Common Shares and Exit Facility was scheduled to begin on January 1, 2019, however, such withholding has been eliminated under proposed U.S. Treasury regulations, which can be relied on until final regulations become effective.

Each non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder.

**F.    Information Reporting and Backup Withholding.**

The Debtors or any other applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest, dividends and other amounts payable under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim or Interest under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. Additionally, under the backup withholding rules, a holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan or in connection with payments made on account of consideration received pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

|  |  |
|---|---|
|  | Extraction Oil & Gas, Inc. on behalf of itself and each of the other Debtors |
| By: | /s/ Matthew R. Owens |
| Name: | Matthew R. Owens |
| Title: | President and Chief Executive Officer Extraction Oil & Gas, Inc. |

Prepared By:

Dated: October 23, 2020
Wilmington, Delaware

/s/ Richard W. Riley
**WHITEFORD, TAYLOR & PRESTON LLC**[16]
Marc R. Abrams (DE No. 955)
Richard W. Riley (DE No. 4052)
Stephen B. Gerald (DE No. 5857)
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone:       (302) 353-4144
Facsimile:        (302) 661-7950
Email:              mabrams@wtplaw.com
                        rriley@wtplaw.com
                        sgerald@wtplaw.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (admitted *pro hac vice*)
Allyson Smith Weinhouse (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900
Email:              christopher.marcus@kirkland.com
                        allyson.smith@kirkland.com
                        ciara.foster@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

---

[16]    Whiteford, Taylor & Preston LLC operates as Whiteford Taylor & Preston L.L.P. in jurisdictions outside of Delaware.

**Exhibit A**

**Chapter 11 Plan (See Docket No. 881)**

**(Will be attached to the Solicitation Version of Disclosure Statement)**

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

**(See Docket No. 338, Exhibit B)**

**(Will be attached to the Solicitation Version of Disclosure Statement)**

**Exhibit C**

**Liquidation Analysis**

**Liquidation Analysis**

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN.  THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HEREIN.

## 1. Introduction

Extraction Oil & Gas, Inc., 7N, LLC, 8 North, LLC, Axis Exploration, LLC, Extraction Finance Corp., Mountaintop Minerals, LLC, Northwest Corridor Holdings, LLC, Table Mountain Resources, LLC, XOG Services, LLC, and XTR Midstream, LLC (each a "**Debtor**" and, collectively, the "**Debtors**"), with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the *Joint Plan of Reorganization of Extraction Oil & Gas, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, supplemented, or modified from time to time, the "**Plan**")[1] and related disclosure statement (as amended, supplemented, or modified from time to time, the "**Disclosure Statement**").  This Liquidation Analysis indicates the estimated recoveries that may be obtained by Holders of Claims and Interests in a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code as an alternative to the Plan.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each Holder of a Claim or Interest in each Impaired Class:  (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, this Liquidation Analysis:  (1) estimates the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each of the Chapter 11 Cases were converted to a chapter 7 case on the Effective Date and the assets of each Debtor's Estate were liquidated; (2) determines the distribution (the "**Liquidation Distribution**") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated under chapter 7 of the Bankruptcy Code; and (3) compares each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. This Liquidation Analysis is based upon certain assumptions discussed herein and in the Disclosure Statement.

## 2. Basis of Presentation

This Liquidation Analysis has been prepared assuming that the Debtors would convert their cases from chapter 11 cases to chapter 7 cases on January 31, 2021 (the "**Conversion Date**") and would be liquidated thereafter pursuant to chapter 7 of the Bankruptcy Code.   The Debtors believe

---

[1]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

that the Conversion Date is a reasonable proxy for the Effective Date of the Plan. This Liquidation Analysis was prepared on a legal entity basis for each Debtor and summarized into a consolidated report. The pro forma values referenced herein are as of August 31, 2020 and include a roll-forward amount representative of activity between August 31, 2020 and January 31, 2021. This Liquidation Analysis is summarized in the table contained herein.

This Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors. It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint a Trustee who would sell the assets of the Debtors during the course of a three-month period following the Conversion Date (the "**Marketing Period**") and distribute the cash proceeds, net of liquidation-related costs, to Holders of Claims and Interests in accordance with the priority scheme set forth in chapter 7 of the Bankruptcy Code. Following the three-month Marketing Period, a transition of service and wind-down of the Estates is assumed to occur over a three-month period (the "**Wind-Down Period**"). It is assumed that the Trustee will retain counsel and other necessary advisors to assist in the liquidation and wind-down of the Estates.

The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtors' managing officers ("**Management**") and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and Management.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of Claims include various potential employee Claims (including any severance Claims or Claims related to the WARN Act), new bonding or letters of credit for plugging and abandonment liabilities, litigation, and Claims related to rejection of Executory Contracts and Unexpired Leases, in addition to other potential Claims. Some of these Claims could be significant and might be entitled to priority in payment over General Unsecured Claims. Those priority Claims would be paid before any Liquidation Proceeds would be made available to pay General Unsecured Claims.

In preparing this Liquidation Analysis, the Debtors have estimated an amount of Allowed Claims for each Class of claimants based upon a review of the Debtors' balance sheets as of August 31, 2020, adjusted for estimated balances as of the Conversion Date where applicable. The estimate of all Allowed Claims in this Liquidation Analysis is generally based on the par value of those Claims. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.

No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

Professional fees, Trustee fees, administrative expenses, priority Claims, and other such

Claims that may arise in a liquidation scenario would have to be paid in full from the Liquidation Proceeds before any proceeds are made available to holders of General Unsecured Claims. Under the priority scheme dictated under chapter 7 of the Bankruptcy Code, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the priority scheme dictated under chapter 7 of the Bankruptcy Code.

This Liquidation Analysis does not include comprehensive estimates for the tax consequences that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

### 3. Liquidation Process

For purposes of this Liquidation Analysis, the Debtors' hypothetical liquidation would be conducted in a chapter 7 environment with the Trustee managing the bankruptcy estate of each Debtor to maximize recoveries in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity-specific assets for distribution to creditors. The three major components of the liquidation are as follows:

- generation of cash proceeds from remaining assets;

- costs related to the liquidation process, such as Estate wind-down costs and Trustee, professional, broker, and other administrative fees; and

- distribution of net proceeds generated from asset sales to the Holders of Claims and Interests in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

### 4. Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable Holders of Claims and Interests in strict priority in accordance with section 726 of the Bankruptcy Code:

- <u>Chapter 7 Liquidation Adjustments</u> – wind-down costs, estimated fees paid to the Trustee, and certain professional and/or broker fees;

- <u>DIP Claims</u> – includes estimated DIP Claims and DIP Professional Fee Carve-Out Claims (as defined below);

- <u>Administrative Claims and Priority Tax Claims</u> – includes estimated Claims for postpetition accounts payable, accrued expenses, accrued and unpaid professional fees excluded from any carveout, estimated Claims arising under section 503(b)(9) of the Bankruptcy Code and certain estimated unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;

- <u>Other Secured Claims and Other Priority Claims</u> – includes Other Secured Claims (Class 1) related to accrued and unpaid expenses that could become subject to mechanic's and materialman's liens and Other Priority Claims (Class 2) related to accrued and unpaid production and ad valorem taxes;

3

- <u>Revolving Credit Agreement Claims</u> – includes Revolving Credit Agreement Claims (Class 3) arising under the RBL Credit Agreement;

- <u>Unsecured Claims</u> – includes the principal and accrued and unpaid prepetition interest on the Senior Notes Claims (Class 4), estimated Trade Claims (Class 5), and General Unsecured Claims (Class 6). It is also assumed that any Deficiency Claims (as defined herein) are assumed to be asserted at each Debtor entity and are entitled to *pari passu* treatment with General Unsecured Claims; and

- <u>Other Claims and Interests</u> – to the extent any available net proceeds remain available for distribution after satisfaction in full of the foregoing classes of Claims, distributions would be made to Holders of Existing Preferred Interests (Class 7), Existing Common Interests (Class 8), Other Equity Interests (Class 9), Intercompany Claims (Class 10), Intercompany Interests (Class 11), and Section 510(b) Claims (Class 12).

Pursuant to the distribution scheme under chapter 7 of the Bankruptcy Code, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the applicable provisions of chapter 7.

## 5. Conclusion

The amount of the final Allowed Claims against the Debtors' Estates may differ from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities as a going concern under chapter 11 of the Bankruptcy Code.

The Debtors have determined, as summarized in the following analysis (the "Projected Liquidation Recovery"), that upon the Effective Date, the Plan will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.[2]

**Summary of Projected Midpoint Claims & Recoveries - USD in Thousands**

| Class | Claims / Equity Interests | Projected Claims in Liquidation Analysis | Estimated Plan Recovery | Projected Liquidation Recovery |
|---|---|---|---|---|
| 1 | Other Secured Claims | $ 40,000.0 | 100.0% | 100.0% |
| 2 | Other Priority Claims | - | 100.0% | NA |
| 3 | Revolving Credit Agreement Claims | 387,356.1 | 100.0% | 63.8% |
| 4 | Senior Note Claims | 1,131,866.2 | 26.9% | 0.0% |
| 5 | Trade Claims | 1,369.5 | 100.0% | 0.0% |
| 6 | General Unsecured Claims | 529,801.9 | 17.6% | 0.0% |
| 7 | Existing Preferred Claims | 198,659.7 | 3.2% | 0.0% |
| 8 | Existing Common Interests | 138,135,046 shares | NA | NA |
| 9 | Other Equity Interests | NA | 0.0% | 0.0% |
| 10 | Intercompany Claims | - | 0% / 100.0% | 0.0% |
| 11 | Intercompany Interests | - | 0% / 100.0% | 0.0% |
| 12 | Section 510(b) Claims | NA | NA | NA |

---

[2]   This Liquidation Analysis was prepared on a legal entity basis for each Debtor and the Projected Liquidation Recovery assumes that the Debtors would be liquidated in jointly administered chapter 7 cases, but on a nonconsolidated basis.

The following table summarizes this Liquidation Analysis for the aggregated Debtor entities. This Liquidation Analysis should be reviewed with the accompanying notes.

| Aggregated Legal Entities - USD $000s | Notes | Pro Forma 1/31/2021 | Estimated Recovery - % | | | Estimated Liquidation Value | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High |
| **Gross Liquidation Proceeds** | | | | | | | | |
| **Liquidated Balance Sheet** | | | | | | | | |
| Cash And Cash Equivalents | [A] | $ - | | | | $ - | $ - | $ - |
| Accounts Receivable, Net | [B] | 101,500.2 | 83.2% | 88.2% | 93.2% | 84,459.5 | 89,534.5 | 94,609.5 |
| Inventory, prepaid expenses and other | [C] | 31,834.0 | 15.4% | 16.1% | 16.9% | 4,899.5 | 5,137.9 | 5,376.4 |
| Oil And Gas Properties, Net | [D] | 1,994,285.5 | 28.6% | 31.1% | 34.3% | 570,000.0 | 620,000.0 | 685,000.0 |
| Commodity derivative asset | [E] | 24,590.9 | 0.0% | 0.0% | 0.0% | | | |
| Other non-current assets | [E] | 16,298.0 | 0.0% | 0.0% | 0.0% | | | |
| **Total Assets** | | $ 2,168,508.5 | 30.4% | 33.0% | 36.2% | $ 659,359.0 | $ 714,672.4 | $ 784,985.9 |
| | | | | | | | | |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | |
| Wind Down Costs | [F] | | | | | $ (42,039.8) | $ (42,039.8) | $ (42,039.8) |
| Chapter 7 Trustee Fees | [G] | | | | | (19,780.8) | (21,440.2) | (23,549.6) |
| Chapter 7 Professional and Broker Fees | [H] | | | | | (16,662.5) | (17,412.5) | (18,387.5) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | $ (78,483.0) | $ (80,892.4) | $ (83,976.9) |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | | $ 580,876.0 | $ 633,780.0 | $ 701,009.0 |

| **Claims and Recoveries** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total Estimated Claim | | | Total Recovery - % | | | Total Recovery - $ | | |
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **DIP Claims** | | | | | | | | | | |
| New DIP Loan Claims | [I] | $ 32,624.0 | $ 32,624.0 | $ 32,624.0 | 100.0% | 100.0% | 100.0% | $ 32,624.0 | $ 32,624.0 | $ 32,624.0 |
| Prepetition Roll-Up Loan Claims | [I] | 78,299.5 | 78,299.5 | 78,299.5 | 100.0% | 100.0% | 100.0% | 78,299.5 | 78,299.5 | 78,299.5 |
| DIP Professional Fee Carve-Out Claims | [I] | 13,775.0 | 13,775.0 | 13,775.0 | 100.0% | 100.0% | 100.0% | 13,775.0 | 13,775.0 | 13,775.0 |
| Other DIP Claims | [I] | 1,700.0 | 1,700.0 | 1,700.0 | 100.0% | 100.0% | 100.0% | 1,700.0 | 1,700.0 | 1,700.0 |
| **Total DIP Claims** | | $ 126,398.5 | $ 126,398.5 | $ 126,398.5 | 100.0% | 100.0% | 100.0% | $ 126,398.5 | $ 126,398.5 | $ 126,398.5 |
| **Remaining Distributable Value after DIP Claims** | | | | | | | | $ 454,477.5 | $ 507,381.5 | $ 574,610.5 |
| | | | | | | | | | | |
| **Administrative Expense and Priority Tax Claims** | | | | | | | | | | |
| Administrative Expense and Priority Tax Claims | | 220,061.5 | 220,061.5 | 220,061.5 | 100.0% | 100.0% | 100.0% | 220,061.5 | 220,061.5 | 220,061.5 |
| **Total Administrative Expense and Priority Tax Claims** | [J] | $ 220,061.5 | $ 220,061.5 | $ 220,061.5 | 100.0% | 100.0% | 100.0% | $ 220,061.5 | $ 220,061.5 | $ 220,061.5 |
| **Remaining Distributable Value after Administrative Expense and Priority Tax Claims** | | | | | | | | $ 234,416.0 | $ 287,320.0 | $ 354,549.1 |
| | | | | | | | | | | |
| **Other Secured Claims, Other Priority Claims, and RCA Claims** | | | | | | | | | | |
| Class 1 - Other Secured Claims | | $ 40,000.0 | $ 40,000.0 | $ 40,000.0 | 100.0% | 100.0% | 100.0% | $ 40,000.0 | $ 40,000.0 | $ 40,000.0 |
| Class 2 - Other Priority Claims | | | | | 0.0% | 0.0% | 0.0% | | | |
| Class 3 - RCA Claims | | 387,356.1 | 387,356.1 | 387,356.1 | 50.2% | 63.8% | 81.2% | 194,416.0 | 247,320.0 | 314,549.1 |
| **Total Other Secured Claims, Other Priority Claims, and RCA Claim** | [K] | $ 427,356.1 | $ 427,356.1 | $ 427,356.1 | 54.9% | 67.2% | 83.0% | $ 234,416.0 | $ 287,320.0 | $ 354,549.1 |
| **Remaining Distributable Value after Other Secured Claims, Other Priority Claims, and RCA Claims** | | | | | | | | $ - | $ - | $ - |
| **Unsecured Claims** | | | | | | | | | | |
| **Net Remaining Distributable Unencumbered Property Value** | | | | | | | | $ - | $ - | $ - |
| Class 4 - Senior Notes Claims | [L] | 1,131,866.2 | 1,131,866.2 | 1,131,866.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| 7.375% Senior Notes Claims | | 417,126.4 | 417,126.4 | 417,126.4 | 0.0% | 0.0% | 0.0% | - | - | - |
| 5.625% Senior Notes Claims | | 714,739.8 | 714,739.8 | 714,739.8 | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 5 - Trade Claims | | 1,369.5 | 1,369.5 | 1,369.5 | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 6 - General Unsecured Claims | [N] | 722,742.0 | 669,837.9 | 602,608.9 | 0.0% | 0.0% | 0.0% | - | - | - |
| RCA Deficiency Claims | | 192,940.1 | 140,036.1 | 72,807.0 | 0.0% | 0.0% | 0.0% | - | - | - |
| General Unsecured Claims | | 8,876.7 | 8,876.7 | 8,876.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| Rejected Executory Contracts & Unexpired Leases | | 520,925.2 | 520,925.2 | 520,925.2 | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Unsecured Claims** | | $ 1,855,977.7 | $ 1,803,073.6 | $ 1,735,844.6 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | $ - | $ - | $ - |
| | | | | | | | | | | |
| **Other Claims and Interests** | | | | | | | | | | |
| Class 7 - Existing Preferred Interests | | 198,659.7 | 198,659.7 | 198,659.7 | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 8 - Existing Common Interests | | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 9 - Other Equity Interests | | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 10 - Intercompany Liabilities | | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 11 - Intercompany Interests | | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| Class 12 - Section 510(b) Claims | | - | - | - | 0.0% | 0.0% | 0.0% | - | - | - |
| **Total Other Claims and Interests** | [O] | $ 198,659.7 | $ 198,659.7 | $ 198,659.7 | 0.0% | 0.0% | 0.0% | $ - | $ - | $ - |
| **Remaining Distributable Value after Other Claims and Interests** | | | | | | | | $ - | $ - | $ - |
| | | | | | | | | | | |
| **Total Claims (excl. Deficiency Claims) / Total Recovery** | | $ 2,635,513.3 | $ 2,635,513.3 | $ 2,635,513.3 | 22.0% | 24.0% | 26.6% | $ 580,876.0 | $ 633,780.0 | $ 701,009.0 |

**Specific Notes to this Liquidation Analysis**

*Total Liquidated Assets*

A. <u>Cash and Cash Equivalents</u>:  Cash and Cash Equivalents consists of cash held in bank accounts. As of the conversion date, cash is estimated at $130.2 million. Cash is reduced by $52.4 million of Revenue Suspense obligations estimated to be outstanding as of the Conversion Date. The remaining projected cash balance of $77.8 million is netted against the RBL Facility balance at the Conversion Date.

B. <u>Accounts Receivable, Net</u>:  Includes proceeds from oil and gas production, along with other receivables related to joint interest billing partners, netting, and miscellaneous receivables.  Accounts receivable is primarily comprised of oil and gas production receipts, which is expected to have a relatively high overall recovery.

    a. <u>A/R – Trade</u>:  Trade amounts are assumed to be highly collectible based on counterparty credit quality and payment history.  Receipts are related to sale of produced oil, natural gas, and natural gas liquids, typically due within 30 days of receipt.  Outstanding receipts are assumed recoverable at a recovery range of 90 percent to 100 percent.

    b. <u>A/R – Other</u>:  Other accounts receivable include joint interest billings after netting of payments owed to non-operated working interest owners and miscellaneous receivables, which have an expected recovery range of 75 percent to 85 percent of net book value.

C. <u>Inventory, Prepaid Expenses, and Other</u>:  Includes prepaid deposits, retainers, and insurance with an assumed recovery rate of 15 percent to 17 percent of net book value.

    a. Primarily includes prepayments made on account of insurance, lease deposits, utility deposits, inventory, and prepaid service providers.

D. <u>Oil & Gas Properties, Net</u>:  This Liquidation Analysis assumes that the Trustee sells or otherwise monetizes the reserves and associated equipment owned by the Debtors, in logical regional or geological packages, or on a piecemeal basis, with sales to buyers after the Marketing Period and Wind-Down Period.

    a. This Liquidation Analysis assumes the divestiture will be directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures.  It also assumes that the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets.  The estimated values realized for such assets reflect, among other things, the following factors:

        i. long-term supply and demand fundamentals for oil and natural gas;

      ii.  projected oil and natural gas prices;

     iii. projected production and operating performance for each asset;

     iv. increasing regulatory restrictions on the development of oil and gas reserves in Colorado;

      v.  projected operating and maintenance costs for each asset; and

     vi. assumed capital and environmental expenditure requirement

  b.  After a review of the assets, the Debtors and their advisors concluded that the forced sale of the Debtors' assets through a chapter 7 liquidation would likely result in a valuation discount relative to "fair value." The liquidation value of reserves is stratified based on probability of recovery and consists of proved developed producing ("**PDP**") and proved developed not-producing ("**PDNP**"), in addition to valuing the Debtors' non-producing acreage. This Liquidation Analysis assumes a net recovery range of 29 percent to 34 percent of net book value for such assets.

E.  <u>Other Assets</u>:  Represents deferred transaction costs, investments, right of use assets, and intangibles that are assumed to have no recovery value.

*Chapter 7 Liquidation Adjustments*

F.  <u>Wind Down Costs</u>:  The total wind-down costs are estimated to be approximately $42.0 million, which include personnel and overhead costs.  In addition, wind-down costs include payments owed to royalty interest owners as property held by Debtors for a third party (such as funds held on account of a resulting trust) is not property of the estate.

G.  <u>Chapter 7 Trustee Fee</u>:  This would be limited to the fee guidelines in section 326(a) of the Bankruptcy Code.  The Debtors assumed that Trustee fees are 3 percent of entity gross Liquidation Proceeds, excluding cash.

H.  <u>Chapter 7 Professional and Broker Fees</u>:  This includes the estimated cost for advisors, attorneys, and other professionals retained by the Trustee.  In the Liquidation Analysis, chapter 7 professional fees are estimated to be $16.7 million – $18.4 million.  These fees are applied on a pro-rata basis across Debtor entities based on the estimated Liquidation Proceeds available to each Estate.  However, this amount can fluctuate based on length and complexity of wind-down process and could be substantially greater than the amounts assumed herein.

*Claims and Recoveries*

*DIP Claims*

I.   DIP Claims[3]

    a.   Holders of DIP Claims, totaling approximately $78.3 million of Prepetition Roll-Up Loan Claims and $32.6 million of New DIP Loan Claims, in addition to certain fees and expenses based on adequate protection commitments approved pursuant to the DIP Orders, are projected to be unimpaired. The DIP Claim amounts assume six months of interest at the default rate for the post-Conversion Date wind-down period for both Prepetition Roll-Up Loan Claims and New DIP Loan Claims.

    b.   The DIP Orders grant superpriority status to Allowed Professional Fee Claims incurred prior to notice of conversion to a Chapter 7 liquidation for each professional retained by the court pursuant to sections 327, 328, or 363 of the Bankruptcy Code plus any Professional Fee Claims incurred after such notice of conversion (collectively, the "**DIP Professional Fee Carve-Out Claims**").  This Liquidation Analysis assumes $13.8 million in DIP Professional Fee Carve-Out Claims and $1.7 million in other DIP Claims at the Conversion Date and that the Liquidation Proceeds would be sufficient to satisfy 100% of the DIP Claims, DIP Professional Fee Carve-Out Claims, and other DIP Claims.

*Structurally Senior Claims*

J.   Administrative and Priority Tax Claims:

    a.   The Debtors estimate that there will be approximately $220.1 million in Administrative Claims and Priority Tax Claims as of the Conversion Date and assume that Administrative and Priority Tax Claims are asserted pro-rata among the Debtors based on the August 31, 2020 balance sheet. The Administrative Claims and Priority Tax Claims include amounts necessary for the preservation of the Debtors' Estates, incurred after the Petition Date but unpaid at the Conversion Date.

    b.   Based on the assumptions herein, this Liquidation Analysis assumes 100 percent recovery on account of Administrative Claims and Priority Tax Claims.

---

[3]   Capitalized terms used but not otherwise defined in this section have the meanings ascribed to such terms in the DIP Orders.

*Other Secured, Other Priority, Revolving Credit Agreement Claims*

K. Other Secured, Other Priority, Revolving Credit Agreement Claims

    a. Other Secured Claims (Class 1)

        i. This Liquidation Analysis assumes that Other Secured Claims (Class 1) are Allowed in the amount of $40.0 million as of the Conversion Date.

        ii. Based on these assumptions, recoveries to Holders of Class 1 Other Secured Claims are unimpaired.

    b. Other Priority Claims (Class 2)

        i. The Debtors' assume all Other Priority Claims (Class 2) will be satisfied before the Conversion Date.  As such, this Liquidation Analysis assumes there will be no Other Priority Claims (Class 2) as of the Conversion Date.

    c. Revolving Credit Agreement Claims (Class 3)

        i. This Liquidation Analysis assumes that Revolving Credit Agreement Claims (Class 3) are Allowed in the amount of $387.4 million as of the Petition Date, net of the roll up of $75 million of Prepetition Roll-Up Loan Claims pursuant to the DIP Orders. Revolving Credit Agreement Claims are further reduced by $77.8 million in cash balance at the Conversion Date. Revolving Credit Agreement Claims recover from the remaining Liquidation Proceeds available after satisfaction of the DIP Claims, Professional Fee Carve-Out Claims, Administrative Expense and Priority Tax Claims.

        ii. Based on these assumptions, implied Liquidation Proceeds distributed on account of Revolving Credit Agreement Claims (Class 3) would range from $194.4 million to $314.5 million, which represents 50 percent and 81 percent recoveries to Holders of Class 3 Claims.

*Unsecured Claims*

L. Senior Notes Claims (Class 4)

    a. The Liquidation Analysis assumes approximately $1,131.9 million of Senior Notes Claims, including accrued and unpaid interest as of the Petition Date. This includes estimated non-Debtor Claim amounts of $417.1 million for the

7.375% Senior Notes due 2024 and $714.7 million for 5.625% Senior Notes due 2026.

b.  Extraction Oil & Gas, Inc. has agreed under the Plan that it will not receive a distribution on account of its Senior Notes Claims, and the proposed pro rata distribution to be made to Holders of Senior Notes Claims under the Plan shall not account for the Senior Notes Claims held by Extraction Oil & Gas, Inc.  In a liquidation scenario, it is assumed that Extraction Oil & Gas, Inc. would have the right to share in any Class 4 recovery on account of its Senior Notes Claims.

c.  Based on the assumptions herein, this Liquidation Analysis assumes no recovery on account of Class 4 Claims.

M.  Trade Claims (Class 5)

a.  Trade Claims consist of any Claim held by an ordinary course trade vendor of the Debtors against any of the Debtors on account of ordinary course goods and/or services provided to any of the Debtors.  For the avoidance of doubt, Trade Claims do not include any Claim arising from or based upon rejection of any Executory Contract or Unexpired Lease, nor any Claim that is not Secured resulting from litigation against one or more of the Debtors

b.  Based on the assumptions herein, this Liquidation Analysis assumes no recovery on account of Class 5 Claims.

N.  General Unsecured Claims (Class 6)

a.  All existing General Unsecured Claims are assumed to be asserted at Debtor entities where liabilities are recorded in the Debtors' books and records, or where they would be recorded in the case of liabilities that only exist in a hypothetical liquidation scenario.  Such Claims may consist of prepetition unpaid and accrued unsecured obligations owed to litigants and other parties as well as Claims on account of rejection of Executory Contracts or Unexpired Claims, and may not be exhaustive of Claims that exist under the Plan or that may arise on account of a liquidation.

b.  "**Deficiency Claims**" means any Claims that result from a shortfall of the value of the secured lenders' collateral when applied to the Revolving Credit Agreement Claims.  The Deficiency Claim amount asserted at any given Debtor may vary from other Debtors, based on the recovery of the value of the secured lenders' collateral at a specific Debtor.  In addition, Holders of Administrative Claims may also have a Deficiency Claim based on the Liquidation Proceeds available against the Debtor at which they have their Administrative Claim.  These Deficiency Claims are assumed to be asserted

at each Debtor borrower and guarantor entity and are *pari passu* with the General Unsecured Claims and Senior Notes Claims.

c. General Unsecured Claims also include an estimate of Rejected Executory Contracts and Unexpired Leases Claims, where impaired parties could assert claims for damages as a result of a premature contract termination. Such Claims are unsecured and applied against any remaining Liquidation Proceeds at the respective Debtor, if available.

d. Based on the assumptions herein, this Liquidation Analysis assumes no recovery on account of Class 6 Claims.

*Other Claims and Interests*

O.  <u>Other Claims and Interests</u>

a. <u>Existing Preferred Interests (Class 7), Existing Common Interests (Class 8), Other Equity Interests (Class 9), Intercompany Liabilities (Class 10), Intercompany Interests (Class 11), Intercompany Interests (Class 11), and Section 510(b) Claims (Class 12)</u>

i. This Liquidation Analysis assumes that there would be no recovery on account of Existing Preferred Interests (Class 7), Existing Common Interests (Class 8), Other Equity Interests (Class 9), Intercompany Liabilities (Class 10), Intercompany Interests (Class 11), and Section 510(b) Claims (Class 12) as of the Conversion Date.

**Exhibit D**

**Disclosure Statement Order**

**Exhibit E**

**Financial Projections**

## FINANCIAL PROJECTIONS

The Debtors believe that the Plan[1] meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their post-Effective Date financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or the Financial Projections to holders of Claims or Interests or other parties in interest going forward, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared the Financial Projections for the years 2021 through 2025. The Financial Projections were prepared by Management and are based on several assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations.

The Debtors have prepared the Financial Projections based on information available to them, including information derived from public sources that have not been independently verified. No representation or warranty, expressed or implied, is provided in relation to fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PRO FORMA BALANCE SHEET HEREIN REFLECTS A PRELIMINARY HIGH-LEVEL PRESENTATION OF WHAT A FRESH START ACCOUNTING ESTIMATE MAY LOOK LIKE, BUT IS SUBJECT TO MATERIAL CHANGE AND DOES NOT REFLECT A FULL FRESH START ACCOUNTING ANALYSIS, WHICH COULD RESULT IN MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES HEREIN.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE UNDERLYING ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words, "anticipate," "believe," "estimate," "will," "may," "intend," "expect," and similar expressions should be generally identified as forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that such plans, intentions and expectations will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which these Financial Projections are attached.

could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether because of new information, future events, or otherwise.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety as well as the notes and assumptions set forth below.

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Although Management believes these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, including, but not limited to: (a) fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices; (b) the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows; (c) the timing and amount of future production of oil and natural gas; (d) changes in the availability and cost of capital; (e) environmental, drilling, regulatory and other operating risks, including liability claims as a result of oil and natural gas operations; (f) proved and unproved drilling locations and future drilling plans; and (g) the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, set-back, and climate change regulation. The Debtors believe, based on preliminary tax and accounting analyses, that it may incur income taxes over the forecast horizon. To the extent it is later determined that these accounting and tax analyses are incorrect, the Reorganized Debtors' projections could change materially. Additional information regarding these uncertainties are described in the Disclosure Statement. Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the  Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of the Reorganized Debtors' future performance.

**OVERVIEW**

Actual balances may vary from those reflected in the opening balance sheet due to variances in projections. The reorganized pro forma balance sheets for the periods ending December 31, 2021 through December 31, 2025 contain certain pro forma adjustments as a result of consummation of the Plan. The estimated pro forma adjustments regarding the equity value of the Reorganized Debtors, their assets, or estimates of their liabilities as of the Effective Date will be based upon the fair value of its assets and liabilities as of that date, which could be materially different than the values assumed in the estimates.

**I. METHODOLOGY**

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including well-level analyses. Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Financial Projections. In preparation of the Financial Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The projections should be read in conjunction with the significant assumptions, qualifications and notes set forth herein.

**II. ASSUMPTIONS**

**A. Overview**

The Reorganized Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore oil and natural gas assets in the United States.

**B. Presentation**

The Projections are presented on a consolidated basis, including estimates of operating results for the Reorganized Debtor entities in the aggregate.

**C. Plan Consummation**

The Financial Projections include projected financial statements for 2021-2025 and an Assumed Effective Date of January 31, 2021.

### D. Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to Accounting Standards Certification ("ASC") 852-10, as issued by the Financial Accounting Standards Board.

### E. Average Daily Net Production

Average daily net production represents the oil, natural gas and NGL production volumes assumed in the plan.



### F. Commodity Pricing

Commodity pricing is based on October 14, 2020 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil and natural gas Management estimates realized pricing based on forecasted differentials for these commodities and estimates NGL realizations based on a differential to benchmark oil prices.

| BENCHMARK PRICING | 11M 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| WTI Oil ($/Bbl) | $42.85 | $43.47 | $43.96 | $44.48 | $45.16 |
| Henry Hub Gas ($/MMBtu) | 3.00 | 2.67 | 2.49 | 2.45 | 2.46 |

| DIFFERENTIALS | 11M 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| WTI Oil ($/Bbl) | ($6.55) | ($6.55) | ($6.55) | ($6.55) | ($6.55) |
| NGLs ($/Bbl) | (32.14) | (32.61) | (32.97) | (33.36) | (33.87) |
| Henry Hub Gas ($/MMBtu) | (0.31) | (0.34) | (0.36) | (0.36) | (0.36) |

### G. Total Revenue

Total revenue is calculated by applying the commodity pricing to the production volume less deductions for specific transportation and marketing costs and consists of production revenue and hedging revenue. Production revenue is generated from the exploration for and development, production, gathering, and sale of oil, natural gas, and natural gas liquids.

### H. Operating Expenses

Operating expenses consist of lease operating expenses, production and ad valorem taxes and gathering, transportation and marketing expense.



### I. Cash General and Administrative Expenses

Cash general and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory and public company

requirements. The Reorganized Debtors' projected G&A expenses are based on the Debtors' current development and operational plans.



## J. Exploration Expense
Exploration expense reflects costs incurred in connection with the Reorganized Debtors' exploration activities.

## K. Capital Expenditures
Capital expenditures consist primarily of drilling and completion costs associated with running a one rig development program throughout the projection period as well as leasehold payments made to maintain acreage positions.

## L. Interest Expense
Post-emergence interest expense is forecasted based on the Reorganized Debtors' anticipated pro forma capital structure.

### Income Statement (presented for the post-Effective Date period)

| ($ in millions) | 11M 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|
| **Net Production** | | | | | |
| Crude Oil (MMbbl) | 9 | 10 | 11 | 9 | 10 |
| Natural Gas (Bcf) | 59 | 62 | 65 | 61 | 60 |
| NGLs (MMbbl) | 6 | 6 | 6 | 6 | 6 |
| Total Net Production (Mmboe) | 25 | 26 | 29 | 25 | 25 |
| *Daily Net Production (Mboe/d)* | *73* | *72* | *78* | *69* | *70* |
| | | | | | |
| **Revenue:** | | | | | |
| Oil Revenue | $320 | $356 | $420 | $348 | $370 |
| Gas Revenue | 138 | 126 | 123 | 113 | 113 |
| NGL Revenue | 62 | 66 | 70 | 65 | 65 |
| Hedge Settlements | 18 | 0 | 0 | 0 | 0 |
| **Total Revenue** | **$538** | **$548** | **$613** | **$525** | **$548** |
| | | | | | |
| Lease Operating Expenses | (53) | (58) | (59) | (59) | (59) |
| Transportation & Marketing | (73) | (82) | (118) | (104) | (122) |
| Production Taxes | (36) | (37) | (40) | (34) | (34) |
| Cash G&A | (27) | (29) | (29) | (29) | (29) |
| **EBITDAX** | **$349** | **$341** | **$367** | **$299** | **$303** |
| Exploration Expense | (5) | (5) | (6) | (5) | (5) |
| **EBITDA** | **$344** | **$336** | **$362** | **$294** | **$298** |

### *Summary Cash Flow Build (presented for the post-Effective Date period)*

| ($ in millions) | Pro Forma 2/1 | 11M 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|
| EBITDA | | $344 | $336 | $362 | $294 | $298 |
| (-) Cash Interest Expense | | (16) | (11) | (6) | (3) | (3) |
| (-) Cash Taxes Paid | | (8) | 0 | (3) | (10) | (20) |
| (-) CapEx | | (146) | (213) | (147) | (122) | (147) |
| (+/-) Change in Net Working Capital[1] | | (129) | (12) | (6) | (7) | 13 |
| **Total Cash Flow** | | **$45** | **$100** | **$200** | **$154** | **$141** |
| | | | | | | |
| **Total Debt[2]:** | | | | | | |
| Beginning Debt | | $318 | $273 | $173 | $0 | $0 |
| Debt (Paydown) / Drawn | | (45) | (100) | (173) | 0 | 0 |
| **Ending Debt** | **$318** | **$273** | **$173** | **$0** | **$0** | **$0** |
| | | | | | | |
| **Cash Balance:** | | | | | | |
| Beginning Cash Balance | | $10 | $10 | $10 | $37 | $191 |
| Cash (Decrease) / Increase | | (0) | 0 | 27 | 154 | 141 |
| **Ending Cash Balance** | **$10** | **$10** | **$10** | **$37** | **$191** | **$333** |
| | | | | | | |
| **Liquidity:** | | | | | | |
| RBL Availability[2] | $182 | $227 | $327 | $500 | $500 | $500 |
| Cash | 10 | 10 | 10 | 37 | 191 | 333 |
| **Total Liquidity** | **$192** | **$237** | **$337** | **$537** | **$691** | **$833** |

*1. Includes approximately $140 million of ad valorem tax payments made post Effective Date through April 2021*
*2. Assumes the RBL is refinanced upon maturity and the Borrowing Base is maintained at $500 million*

**Exhibit F**

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED HEREIN DOES NOT PURPORT TO BE OR CONSTITUTE (I) A RECOMMENDATION TO ANY HOLDER OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AS TO HOW TO VOTE ON, OR OTHERWISE ACT WITH RESPECT TO, THE PLAN, (II) AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN OR OF THE TERMS AND PROVISIONS OF THE PLAN OR OF ANY TRANSACTION OFFERED PURSUANT TO THE PLAN OR OTHERWISE DESCRIBED THEREIN, OR (III) AN APPRAISAL OF THE ASSETS OF THE REORGANIZED DEBTORS.

THE VALUATION INFORMATION CONTAINED HEREIN IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER BANKRUPTCY CODE SECTION 1125 TO ENABLE HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS (AND, IF APPLICABLE, OTHER STAKEHOLDERS) ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN, AND, OTHER THAN WITH RESPECT TO THE FOREGOING, WAS NOT PREPARED FOR THE PURPOSE OF PROVIDING THE BASIS FOR AN INVESTMENT DECISION BY ANY HOLDER OR ANY OTHER PERSON OR ENTITY WITH RESPECT TO ANY TRANSACTION OFFERED PURSUANT TO THE PLAN OR OTHERWISE DESCRIBED THEREIN, AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING WITHOUT LIMITATION THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS.   THE VALUATION INFORMATION CONTAINED HEREIN SHOULD ALSO BE CONSIDERED IN CONJUNCTION WITH THE RISK FACTORS DESCRIBED IN ARTICLE VIII OF THE DISCLOSURE STATEMENT.

## <u>VALUATION ANALYSIS</u>[1]

The Debtors have been advised by Moelis & Company LLC ("<u>Moelis</u>") with respect to the enterprise value of the Reorganized Debtors (the "<u>Enterprise Value</u>") on a going concern basis.

The valuation analysis set forth herein (this "<u>Valuation Analysis</u>") is based on information as of the date hereof and is based on the business plan prepared by and provided by the Debtors' management to Moelis (the "<u>Business Plan</u>").  For purposes of this Valuation Analysis, Moelis has assumed that no material changes that would affect value occur between the date hereof and January 31, 2021 (the "<u>Assumed Effective Date</u>").

For purposes of the Plan, and as a result of the Valuation Analysis described herein, Moelis estimates that the range of Enterprise Value of the Reorganized Debtors is approximately $875 million to $1.275 billion, with a mathematical mid-point of $1.075 billion, as of the Assumed Effective Date.  The implied mid-point total equity value, which takes into account Moelis' mid-point estimate of Enterprise Value  less estimated pro forma net debt and other cash obligations outstanding as of the Effective Date[2], was estimated at approximately $641 million (the "Plan

---

[1]     Capitalized terms used but not defined in this Valuation Analysis shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Extraction Oil & Gas Corporation and Its Debtor Affiliates* (the "<u>Plan</u>").

[2]     Includes pro forma estimated net debt of $308 million as of the Effective Date, after giving effect to the equity investment on account of the Rights Offering and after deducting certain exit-related obligations and

Equity Value"). Moelis' estimate of the range of Enterprise Value and the Plan Equity Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan, the terms and provisions of the Plan, or any other matter with respect to the Debtors and the Chapter 11 Cases.

THE ESTIMATED ENTERPRISE VALUE AND ESTIMATED PLAN EQUITY VALUE, AS OF THE ASSUMED EFFECTIVE DATE, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION REGARDING THE BUSINESS AND ASSETS OF THE DEBTORS THAT WAS AVAILABLE TO MOELIS AS OF OCTOBER 22, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATES OF THE REORGANIZED DEBTORS' ENTERPRISE VALUE AND PLAN EQUITY VALUE SET FORTH HEREIN. AS YOU ARE AWARE, THE CREDIT, FINANCIAL AND STOCK MARKETS HAVE BEEN EXPERIENCING UNUSUAL VOLATILITY, AND WE EXPRESS NO OPINION OR VIEW AS TO ANY POTENTIAL EFFECTS OF SUCH VOLATILITY ON THE REORGANIZED DEBTORS.

MOELIS DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH MOELIS' ESTIMATES OF THE ENTERPRISE VALUE AND PLAN EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. MOELIS' ESTIMATES OF THE ENTERPRISE VALUE AND PLAN EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE DIRECTLY OR INDIRECTLY REALIZED IF ANY OF THE DEBTORS' ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE, IN CHAPTER 11 OR AN OUT-OF-COURT BASIS. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE AND PLAN EQUITY VALUE PREPARED BY MOELIS REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE AND PLAN EQUITY VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE ESTIMATED ENTERPRISE VALUE OR PLAN EQUITY VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND

---

professional fees. Also includes $126 million deduction for net working capital obligations as of the Effective Date adjusted for normalized net working capital over the projection period.

WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE ENTERPRISE VALUE OR PLAN EQUITY VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MOELIS, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Moelis assumed the Business Plan was reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate, currently-available estimates, and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated range of Enterprise Value and the Plan Equity Value assume the Reorganized Debtors will achieve their projections in all material respects, including revenue, EBITDA margins, and cash flows. If the business performs at levels below or above those set forth in the Business Plan, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Plan Equity Value. In estimating the range of Enterprise Value and the Plan Equity Value, Moelis: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial, reserves and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team; (d) reviewed certain publicly-available financial data for, and considered the market value of, public companies that Moelis deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the Debtors' operating businesses; and (f) conducted such other analyses, inquiries and investigations as Moelis deemed appropriate. Moelis assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly-available information. Moelis does not offer an opinion as to the reasonableness of the Business Plan or the attainability of the Business Plan, as future results are dependent on various factors, many of which are beyond the control or knowledge of the Reorganized Debtors and Moelis, and thus are difficult to project.

The following is a brief summary of analyses performed by Moelis to arrive at its estimated estimated range of Enterprise Value and the Plan Equity Value for the Reorganized Debtors and does not purport to be a complete description of all of the analyses and factors undertaken. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances.

In performing its analysis, Moelis applied the following valuation methodologies as applicable to the operations of the Debtors: (a) a net asset valuation analysis; and (b) a selected publicly-traded companies analysis. In addition, Moelis considered a precedent transactions analysis but because the precedent transactions occurred in different commodity pricing environments and other market conditions, and involved companies with differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size and other factors, Moelis believed that the inclusion of this approach was of limited applicability.

## Net Asset Valuation Analysis

The value of the Debtors' oil and gas reserves was estimated using a net asset value ("NAV") approach. The Debtors' reserve report associated with its Business Plan calculates the estimated sum of net cash flows directly attributable to the Debtors' oil and gas properties. Future production volumes attributable to the properties are estimated and multiplied by the projected realized price, which incorporates the projected market price less an expected differential between the market price and the price at which the Debtors can sell their production. Projected severance, production and ad valorem taxes, lease operating expenses, gathering, processing, transportation and marketing expenses, and capital expenditures are then subtracted from revenue to calculate net cash flows. Moelis then risk adjusted the reserve values by reserve category using both reserve adjustment factors and risk adjusted discount rates as detailed by the Society of Petroleum Evaluation Engineers in its 39th annual survey dated June 2020. These values were then adjusted for other non-reserve assets and liabilities, including general and administrative expenses, non-drilling and completion capital expenditures of the Debtors not reflected in the reserve report, and income taxes to determine the net asset value of the Debtors. Moelis relied on the Debtors' and their tax professionals' assumptions to estimate the impact of future income taxes. Given that the Debtors anticipate an ownership change in connection with the Plan, the ability to use pre-change tax attributes to offset the Reorganized Debtors' future taxable income is expected to be limited.

## Selected Publicly-Traded Companies Analysis

A selected publicly-traded companies analysis estimates the value of a company based on a comparison with certain other publicly-traded companies in lines of business and operating characteristics similar in certain respects to the company being valued. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to certain of the Debtors' financial metrics to imply an enterprise value for the Debtors. Moelis used enterprise value as a multiple of each selected company's publicly-available consensus projected 2021 and 2022 EBITDAX. This implies a range of EV/EBITDAX multiples and ratios that Moelis then applied to the Debtors' Business Plan projections to determine the Enterprise Value and Plan Equity Value. Although the selected companies were compared to the Debtors for purposes of this analysis, no entity used in this analysis is identical to the Reorganized Debtors. The selection of public entities for this purpose was based upon characteristics that were deemed relevant based on Moelis' professional judgment. The selection of appropriate companies is a matter of judgment and subject to limitations due to sample size and the availability of meaningful market-based information.

Accordingly, Moelis' comparison of the selected companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size and other factors that could affect the relative values of the selected companies and the Debtors.

Moelis did not consider any one analysis or factor to the exclusion of any other analyses or factors.  Moelis believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of this Valuation Analysis.  Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The estimated range of Enterprise Value and the Plan Equity Value do not constitute a recommendation to any Holder of Allowed Claims or Interests as to how such Holder should vote or otherwise act with respect to the Plan.  Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance or at any time.  The estimated range of Enterprise Value and the Plan Equity Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Moelis relied on the Debtors' and their tax professionals' assumptions and estimates regarding the availability of tax attributes and the impact of any cancellation of indebtedness income on the Reorganized Debtors.  Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Moelis' valuation analysis.

THE ESTIMATES OF THE ENTERPRISE VALUE AND PLAN EQUITY VALUE DETERMINED BY MOELIS REPRESENT ESTIMATED ENTERPRISE VALUES AND PLAN EQUITY VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE PLAN EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH MOELIS' VALUATION ANALYSIS.

MOELIS IS ACTING AS FINANCIAL ADVISER AND INVESTMENT BANKER TO THE DEBTORS, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, OR LEGAL ADVICE.

**<u>Exhibit G</u>**

**Rights Offering Procedures**

**(Will be attached to the Solicitation Version of Disclosure Statement)**

**(See Docket No. 880-3)**

**Exhibit H**

**Exit Facility Term Sheet**