**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXTRACTION OIL & GAS, INC. et al.,[1] | ) | Case No. 20-11548 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 176, 313** |

**MIDWEST TRUST AND OTHER ROYALTY OWNER CLAIMANTS'**
**OBJECTIONS TO PARAGRAPH 11 OF ARTICLE IV OF THE DEBTORS'**
**THIRD AMENDED JOINT PLAN OF REORGANIZATION**

Midwest Trust, as Trustee of the Meredith O. Johnson Trust ("Midwest Trust"), individually and on behalf of itself and the certified Class of royalty owners in the pending Class Arbitration proceeding captioned *In re the Arbitration of Midwest Trust Company, as Trustee of the Meredith O. Johnson Trust, on behalf of itself and the defined Class v. Extraction Oil and Gas, Inc.*, JAG No. 2018-0919A ("the *Midwest Trust* Class Arbitration"), and royalty owners C and M Resources, LLC ("C and M Resources"), Winter Oil, LLC ("Winter Oil"), Principle Energy, LLC ("Principle Energy"), and Regal Petroleum, LLC ("Regal Petroleum") (collectively "Royalty Owners"), object to the Debtors' ("Extraction") proposed plan to treat the Royalty Owners' breach of contract claims against Extraction as General Unsecured Claims, as set forth in Paragraph 11 of Article IV of Extraction's Third Amended Joint Plan of Reorganization ("the Plan").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Extraction Oil & Gas, Inc. (3923); 7N, LLC (4912); 8 North, LLC (0904); Axis Exploration, LLC (8170); Extraction Finance Corporation (7117); Mountaintop Minerals, LLC (7256); Northwest Corridor Holdings, LLC (9353); Table Mountain Resources, LLC (5070); XOG Services, LLC (6915); and XTR Midstream, LLC (5624). The location of the Debtors' principal place of business is 370 17th Street, Suite 5300, Denver, Colorado 80202.

**PRELIMINARY STATEMENT**

The Royalty Owners object to the portion of Extraction's Plan which purports to treat the Royalty Owners' breach of contract claims against Extraction as General Unsecured Claims. (Plan, Article IV, Paragraph 11). The Royalty Owners should not be treated as unsecured creditors because: (1) under the applicable provisions of Colorado's Uniform Commercial Code ("UCC"), the Royalty Owners have had security interests in the proceeds received by Extraction on the sale of oil and natural gas products produced from wells subject to the Royalty Owners' Leases; and (2) the Royalty Owners' share of the oil and natural gas sale proceeds, which Extraction has persistently failed to correctly pay the Royalty Owners, is not property of Extraction's bankruptcy estate.

The Royalty Owners own the lessors' interests in certain recorded oil and gas leases in Colorado under which Extraction has been the lessee ("Leases"). The applicable royalty provisions in the Leases have required Extraction to pay a specified percentage of the proceeds received by Extraction on the sale of oil and natural gas products (residue gas and natural gas liquids) obtained from wells subject to the Leases.

Extraction has breached its royalty payment obligations under the Leases by failing to pay the Royalty Owners their specified share of the proceeds which Extraction received on its sale of oil and natural gas products at issue. Some of the Royalty Owners commenced litigation and a class arbitration in Colorado to recover their full royalty share of the proceeds which Extraction had failed to correctly pay them. Those lawsuits and the Class Arbitration were pending on the date when Extraction filed its Chapter 11 petition in this Court.

In its proposed Plan, Extraction wrongly contends that the Royalty Owners should be treated as unsecured creditors. Under the applicable Colorado substantive law, the Royalty Owners

are either one or both of the following: (1) secured creditors pursuant to the pertinent provisions of the Colorado Uniform Commercial Code ("UCC"), C.R.S. § 4-1-203; § 4-9-102; or (2) have an ownership interest in the underpaid oil and natural gas proceeds, which underpaid proceeds are not part of Extraction's bankruptcy estate. In fact, the plain language of the Comments to the Colorado UCC confirms that the Royalty Owners are either secured creditors, or "own" a residual interest in the sale proceeds which "is entitled to full protection against the lessee's creditors and trustee in bankruptcy …" C.R.S. § 4-1-203, Cmt. 2, citing to 1 G. Gilmore, Security Interests in Personal Property, Section 3.6, at 76 (1965).

For these reasons, as further discussed below, Extraction's proposal to treat the Royalty Owners as unsecured creditors should be rejected, and the Royalty Owners should be designated as secured creditors, and /or as persons who have a claim to underpaid proceeds which are not part of Extraction's bankruptcy estate.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. Extraction's Royalty Payment Obligations to the Members of the Certified Class in the Pending *Midwest Trust* Class Arbitration Proceeding.**

1. In the *Midwest Trust* Class Arbitration, Midwest Trust is the class representative for a certified Class of royalty owners who are seeking damages from Extraction based upon Extraction's underpayment of royalties on natural gas produced and sold by Extraction, under leases which are subject to the future royalty payment method which was agreed to as part of the Class Settlement Agreement in the class action captioned *Miller, et al. v. EnCana Oil and Gas (USA), Inc.* ("EnCana"), No. 05-CV-2753, District Court for the City and County of Denver, Colorado ("*Miller* Class Action"). (Exhibit 1, *Miller* Class Action Settlement Agreement, ¶ 10).

2. The *Miller* Class Action resulted in a class action settlement which was finally approved by the District Court for the City and County of Denver, Colorado ("District Court") on

3

August 26, 2008 ("*Miller* Class Settlement Agreement"). (Exhibit 2, District Court's Order Finally Approving Class Settlement).

3. The *Miller* Class Settlement Agreement includes a future royalty payment calculation method, which is binding on EnCana, its successors and assigns for the life of the leases subject to the *Miller* Class Settlement Agreement. (Ex. 1, ¶ 10).

4. The *Miller* Class Settlement Agreement also contains a binding arbitration provision, which binds both the Class members and EnCana, and their successors and assigns, to resolve any disputes regarding the future royalty payment method contained in Paragraph 10 of the *Miller* Class Settlement through arbitration. (Ex. 1, ¶ 10(l)).

5. Extraction is the successor in interest to EnCana's lessee's interests in numerous oil and gas leases which are subject to the *Miller* Class Settlement Agreement. (Exhibit 3, List of Leases Produced by Extraction to in the *Midwest Trust* Class Arbitration). Extraction failed to abide by the terms and conditions of the future royalty payment method in its calculation and payment of royalties to members of the *Miller* Settlement Class (and their successors and assigns) under various leases which Extraction had acquired, and which were subject to the *Miller* Class Settlement Agreement. As a result, the royalties owed by Extraction to such *Miller* Class members were substantially underpaid. (Ex. 4).

6. On June 20, 2018, pursuant to the binding arbitration provision in the *Miller* Class Settlement Agreement, Midwest Trust filed its demand for class arbitration against Extraction to enforce Paragraph 10 of the *Miller* Class Settlement Agreement. (Exhibit 5). Midwest Trust alleges that Extraction has underpaid the royalties owed to the defined Class of persons who are lessors under leases which are subject to the *Miller* Class Settlement Agreement, and which have been

acquired by Extraction at various times after the effective date of the *Miller* Class Settlement Agreement. (Ex. 4).

7. In its discovery responses in the *Midwest Trust* Class Arbitration, Extraction admitted to failing to pay royalties in accordance with the *Miller* Class Settlement Agreement. (Exhibit 6, Extraction's Combined Responses to Midwest Trust's Discovery Request dated July 25, 2019, Resp. No. 3). Extraction, however, has not remitted the correct amount of royalties to the Class members in the *Midwest Trust* Class Arbitration.

8. In addition, in July 2018, one month after Midwest Trust filed its Class Arbitration Demand, Extraction alleged that it had changed its royalty payment methodology for the *Midwest Trust* Class members, in order to comply with Paragraph 10(f) of the *Miller* Class Settlement Agreement. (Ex. 7, Extraction's Combined Supplement Responses to Midwest Trust's Discovery Request dated August 23, 2019, Resp. No. 3). Although Midwest Trust disputes that Paragraph 10(f) is the applicable future royalty payment method subparagraph that applies to Extraction's calculation and payment of royalties to the *Midwest Trust* Class members, Extraction's change in its royalty calculation method is a clear admission that Extraction was underpaying the royalties owed to the *Midwest Trust* Class Arbitration Class members for many years prior to July 2018.

**B. Extraction's Royalty Payment Obligations to C and M Resources, Winter Oil, Principle Energy, and Regal Petroleum.**

9. Under established Colorado law, where a lease is "silent" as to the allocation of post-production costs, the lessee is required to pay the lessor royalties based upon prices received on the sale of marketable gas or oil products at the location of the first commercial market. *Rogers v. Westerman Farm Co.*, 29 P. 3d 887, 896-913 (Colo. 2001). At a minimum, under the applicable lease agreements between Extraction and the lessors described below, Extraction has been obligated to pay such lessors royalties based upon prices received by Extraction on its sale of

marketable oil and gas products at the first commercial market. Extraction has repeatedly breached its royalty payment obligations to such lessors, by failing to pay the royalties based upon prices received at the location of the first commercial market.

10. C&M Resources owns the lessor's interests in an oil and gas lease which obligates Extraction, on oil, to "deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect his wells, the equal one-eighth (1/8) part of all oil produced and saved from the leased premises." (Exhibit 8). C&M Resources' lease also obligates Extraction, on natural gas, to "monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (1/8) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (1/8) of its market value at the well." (Exhibit 8). Pursuant to the *Rogers* decision, this lease requires the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

11. Winter Oil owns the lessor's interests in an oil and gas lease which obligates Extraction, on oil, to "deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect its wells, the equal one-fifth (1/5) part of all oil produced and saved from the leased premises, or lessee may from time to time at its option purchase any royalty oil in its possession, paying the market price thereof prevailing for oil of like grade and gravity in the field where produced on the day of purchase." (Exhibit 9). Winter Oil's lease also obligates Extraction, on natural gas, to "pay lessor, as royalty, on gas, including casinghead gas or other gaseous substances, produced form the leased premises and sold or used off the premises or used in the manufacture of gasoline or other products, the market value at the well of the gas sold or used, provided on gas sold the royalty shall be one-fifth (1/5) of the amount realized from such sale."

(Exhibit 9). Pursuant to the *Rogers* decision, this lease requires the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

12.     Winter Oil owns the lessor's interests in another oil and gas lease which obligates Extraction, on oil and gas, to "pay Lessor 20% of the proceeds received by Lessee for all oil (including but not limited to condensate and distillate) and 20% of the proceeds received by Lessee for all gas of whatsoever nature or kind (with all of its constituents) sold from the leased premises or on acreage pooled therewith, but in no event more than 20% of the actual amount received by Lessee, payments to be made monthly." (Exhibit 10). Pursuant to the *Rogers* decision, this lease requires the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

13.     Principle Energy and Regal Petroleum own the lessor's interests under sixty oil and gas leases wherein Extraction owns the lessee's interests.

14.     Regarding the gas royalty provisions, Principle Energy's and Regal Petroleum's leases can be divided into five categories of leases: (1) 1 memorandum of lease, (2) 8 amount realized leases, (3) 15 gross proceeds leases, (4) 15 net proceeds leases, and (5) 21 Producers 88 leases.

15.     Principle Energy owns the lessor's interests in an oil and gas lease which was executed by and between Dorothy Ruth Hooker, as lessor, and Sharpe Energy Resources, LLC, as lessee, on June 24, 2013. (Exhibit 11, Memorandum of Lease). The oil and gas lease itself is not recorded and Principle Energy does not possess a copy of this lease.

16.     Principle Energy owns the lessor's interests in 8 oil and gas leases which obligate Extraction to calculate and pay royalties on natural gas as follows: "the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be

one-eighth of the amount realized from such sale." (Exhibit 12, Amount Realized Lease Sample). Pursuant to the *Rogers* decision, those leases require the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

17. Principle Energy owns the lessor's interests in 15 oil and gas leases which obligate Extraction to calculate and pay royalties on natural gas as follows: "To pay Lessor one-eighth (1/8) of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found, while the same is being used off the premises, and if used in the manufacture of gasoline a royalty of one-eighth (1/8), payable monthly at the prevailing market rate for gas." ("Gross Proceeds Provision") (Exhibit 13, Gross Proceeds Lease Sample). Pursuant to the *Rogers* decision, these leases require the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

18. Principle Energy owns the lessor's interests in 15 oil and gas leases which obligate Extraction to calculate and pay royalties on natural gas as follows: "To pay to Lessor, as royalty, one-sixth (1/6th) of the market value for gas of whatsoever nature or kind, liquid hydrocarbons and their respective constituent elements, casinghead gas or other gaseous substances, produced from the leased premises. The term 'market value' shall be deemed to mean the net value realized at the wellhead . . . ." (Exhibit 14, Market Value Lease Sample). Pursuant to the *Rogers* decision, these leases require the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

19. Principle Energy owns the lessor's interest in 9 oil and gas leases, and Regal Petroleum owns the lessor's interests in 12 oil and gas leases, which obligate Extraction to calculate and pay royalties on natural gas as follows: "monthly pay lessor as royalty on gas marketed from each well where gas only is found, one-eighth (1/8) of the proceeds if sold at the

well, or if marketed by lessee off the leased premises, then one-eighth (1/8) of its market value at the well." (Exhibit 15, Producers 88 Lease Sample). Pursuant to the *Rogers* decision, these leases require the lessee to pay royalties based upon prices received on the sale of oil and gas at the location of the first commercial market.

20. All of the above-referenced Leases convey the oil and gas to Extraction, subject to the obligation to pay royalty on gas, if, as, and when produced. Extraction owns the lessee's interests in the Leases, which entitles Extraction to ownership of the oil and gas which it produces as a physical commodity, as well as a specified percentage of the proceeds from the sale of such gas. Under such leases, Extraction is obligated to remit a specified percentage of the proceeds from the sale of the oil and gas to the Royalty Owners. (Exs. 1, 8-15; also see Ex. 16, Midwest Trust Lease).

21. Extraction's right to produce, obtain, and own the oil and gas is subject to its non-terminable obligation to pay royalties. (Exs. 8-16).

22. Extraction failed to calculate and pay royalties in accordance with its contractual obligations under the Leases, because: (1) Extraction did not pay the Royalty Owners royalties based upon the proceeds which Extraction received on the sale of the oil and natural gas products at the location of the first commercial market. Extraction instead deducted various post-production costs from the sale proceeds in its calculation and payment of royalties to the Royalty Owners, or otherwise failed to pay royalties based upon first commercial market prices; or (2) Extraction failed to abide by the terms of the future royalty payment method set forth in the *Miller* Class Settlement Agreement, thus damaging the Class Members in the *Midwest Trust* Class Arbitration proceeding.

23. C and M Resources and Winter Oil were the named plaintiffs in a class action filed in the Denver District Court against Extraction, which alleged royalty underpayment claims against Extraction under the C and M Resources and Winter Oil leases referenced above. (Ex. 17).

24. Timely proofs of claims have been filed in this Bankruptcy proceeding on behalf of Midwest Trust, the certified Class in the *Midwest Trust* Class Arbitration, C and M Resources, Winter Oil, Principle Energy, and Regal Petroleum. (Exs. 18-22).

### C. The Interests Conveyed to the Lessors and to Extraction Under the Leases at Issue.

25. Prior to the execution of the Leases, the Royalty Owners owned the entire mineral estates underlying their lands. (Exs. 8-16).

26. By executing the Leases, the Royalty Owners conveyed to Extraction the right to produce, obtain, and own the oil and gas, as well as an interest in a specified percentage of the proceeds from the sale of the gas. (Exs. 8-16).

27. The Leases reserved to the Royalty Owners a specified percentage of the proceeds from Extraction's sale of the oil and natural gas products which Extraction produced. (Exs. 8-16). Extraction never obtained an ownership interest in any part of the sale proceeds which have been reserved to the Royalty Owners. (Exs. 8-16).

28. The Leases obligate Extraction to sell the oil and gas which Extraction produces, and to pay the Royalty Owners their specified percentage of the proceeds received on the sale of oil and natural gas. (Exs. 8-16).

29. Upon termination of the Leases, the lessee's interests in the entire mineral estate reverts back to the Royalty Owners. (Exs. 8-16).

**ARGUMENT**

I. **THE ROYALTY OWNERS HAVE SECURITY INTERESTS IN THEIR PERCENTAGE SHARE OF THE PROCEEDS RECEIVED ON THE SALE OF EXTRACTION'S OIL AND NATURAL GAS PRODUCTS AT ISSUE.**

30.  Under the UCC, a transaction in the form of a lease creates a security interest where the consideration the lessee is to pay for the right to possess and enjoy the goods is a non-terminable condition and, *inter alia*, the lessee is bound to become the owner of the goods. C.R.S. § 4-1-203. Under the UCC, as-extracted collateral (oil and gas as well as the accounts arising out of the sale thereof) are eligible to become goods, subject to the UCC. C.R.S. § 4-9-102(a)(6). As described in detail below, the Leases obligate Extraction to pay royalties on the sale of oil and natural gas products in exchange for Extraction's right to produce, obtain, and own the oil and gas.

**A. The Nature of the As-Extracted Collateral At Issue.**

31.  Under the UCC, once oil and gas minerals are severed from the ground (produced) they "become personal property (goods) and are eligible to be collateral." C.R.S. § 4-9-102, Cmt. 4(c). As-extracted collateral also includes "accounts arising out of the sale" of oil and gas. C.R.S. § 4-9-102(a)(6). An account is simply, *inter alia*, "a right to payment of a monetary obligation" "for property that has been or is to be sold, leased, licensed, assigned or otherwise disposed of." C.R.S. § 4-9-102(a)(2)(A)(i). Courts interpreting the UCC have consistently recognized the nature of oil and gas and proceeds on the sale thereof as as-extracted collateral, *i.e.* a good subject to the UCC. *Matter of Fullop*, 6 F.3d 422, 422-27 (7th Cir. 1993) ("In adopting the UCC, Illinois codified the common law distinction between the character of oil and gas, before and after its extraction, and subjected a security interest in extracted oil and gas to the requirements of Article 9."); *Ingram v. Ingram*, 521 P.2d 254, 260 (Kan. 1974) ("It is upon extraction [of oil and gas] that the law pertaining to security interests in personal property comes into play."); *Octagon Gas Systems, Inc.*

11

*v. Rimmer*, 995 F.2d 948, 954-55 (10th Cir. 1993) ("Because extracted gas is a 'good,' [the] right to gas sold, as well as [an overriding royalty owner's] right to payment, is an account."); *In re Arithson*, 175 B.R. 313, 322 (Bankr. D.N.D. 1994) ("any proceeds flowing from the production of extracted gas and oil is likewise considered personal property governed by Article 9."). Thus, both (a) the extracted oil and gas and (b) the accounts arising from the sale of the extracted oil and gas, are goods to which the UCC applies.

   **B. The Leases Created Security Interests Because Extraction's Obligation to Pay Royalties is Non-Terminable and Because Extraction is Bound to Become the Owner of the Goods at Issue.**

   32.     Under the UCC's two-prong bright-line test, a transaction in the form of a lease is a secured interest where: (a) the consideration that the lessee is to pay to the lessor for the right to possession and use of the goods is an obligation for the term of the lease, and is not subject to termination by the lessee and, *inter alia*, (b) the lessee is bound to become the owner of the goods ("Bright-Line Test"). C.R.S. § 4-1-203(b)(2); *In re WorldCom, Inc.*, 339 B.R. 56, 64-65 (Bankr. S.D.N.Y. 2006).

   33.     The first prong referenced above is clearly satisfied because the payment of the royalty is the consideration provided by the lessee for the right to produce and own the as-extracted collateral. Under Colorado law, an oil and gas lease conveys to the lessee title to the oil and gas in place. *Maralex Res., Inc., v. Chamberlain*, 320 P.3d 399, 403 (Colo. App. 2014). As the primary consideration for conveying the oil and gas to the lessee, the lessor retains a royalty interest in the oil and gas in place. *Whitham Farms, LLC v. City of Longmont*, 97 P.3d 135, 137 (Colo. App. 2003); *see also Davis v. Cramer*, 808 P.2d 358, 360 (Colo.1991). Furthermore, the Supreme Court of Colorado has recognized that, in the context of an oil and gas lease, the term "royalty" is defined as the compensation provided to the lessor royalty owner by the producer for the privilege of

drilling for and producing oil and gas. *Simson v. Langholf*, 293 P.2d 302, 306 (Colo. 1956). Simply put, an oil and gas lease provides the mineral owner with an ownership interest in a specified percentage of the proceeds (i.e. the royalty which is a form of as-extracted collateral) in exchange for the oil and gas lessee's right to produce and keep the lion's share of the as-extracted collateral. The above-referenced principles of law are fully applicable to each of the Leases at issue. (Exs 8-16).

34.     The second prong is also clearly satisfied because the lessee is the owner of the produced oil and gas. Under the Leases at issue, the lessee is granted the right of ownership over the oil and gas it produces; in return, the lessee owes the lessor a royalty based upon a specified percentage of the proceeds on the sale of the oil and gas. (Exs. 8-16). *Garman v. Conoco, Inc*., 886 P.2d 652, 656 (Colo. 1994*)*. Colorado courts characterize the lessee's ownership in the minerals as a fee simple determinable interest in real property. *Maralex Res*., 320 P.3d at 403. Moreover, this Court has previously recognized the lessee's ownership over the as-extracted collateral under an oil and gas lease. *In re SemCrude, L.P.*, 407 B.R. 82, 90 (Bankr. D. Del. 2009) (As to every oil and gas lease, the holder of the lessee's interests has "the right to all of the oil and gas [it produces] from the land, other than that which goes to royalty owners.").

35.     It is apparent that – though in the form of a lease – an oil and gas lease creates a security interest whereby the lessee (Extraction) is entitled to the ownership of the oil and gas which it produces, and in consideration therefor is obligated to pay the lessors (Royalty Owners) a royalty. The Bright-Line Test is therefore satisfied, and the Leases at issue created security interests in the Lessor's share of the oil and gas produced and sold from wells subject to the Leases.

### C. The Leases Were Perfected When Recorded in the Applicable Recorder of Deeds Office.

36. As-extracted collateral has special rules for perfection and priority under the UCC. First, in order to perfect a secured interest in as-extracted collateral, the security agreement must be filed in the office of the county clerk where a related real property record would be filed. C.R.S. §§ 4-9-301(4), 4-9-501(a)(1)(A). All of the Leases were filed in the appropriate Colorado recorder of deeds office. (Exs. 8-16). Accordingly, the security interests were perfected when the Leases were recorded.

37. Extraction might point out that the Royalty Owners and Extraction are often not the original parties to the Leases. True, some of the Royalty Owners and Extraction have been assigned their lessor's and lessee's interests under the Leases, respectively. This fact, however, is legally irrelevant, because the assignments sufficiently identify the oil and gas leases which are being assigned thereunder. *In re Fullop*, 125 B.R. 536, 544-55 (Bankr. S.D. Ill. 1990) ("**the Bank properly perfected its security interest in the extracted oil and accounts by filing [the assignments of overriding royalty interests] in the real estate records.**") (emphasis added). The Court in *In re Fullop* reasoned that because the instruments creating the security interests (overriding royalty agreements) were filed in the recorder of deeds office, and the transfer of the overriding royalty interests to the Bank were also recorded, the Bank held a perfected security interest in the oil and accounts arising therefrom. *Id.*

38. Accordingly, the Royalty Owners properly perfected their security interests in their share of the proceeds when the relevant recordings of the Leases were made in the appropriate Colorado recorder of deeds office.

## II. THE ROYALTY OWNERS ARE NOT UNSECURED CREDITORS IN EXTRACTION'S BANKRUPTCY BECAUSE THE PROCEEDS WHICH THEY SEEK TO RECOVER ARE NOT PART OF EXTRACTION'S BANKRUPTCY ESTATE.

39. As discussed above, under all of the Leases at issue, the Royalty Owners are the owners of their specified share of the proceeds received by Extraction on its sale of natural gas and oil. *Whitham Farms,* 97 P.3d at 137, *Simson*, 293 P.2d at 306. When Extraction sells the natural gas and oil at issue, the purchaser makes its entire payment to Extraction for the natural gas and oil which it purchases. Extraction, however, does not have an ownership interest in all of the sale proceeds which it receives. Instead, each of the Royalty Owners has an ownership interest in a specified percentage of those proceeds, and Extraction (or the other working interest owners) have an ownership interest in the percentage of the proceeds which is not owned by the Royalty Owners. Thus, when Extraction failed to correctly pay the Royalty Owners a royalty based upon their proportionate share of the proceeds which were paid to Extraction by the oil and gas purchasers, Extraction withheld proceeds which are the property of the Royalty Owners. Those proceeds which Extraction wrongfully withheld from the Royalty Owners are not property of Extraction's bankruptcy estate.

40. The applicable comments to Colorado UCC § 4-1-203 confirm that the Royalty Owners' share of the sale proceeds received on Extraction's sale of the oil and natural gas at issue is not part of Extraction's bankruptcy estate. These comments state, in pertinent part, that "if a transaction creates a lease and not a security interest, the lessee's interest in the goods is limited to its leasehold estate; the residual interest in the goods belongs to the lessors. This has significant implications to the lessee's creditors. 'On common law theory, the lessor, since he has not parted with title, is entitled to full protection against the lessee's creditors and trustee in bankruptcy … 1 G. Gilmore, Security Interests In Personal Property Section 3.6, at 76 (1965)." C.R.S. § 4-1-203,

15

Cmt. 2. (emphasis added). Thus, the Royalty Owners' entire share of the oil and natural gas sale proceeds must be fully protected against Extraction's creditors, and is not part of Extraction's bankruptcy estate.

41.     Moreover, it is a fundamental principle of the Bankruptcy Code that property in which the debtor holds only legal title and not an equitable interest is not property of the debtor's estate. 11 U.S.C. § 541(d). "The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers." *In re LAN Tamers, Inc.*, 329 F.3d 204, 210 (1st Cir. 2003); accord, *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1061 (3d Cir. 1993) (refunds held by natural gas pipeline for third-party were not property of debtor's estate); *In re Penn Central Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973) (imposing an implied trust on funds held by a bankrupt debtor for another entity, where the debtor collected freight charge fees from its customers and remitted those fees to the rightful owner on a monthly basis.).

42.     This Court has previously found that oil sale proceeds which are in the debtor's possession solely so that it can distribute the proceeds to royalty interest owners are held in trust, and are not property of the debtor's estate under the Bankruptcy Code. *In re SemCrude, L.P.*, 418 B.R. 98, 104-05 (Bankr. D. Del. 2009). A bankrupt oil and gas producer's estate does not extend to the interests of its royalty owners, because the holder of the lessee's interests has "the right to all of the oil and gas [it produces] from the land, *other than that which goes to royalty owners*." *In re SemCrude, L.P.*, 407 B.R. 82, 90 (Bankr. D. Del. 2009) (emphasis added). This rule has been applied by other bankruptcy courts to royalty owners' interests in oil and gas leases in the bankruptcy context. *In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (funds held in joint account to be disbursed to royalty owners were not property of the estate.); *In re Delta Petroleum*

*Corp.*, 2015 WL 1577990, at *9 (Bankr. D. Del. Apr. 2, 2015); *Boyd v. Martin Exploration Co.*, 56 B.R 776, 779 (E.D. La. 1986); *In re Reichmann Petroleum Corp.*, 434 B.R. 790, 798-99 (Bankr. S.D. Tex. 2010).

43. Significantly, in the First Day Motions which Extraction filed at the outset of this bankruptcy proceeding, Extraction made a series of statements which further confirm that the Royalty Owners' entire share of the oil and gas sale proceeds is not part of Extraction's bankruptcy estate:

- "**Proceeds Attributable to the Mineral and Other Interests Are Not Property of the Debtors' Estates**." (Dkt. 12, p. 6).

- "Thus, if a debtor holds no legal or equitable interest in property as of the commencement of the case, such property does not become property of the debtor's estate under section 541 and the debtor is prohibited from distributing such property to its creditors. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ('The Bankruptcy Act simply does not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.')." (Dkt. 12, p. 7).

- "When a debtor holds legal title to but does not have equitable interest in certain property, the debtor must turn such property over to the holders with such equitable interest in the property. *See MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ('[w]here Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner.' (citations omitted))." (Dkt. 12, p. 8).

- "If the Debtors merely hold bare legal title to the accrued prepetition proceeds of oil and gas sales that are due to be remitted to holders of Mineral and Other Interests, no creditors will be prejudiced by the relief requested in this Motion. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to satisfy their prepetition and postpetition obligations to holders of Mineral and Other Interests in the ordinary course of business." (Dkt. 12, p. 9).

- "<u>Indeed, the Debtors only take possession of the holders of Mineral and Other Interests' share of oil and gas production, or the proceeds therefrom, because they market and sell the oil and gas production on behalf of the holders of Mineral and Other Interests and Non-Op Working Interests before remitting the Royalties and Non-Op Working Payments.</u> Courts in this district have held that in such situations,

a resulting trust is established on behalf of the holders of oil and gas royalty interests. *See Vess Oil Corp. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 418 B.R. 98, 106 (Bankr. D. Del. 2009) (holding that funds in debtors' possession held on behalf of royalty interest holders were held in a resulting trust for such parties, debtors only held bare legal title to such property, and thus such funds were not property of the estate)." (Dkt. 12, p. 9-10). (emphasis added).

44. In its Plan (Article IV, ¶11), Extraction is taking a position which is in direct contradiction to the above-referenced statements which Extraction made in its First Day Motions. Extraction is now advancing the fundamentally erroneous contention that the Royalty Owners' property interests in the sale proceeds are limited to what Extraction unilaterally determines those interests to be, even though Extraction has persistently, and wrongfully, underpaid the amount of royalties owed to the Royalty Owners. Contrary to Extraction's position, the Royalty Owners' property interests in the sale proceeds are not limited to what Extraction has wrongly determined them to be in each of the Leases. The Leases reserved to the Royalty Owners a specified percentage of the oil and gas sale proceeds. Extraction's unilateral failure to correctly pay the Royalty Owners their full share of the oil and gas sale proceeds does not, and cannot, diminish the Royalty Owners' property interests in such proceeds, in any respect.

45. Finally, the Royalty Owners' position is further supported by the numerous decisions which have imposed constructive trusts to prevent the unjust enrichment that would result if the person in possession of the property was permitted to retain it. *Ralston Oil & Gas Co. v. July Corp.*, 719 P.2d 334, 338 (Colo. App. 1985). Indeed, Colorado Courts have recognized that a constructive trust may be imposed to prevent unjust enrichment whenever there is a breach of any legal or equitable duty. *Yetter Well Serv., Inc. v. Cimarron Oil Co.,* 841 P.2d 1068, 1070 (Colo. App. 1992).

46. Thus, because the Royalty Owners have a property interest in their full share of the oil and gas sale proceeds, the Royalty Owners' entire share of such proceeds is not part of Extraction's bankruptcy estate.

## CONCLUSION

For the reasons stated above, the Court should reject that portion of Extraction's Plan which purports to treat the Royalty Owners' claims against Extraction as unsecured creditor claims, and should find that the Royalty Owners have security interests in their royalty share of the oil and gas proceeds, and/or that the Royalty Owners' share of the oil and gas proceeds at issue is not part of Extraction's bankruptcy estate.

Dated: December 14, 2020

Respectfully submitted,

*/s/ James Tobia*
James Tobia (No. 3798)
The Law Office of James Tobia, LLC
1716 Wawaset Street
Wilmington, DE 198060
Telephone:  (302) 655-5303
Facsimile:  (302) 656-8053
Email: jtobia@tobialaw.com

-and-

George A. Barton
Taylor P. Foye
LAW OFFICES OF GEORGE A. BARTON, P.C.
7227 Metcalf Avenue, Suite 301
Overland Park, Kansas 66204
Telephone: (913) 563-6250
Facsimile:  (913) 563-6259
Email:gab@georgebartonlaw.com
taylor@georgebartonlaw.com

*Counsel for Royalty Owners*